*Before the*
**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

...

| | | |
|---|---|---|
| Pennsylvania Prison Society, | ) | |
| Petitioner, | ) | |
| v. | ) | |
| Federal Communications Commission | ) | No. 25- |
| and the | ) | |
| United States of America, | ) | |
| Respondents. | ) | |

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. §702, 47 U.S.C. §402(a), 28 U.S.C. §§2342(1) and 2344, and Rule 15(a) of the Federal Rules of Appellate Procedure, the Pennsylvania Prison Society (PPS) seeks review of the attached *Order* of the Federal Communications Commission (FCC or Commission), *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, Rates for Interstate Inmate Calling Services, Report and Order, Order on Reconsideration and Further Notice of Proposed Rulemaking*, Docket No. 12-375, Docket No. 23-62 (released November 6, 2025)(*2025 IPCS Reconsideration Order*)(Exhibit A). On December 5, 2025, the *2025 IPCS Reconsideration Order* was published in the Federal Register at 90 Fed. Reg. 56013 (Exhibit B).

Venue and jurisdiction in this Court is proper under 28 U.S.C. §2343 because the instant petition is timely, having been filed within the 60 day deadline established in 28 U.S.C. §2344, and because PPS' principal place of business is in

Philadelphia, PA, within this circuit.

As explained below, the proceedings below transpired in an ongoing matter which is *sub judice* in the U.S. Court of Appeals for the First Circuit. *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, Rates for Interstate Inmate Calling Services, Report and Order, Order on Reconsideration, Clarification and, and Further Notice of Proposed Rulemaking*, 39 FCCRcd 7647 (2024), review pending *sub nom. DARE v. FCC*, Docket 24-8028 (1ˢᵗ Cir.)(*2024 IPCS Order*). That statute significantly expands the Commission's jurisdiction over incarcerated people's communications services (IPCS) and directs the Commission to "establish a compensation plan to...ensure just and reasonable charges for interstate and intrastate telephone and advanced communications services in correctional and detention facilities."[1] Several parties timely filed petitions for reconsideration of the *2024 IPCS Order*.

On June 30, 2025, purportedly acting under delegated authority, the Commission staff, on its own motion, issued a waiver that delayed the effective date of the rules adopted in the *2024 IPCS Order* "until April 1, 2027 or any alternative date the Commission sets as part of further action in this proceeding." *Incarcerated People's Communications Services; Implementation of the Martha*

---

[1] *Id.*

*Wright-Reed Act; Rates for Interstate Inmate Calling Services*, 40 FCC Rcd 4309 (WCB 2025)(*2025 IPCS Waiver Order*).  PPS and other groups timely filed an application for review of the *2025 IPCS Waiver Order.*

The *2025 IPCS Reconsideration Order* grants one of the petitions for reconsideration and substantially modifies the agency's *2024 IPCS Order*.  Among other things, the *2025 IPCS Reconsideration  Order*, adopted over a timely filed opposition and comments of PPS and other advocates for incarcerated persons, granted in part one of the reconsideration petitions of the *2024 IPCS Order* by increasing many IPCS rates and delaying implementation of certain provisions adopted in the *2024 IPCS Order.*  The *2025 IPCS Reconsideration Order* also denied the application for review filed by PPS as to the *2025 IPCS Waiver Order*, postponing effective date of certain rules adopted that had been adopted in the *2024 IPCS Order.*

Because PPS had filed comments, a timely filed opposition to the petitions for reconsideration of the *2024 IPCS Order*, and a timely filed application for review of the *2025 IPCS Waiver Order*, it is a party aggrieved by the order below within the meaning of 28 U.S.C. §2344.

PPS is a non-profit corporation operating pursuant to Section 501(c)(3) of the Internal Revenue Code.  It was founded in 1787 by this country's founding

fathers out of the notion that even though a person is incarcerated they still deserve the same dignity and respect that every person deserves.[2] PPS enjoys statutory access to correctional facilities across the commonwealth where it is able to monitor prison conditions, interview residents about conditions and work to keep families together during incarceration. In addition, the PPS focuses on legislative measures related to these conditions and works with key stakeholders on strategies to address them.

PPS maintains a helpline through which people incarcerated in Pennsylvania can report issues. The vast majority of calls to PPS's helpline, as well as from resident interviews, implicate serious conditions, including poor or substandard health care and failures to provide assistive devices and aids. PPS resolves many of these reports administratively by working directly with jail and prison officials. PPS also utilizes these reports in its broader work to improve conditions in facilities wholesale. Legislators, advocates, and other interested parties work directly with PPS on these broader reform efforts. For these reasons, it is imperative that incarcerated people and their loved ones have low-cost and unimpeded access to the PPS's helpline.

---

[2]*See Pennsylvania Prison Society v. Cortes*, 622 F.3d 215, 229 (3d Cir. 2010).

PPS' mission is to protect the health, safety, and dignity of incarcerated people and their families. The ability to have contact, to have a family relationship is central to the dignity of incarcerated people and their families. Excessive phone rates impede those relationships and thereby impair PPS' mission.

Excessive phone call rates have historically impeded PPS' access to incarcerated persons, including by increasing the cost for incarcerated people to call PPS, and the cost PPS has had to pay when accepting collect phone calls from incarcerated persons. Sometimes, incarcerated people cannot afford to call the PPS's helpline and must instead resort to mail or other, slower forms of communication. Similarly, family members and friends often cannot afford to speak with their incarcerated

PPS respectfully calls the Court's attention to the fact that the *2025 IPCS Reconsideration Order* was adopted in the same dockets as the *2024 IPCS Order* and arose out the same administrative proceedings as the *2024 IPCS Order* which is *sub judice* in the U.S. Court of Appeals for the First Circuit in *DARE v. FCC, supra*. Oral argument in that case was held on October 7, 2024. In a decision issued on October 31, 2025, that Court recognized that the *2025 IPCS Reconsideration Order* likely moots some of the issues before that Court, but it determined that it should resolve jurisdictional issues pertaining to venue while

keeping the merits issues in abeyance. *DARE v. FCC.* 158 F.4th 294 (1st Cir. 2025).[3]

PPS seeks review pursuant to 28 U.S.C. §2343 because its principal place of business is in this Circuit. Petitioner understands that other petitioners may also file challenges to the *2025 IPCS Reconsideration Order* in their respective home circuits. Because, as noted above, the order now on review arises in the same proceeding as that currently before the First Circuit, PPS believes that the record in this proceeding should be filed in the U.S. Court of Appeals for the First Circuit without need for invoking the random selection process set out in 28 U.S.C. §2112(a), and that this Court should transfer this case to the First Circuit. However, in the event that the FCC determines to present multiple timely filed petitions for review to the Judicial Panel on Multidistrict Litigation pursuant to Section 2112(a), PPS understands that this matter would be subject to such procedure. Were this Court to be selected as the venue where the record should be filed, PPS respectfully suggests that the consolidated cases be transferred to the First Circuit.

---

[3]"Accordingly, we think it sensible to resolve now the contentions about whether this Court is the proper one to address the petitions at hand, notwithstanding that we are otherwise holding them in abeyance." *Id.*, slip op. at 6.

PPS seeks review of the *2025 IPCS Reconsideration Order* on the grounds that it was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  To the extent that the Commission's action with respect to the application for review of the *2025 IPCS Waiver Order* has continuing effect and is not deemed to be a final action of denial, PPS seeks review of such agency action as having been unlawfully withheld or unreasonably delayed and compel prompt remedial action pursuant to 5 U.S.C. §706(1).  PPS also asks that this Court and grant all such further relief as may be just and proper.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

December 10, 2025

**CORPORATE DISCLOSURE STATEMENT**

  Pursuant to the United States Court of Appeals for the Third Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1, the Pennsylvania Prison Society respectfully states that it is a non-profit organization with no parent companies, subsidiaries or affiliates and that none of them have issued shares to the public.

          Respectfully submitted,

          /s/ Andrew Jay Schwartzman

          Andrew Jay Schwartzman
          525 Ninth Street, NW
          Seventh Floor
          Washington, DC 20004
          (202) 241-2408
          AndySchwartzman@gmail.com

December 10, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of December, 2025, I electronically filed the foregoing Petition for Review with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the Court's appellate CM/ECF system. I further certify that service was accomplished on all participants in the case via the Court's CM/ECF system.

I further certify that I have served the following by email:

D. Adam Candeub
General Counsel
Federal Communications Commission
Washington, DC 20554
adam.candeub@fcc.gov
FCCLitigation@fcc.gov

I further certify that I have served the following by US mail, postage prepaid:

Hon. Pam Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Respectfully submitted,

/s/ Andrew Jay Schwartzman

525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

# ATTACHMENT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |

**REPORT AND ORDER, ORDER ON RECONSIDERATION,**
**AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: October 28, 2025**                    **Released: November 6, 2025**

**Comment Date: 30 days after publication in the Federal Register**
**Reply Comment Date: 60 days after publication in the Federal Register**

By the Commission: Chairman Carr and Commissioner Trusty issuing separate statements; Commissioner
Gomez dissenting and issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                 Paragraph #

I. INTRODUCTION ........................................................................................................... 1
II. BACKGROUND ........................................................................................................... 3
III. REPORT AND ORDER AND ORDER ON RECONSIDERATION ..................................... 6
    A. Revisions to Rate Cap Setting Methodology and Rate Structure ............................... 9
        1. Exclusion of Unbilled Minutes in Calculating Rate Caps ..................................... 10
        2. Establishing the Extremely Small Jail Tier ...................................................... 19
        3. Inclusion of Safety and Security Costs ............................................................ 28
        4. Interim Facility Cost Rate Additive ................................................................ 37
    B. Adopting Revised Interim Audio and Video IPCS Rate Caps ................................... 52
        1. Preliminary Rate Cap Setting Observations ..................................................... 55
        2. Establishing Zones of Reasonableness ............................................................ 58
        3. Determining Interim Rate Caps for Audio IPCS and Video IPCS ......................... 69
    C. Other Matters ................................................................................................... 81
        1. Data Collection ........................................................................................... 81
        2. Cost Benefit Analysis ................................................................................... 82
        3. Effective Date and Compliance Date ............................................................... 87
IV. FURTHER NOTICE OF PROPOSED RULEMAKING .................................................... 90
    A. Adoption of Permanent Rate Caps for Audio and Video IPCS ................................. 91
    B. Adoption of Permanent Rate Additives for Facility Cost Recovery ........................... 103
    C. Continued Prohibition of Ancillary Service Charges ............................................. 108
V. PROCEDURAL MATTERS .......................................................................................... 118
VI. ORDERING CLAUSES ............................................................................................... 129
APPENDIX A – FINAL RULES

**CONTAINS CONFIDENTIAL AND HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN WC DOCKET NO 23-62; DOCKET NO. 12-375**

**Federal Communications Commission** FCC 25-75

APPENDIX B – FINAL REGULATORY FLEXIBILITY ANALYSIS
APPENDIX C – INITIAL REGULATORY FLEXIBILITY ANALYSIS
APPENDIX D – RATE CAP METHODOLOGY

## I.  INTRODUCTION

1.      The rates and other practices of the incarcerated people's communications services (IPCS) industry have been the subject of the Commission's and Congress' attempts to ensure just and reasonable rates for consumers and fair compensation for providers for over a decade.  Indeed, the Commission has attempted on multiple occasions over the last 12 years to address these issues, spawning multiple rounds of litigation in several federal courts.  With the passage of the Martha Wright-Reed Act[1] and its implementation by the Commission in the *2024 IPCS Order*, the regulatory framework to achieve these dual goals was largely established.[2]  But in taking those steps, the new regulatory framework has led to significant unintended consequences that have been brought to light by stakeholders, as well as other challenges that are currently before the First Circuit.  The ongoing implementation challenges and the resulting risks to safety and security they cause greatly exceed what the Commission considered or anticipated when it adopted the *2024 IPCS Order*, leading the Commission to today's action.

2.      The goal of today's action is to establish a regulatory framework that is faithful to the Martha Wright-Reed Act and is also consistent with the record that has developed over the last two years.  The changes we make in the IPCS regulatory framework today, in particular changes to the methodology for calculating IPCS rate caps, supersede the corresponding aspects of the *2024 IPCS Order* and result in revised, interim audio and video IPCS rate caps that respond to these unintended consequences.  We modify certain aspects of the rate cap calculations and rate structure to more accurately reflect the costs providers and correctional authorities incur in the provision of IPCS.  The revised audio and video rate caps we establish are interim, while we seek additional comment in the Further Notice of Proposed Rulemaking (Further Notice) on, among other issues, rate structure and rate cap setting methodologies, the continued evolution of the IPCS market, and potential unintended consequences of these proposals.  The goal of our actions today is to create a durable, predictable, and lawful framework that will properly balance our implementation of the dual statutory mandates—just and reasonable rates for consumers and providers and fair compensation for providers—and thereby ensure the continued availability of IPCS to incarcerated people and preserve correctional officials' ability to provide safe and secure access to IPCS.  The steps we take today will provide a more stable framework to ensure continued higher levels of communication between incarcerated people and their loved ones, bringing all the benefits that has been demonstrated to provide, including improved reentry into society, reduced recidivism, increased public safety, and strengthened family ties between parents and children, between spouses, and with family members generally.

## II.  BACKGROUND

3.      The Martha Wright-Reed Act was enacted by Congress in January 2023 to ensure that "all [IPCS] rates and charges are just and reasonable" while continuing to ensure that "all payphone service providers are fairly compensated."[3]  The Act expanded the Commission's jurisdiction to regulate

---

[1] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156, pmbl. (Martha Wright-Reed Act or the Act).

[2] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647, 7650-52, paras. 5-8 (2024) (*2024 IPCS Order* or *2024 IPCS Notice*).

[3] 47 U.S.C. § 276(b)(1)(A).

IPCS to include intrastate IPCS and advanced communications services, including video IPCS.[4]  It also permitted the Commission to use industry-wide average costs to determine just and reasonable rates and directed the Commission to "consider costs associated with any safety and security measures necessary to provide" IPCS in determining those rates.[5]  In July 2024, the Commission adopted the *2024 IPCS Order*, implementing the Martha Wright-Reed Act and establishing a new framework for the regulation of the IPCS industry.  The Commission also adopted the *2024 IPCS Notice*, seeking further comment on certain issues, including further disaggregation of the very small jail rate cap tier and the adoption of a uniform rate additive to account for costs incurred by correctional facilities providing IPCS.[6]

4.        In October 2024, petitions were filed seeking reconsideration of various aspects of the *2024 IPCS Order*, including for our purposes here, a petition by NCIC (NCIC Reconsideration Petition). The NCIC Reconsideration Petition seeks reconsideration of two issues the Commission addresses herein. First, it challenges the Commission's decision to exclude certain safety and security costs from the lower bounds of its zones of reasonableness, asserting that the exclusion led to rate caps that are "below the cost of providing service for most IPCS providers."[7]  It also seeks reconsideration of the Commission's decision to include unbilled minutes of use in its cap calculations, claiming that "led to unsustainable rate cap reductions."[8]

5.        During the transition period to the newly adopted rate caps, the Commission was made aware of certain unintended consequences of the new IPCS rules for the industry and for correctional facilities.  In the *2025 IPCS Waiver Order*, the Wireline Competition Bureau (WCB or the Bureau) found the record, developed subsequent to the adoption of the *2024 IPCS Order*, contained evidence indicating that the restructuring of the IPCS industry required to implement the Commission's new rate cap rules "imposes implementation challenges and safety and security risks greatly exceeding those the Commission envisioned in the *2024 IPCS Order*."[9]  In light of these difficulties, the Bureau adopted the *2025 IPCS Waiver Order*, which extended compliance deadlines for the IPCS rate caps and other rules "until April 1, 2027 or any alternative date the Commission sets as part of further action in this proceeding."[10]  On July 30, 2025, the Public Interest Parties filed an Application for Review of the *2025*

---

[4] *See Global Tel\* Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) (vacating certain permanent rate caps adopted in the Commission's *2015 ICS Order*) (*GTL v. FCC*); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12768, 12813-18, paras. 7, 106-16 (2015) (*2015 ICS Order*).  Congress enacted the Martha Wright-Reed Act largely in response to *GTL v. FCC*.

[5] Martha Wright-Reed Act § 3(b).

[6] *2024 IPCS Notice*, 39 FCC Rcd at 7958-65, paras. 608-24.

[7] Petition for Reconsideration of Network Communications International Corp. d/b/a NCIC Correctional Services, WC Docket Nos. 23-62 and 12-375, at 4 (filed Oct. 21, 2024) (NCIC Reconsideration Petition).

[8] *Id.* at 10.

[9] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, DA 25-565, at 3, para. 5 (WCB June 30, 2025) (*2025 IPCS Waiver Order*).  *See also* Letter from Michael Pryor, Counsel for Securus Technologies, LLC, and Marcus Trathen, Counsel for Pay Tel, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 (filed Apr. 3, 2025) (Securus and Pay Tel Apr. 3, 2025 *Ex Parte*); Letter from Michael J. Lozich, Associate General Counsel, Regulatory Affairs, Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 (filed June 27, 2025) (Securus June 27, 2025 *Ex Parte*) (stating that the industry is "straining to implement" some of the requirements adopted in the *2024 IPCS Order*).

[10] *2025 IPCS Waiver Order* at 1, para. 1.

*IPCS Waiver Order*, asking the Commission to rescind the order and allow the relevant IPCS rules to go into effect as adopted.[11] The Bureau sought and received comment on the Application for Review.[12]

## III. REPORT AND ORDER AND ORDER ON RECONSIDERATION

6. We adopt a joint Report and Order and Order on Reconsideration (Order) to address rate cap setting issues that arose in two distinct procedural settings in this rulemaking—some in response to the *2024 IPCS Notice* and others in response to the NCIC Reconsideration Petition. We combine the discussions of our Report and Order and Order on Reconsideration into a single holistic discussion to simplify and clarify our analysis of the various rate cap setting modifications we make, which are interrelated and interdependent, but which must be factored together to result in a single set of revised rate caps. For clarity's sake, we identify throughout this hybrid discussion the procedural source of each issue we address and therefore the aspect of the joint Order we issue today.

7. In this Order, we use a two-step process for revising the IPCS rate caps. We first address four methodological issues raised in the record and revise the approach to each in response to comments raised in the record. We then incorporate the effects of those modifications into the audio and video rate cap calculations by establishing a zone of reasonableness for each rate tier, calculating upper and lower bounds for each rate tier, and then select new rate caps from within the resulting zones, rounding to whole cent amounts. The rate caps we establish are interim, acknowledging the limitations of the data submitted and allowing the Commission to seek further comment before setting permanent rate caps.

8. We adopt the following revised, interim audio and video IPCS rate caps:

### Table 1: Revised Interim Audio and Video IPCS Rate Caps

| Tier (ADP) | Audio (Per Minute) | | | Video (Per Minute) | | |
|---|---|---|---|---|---|---|
| | **Rate Cap** | **Rate Additive** | **Effective Rate Cap** | **Rate Cap** | **Rate Additive** | **Effective Rate Cap** |
| **Prisons (any ADP)** | **$0.09** | $0.02 | $0.11 | **$0.23** | $0.02 | $0.25 |
| **Large Jails (1,000 +)** | **$0.08** | $0.02 | $0.10 | **$0.17** | $0.02 | $0.19 |
| **Med. Jails (350-999)** | **$0.10** | $0.02 | $0.12 | **$0.17** | $0.02 | $0.19 |
| **Small Jails (100-349)** | **$0.11** | $0.02 | $0.13 | **$0.19** | $0.02 | $0.21 |
| **Very Small Jails (50-99)** | **$0.13** | $0.02 | $0.15 | **$0.23** | $0.02 | $0.25 |
| **Extremely Small Jails (0-49)** | **$0.17** | $0.02 | $0.19 | **$0.42** | $0.02 | $0.44 |

---

[11] Application for Review of the Public Interest Parties, WC Docket Nos. 23-62 and 12-375, at ii (filed July 30, 2025) (Public Interest Parties' Application for Review).

[12] *Wireline Competition Bureau Seeks Comment on the Public Interest Parties' Application for Review of the 2025 IPCS Waiver Order*, WC Docket Nos. 23-62 and 12-375, Public Notice, DA 25-710 (WCB Aug. 12, 2025). Several parties commented in opposition to the Application. *See, e.g.*, Securus Opposition (rec. Aug. 29, 2025); NCIC Opposition (rec. Aug. 29, 2025); National Sheriffs' Association Opposition (rec. Aug. 29, 2025); Pay Tel Opposition (rec. Aug. 29, 2025); State of Louisiana Opposition (rec. Aug. 29, 2025). *But see* Lisa Butler Comments (rec. Sept. 5, 2025) (supporting Application for Review). The Public Interest Parties and Worth Rises responded to the oppositions. *See* Reply to Oppositions by the Public Interest Partes (rec. Sept. 15, 2025); Letter from Bianca Tylek, Executive Director, Worth Rises, to Marlene H. Dortch, Secretary, FCC (filed Sept. 15, 2025) (including petition supporting the Application).

### A. Revisions to Rate Cap Setting Methodology and Rate Structure

9.      We first revise four aspects of the rate cap setting approach the Commission used in the *2024 IPCS Order*, based on the record developed in response to the *2024 IPCS Notice* and NCIC's Petition for Reconsideration of various aspects of the *2024 IPCS Order*, as well as updated information received in the record of this proceeding.[13]  As noted above, these changes supersede the corresponding aspects of the *2024 IPCS Order*.  First, in response to the NCIC Reconsideration Petition, we reconsider the use of unbilled minutes in calculating the IPCS rate caps, excluding such minutes as they result in no compensation for IPCS providers.  Second, pursuant to comment sought in the *2024 IPCS Notice*, we adopt an additional size tier for extremely small jails (from 0 to 49 average daily population (ADP)) to better reflect the generally higher per-minute and per-capita costs extremely small jails face.  Third, in response to the NCIC Reconsideration Petition, we revise the treatment of safety and security costs to include all such reported costs in the revised rate caps.  Finally, pursuant to comment sought in the *2024 IPCS Notice*, we adopt a separate rate additive for all rate tiers of up to $0.02 per minute that may be charged on top of the newly revised per-minute rate caps.[14]  The net effect of these changes will be to properly balance the way we implement the Martha Wright-Reed Act and thereby ensure consumers, correctional facilities, and IPCS providers realize the shared goal of increased communication with all the benefits that has been shown to produce.[15]

#### 1. Exclusion of Unbilled Minutes in Calculating Rate Caps

10.      NCIC seeks reconsideration of the Commission's inclusion of unbilled minutes of use in calculating IPCS rate caps in the *2024 IPCS Order*.[16]  NCIC argues that the inclusion of unbilled minutes of use—minutes that facilities may require and for which providers currently collect no revenue—"would lead to IPCS providers being under-compensated."[17]  The majority of commenters that responded to the petition support NCIC's claim.[18]  We agree and therefore grant this portion of the NCIC Reconsideration Petition.

---

[13] NCIC Reconsideration Petition at 10-12 (requesting reconsideration concerning unbilled minutes), 8-10 (requesting reconsideration concerning safety and security costs).  *See 2024 IPCS Order*, 39 FCC Rcd at 7747-70, paras. 183-222 (discussing the ratesetting process); *see also Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9536-96, paras. 39-175 (2021) (*2021 ICS Order* or *2021 ICS Notice*).

[14] *2024 IPCS Notice*, 39 FCC Rcd at 7963-64, paras. 621-22; *see 2021 ICS Order*, 36 FCC Rcd at 9536, para. 40.

[15] *See, e.g.*, *2024 IPCS Order*, 39 FCC Rcd at 7664-66, para. 29 & n.116.

[16] NCIC Reconsideration Petition at 10-12.

[17] NCIC Reply, WC Docket Nos. 23-62 and 12-375, at 5 (rec. Dec. 5, 2024) (NCIC Reply to Reconsideration Petition Oppositions).

[18] Pay Tel Comments, WC Docket Nos. 23-62 and 12-375, at 6 (rec. Nov. 25, 2024) (Pay Tel Comments to Reconsideration Petitions) (asserting the inclusion of unbilled minutes "ensure[s] that IPCS providers cannot recover their costs through billed minutes"); Securus Comments, WC Docket Nos. 23-62 and 12-375, at 10 (rec. Nov. 26, 2024) (Securus Comments to Reconsideration Petitions) ("Providers cannot recover costs from minutes that generate no revenue and, as a result of their inclusion in the rate cap calculations, the rate caps assure under-recovery of costs."); Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 16-17 (filed July 9, 2024) (Pay Tel July 9, 2024 *Ex Parte*) ("By calculating average costs by reference to both billed and unbilled minutes, the draft inappropriately deflates costs by matching costs against minutes for which the provider is not receiving revenue."); Letter from Michael H. Pryor, Counsel for Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 3 (filed July 15, 2024) (Securus July 15, 2024 *Ex Parte*) ("IPCS providers often provide consumers with free or unbilled calls in order to assure communication to more incarcerated individuals.  As these

(continued….)

11.     In the *2024 IPCS Order*, the Commission calculated the IPCS rate caps by dividing used and useful costs incurred in the provision of IPCS by the sum of billed and unbilled minutes as the unit of sale.[19]  It reasoned that using both billed and unbilled minutes "better reflect[ed] the cost of actual minutes."[20]  The Commission considered that using both billed and unbilled minutes would "ensure all incarcerated persons are charged no more than the cost of their calls, and treat[] all minutes equally, regardless of a facility's or a provider's policy decisions on whether and how to provide free minutes."[21]

12.     NCIC contends that the Commission erred by including unbilled minutes in its calculation of rate caps.  It claims that the Commission failed to "adequately explain how including unbilled minutes, for which IPCS providers incur costs to carry the traffic and monitor the communications but receive no revenue, is a better reflection of an IPCS providers' costs to provide service."[22]  We find that using total reported minutes of use to calculate interim rate caps may not produce rate caps that allow providers sufficient revenues to recover their costs, even if doing so may be useful in assessing overall industry cost characteristics.  Using both billed and unbilled minutes, without accounting for the fact that providers may not presently have contracts in place enabling them to recover from facilities the costs of providing any unbilled minutes that facilities require, may lead to under-compensation, contrary to the "fair compensation" principle of section 276(b)(1)(A) of the Communications Act of 1934, as amended (Communications Act).[23]

13.     NCIC challenges the Commission's conclusion that using billed and unbilled minutes to derive its rate caps was "an improvement from the *2021 ICS Order*, which divided expenses by paid minutes."[24]  It further claims the Commission "failed to provide any meaningful discussion on why its prior conclusion to rely on solely [paid] minutes was in error."[25]  It cites the Commission's previous conclusion in the *2021 ICS Order* to use paid minutes to derive rate caps "because those are the minutes that providers rely on to recover their costs."[26]  As NCIC noted, using unbilled minutes for which no compensation is received to calculate rate caps leads "to IPCS providers' costs being diluted by non-revenue generating IPCS calls," which may not ensure providers are fairly compensated,[27] as required by the Martha Wright-Reed Act.

calls generate no revenue, they cannot result in the recovery of any provider costs.").  *But see* Public Interest Parties' Comments, WC Docket Nos. 23-62 and 12-375, at 5-7 (rec. Nov. 25, 2024) (Public Interest Parties' Opposition to NCIC Reconsideration Petition) (arguing that the Commission's inclusion of unbilled minutes in calculating rate caps was proper).

[19] *2024 IPCS Order*, 39 FCC Rcd at 8024, Appx. E, para. 4.

[20] *Id*.

[21] *Id*.

[22] NCIC Reconsideration Petition at 11; *see also* Securus July 15, 2024 *Ex Parte* at 7 ("It is not appropriate to use unbilled minutes because they generate no revenue to offset costs.").

[23] *See* 47 U.S.C. § 276(b)(1)(A).

[24] *2024 IPCS Order*, 39 FCC Rcd at 8024, Appx. E, para. 4.

[25] NCIC Reconsideration Petition at 11; *see also* Securus July 15, 2024 *Ex Parte* at 3 ("The draft order relies on unbilled minutes in its calculation of the per-minute rates needed to recover costs.  The Commission has never done this before and this change has the unreasonable outcome of assuming that provider costs can be recovered from calls that generate no revenue.").

[26] NCIC Reconsideration Petition at 11.

[27] *Id*. at 5.

14.     While NCIC seeks to exclude unbilled minutes from the calculation of IPCS rate caps, it does not seek a return to the use of paid minutes to calculate rate caps as was done in the *2021 ICS Order*. A return to using paid minutes was not necessary in the *2024 IPCS Order* as the Commission accounted for the difference between paid and billed minutes by including bad debt expense in its rate cap calculations.[28]  In this Order, we account for this difference by including a similar allowance for bad debt expense in the costs used to calculate rate caps.[29]

15.     The Public Interest Parties assert that "excluding unbilled minutes would lead to rate caps that are unreasonably high . . . in at least some facilities."[30]  But they fail to acknowledge that basing rates on unbilled minutes will undercompensate providers unless they recover those costs directly from facilities.  We therefore are not persuaded that excluding unbilled minutes results in interim rate caps that are not just and reasonable.  Additionally, the Commission must take into account the fact that unbilled minutes represent a non-trivial percentage of all minutes as it balances the dual goals of ensuring just and reasonable rates for consumers and fair compensation for providers.[31]  Finally, consumers are direct beneficiaries of unbilled minutes, an offsetting benefit which must be factored in assessing the reasonableness of industry rate caps overall.  This revision to our rate caps, as well as the others adopted in this Order, are cost-based, supported by the record, and meet the dual requirements that our rate caps be just and reasonable and fairly compensatory.  We find that excluding unbilled minutes in calculating our interim rate caps satisfies both statutory mandates.[32]

16.     In the *2024 IPCS Order*, the Commission further explained its decision to use unbilled minutes by citing the fact that the "ratio of billed minutes to unbilled minutes varies across facilities" and that basing rates on billed and unbilled minutes would minimize the problem of under-recovery in facilities with a higher proportion of unbilled minutes and over-recovery in facilities with a lower proportion of unbilled minutes.[33]  However, as NCIC observes, that reasoning reflects the inherent variability of rate caps based on average industry data and therefore does not constitute a flaw in the Commission's rate cap setting methodology, only an inherent attribute of average cost-based ratemaking.[34]

17.     Finally, NCIC questions the Commission's reasoning that "if the relative proportions of billed to unbilled minutes were to shift in the future, a rate cap based on the amount of billed minutes would become outdated."[35]  It asserts that the Commission "already has plans to address any outdated rate caps in connection with ongoing oversight of IPCS service."[36]  The Public Interest Parties assert in contrast that including unbilled minutes "eliminat[es] the need for the type of ongoing monitoring NCIC

---

[28] *2024 IPCS Order*, 39 FCC Rcd at 8025, Appx. E, para. 4, n.10 ("Billed minutes do not equal paid minutes to the extent minutes are billed for, but not paid. . . .  (Our measure of expenses reflected in the rate caps includes an allowance for bad debt expense to recognize unpaid bills that are no longer expected to be collected due to customer default.)").

[29] *See infra* Appx. D.

[30] Public Interest Parties' Opposition to NCIC Reconsideration Petition at 6.

[31] *See infra* Appx. D.

[32] 47 U.S.C. § 276(b)(1)(A) (requiring that IPCS "service providers are fairly compensated, and all rates and charges are just and reasonable").

[33] *2024 IPCS Order*, 39 FCC Rcd at 8024, Appx. E, para. 4 & n.8.

[34] NCIC Reconsideration Petition at 12.

[35] *2024 IPCS Order*, 39 FCC Rcd at 8024, Appx. E, para. 4 & n.8.

[36] NCIC Reconsideration Petition at 12.

describes,"[37] but do not explain how including unbilled minutes in rate calculations would obviate the need for the Commission to discharge its ongoing oversight responsibilities under the Communications Act and the Martha Wright-Reed Act.  We agree with NCIC.  We are currently monitoring and fully intend to continue to monitor the IPCS industry as part of our ongoing oversight obligations under the Communications Act and the Martha Wright-Reed Act.

18.     We therefore use only billed minutes in calculating our interim rate caps, superseding our decision in the *2024 IPCS Order*, which we find will help ensure IPCS providers are fairly compensated while still ensuring just and reasonable rates.  Removing unbilled minutes from the calculation of those rate caps will, in combination with the other modifications to IPCS rate caps adopted in this Order, ensure those rate caps comply with the statutory requirement that providers are fairly compensated.  The impact of altering this aspect of the Commission's rate cap calculation, as further explained in Appendix D, is material.  Unbilled minutes constitute 7.8% of the total number of minutes reported by the industry in response to the 2023 Mandatory Data Collection, although this proportion varies across different rate tiers and between audio and video services.[38]  Removing unbilled minutes from our calculations increases the per minute industry averages for audio and video IPCS and safety and security expenses by as little as 6.2% to as much as 63.7%, depending on the service and the tier in question (before lower-bound adjustments).[39]  The effect of this change is reflected in the interim rate caps adopted by the Commission.

**Table 2:  Effect of Removing Unbilled Minutes on Audio and Video Safety and Security Expenses**

|  | Audio | | | Video | | |
|---|---|---|---|---|---|---|
|  | IPCS and Safety & Security Expenses Per Total Minute | IPCS and Safety & Security Expenses Per Billed Minute | Percent Change | IPCS and Safety & Security Expenses Per Total Minute | IPCS and Safety & Security Expenses Per Billed Minute | Percent Change |
| Prisons | 0.074 | 0.079 | 7.0% | 0.293 | 0.455 | 55.1% |
| Large Jails | 0.065 | 0.071 | 9.1% | 0.190 | 0.312 | 63.7% |
| Medium Jails | 0.077 | 0.082 | 7.5% | 0.183 | 0.244 | 32.8% |
| Small Jails | 0.088 | 0.093 | 6.2% | 0.175 | 0.215 | 22.7% |
| Very Small Jails | 0.106 | 0.113 | 7.0% | 0.222 | 0.248 | 11.6% |
| Extremely Small Jails | 0.141 | 0.153 | 8.6% | 0.369 | 0.421 | 14.1% |

Source: 2023 Mandatory Data Collection facility-specific Excel tabs.
Total minutes include billed and unbilled audio or video minutes. Billed minutes do not include unbilled audio or video minutes.

### 2.      Establishing the Extremely Small Jail Tier

19.     In the *2024 IPCS Notice*, the Commission sought comment on the costs of providing IPCS to very small jails, whether to disaggregate the very small jail tier, and the types of data that would

---

[37] Public Interest Parties' Opposition to NCIC Reconsideration Petition at 6-7.

[38] As we explain in greater length in Appendix D, unbilled minutes consist of a greater proportion of video minutes than audio minutes, approximately 27.5% of reported video minutes, versus roughly 7% of audio minutes.  By consequence, the use of billed minutes alone has a disproportionate effect on video rates.  *See infra* Appx. D.

[39] Replacing total minutes with billed minutes increases the per-minute allowance for recovery of ancillary service expenses reflected in the rate caps by about 8.5% (before lower-bound adjustments and rounding to the nearest third decimal place).  *See id*.

help capture the variability of IPCS costs in this very small jail tier.[40]  After analyzing the record received in response to the *2024 IPCS Notice*, we now further disaggregate the very small jail tier into two separate tiers—very small jails and extremely small jails.[41]  Specifically, we revise our definition of "very small jails" to include jails with an ADP between and including 50 to 99 and create a new rate cap tier for "extremely small jails" for jails with an ADP of 0 to 49.  These revisions result in the following rate cap tiers, reflecting differences in facility type and size, which we hereby adopt:[42]

- A separate tier for all prisons regardless of average daily population;

- Jails with an average daily population of 1,000 or more (large jails);

- Jails with an average daily population between and including 350 to 999 (medium jails);

- Jails with an average daily population between and including 100 to 349 (small jails);

- Jails with an average daily population between and including 50 to 99 (very small jails); and

- Jails with an average daily population of 0 to 49 (extremely small jails).

20.     The Martha Wright-Reed Act directs the Commission to ensure just and reasonable rates and consider costs associated with "small, medium, and large facilities" or "other characteristics."[43]  In the *2024 IPCS Order*, the Commission interpreted this language as a mandate to analyze the cost characteristics of different-sized facilities.[44]  Given the record then before it, the Commission adopted a four-tiered rate cap structure that includes the "very small jail" rate cap tier that we reexamine here to better reflect the differences in the costs of serving various sizes of jails.[45]

---

[40] *2024 IPCS Notice*, 39 FCC Rcd at 7960, para. 612 ("[W]e seek comment on the types of cost or other data that would be most helpful for the Commission to collect from providers serving this tier of facilities to ascertain whether, and if so how, to further disaggregate this tier to capture any variability that may exist within segments of this tier.").

[41] *Id.*

[42] *Id.* at 7725-26, para. 146.  We note that today's actions do not change the requirement for annual recalculation of ADP by April 30 of each year.

[43] Martha Wright-Reed Act §§ 2(a) and 3(b).

[44] *2024 IPCS Order*, 39 FCC Rcd at 7728, para. 149.  The Commission found no need to create separate rate cap tiers among prisons because they are almost uniformly large, enjoy greater economies of scale, and the data do not indicate significant differences in the costs of serving different prison facilities.  *See id.* at 7726-28, para. 148 & n.507.  Further, the Commission did not interpret the Martha Wright-Reed Act as a directive that limits the Commission to adopting only three size tiers.  *See id.* at 7728-29, paras. 149-50; *see also* Securus Comments, WC Docket Nos. 23-62 and 12-375, at 19 (rec. May 8, 2023) (Securus May 8, 2023 Comments) ("To the extent cost data reflect[] differing per unit costs at different types or sizes of facilities, faithful adherence to the [Martha-Wright Reed] Act requires adoption of rate tiers."); ViaPath Comments, WC Docket Nos. 23-62 and 12-375, at 9 (rec. May 8, 2023) (ViaPath May 8, 2023 Comments) ("If the record continues to support that costs vary based on size of the facility, ADP tracked by correctional authorities is a practical approach for differentiating between facilities.").

[45] *2024 IPCS Order*, 39 FCC Rcd at 7725, para. 146.  At the time of adoption, the "very small" jails category included facilities that ranged in size from 0-99 ADP.

21.     Notably, the very small jail tier included jails with an ADP between 0 and 99, which encompassed over half of all jails in the United States.[46]  Generally speaking, these and other small jails are located in rural areas—an "other characteristic[]" within the meaning of the Martha Wright-Reed Act—where the record suggests that providing IPCS involves increased costs due to "higher telecommunications expenses and customization requirements."[47]  The Commission recognized that the rate cap tiers adopted in the *2024 IPCS Order*, while an improvement over its previous rate caps, may still not effectively capture cost variations within this tier, and sought comment in the *2024 IPCS Notice* on further disaggregation of the very small jail tier.[48]  Given the significant number of such jails and their distinct cost structures, and given their generally more rural nature, we find it necessary to further refine our rate cap tiers to better capture the variability among small jails generally and within the very small jail tier specifically to more accurately reflect providers' costs and ensure they are fairly compensated.[49]

22.     As a general matter, we agree with commenters that as ADP decreases, per-minute or per capita costs for the provision of IPCS increase for the provider.[50]  Several factors cause per-minute IPCS costs to rise as ADP shrinks.  For one, the fixed costs of providing IPCS at smaller or more rural facilities are distributed over fewer incarcerated people and therefore fewer minutes of use, which results in providers tending to have higher costs per minute at smaller facilities as opposed to larger facilities.[51]  Importantly, extremely small jails and very small jails are more typically located in rural areas, where the per minute cost of service is higher because of the reported difficulty of serving those areas.[52]  In addition

---

[46] Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed July 11, 2024) (Pay Tel July 11, 2024 *Ex Parte*) ("Of the 2,779 jails in operation today, 1,523 have populations below 100 . . . .").

[47] Pay Tel Comments, WC Docket Nos. 23-62 and 12-375, at 10-11 (rec. May 8, 2023) (Pay Tel May 8, 2023 Comments); *see* Securus May 8, 2023 Comments at 19 ("A provider that exclusively or primarily serves smaller jails particularly in more rural areas is likely to have higher average per unit costs than a provider that serves a diverse array of facilities."); *see also 2024 IPCS Order*, 39 FCC Rcd at 7729-30, paras. 152 & n.530 (stating that "the rural nature of many smaller facilities tends to increase costs due to higher telecommunications expenses and customization requirements").

[48] *2024 IPCS Notice*, 39 FCC Rcd at 7960, para. 612.  *See also 2024 IPCS Order*, 39 FCC Rcd at 7728-29, paras. 149-50.  As we describe below, subsequent record development continues to suggest that jails of extremely small sizes are subject to heightened costs.

[49] *Id*.

[50] National Sheriffs' Association Comments, WC Docket Nos. 23-62 and 12-375, at 2 (rec. Oct. 21, 2024) (National Sheriffs' Association Oct. 21, 2024 Comments); JustLeadershipUSA Comments, WC Docket Nos. 23-62 and 12-375, at 3 (rec. Oct. 15, 2024) (JustLeadershipUSA Oct. 15, 2024 Comments).  *But see* Wright Petitioners, Benton Institute for Broadband and Society, Pennsylvania Prison Society, and Public Knowledge Comments, WC Docket Nos. 23-62 and 12-375, at 5-6 (rec. Oct. 21, 2024) (Public Interest Parties Oct. 21, 2024 Comments).  The Wright Petitioners argue that available data do not show an economic basis for further disaggregating the very small jail tier for audio IPCS.  At the same time, the Wright Petitioners support the possibility for disaggregation of the very small jail tier for audio IPCS, particularly on the basis of non-ADP factors.  *See also* Worth Rises Comments, WC Docket Nos. 23-62 and 12-375, at 8 (rec. Oct. 21, 2024) (Worth Rises Oct. 21, 2024 Comments); ViaPath Comments, WC Docket Nos. 23-62 and 12-375, at 7-8 (rec. Oct. 21, 2024) (ViaPath Oct. 21, 2024 Comments).

[51] ViaPath Oct. 21, 2024 Comments at 9-10.

[52] *2024 IPCS Order,* 39 FCC Rcd at 7726-28, para. 148 & n.512 ("[I]t is simply more efficient to deploy equipment at a larger location than a smaller location. . . . [Additionally,] the resources devoted [for on-site services] are often similar or the same for both smaller and larger facilities, even though the smaller facility will generate fewer revenue-producing [minutes of use] (and the geographically remote nature of many small jails may cause required

(continued….)

to increased costs for jail management and account set-up, greater reliance on prepaid accounts, and fewer calling minutes,[53] IPCS providers that serve smaller jail facilities typically in rural locations often must also provision longer haul, higher cost broadband connections to deliver service.[54]  Accordingly, building upon the Commission's prior actions and based on the record and analysis of IPCS data, we subdivide the very small jail tier established in the *2024 IPCS Order* and instead create two separate tiers:  a more focused very small jail tier for jails with ADPs between 50 and 99, and a new extremely small jail tier for jails with ADPs between 0 and 49.

23.      The real world implications of adopting rate caps that do not sufficiently take into account the higher costs of serving the smallest and most rural facilities is evident in the record subsequent to the adoption of the *2024 IPCS Order*.  One provider reported being "forced to cease the provision of IPCS services to four small jails in Arizona and New Mexico that would no longer be financially viable under the 2024 Order."[55]  After attempting to find a replacement provider, "the facilities had no other choice but to revert to 1980s-style supervised public pay telephones for use by the incarcerated population."[56]  Securus and Pay Tel further emphasize that rate caps that do not take into account the costs of serving very small facilities "will undoubtedly impact small jails in rural areas to the greatest extent, as those facilities typically have the lowest calling levels and the highest costs."[57]

24.      We find that further disaggregating the very small jail tier into two separate tiers better accounts for the operational challenges of providing IPCS to very small and extremely small jails, more accurately captures the heightened costs associated with providing IPCS to jails in rural areas, and therefore more reliably ensures that IPCS rates are just, reasonable, and fairly compensatory.  Further, the majority of incarcerated people that would have been covered by the former very small jail tier rate cap will pay relatively lower rates than they otherwise would have if the very small jail tier were not subdivided, given that the majority of incarcerated people within the two new tiers will be in the revised very small jail tier.  Incarcerated people housed in jails included in the new extremely small jail tier, while paying marginally higher rates than they otherwise would have if the very small jail tier were not subdivided, will be assured of the long-term availability of IPCS at those institutions given that those rates will more accurately compensate providers for their costs.

---

(Continued from previous page) ———————————

person-hours to be higher for these tasks).") (citing Pay Tel Reply, WC Docket No. 12-375, Attach. at 12 (rec. Mar. 3, 2023) (Pay Tel Mar. 3, 2023 Wood Report); Pay Tel May 8, 2023 Comments at 11.

[53] Pay Tel May 8, 2023 Comments at 11.

[54] NCIC Comments, WC Docket Nos. 23-62 and 12-375, at 6, 9-11 (rec. Oct. 21, 2024) (NCIC Oct. 21, 2024 Comments) (explaining that providing video IPCS in rural areas involves contracting with third parties to ensure the maintenance of broadband infrastructure in areas without reliable broadband connections.  NCIC further explains that to carry IPCS video calls from a correctional facility to an IPCS provider's data center in very rural areas, IPCS providers contract broadband services to StarLink, which is more expensive than traditional broadband service and can be unstable.); Pay Tel Comments, WC Docket No. 12-375, at 10 (rec. Mar. 25, 2013) (Pay Tel Mar. 25, 2013 Comments) ("To take a specific example of the disparate impact here, consider that larger providers generally can negotiate a deeply discounted rate to access and obtain high-volume, special access circuits to interconnect with the LEC's central office, which ultimately saves providers money in the long run.  Conversely, providers like Pay Tel, serving small and medium sized jails, often cannot access such circuits and instead use more costly broadband circuits in rural locations, which are much more expensive over time.").

[55] Securus and Pay Tel Apr. 3, 2025 *Ex Parte* at 4 ("The low call volume at these small facilities coupled with the reduced rates in the 2024 Order simply made it impossible for Pay Tel to recover its costs.").

[56] *Id.*

[57] *Id.*

25.     We subdivide the former very small jail tier at 50 ADP to create two tiers, and find that using this additional threshold will improve or better ensure the provision of IPCS within these tiers, while balancing the differences in ADP, average length of time incarcerated people are detained, and consumers' interests.[58]  This action subdivides the rate tier that encompasses the largest number of facilities.[59]  The most recent Bureau of Justice Statistics show that of the 2,779 jails in operation, over half have an ADP below 100 (567 with an ADP of between 50 to 99 and 956 with an ADP lower than 50).[60]  While there are a higher number of jails in the lower half of the 0-100 ADP range, those jails house significantly fewer people.  Of the total ADP of 59,600 in jails below 100 ADP during the 12-month period from July 1, 2021 to June 30, 2022, jails with ADPs from 50 to 99 account for roughly 40,500 (68%), while jails with ADPs under 50 account for only 19,100 (32%).[61]

26.     We agree with commenters that assert that, because of this uneven population distribution within the former very small jail tier, the rate cap for this tier "saddles many with rates that are far too high as a result of the costs associated with providing service in the smallest jails."[62]  Taking into account the differences in ADP at the very small jail tier and the extremely small jail tier, we find that dividing the existing very small jail tier at 50 ADP will ensure that, at any given point in time, the majority of consumers in this group will pay lower IPCS rates, reflecting the relatively lower per-minute cost of service in jails from 50 to 99 ADP, while allowing providers at extremely small jails to charge rates that will enable them to recover their higher per-minute cost of service and therefore ensure they will be able to continue providing service over the long term.  Differences in average length of stay between these two sets of facilities further amplify the importance of disaggregating the former very small jail tier to set appropriate rates for both new tiers.  According to Worth Rises, on average, "people in jails with an ADP of 50 to 99 are detained for 21.6 days, whereas people in jails with an ADP of 0 to 49 are detained for 13.4 days."[63]  Shorter detentions would tend to increase the frequency of one-time administrative costs, all else being the same.  We therefore divide the former very small jail tier into two separate tiers based on ADP.[64]

27.     We decline to further disaggregate the extremely small jail tier by setting an additional threshold below 50 ADP.  NCIC suggests that there are a limited number of IPCS providers willing to serve very small jails because they lack a consistent ADP that would enable adequate revenue projections.[65]  After a certain point, however, we find further disaggregating the smallest rate cap tiers beyond those we adopt today would likely offer diminishing benefits.  We recognize that IPCS providers—both large and small—serving jails with, for example, an ADP below 20 would likely face disproportionate compliance burdens if an additional, even smaller tier were created.  Therefore, after

---

[58] *See 2024 IPCS Order*, 39 FCC Rcd at 8023-24, Appx. E, para. 3 & n.6 ("While there were no sharply obvious break points, per-minute costs increased at an increasingly steep rate as facility ADP fell.").

[59] Pay Tel July 11, 2024 *Ex Parte* at 2.

[60] Zhen Zeng, *Jail Inmates in 2022 – Statistical Tables,* Bureau of Justice Statistics, at 12 (2023), https://bjs.ojp.gov/document/ji22st.pdf (*DOJ Jails Data*).

[61] Worth Rises Oct. 21, 2024 Comments at 7; *see also DOJ Jails Data* at 14 (estimating a total of 652,500 ADP across jails of all sizes in the United States in 2023).

[62] Worth Rises Oct. 21, 2024 Comments at 7.

[63] *Id.*

[64] JustLeadershipUSA Oct. 15, 2024 Comments at 3 ("We recommend splitting the data into two equal categories with further adjusted caps for IPCS products.").

[65] NCIC Oct. 21, 2024 Comments at 9.

carefully reviewing the data and record, we conclude 50 ADP represents a reasonable break point between the very small and extremely small jail tiers.

### 3. Inclusion of Safety and Security Costs

28.     In the *2024 IPCS Order*, to determine which provider-reported expenses to include when calculating industry-average IPCS costs, the Commission applied a used and useful framework and evaluated various categories of safety and security expenses.[66]  After evaluating seven categories "based on the nature of the preponderance of tasks or functions within each category," the Commission found that two categories of safety and security expenses were used and useful in the provision of IPCS.[67]  The Commission therefore included the reported costs for the two categories—CALEA compliance measures and communications security services—in the cost of service, but ultimately concluded that "the remaining five categories should not be treated as used and useful" for purposes of determining the lower bounds of the zones of reasonableness.[68]  NCIC disputes this conclusion, arguing that the Commission's "inconsistent application of the 'used and useful' standard led to material errors" when the Commission rejected the costs in those five categories.[69]

29.     We now grant in part NCIC's Petition, by reconsidering the Commission's previous decision to exclude various safety and security costs from its IPCS rate cap calculations and instead treat all reported safety and security costs as used and useful costs for determining the costs to be included in the lower bounds of the zones of reasonableness.[70]  In its Petition, NCIC alleges that the Commission's application of the used and useful analysis "did not fully account for IPCS providers' safety and security costs."[71]  NCIC argues that "the lack of comprehensive data" prevented "a reasoned analysis of the IPCS costs allocated across the seven categories of safety and security measures."[72]  On reconsideration, we agree.  While the available record evidence concerning used and useful safety and security costs provided a basis for the Commission to exclude certain categories of safety and security costs, given the record which has developed since the Commission adopted the *2024 IPCS Order*, we find that this led to rate caps that did not sufficiently recover providers' used and useful safety and security costs.  Accordingly, given our concerns about jeopardizing access to IPCS if we underestimate used and useful safety and security costs, we take a more conservative approach on the existing record and treat all reported such costs as used and useful, unless and until an improved record going forward shows otherwise, thereby superseding our treatment of safety and security costs in the *2024 IPCS Order*.  Therefore, for the purposes of our interim rate caps we now incorporate all safety and security cost categories in the

---

[66] *2024 IPCS Order*, 39 FCC Rcd at 7851, para. 384.

[67] *Id*. at 7851-52, 7855-66, paras. 385, 391-407 (discussing how categories were evaluated and applying the used and useful framework, category by category).

[68] *Id*. at 7852, para. 386; *see id.* at 7852-66, paras. 386-407 (excluding law enforcement support services (category 2); communication recording services (category 4); communication monitoring services (category 5); voice biometrics services (category 6); and other safety and security measures (category 7) from the lower bounds).

[69] NCIC Reconsideration Petition at 5-6, 8-10.

[70] *Id*. at i, 8 (arguing that "the FCC . . . exempt[ed] more than two-thirds of safety and security costs incurred by IPCS providers to make audio and video IPCS available to consumers" which contributed to "the adoption of low audio and video IPCS rates").

[71] *Id*. at 8.

[72] *Id*. at 8, 10; *see also* National Sheriffs' Association Comments, WC Docket Nos. 23-62 and 12-375, at 2-3 (rec. Nov. 25, 2024) (National Sheriffs' Association Nov. 25, 2024 Comments to NCIC Reconsideration Petition) (agreeing with NCIC's argument and attributing a reason for the poor results due to a lack of a uniform system of accounts).

Commission's IPCS rate cap calculations and specifically add all such categories of costs into our calculation of the lower bounds.[73]  In doing so, we not only reconsider the Commission's earlier exclusion of five of the seven reported cost categories, but also incorporate and reaffirm the Commission's earlier reasons for including the other two reported cost categories.[74]

30.     In the 2023 Mandatory Data Collection, the Commission expanded the scope of collected data, gathering more granular information concerning safety and security services offered by providers, particularly those safety and security services which were used and useful in the provision of IPCS, and required providers to report on these data in detail for the first time.  The Commission structured reporting of safety and security expenses by requiring providers to allocate these expenses across seven different cost categories.[75]  Industry-wide, providers reported the following expenses by category:

**Table 3:  Reported Safety & Security Expenses By Category**

|  | Total | Percent |
|---|---|---|
| CALEA Compliance Measures | 5,839 | 0.001% |
| Law Enforcement Support Services | 24,593,237 | 4.3% |
| Communication Security Services | 195,760,913 | 34.4% |
| Communication Recording Services | 144,917,189 | 25.4% |
| Communication Monitoring Services | 99,898,694 | 17.5% |
| Voice Biometrics Services | 44,599,879 | 7.8% |
| Other Safety and Security Measures | 60,113,471 | 10.5% |
| All Categories | 569,889,222 | 100% |

Source: 2023 Mandatory Data Collection Safety & Security Measures Excel tabs.

As the chart demonstrates, providers reported a total of $569.9 million in safety and security costs across all categories, with Category 3 ("Communications Security Services") showing the highest reported costs of any category.  These costs represent 34.4% of all reported costs.

---

[73] *2024 IPCS Order*, 39 FCC Rcd at 7750-51, 7757-58, paras. 186-87, 200 (implementing the zones of reasonableness and removing the excluded categories of safety and security measure costs from the lower bounds of the zones of reasonableness).  The zone's upper bounds already included and incorporated all reported safety and security costs, and we need make no corresponding change to the upper bounds as a result.  *See id.* at 7753-54, para. 191 (explaining the Commission "also include[s] all reported safety and security costs in our upper bounds of the zones of reasonableness," which the Commission identifies as a conservative approach).

[74] *See id.* at 7855-57, paras. 391–93 (CALEA Compliance Measures); *id.* at 7859-61, paras. 395–97 (Communications Security Services).

[75] *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, 38 FCC Rcd 6625, 6631-32, para. 20 & n.44 (WCB 2023) (*2023 MDC Order*) (identifying the category approach and listing the categories); *see also* Incarcerated People's Communications Services 2023 Mandatory Data Collection Instructions, WC Docket Nos. 23-62 and 12-375, Instructions, at 35-37, https://www.fcc.gov/files/2023-ipcs-mandatory-data-collection-instructions (*2023 MDC Instructions*) (directing providers on how to separate and report costs for the safety and security measures provided in 2022 by first directing providers to sort individual measures into listed categories, then directing providers to report in the Word template each service and description sorted into each category, and lastly, directing providers to record costs for each category in the Excel template).

31.     While the Commission's categories were designed to group costs according to the uses or functions for which they were incurred,[76] commenters have since disputed the categories as a viable means of identifying used and useful costs, arguing that "IPCS providers do not categorize safety and security measures costs the same way the [Commission] grouped them."[77]  For example, the record demonstrates that responding providers interpreted communications monitoring services (category 5) to include functions that might be considered as typical of law enforcement, such as "aid[ing] investigations related to detention facilities,"[78] but that providers also reported services more typically considered IPCS-related in category 5, for example costs for "keeping incarcerated people from calling blocked numbers and from engaging in three-way calling."[79]  Similarly, as the National Sheriffs' Association argues, call recording (category 4) and call monitoring (category 5) both may include functions they consider used and useful in the provision of IPCS, insofar as threats are made or crimes are committed during the use of IPCS.[80]  On reconsideration, we find these arguments imply a benefit to IPCS consumers and that overlapping uses between the categories of safety and security measures include costs that the Commission did not evaluate previously, which we find appropriate to contemplate for all categories. Without more and better information, the Commission undermined its category-based analysis by

---

[76] *See* 2023 Mandatory Data Collection Excel Template, WC Docket Nos. 23-62 and 12-375, at Worksheet C3 Safety & Security Measures, https://www.fcc.gov/2023-ipcs-mandatory-data-collection (*2023 MDC Excel Template*).  The Bureaus further disaggregated the category-based approach by directing providers to report cost data for each category between regulated IPCS (like audio IPCS, video IPCS, and ancillary services) and nonregulated services using a catch-all column for reporting.  *See 2023 MDC Instructions* at 37; *see also 2023 MDC Order*, 38 FCC Rcd at 6632-33, paras. 22-23 (explaining that tradeoffs were made in order to ensure the Commission could collect and process "highly disaggregated safety and security measure cost data within the 18 to 24 month statutory timeframe, but also recognizing providers' concerns and confusion with the category-based approach and implementing changes).  Despite these changes and attempts at clarification, providers still had difficulty in reporting.  *See, e.g.*, *2024 IPCS Order*, 39 FCC Rcd at 7765, para. 214 & n.759 (recognizing that {[

         ]}).  Material that is set off by double brackets {[ ]} is subject to a request for confidential treatment and is redacted from the public version of this document.  *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Dockets Nos. 23-62 and 12-375, Protective Order, DA 23-298 (WCB Apr. 5, 2023).

[77] National Sheriffs' Association Nov. 25, 2024 Comments to NCIC Reconsideration Petition at 2.  *See also* Letter from Michael H. Pryor, Counsel to Securus, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach., at 7-8 (filed Apr. 30, 2024) (Securus Apr. 30, 2024 *Ex Parte*) ("There is a recognition throughout the Commission's Instructions for the 2023 MDC that segregated safety and security cost data does not exist for IPCS providers and that each provider would be required to determine an appropriate approach for cost allocation for the seven Commission-defined safety and security categories."); Pay Tel July 9, 2024 *Ex Parte* at 11 (arguing that the Commission is responsible for the quality of the data it received "by seeking the reporting of data that no provider maintained, based on confusing and contradictory instructions that mixed up the collection of data regarding safety and security services (i.e. stand-alone and optional service options) and safety and security functions (which include nearly every component of IPCS)").

[78] *2024 IPCS Order*, 39 FCC Rcd at 7864, para. 403 (citing Securus May 8, 2023 Comments at 39; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 43).

[79] *Id.* at 7864, para. 403 & n.1454 (citing Securus's position "that part of the purpose of monitoring is to ensure 'compliance with correctional authorities' reasonable calling restrictions") (internal citations omitted).

[80] *See* National Sheriffs' Association  Nov. 25, 2024 Comments to NCIC Reconsideration Petition at 3; *see e.g.*, Securus and Pay Tel Apr. 3, 2025 *Ex Parte* at 5 (describing voice biometrics as a measure "to protect incarcerated consumers from account theft").

requiring providers to lump reported costs into inexact categories, which, in some instances, excluded certain reported costs from the categories the Commission deemed used and useful.[81]

32.     At a more granular level, some of the individual services within each category also suffered from ambiguity in function and use, as they could be classified as a law enforcement function, as a service which supported the provision of IPCS, or potentially both.  Cost data for safety and security measures can be allocated among different security categories or functions in many ways, for example, by allocating costs for research and development processes to one specific category even if those costs apply more broadly to additional categories.  Further, reported safety and security costs—such as platform development—could support both regulated IPCS and nonregulated services like text messaging.[82]  For example, certain IPCS providers develop their own proprietary software platforms for use by customers and law enforcement; such platforms naturally serve multiple functions, supporting not only the use of IPCS, but also education, entertainment, or other nonregulated uses, in addition to providing some safety and security features.[83]  Without a prescribed method of cost allocation or attribution, the categorical distinctions lose reliability, and can be treated differently by different respondents.[84]  In sum, we find other costs, such as platform development costs, and other functional overlaps heighten the degree to which regulated and nonregulated service costs are intermingled, and further obfuscate the Commission's ability to exclude reported safety and security cost categories without better data.[85]

33.     Next, given the limitations of the available data in the *2024 IPCS Order*, the Commission could not verify whether the costs of each provider's reported safety and security measures were allocated

---

[81] *See* Securus July 15, 2024 *Ex Parte* at 15-16 (arguing that as a result of the Commission's category-based approach, "some providers may have allocated [personal identification number (PIN)] costs into one of the disallowed categories such as 'monitoring' or 'other,' in which case PIN costs are no longer deemed used and useful and can no longer be recovered in rates").

[82] *See 2023 MDC Order*, 38 FCC Rcd at 6635, para. 28 (recognizing the "ambiguity as to providers' accounting practices for safety and security measures, particularly in light of providers' concerns about the ability to apply their accounting systems" to the Commission's category-based approach).

[83] *See* Letter from Michael H. Pryor, Counsel to Securus, and Marcus W. Trathen and Christopher B. Dodd, Counsel to Pay Tel, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. B, Joint Report by FTI Consultants and Wood and Wood at 12-15 (filed June 10, 2024) (Securus and Pay Tel June 10, 2024 *Ex Parte* Joint Report) ("The safety and security features are, in a very real way, inseparable within Securus' Next Generation Secure Calling Platform."); *see also id.* ({[

                                                                      ]} but also stating that Pay Tel did not because it "does not separately identify or track safety and security costs in its accounting system and they are not severable in its calling platform").  As FTI notes in its allocation methodology for safety and security measures, "[p]roject descriptions are often more general, such as 'Platform Upgrades,' making it impossible to quantify or delineate the percent of time associated with any given portion of the integrated [Securus] platform."  *Id.* at 14, n.11.

[84] *See, e.g.*, *2023 MDC Instructions* at 35-36 ("Put any Safety and Security Measure that does not match any of those examples into the category that provides the closest fit based on its similarity to or close association with the examples."); *see also 2024 IPCS Order*, 39 FCC Rcd at 7852-54, para. 387 (noting that some call recording and call monitoring costs would be recoverable as CALEA expenses); *id.*, at 7765-66, paras. 214-15 & n.759 (describing {[
      ]} reporting of certain costs).

[85] *See, e.g.*, *2023 MDC Order*, 38 FCC Rcd at 6632-34, paras. 21, 23-25 (discussing adjustments made to the instructions for reporting safety and security measures costs in response to provider concerns from the record); *see also* National Sheriffs' Association Nov. 25, 2024 Comments to NCIC Reconsideration Petition at 2 (arguing that there is "a recognized lack of uniformity" between their data and the Commission reporting structure, and that the Commission's approach is "fundamentally flawed").

consistently to the seven cost categories.[86]  Despite the detailed instructions and description of the safety and security cost categories the Commission issued in the Mandatory Data Collection,[87] providers did not report their safety and security data in a uniform fashion; in fact, the absence of costs reported in certain categories by certain carriers underscores this point.[88]  For example, {[          ]} recorded costs for all seven categories of safety and security measures costs.[89]  Similarly, {[                    ]} providers reported costs in only two out of seven categories, while the remaining {[      ]} reported costs across six different categories.[90]  Different sized providers made very different safety and security cost allocations.  The two largest providers allocated approximately {[          ]} percent of their expenses (besides other ancillary services and other products and services expenses) to safety and security, in contrast to all other providers which collectively allocated only about 3.3 percent of these expenses to safety and security.[91]  Further, the Commission was aware that providers had difficulty allocating safety and security costs among categories as instructed or otherwise attributed safety and security measures to many categories without supporting that allocation.[92]  Similarly, the National Sheriffs' Association argues that many providers do not maintain "more granular cost" data that would allow accurate categorization.[93]  Reporting disparities like these cannot be attributed exclusively to the inexactitude of the Commission's reporting categories; nonetheless, we agree that, upon reconsideration, these flaws suggest on balance that the structure of the data collection needs further refinement.

34.  Despite the Commission's analysis, the safety and security data on which the Commission relied in the *2024 IPCS Order* were imperfect; our reevaluation of that data in light of the

---

[86] *2024 IPCS Order*, 39 FCC Rcd at 8079, Appx. I, para. 56, n.81 (noting that despite the option for more granular and discrete reporting for safety and security measure costs, the Commission was precluded "from identifying those expenses on a more granular basis").

[87] *2023 MDC Instructions* at 35-38 (providing detailed instructions with examples for providers to sort safety and security measures into categories, identify which measures are attributed to which category, report the costs for each category, and then attribute the proportionate costs of each category among regulated and nonregulated services).

[88] *See 2024 IPCS Order*, 39 FCC Rcd at 7852-54, para. 387 (noting that "some providers have allocated certain functions, such as portions of call monitoring and recording to other categories . . . that likely should have been allocated to the CALEA category insofar as they facilitate the type of electronic surveillance required by CALEA").

[89] *Id.* at 8050, Appx. F, Tbl. 18: Safety and Security Expenses Per Billed and Unbilled Audio and Video Minute, By Provider (demonstrating the distribution of provider reported costs for each category of safety and security measures).

[90] *Id.*

[91] *See id.* at 8032, Appx. F, Tbl. 3: Industry Expenses and Site Commissions, By Provider and Category.  These percentages are derived from company-wide data.  The expenses reflected in the base used to calculate these percentages are expenses reported as audio IPCS, video IPCS, safety and security measures, automated payment services, live agent services, paper bill/statement services, single-call and related services, and third-party financial transaction services.

[92] We find these types of reporting issues to be particularly impactful on allocation decisions, particularly when some providers elected not to allocate, despite instructions to do so.  *See, e.g.*, NCIC Inmate Communications, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 37 (filed Dec. 4, 2023) (claiming {[

                                                                    ]}).

[93] *See* National Sheriffs' Association Nov. 25, 2024 Comments to NCIC Reconsideration Petition at 2; *see also* Securus Apr. 30, 2024 *Ex Parte*, Attach. at 7-8 (arguing "it should be noted that although Securus and other IPCS providers developed allocations to satisfy the Commission's requirements in this regard, the discrete categories specified by the Commission do not map neatly to Securus' accounting records").

record we have since developed leaves us without assurance that the Commission's approach was the best way to implement the relevant directives of the Martha Wright-Reed Act.[94]  We now find that the method of data collection, and providers' allocations in response to the collection, together impaired the Commission's ability to assess the effect of excluding certain safety and security costs.  The data collection results fell short of capturing the manner in which individual safety and security measures were used in the provision of IPCS, particularly at smaller institutions.[95]  We also agree that more specific, discrete, and granular cost data and operational information would assist the Commission in more reliably analyzing the costs and uses of reported safety and security measures.[96]

35.    The record demonstrates that the unintended consequences of these shortcomings have had a significant impact on providers, correctional facilities, and ultimately consumers.  Correctional facilities have raised basic safety and security concerns following the adoption of the *2024 IPCS Order* suggesting that the adopted rates resulted in reduced access to certain safety and security measures.  For example, certain IPCS providers state that "many correctional facilities have made the difficult – but [2024 IPCS] Order-required – decision to forgo these services because they lack the funds to pay for them,"[97] ultimately impacting the availability of IPCS generally.  One provider reported that it renegotiated contracts with a number of facilities that "lack sufficient financial resources to pay for the suite of safety and security tools they previously relied upon to provide IPCS safely to their populations and, accordingly, have elected to move forward with a substantially reduced set of those tools, thus endangering facility and public safety."[98]  The effects of the exclusion of certain safety and security costs from IPCS rate calculations also appears to have impacted access to IPCS generally.[99]  Another IPCS

---

[94] *See* NCIC Reconsideration Petition at 8-10; National Sheriffs' Association Nov. 25, 2024 Comments to NCIC Reconsideration Petition at 2; Letter from Lee G. Petro and Glenn S. Richards, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 5 (filed Mar. 6, 2025) (NCIC Mar. 6, 2025 *Ex Parte*) (claiming the Commission "rejected more than 65% of IPCS providers' reported safety and security costs because the loosely-defined categories used in the 2023 Mandatory Data Collection led to anomalous reporting"); Securus July 15, 2024 *Ex Parte* at 2 (suggesting the Commission abandon the public draft of the *2024 IPCS Order* to "return to the drawing board, resolve any concerns it has about the validity and completeness of provider cost data, and address the issue of rate caps and safety and security costs via a sound and defensible interpretive and methodological approach").  *But see 2023 MDC Order*, 38 FCC Rcd at 6632-33, para. 22 (stating that the Bureaus accepted the "tradeoffs between pinpointing the costs of each safety and security measure" and the ability to complete the data collection and rulemaking task delegated to the Commission within the 18-24 month statutory timeframe afforded by the Martha Wright-Reed Act).

[95] Securus and Pay Tel Apr. 3, 2025 *Ex Parte* at 2 (noting that the *2024 IPCS Order*'s rate caps "will undoubtedly impact small jails in rural areas to the greatest extent, as those facilities typically have the lowest calling levels and the highest costs" while discussing recent decisions by both Pay Tel and Securus to end service to smaller facilities over cost recovery); *see also* Letter from Angela F. Collins, Counsel to Global Tel*Link d/b/a ViaPath Technologies, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed Mar. 24, 2025) (ViaPath Mar. 24, 2025 *Ex Parte*) (explaining that "some facilities have decided to stop offering IPCS altogether because they cannot guarantee the continued safety and security of their facilities in light of the Commission's new rate mandates").

[96] *2023 MDC Order*, 38 FCC Rcd at 6632-33, para. 22 (acknowledging the Commission was foregoing a more rigorous and granular examination of safety and security measures costs due to timing).

[97] Securus and Pay Tel Apr. 3, 2025 *Ex Parte* at 5.

[98] *Id.*

[99] *See* Letter from Salvatore Taillefer, Jr., Counsel to the National Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1-2 (filed Jan. 27, 2025) (National Sheriffs' Association Jan. 27, 2025 *Ex Parte*) (expressing concern that "the exclusion of five out of seven categories of safety and security measures from recovery in IPCS rates would result in some level of reduction in access to IPCS for incarcerated

(continued….)

provider reported that some facilities "have decided to stop offering IPCS altogether because they cannot guarantee the continued safety and security of their facilities."[100]

36.    While the Commission attempted to reconcile the intermingled nature of these costs in the *2024 IPCS Order*, particularly when setting the relevant rate caps inside the zones of reasonableness,[101] the results of the 2023 Mandatory Data Collection did not enable the Commission to be precise enough to avoid the unintended consequences described above.  As we have noted, the categories excluded by the *2024 IPCS Order* included services or functions that are used and useful.[102]  As a result of excluding the costs of such services from the rate caps, and as the record since the adoption of the *2024 IPCS Order* shows, the fiscal resources required to provide requisite safety and security services were put at risk, implicating the availability of IPCS generally.[103]  We therefore take the interim step of reincorporating the five excluded cost categories of safety and security measures into the lower bounds and calculating new interim rate caps for audio IPCS and video IPCS accordingly, while continuing to include the two previously included categories.[104]  This approach applies the used and useful framework to an imperfect record and therefore best ensures that all used and useful costs from safety and security measures necessary to the provision of IPCS will be accounted for in the governing interim rate caps pending the adoption of permanent rate caps, alleviating the risk that consumers could lose access to IPCS at some facilities altogether while the Commission works to collect more precise data and operational

(Continued from previous page) ──────────────────────
people"); *see also* National Sheriffs' Association Nov. 25, 2024 Comments to NCIC Reconsideration Petition at 3-4 (same).

[100] ViaPath Mar. 24, 2025 *Ex Parte* at 2.  *See* Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. (filed Mar. 7, 2025) (Pay Tel Mar. 7, 2025 *Ex Parte*) (attaching an article from Ozark Radio News, titled "FCC Regs to End Phone System," dated Feb. 25, 2025); Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 at 2 (describing Pay Tel's notification to a facility of its decision to discontinue service and stating that subsequently "limited non-IPCS service is being offered in these facilities via a VOIP provider and that they have yet to achieve installation of the payphones").

[101] *2024 IPCS Order*, 39 FCC Rcd at 7765, para. 214 (recognizing, as reason to select rates above the lower bound, that the Commission was "unable to meaningfully identify the specific costs for the various functions within each safety and security category" and acknowledging "the possibility that providers may have misallocated the costs of providing certain component functions, causing those costs to be improperly excluded from the calculation of the lower bounds").

[102] *Id*. at 7852-54, para. 387 (noting that some CALEA related costs were likely not included in the lower bounds because they were reported as communications recording or communications monitoring costs); *see also id.* at 7864, para. 403 (excluding call monitoring services used to "keep[] incarcerated people from calling blocked numbers and engaging in three-way calling" but allowing recovery for those features under communications security services).

[103] *See* ViaPath Mar. 24, 2025 *Ex Parte* at 2 (citing the decision by the Baxter County (AR) Sheriff to end provision of IPCS); *see also* Securus and Pay Tel Apr. 3, 2025 *Ex Parte* at 2; *see also* Letter from Lee G. Petro and Glenn S. Richards, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1, n.2 (filed  Jan. 9, 2025) (NCIC Jan. 9, 2025 *Ex Parte*) (noting "that rate reductions in California resulted in several IPCS providers ceasing to provide service in the state" to explain that the Commission's rate caps "will result in NCIC providing service below its actual costs at more than half its facilities").

[104] The seven categories are as follows: Communications Assistance for Law Enforcement Act (CALEA) compliance measures; law enforcement support services; communication security services; communication recording services; call monitoring services; voice biometrics services; and other safety and security measures. *2023 MDC Order*, 38 FCC Rcd at 6631, para. 20 & n.44.  With the steps taken today, all reported costs within these seven categories will be included in the lower bounds of the zones of reasonableness for rate calculation, encompassed by this change in method.

information.[105]  The inclusion of these costs for the purposes of our interim rate caps produces a reasonable outcome given the fact that they are based on providers' reported costs.  We note that the upcoming data collection to establish permanent rates for IPCS will provide the Commission and interested parties another opportunity to revisit and reconsider these topics in the future.[106]

### 4. Interim Facility Cost Rate Additive

37.     On an initial basis and consistent with the record, we adopt a uniform rate additive of up to $0.02 per minute separate from and in addition to our rate caps to account for the costs correctional facilities incur in allowing access to IPCS.  This additive is applicable equally to each rate tier we adopt today, and may be charged on top of the new, interim per-minute audio and video IPCS rate caps adopted in this Order.  Our adoption of this uniform additive is an interim measure designed to provide greater certainty to IPCS providers and correctional facilities in determining compensation for correctional facilities for the costs they incur in allowing access to IPCS while the Commission seeks comment on how to structure a permanent rate additive in today's Further Notice.

38.     As an initial matter, we modify the IPCS rate structure to create separate provider-related and facility-related cost recovery components, as the Commission previously did in the *2021 ICS Order*.[107]  This rate structure more clearly delineates between provider-incurred IPCS costs and IPCS costs incurred by correctional facilities.  Importantly, both rate elements are limited to the recovery of used and useful expenses incurred in the provision of IPCS.[108]  Accordingly, we modify the rate calculations used in the *2024 IPCS Order*, which included, based on the record before the Commission at that time, all of the used and useful costs incurred in the provision of IPCS regardless of whether such costs are incurred by IPCS providers or correctional facilities.[109]  In this Order, we supersede that decision and remove from our rate cap calculations the costs incurred by correctional facilities in making IPCS

---

[105] *See infra* note 179.  UCC et al. claim that the "Commission's about face with respect to safety and security costs with almost no change in the underlying factual record is arbitrary and capricious and a violation of the APA."  UCC et al. Oct. 21, 2025 *Ex Parte* at 6.  We disagree.  While it may at times be challenging to discern actual IPCS market conditions given imperfect data and marketplace complexities, the evidence of a threat to the availability of service is sufficient to justify our actions today.  *See supra* para. 35.  The difficulty in discerning marketplace realities is evidenced by competing record claims regarding service availability to certain facilities in Arizona.  *See* Letter from Stephen Raher, Amalgamated Policy Research, LLC, to Marlene Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 3 (filed Oct. 12, 2025) (claiming that "Pay Tel did not . . . seek to terminate the contract" with the relevant facilities in Arizona as it had claimed in its April 3, 2025 *Ex Parte*); *but see* Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed Oct. 20, 2025) (clarifying that Pay Tel was obliged to terminate service and that "limited non-IPCS service is being offered in these facilities via a VOIP provider and that they have yet to achieve installation of the payphones").  We note that Pay Tel asserts that "[b]ut for the 2025 waiver order suspending several portions of the 2024 order, and the FCC's ongoing consideration of revisions to the 2024 order, Pay Tel would likely have been forced to forego service in other high-cost jails."  *Id*.  Ultimately, we do not have the option to wait until market failure becomes more widespread to intervene.

[106] *See infra* Section IV.A (Adoption of Permanent Rate Caps for Audio and Video IPCS).

[107] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9683, Appx. A, § 64.6030 (distinguishing between provider-related and facility-related rate components).

[108] *See* Letter from Cheryl A. Leanza, Policy Advisor, United Church of Christ Media Justice Ministry et al., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 at 4 (rec. Oct. 21, 2025) (UCC et al. Oct. 21, 2025 *Ex Parte*) (urging the Commission to "clarify the facility additive is a cap, not a pre-authorized *de facto* site commission").

[109] *See 2024 IPCS Order*, 39 FCC Rcd at 7746-47, para. 181; *see also* 47 CFR § 64.6000 (definitions of "facility-related rate component" and "provider-related rate component").

available and allow recovery of those costs through a separate rate additive for facility-related cost recovery. Establishing separate provider-related and facility-related rate components helps ensure our rate structure accounts for both providers' and correctional facilities' used and useful costs.[110]

39. In the *2024 IPCS Order*, the Commission established a framework that aimed to account for, and to allow providers to reimburse correctional facilities for the used and useful costs they incur in allowing access to IPCS.[111] To do so, the Commission incorporated its best estimate of the costs correctional facilities incur into the zones of reasonableness.[112] Due to the lack of reliable correctional facility cost data in the record, the Commission relied on the National Sheriffs' Association's 2015 cost survey to incorporate $0.02 into the upper bounds of the zones of reasonableness for all facilities.[113] The Commission explained that the "$0.02 figure derives from the Commission's prior analysis of the amount of used and useful correctional facility costs the National Sheriffs' Association Cost survey reasonably supported" in the *2021 ICS Order*.[114] The Commission included no estimate for correctional facility costs in the lower bounds of the zones of reasonableness as the record contained "no data that would allow [it] to estimate those costs with any degree of precision."[115] Because the Commission did not incorporate a measure of correctional facility costs in the lower bounds, it explained that those bounds may understate the used and useful costs of providing IPCS.[116] The Commission aimed to account for this fact by adopting rate caps that exceeded the lower bounds of the zones of reasonableness at each tier.[117]

40. To provide correctional facilities with the opportunity to recover their used and useful costs, the Commission permitted IPCS providers to reimburse correctional facilities for such costs under the rate caps.[118] The Commission explained that the rate caps "reflect . . . all of the used and useful costs incurred in the provision of IPCS regardless of whether such costs are incurred by IPCS providers or correctional facilities" and thus "recognize[d], consistent with the record, that correctional facilities may

---

[110] *2021 ICS Order,* 36 FCC Rcd at 9536, para. 40.

[111] *See 2024 IPCS Order*, 39 FCC Rcd at 7736-47, paras. 163-82.

[112] *Id*. at 7736-37, para. 163.

[113] *Id.* at 7740, para. 170; National Sheriffs' Association Comments, WC Docket No. 12-375, Exh. A (rec. Jan. 12, 2015) (National Sheriffs' Association Jan. 12, 2015 Survey).

[114] *Id*. at 7740, para. 170; *2021 ICS Order*, 36 FCC Rcd at 9579, para. 134. In the *2021 ICS Order*, the Commission stated that it relied on "two separate independent bases" in adopting the $0.02 per minute facility rate additive. *2021 ICS Order*, 36 FCC Rcd at 9579, para. 135. The *2021 ICS Order* first based the rate additive on the Commission's analysis of the portion of site commissions that were legitimately related to inmate calling services. That analysis included site commission data submitted by prisons and jails and compared the per-minute site commission costs between all facilities that paid site commissions to all those that did not. *See 2021 ICS Order*, 36 FCC Rcd at 9755-56, Appx. H. *See also Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, 8521-22, para. 103 (2020) (*2020 ICS Notice*); *id*. at 8572, Appx. H. Second, the Commission also based its decision on survey data submitted by the National Sheriffs' Association. *See 2021 ICS Order*, 36 FCC Rcd at 9581-83, paras. 141-42. We likewise rely on both sources of data here in adopting an interim rate additive and therefore reject the assertion by the UCC, et al. that the "2-cent facility fee does not apply to prisons" and that the data on which the $0.02 per minute rate additive is based is "not related to costs in prisons." UCC et al. Oct. 21, 2025 *Ex Parte* at 5.

[115] *2024 IPCS Order*, 39 FCC Rcd at 7745, para. 178.

[116] *Id.* at 7746, para. 180.

[117] *Id.*

[118] *Id.* at 7746-47, paras. 181-82.

incur some used and useful costs in allowing access to IPCS."[119] Since the Commission also eliminated site commissions, which likely were the primary means by which correctional facilities recovered their used and useful costs, they would have no means to recover those costs absent a reimbursement mechanism.[120]

41.     In response to comments that the Commission's reimbursement mechanism may be difficult for IPCS providers to implement and the suggestion of some commenters that the Commission should instead use an explicit additive to IPCS rate caps to account for correctional facility costs, the Commission sought comment in the *2024 IPCS Notice* on whether the Commission should adopt a uniform additive to its IPCS rate caps to account for correctional facility costs.[121] The Commission sought comment on the appropriate amount of a uniform rate additive, noting that one commenter had suggested that $0.02 per-minute could be established as a maximum facility cost recovery amount.[122] Considering the "perennial problem" of receiving reliable correctional facility cost data in these proceedings, the Commission also sought comment on which data the Commission should rely on in determining any additive and how the Commission can ensure that it receives reliable data.[123]

42.     The record now before us supports the adoption, on an interim basis, of a uniform rate additive in lieu of the reimbursement framework adopted in the *2024 IPCS Order*.[124] Commenters explain that the reimbursement mechanism, which leaves correctional facilities and IPCS providers to negotiate reimbursement between them "will create confusion and conflict for facilities and IPCS providers, and will be less transparent for end users."[125] Some commenters argue that the reimbursement framework effectively resurrects the harms of site commission payments insofar as IPCS providers will

---

[119] *Id.* at 7746, para. 181.

[120] *Id.*

[121] *2024 IPCS Notice*, 39 FCC Rcd at 7963, para. 621.

[122] *Id.* at 7964, para. 622 (citing Letter from Peter Wagner, Executive Director, Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed June 25, 2024) (PPI June 25, 2024 *Ex Parte*)).

[123] *Id*. at 7964, para. 622 & n.2166.

[124] *See, e.g.*, Pay Tel Communications, Inc. Comments, WC Docket Nos. 23-62 and 12-375, at 16-19 (rec. Oct. 21, 2024) (Pay Tel Oct. 21, 2024 Comments) (arguing that the Commission should adopt a fixed additive in place of the reimbursement mechanism); Pay Tel July 9, 2024 *Ex Parte* at 6 (advocating for a "specific fixed additive" for facility cost recovery); Securus Technologies, LLC Comments, WC Docket Nos. 23-62 and 12-375, at 42 (rec. Oct. 21, 2024) (Securus Oct. 21, 2024 Comments) ("A return to utilizing a rate additive as a method for facility cost-recovery is preferable to the MWR Order's reimbursement regime."); ViaPath Oct. 21, 2024 Comments at 5 (noting that "the use of a uniform additive is tested and preferable to the ambiguous reimbursement process"); National Sheriffs' Association Oct. 21, 2024 Comments at 4 (asserting that it "continues to believe a cost additive could be an appropriate mechanism to fairly compensate facilities for the costs associated with the availability of IPCS"); NCIC Oct. 21, 2024 Comments at 12-13 ("NCIC strongly suggests that the FCC consider adopting a uniform additive to account for correctional facility costs associated with making audio and video IPCS available at their facilities."); iWebVisit.com, LLC Reply, WC Docket Nos. 23-62 and 12-375, at 3 (rec. Dec. 12, 2024) (iWebVisit Dec. 12, 2024 Reply) ("iWebVisit supports the concept of Cost Recovery promoted by numerous parties provided that it is designed as a per minute rate additive to achieve the desired result of aligning party interests."); PPI June 25, 2024 *Ex Parte* at 7 (proposing facility cost recovery fee of $0.02 per minute to operate within the applicable rate caps).

[125] ViaPath Oct. 21, 2024 Comments at 5; Securus Oct. 21, 2024 Comments at 42 (noting that the Commission "created a cumbersome reimbursement scheme that places IPCS providers in the precarious role of assessing whether a correctional agencies' request for cost reimbursement is for 'used and useful' services as determined by the Commission").

compete to offer the highest reimbursement amounts instead of competing on price or quality of service metrics, just as they did in connection with site commission payments.[126] In addition, "the absence of a specific additive to rates as a cost-recovery mechanism, and the separate prohibition on providers using regulated revenue to fund safety and security services, is by necessity requiring correctional facilities to divert already-limited resources away from core elements of their public-safety mission."[127]

43. In contrast, a "rate additive would provide much greater certainty and remove providers from the role of gatekeeper for correctional facility cost reimbursement."[128] Pay Tel explains that a fixed correctional facility cost rate additive would "prevent the harms associated with the flawed reimbursement provision and better align market forces for all participants in the IPCS industry" because it would permit "full facility cost recovery" while also incentivizing correctional facilities to increase the availability of IPCS and create downward pressure on rates "to stimulate more calling."[129] Commenters also point out that a rate additive structure is a "tested approach" that is "far simpler to implement and enforce, and can better ensure that facilities can recover their reasonably incurred costs."[130] Indeed, "a uniform additive has been in place" for prisons and large jails since the *2021 ICS Order* became effective.[131] The $0.02 per-minute rate additive "has proven to be an efficient, consistent, predictable, and transparent solution for ensuring correctional facilities can recover their costs associated with providing access to IPCS."[132]

44. Although there is broad support for a rate additive, some commenters oppose this approach. Worth Rises argues because "the Commission's rates already account for all investments necessary to sustain IPCS, a uniform rate additive is duplicative at best and a way around the ban on commissions at the worst."[133] Given the prohibition on paying site commissions, however, a rate additive does not result in duplicative recovery. Nor does a uniform rate additive allow circumvention of that prohibition because the rate additive is limited to used and useful IPCS costs incurred by facilities. The Public Interest Parties likewise oppose a rate additive, noting that it "would include an additional amount on top of the rate caps," which already incorporate an estimate of used and useful correctional facility

---

[126] Pay Tel Oct. 21, 2024 Comments at 18; Pay Tel Communications, Inc. Reply, WC Docket Nos. 23-62 and 12-375, at 4-5 (rec. Dec. 17, 2024) (Pay Tel Dec. 17, 2024 Reply); ViaPath Oct. 21, 2024 Comments at 5 ("Just as the Commission believes site commissions 'have distorted the IPCS marketplace,' so will the reimbursement concept unless there are clear refinements to eliminate the inconsistencies and ambiguity related to when such reimbursements are permissible."); Securus Technologies, LLC Reply, WC Docket Nos. 23-62 and 12-375, at 15 (rec. Dec. 17, 2024) (Securus Dec. 17, 2024 Reply) ("Commenters concur with Securus that the recently-established reimbursement process will lead to confusion and result in the same types of pressures and adverse consequences that drove the Commission to eliminate site commissions."). *See also 2024 IPCS Order*, 39 FCC Rcd at 7784-85, para. 254 (explaining how site commissions have historically distorted the IPCS marketplace).

[127] Securus and Pay Tel Apr. 3, 2025 *Ex Parte* at 7.

[128] Securus Oct. 21, 2024 Comments at 42.

[129] Pay Tel Dec. 17, 2024 Reply at 8.

[130] Securus Dec. 17, 2024 Reply at 16; Pay Tel Dec. 17, 2024 Reply at 6 ("A fixed additive for facility cost recovery is not a new or untested concept.").

[131] ViaPath Oct. 21, 2024 Comments at 5; Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 and 12-375, at 8 (rec. Dec. 17, 2024) (ViaPath Dec. 17, 2024 Reply); *2021 ICS Order*, 36 FCC Rcd at 9561-62, para. 100 (permitting IPCS providers serving prisons and jails with average daily populations of 1,000 or more to recover an additional $0.02 per minute).

[132] ViaPath Oct. 21, 2024 Comments at 5.

[133] Worth Rises Oct. 21, 2024 Comments at 7.

costs.[134]  But, unlike in the *2024 IPCS Order*, our ratemaking methodology is based exclusively on provider costs and thus excludes facility costs from our interim rate cap calculations.  Commenters also note that even if there were a basis to adopt an additive, the record is devoid of reliable correctional facility cost data on which to base an additive.[135]

45.     Securus and Pay Tel acknowledge that the record lacks definitive correctional facility cost data and that such data is difficult to obtain, complicating the process of determining the appropriate additive amount.  Securus notes that "the data used to derive the previous $0.02 rate additive . . . is based on old data" but that IPCS providers "do not have information on the costs correctional facilities incur."[136]  For its part, Pay Tel argues that "implementing an interim fixed additive of $0.02 per minute consistent with the 2021 ICS Order is achievable" even if it would need adjustment at a later date "based on further evidence."[137]  Additionally, prior to the adoption of the *2024 IPCS Order*, the Prison Policy Initiative proposed that if the Commission were to adopt a rate additive, it should set a "maximum facility cost recovery fee of 2 cents per minute of use" while prohibiting site commission payments.[138]

46.     Considering the significant record support, we adopt an interim uniform rate additive of up to $0.02 per minute.  We agree with commenters that an additive will provide greater certainty for IPCS providers and correctional facilities.[139]  In particular, as Securus notes, a rate additive "would better enable facilities to estimate their IPCS-related costs that would be compensable by providers" as opposed to the current reimbursement mechanism which requires correctional facilities to negotiate contracts with providers providing for reimbursement of their used and useful costs and to persuade the provider that the costs for which they seek reimbursement are used and useful.[140]  Additionally, as some commenters note, providers and correctional facilities are already familiar with the rate additive mechanism adopted in the *2021 ICS Order*, which will facilitate implementation by IPCS providers and correctional facilities alike.[141]  While some commenters support non-uniform rate additives that would reflect the varying costs

---

[134] Public Interest Parties Oct. 21, 2024 Comments at 8; Wright Petitioners, Benton Institute for Broadband and Society, Pennsylvania Prison Society, and Public Knowledge Reply, WC Docket Nos. 23-62 and 12-375, at 5 (rec. Dec. 17, 2024) (Public Interest Parties Dec. 17, 2024 Reply) (arguing that an additive "risks double-counting costs or reimbursing facilities for prohibited site commissions"); United Church of Christ Media Justice Ministry Reply, WC Docket Nos. 23-62 and 12-375, at 9-11 (rec. Dec. 17, 2024) (UCC Dec. 17, 2024 Reply) (arguing that a rate additive "would result in duplicate fees to users" and noting the inclusion of correctional facility costs in the Commission's rate cap calculations).

[135] Stephen A. Raher Reply, WC Docket Nos. 23-62 and 12-375, at 13 (rec. Dec. 17, 2024) (Raher Dec. 17, 2024 Reply) (noting that "the record still fails to reflect meaningful used-and-useful costs incurred by correctional facilities"); UCC Dec. 17, 2024 Reply at 10; Public Interest Parties Dec. 17, 2024 Reply at 6.

[136] Securus Oct. 21, 2024 Comments at 44.

[137] Pay Tel Dec. 17, 2024 Reply at 7.  In today's Further Notice, we seek comment on how to obtain correctional facility cost data that could be used to implement a permanent rate additive.  *See infra* Section IV.B (Adoption of Permanent Rate Additives for Facility Cost Recovery).

[138] PPI June 25, 2024 *Ex Parte* at 7; Raher Dec. 17, 2024 Reply at 12.

[139] *See, e.g.*, Securus Oct. 21, 2024 Comments at 42; Pay Tel Oct. 21, 2024 Comments at 18; Pay Tel Dec. 17, 2024 Reply at 6-7.

[140] Securus Oct. 21, 2024 Comments at 43.

[141] *See, e.g.*, ViaPath Oct. 21, 2024 Comments at 5; Securus Dec. 17, 2024 Reply at 16; Pay Tel Dec. 17, 2024 Reply at 6.

faced by different facilities,[142] the record at this point is insufficient for us to adopt such additives. We seek further comment on such rate additives in the Further Notice.

47. We therefore cap the interim additive at $0.02 per minute for audio and video IPCS across all rate tiers for all correctional facilities. The $0.02 additive derives from the additive adopted in the *2021 ICS Order* and the estimate of used and useful correctional facility costs in the upper bounds of the zones of reasonableness in the *2024 IPCS Order*, both of which were based in part on the National Sheriffs' Association's 2015 cost survey.[143] The lack of reliable correctional facility cost data in the record[144] constrains our ability to justify adopting a different additive today, including one based on facility size, as the National Sheriffs' Association suggests.[145] Although we concur with the National Sheriffs' Association suggestion that rate additives more closely tailored to facilities' costs would be preferable, the record before us does not allow it and we therefore seek additional comment in the Further Notice. Nevertheless, the National Sheriffs' Association cost survey remains the best data available about the costs correctional facilities incur in allowing access to IPCS that has been reported by correctional facility representatives, despite outstanding questions about the reliability of these data.[146] We also continue to rely in part on the analysis of prison and jail site commission data that the Commission conducted when it originally adopted the $0.02 per minute rate additive in the *2021 ICS Order*.[147] We therefore rely on these data to implement an interim rate additive of up to $0.02 per minute at all correctional facilities while the Commission considers the record that develops in response to today's Further Notice.[148]

48. The interim additive we adopt today is to be charged on top of the per-minute audio and video rate caps as set forth in this Order. It is thus "in addition to, and not an offset or extraction from" the IPCS rate caps as they have been recalculated in this Order.[149] To be clear, however, the revised rate

---

[142] NCIC Mar. 6, 2025 *Ex Parte* at 5-6.

[143] *2021 ICS Order*, 36 FCC Rcd at 9581-82, para. 141; *2024 IPCS Order*, 39 FCC Rcd at 7740, para. 170. *See also* National Sheriffs' Association Oct. 21, 2024 Comments at 4 (arguing that "a cost additive must be able to act as a kind of safe harbor or presumption of used and usefulness").

[144] Securus Oct. 21, 2024 Comments at 44; Public Interest Parties Oct. 21, 2024 Comments at 8; Pay Tel Dec. 17, 2024 Reply at 7; Securus Dec. 17, 2024 Reply at 16; Raher Dec. 17, 2024 Reply at 13; UCC Dec. 17, 2024 Reply at 10.

[145] National Sheriffs' Association Oct. 21, 2024 Comments at 4. We find that the $0.02 per minute interim rate additive to be a reasonable proxy for correctional facilities' used and useful costs pending the receipt of additional information and data in response to today's Further Notice.

[146] *See 2024 IPCS Order*, 39 FCC Rcd at 7740, 7754, paras. 170, 192; *see also id*. at 7754, para. 192 & n.695 (noting that "[t]he use of this additive did not generate any waiver requests" previously, "suggesting that the estimate was not unduly low").

[147] *2021 ICS Order*, 36 FCC Rcd at 9579, para. 135; *id*. at 9755-56, Appx. H.

[148] The survey provided by Pay Tel's outside consultant, which quantified safety and security costs at 30 correctional facilities, is potentially helpful to inform future consideration of a permanent additive. However, the survey is not sufficient for the purposes of the industry-wide interim step we take today. *See* Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. (filed June 7, 2024) (Wood June 7, 2024 Report). *See also 2024 IPCS Order*, 39 FCC Rcd at 7743, para. 175 (concluding that it is unlikely that the survey "is representative of the costs incurred by correctional facilities in connection with safety and security measures across the IPCS industry" due to the low number of facilities included in the analysis).

[149] National Sheriffs' Association Oct. 21, 2024 Comments at 4. We agree with the National Sheriffs' Association that the rate caps "must not be reduced to accommodate an additive" because this "would undermine the usefulness

(continued....)

caps we adopt today reflect our removal from the upper bounds of the zones of reasonableness the $0.02 estimate of used and useful correctional facility costs that the Commission had added in the *2024 IPCS Order*.[150]  Additionally, removing the $0.02 from the upper bounds of the zones of reasonableness will mitigate the possibility that the interim uniform additive we adopt today "could double-count any purported used and useful facility costs that have already been factored into the Commission's IPCS rate caps."[151]

49.     The interim $0.02 per-minute rate additive "does not constitute a site commission" as that term is defined in the Commission's rules.[152]  In the *2024 IPCS Order*, the Commission distinguished between "IPCS provider payments to correctional facilities for costs used and useful in the provision of IPCS" from site commissions.[153]  With respect to the former, the Commission concluded that its rate caps would "allow for IPCS provider reimbursements to correctional facilities for costs used and useful in the provision of regulated IPCS."[154]  The Commission took a different approach with respect to site commissions, concluding that these payments are not used and useful in the provision of IPCS and therefore must be excluded from the calculation of the Commission's rate caps.[155]  We maintain this distinction today.

50.     Some commenters argue that if "IPCS providers are allowed to freely compensate correctional facilities for costs without oversight, they will effectively reintroduce site commissions by a different name."[156]  We disagree.  The interim rate additive we adopt is capped at $0.02 per minute.  In contrast, the current reimbursement mechanism is "uncapped" in that its only constraint is the IPCS rate caps.[157]  The $0.02 per-minute rate additive we adopt here will provide a more "consistent, predictable,

───────────────────────────────

(Continued from previous page)

of an additive by continuing to keep it tied to rates."  National Sheriffs' Association Oct. 21, 2024 Comments at 4.  The interim rate caps adopted in this Order are higher than the rate caps adopted in the *2024 IPCS Order* due to the inclusion of an additional $346 million of safety and security costs now included in the lower bounds of the zones of reasonableness.

[150] *2024 IPCS Order*, 39 FCC Rcd at 7740, para. 170.  The $0.02 per minute allowance in the upper bounds of the zones of reasonableness represented "the Commission's best estimate of the costs that correctional facilities may incur."  *Id.* at 7737, para. 163.  *See also* Securus Oct. 21, 2024 Comments at 45 (arguing that a rate additive "should not be incorporated into a zone of reasonableness calculation").

[151] Public Interest Parties Oct. 21, 2024 Comments at 8; Public Interest Parties Dec. 17, 2024 Reply at 6; UCC Dec. 17, 2024 Reply at 9 (arguing that a uniform additive "would result in duplicate fees to users" because the existing rate cap calculations already incorporate some measure of correctional facility costs in the upper bounds of the zones of reasonableness).

[152] Securus Oct. 21, 2024 Comments at 42; *see also* 47 CFR § 64.6000.

[153] *2024 IPCS Order*, 39 FCC Rcd at 7791, para. 267.

[154] *Id.* at 7792, para. 268.

[155] *Id.* at 7792, para. 269.

[156] Worth Rises Oct. 21, 2024 Comments at 7; Public Interest Parties Oct. 21, 2024 Comments at 8 (suggesting that an additive could "offset the prohibition on site commissions").  *See also* Public Interest Parties Dec. 17, 2024 Reply at 6 (arguing that "allowing compensation of facility costs that do not fit into the Commission's used and useful framework, essentially open[s] a backdoor to paying site commissions"); Worth Rises Oct. 21, 2024 Comments at 7 (arguing that the Commission should allow providers to reimburse correctional facilities only for costs used and useful in the provision of IPCS).

[157] Securus Oct. 21, 2024 Comments at 43; Pay Tel Dec. 17, 2024 Reply at 4.

and transparent solution for ensuring correctional facilities can recover their costs associated with providing access to IPCS."[158]

51.     We also disagree with commenters arguing against a rate additive based on the lack of data in the record regarding used and useful correctional facility costs.[159]  While the Commission has noted the lack of updated correctional facility cost data in the record, it has, "out of an abundance of caution," incorporated a measure of correctional facility costs into its rate structure based on the National Sheriffs' Association's 2015 cost survey in both the *2021 ICS Order* and the *2024 IPCS Order*.[160]  In both cases the Commission determined that capping facility reimbursement at $0.02 per minute represents a "reasonable estimate" of used and useful correctional facility costs and provides a reasonable outer bound for providers' negotiations with facilities over the used and useful costs they incur in making IPCS available.[161]  For purposes of the interim facility rate additive we adopt today, we continue to rely on these data while we seek further information regarding correctional facility costs in today's Further Notice.[162]  Given this capped and interim nature of the rate additive we adopt while we consider alternatives, we find it is unlikely that the additive will result in unreasonably high IPCS rates during the period the rate additive remains in effect.

### B.     Adopting Revised Interim Audio and Video IPCS Rate Caps

52.     After carefully considering the record developed since the Commission adopted the *2024 IPCS Order* and the *2024 IPCS Notice*, and incorporating the foregoing modifications to our rate cap setting methodology and rate structure, we adopt the following interim, per-minute, audio and video IPCS rate caps:

**Table 4:  Interim Audio and Video IPCS Rate Caps**

| Tier (ADP) | Audio (Per Minute) | | | Video (Per Minute) | | |
|---|---|---|---|---|---|---|
| | Rate Cap | Rate Additive | Effective Audio Rate Cap | Rate Cap | Rate Additive | Effective Video Rate Cap |
| Prisons (any ADP) | $0.09 | $0.02 | $0.11 | $0.23 | $0.02 | $0.25 |
| Large Jails (1,000 +) | $0.08 | $0.02 | $0.10 | $0.17 | $0.02 | $0.19 |
| Med. Jails (350-999) | $0.10 | $0.02 | $0.12 | $0.17 | $0.02 | $0.19 |
| Small Jails (100-349) | $0.11 | $0.02 | $0.13 | $0.19 | $0.02 | $0.21 |
| Very Small Jails (50-99) | $0.13 | $0.02 | $0.15 | $0.23 | $0.02 | $0.25 |
| Extremely Small Jails (0-49) | $0.17 | $0.02 | $0.19 | $0.42 | $0.02 | $0.44 |

[158] ViaPath Oct. 21, 2024 Comments at 5; ViaPath Dec. 17, 2024 Reply at 8.

[159] Raher Dec. 17, 2024 Reply at 13; UCC Dec. 17, 2024 Reply at 10; Public Interest Parties Dec. 17, 2024 Reply at 6; Public Interest Parties Oct. 21, 2024 Comments at 6-7.

[160] *2024 IPCS Order*, 39 FCC Rcd at 7738, 7740, paras. 166, 170.

[161] *Id.* at 7740, para. 170.

[162] While the Commission originally applied the $0.02 per-minute additive only to prisons and jails with average daily populations of 1,000 or more in the *2021 ICS Order*, those facilities' used and useful IPCS costs may be less per minute than the used and useful IPCS costs incurred by jails with lower average daily populations, a question we seek further comment on in the attached Further Notice.  *See 2021 ICS Order*, 36 FCC Rcd at 9579, para. 134.

53.     Our revised rate structure consists of two primary rate components:  provider-related rate caps designed to allow providers to recover their used and useful costs in providing IPCS, and facility-related rate additives, designed for the recovery of the used and useful costs facilities incur in making IPCS available.  In calculating revised interim rate caps and rate additives for each tier, we incorporate the four principal changes described in the foregoing section based on the record developed in response to the *2024 IPCS Notice* and NCIC's Petition for Reconsideration.[163]  Those changes include: (1) the removal of unbilled minutes from the rate cap calculations in response to the NCIC Reconsideration Petition; (2) the adoption of an additional size tier for extremely small jails (from 0 to 49 ADP) pursuant to the *2024 IPCS FNPRM*; (3) revisions to the treatment of safety and security costs to include all such reported costs in the rate caps in response to the NCIC Reconsideration Petition; and (4) the adoption of a separate rate additive component consistent with the rate additive adopted in the *2021 ICS Order*[164] of up to $0.02 per minute for all rate tiers to address facilities' costs in making IPCS available, pursuant to the *2024 IPCS Notice*.  Together, these modifications to our rate caps and rate structure result in new, interim audio and video IPCS rate caps that, while higher than the rate caps adopted in the *2024 IPCS Order*, appropriately balance the need to ensure that IPCS rates and charges are just and reasonable and that IPCS providers are fairly compensated in accordance with section 276.[165]  These interim rate caps and rate additives supersede the rate caps from the *2024 IPCS Order* and will remain in place pending resolution of the issues set forth in today's Further Notice.

54.     Each of these modifications functions within the ratesetting methodology that the Commission used in both the *2021 ICS Order* and the *2024 IPCS Order*.  That framework remains unchanged.  We use average industry costs to develop rate caps pursuant to section 3(b)(1) of the Martha Wright-Reed Act as the Commission did in the *2024 IPCS Order*.[166]  We continue to rely on the 2023 Mandatory Data Collection and record evidence to calculate rate caps as the Commission did in the *2024 IPCS Order* since it remains the best data available to the Commission on which to base IPCS rate caps. In calculating the revised rate caps, we use the zone of reasonableness approach that was previously used in both the *2021 ICS Order* and the *2024 IPCS Order* as the best means for minimizing the impact of any imperfections in the dataset on our final rate caps.  As the Commission noted in the *2024 IPCS Order*, the zone of reasonableness approach is "well-suited to reconcile competing concerns," in particular, the "competing interests of providers and consumers."[167]  It also gives us "flexibility to effectively address imperfections in the data and ultimately select rate caps that satisfy" the dual mandates of the Martha Wright-Reed Act—just and reasonable rates for consumers and fair compensation for providers.[168]  As the Commission did in the *2024 IPCS Order*, we include an allowance for the additional costs IPCS providers incur in making TRS and other, related disability access communications technologies available to

---

[163] *See* NCIC Reconsideration Petition (requesting reconsideration of the Commission's treatment in the *2024 IPCS Order* of unbilled minutes and certain safety and security costs); *see also 2024 IPCS Order*, 39 FCC Rcd at 7747-70, paras. 183-222 (discussing the rate cap setting process); *see also 2021 ICS Order*, 36 FCC Rcd at 9537-96, paras. 39-175.

[164] *2021 ICS Order*, 36 FCC Rcd at 9536, para. 40.

[165] 47 U.S.C. § 276(b)(1)(A).

[166] We describe this process in additional detail in the attached Appendix.  *See infra* Appx. D; *see also 2024 IPCS Order*, 39 FCC Rcd at 8015-22, Appx. D.

[167] *2024 IPCS Order*, 39 FCC Rcd at 7750-51, para. 186.

[168] *Id.*

disabled incarcerated people in both our upper and lower bounds calculations.[169]  Finally, we continue to include IPCS providers' reported costs of providing ancillary services in both our upper and lower bounds calculations to ensure providers are fairly compensated.[170]  Together, these modifications will ensure a stable regulatory framework that continues to foster increased communication for incarcerated people while the Commission adopts permanent rate caps and rate additives based on additional data and stakeholder input.

### 1.    Preliminary Rate Cap Setting Observations

55.    Our revisions to IPCS rates are based on the 2023 Mandatory Data Collection, which remains the best data available to us, notwithstanding the limitations previously acknowledged.[171]  From the results of that data collection, the Commission developed and refined a database that enabled it to analyze industry cost and operational characteristics and ultimately to select IPCS rate caps.[172]  We revisit the IPCS rate caps and rate cap setting methodology given the fact that the record developed since the adoption of the *2024 IPCS Order* makes clear the unforeseen consequences of some aspects of the methodology used.  The modifications we make in our rate cap setting methodology and rate structure ensure that the revised rate caps we set today will result in just and reasonable rates for consumers and fair compensation to providers.

56.    We set audio and video IPCS rate caps on an interim basis.  As the aforementioned discussion on safety and security costs illustrates, more accurate data is needed with regard to how safety and security measures are used in the provision of IPCS, including data on the costs of individual safety and security measures and data on how and where such measures are used, before the Commission can set permanent audio rate caps.  Additionally, as the Commission previously noted in the *2024 IPCS Order*, the data collected regarding the video IPCS market demonstrates the nascent character of that market, which will continue to mature over time as video IPCS deployment and usage becomes more widespread.[173]  Therefore, we adopt interim rate caps, which will give us flexibility to adjust our rate caps to reflect the evolution of the marketplace, and time for us to refine our rate analysis based on a future data collection before adopting permanent IPCS rates.[174]

---

[169] *Id.* at 8057, Appx. H., para. 5; *see id.* at 8073, Appx. I, para. 41 (describing the Commission's inclusion of a $0.002 per minute additive in both the upper and lower bounds of its zone of reasonableness analysis as part of its rate cap calculations).

[170] *Id.* at 7867, para. 408 (concluding that "the best means of discharging our mandate to establish a compensation plan that ensures both just and reasonable IPCS rates and charges, as well as fair compensation for providers is to allow recovery of the costs of ancillary services within our overall IPCS rate caps"); *see also id.* at 8043-44, Appx. F, para. 26, Tbl. 11: Lower Bound Audio and Video IPCS and IPCS-Related Expenses Per Billed and Unbilled Audio and Video Minutes, By Facility Type ($/minute) (calculating the amount of ancillary service-related costs reported by providers to be included in the rate caps).

[171] *Id.* at 7748, para. 184 (citing the fact that "providers are incentivized to report their data in ways that produce higher IPCS costs, that providers are differently situated and may interpret our data requests differently, and that cost allocation, as a general matter, can be difficult"); *see id.* at 8016, Appx. D, para. 4 (describing the structure of the collection, including, for example, treatment of bad debt expense as an IPCS operating cost).

[172] *See id.* at 8015-22, Appx. D.  The database represents approximately 99% of all industry minutes of use and approximately 97% of all industry revenues.

[173] *See id.* at 7945, para. 574 ("As our rate cap analysis recognizes, the video IPCS data from the 2023 Mandatory Data Collection reflect conditions typical of a nascent market, including relatively high initial investment costs and relatively low initial demand.").

[174] In the *2024 IPCS Order*, the Commission directed WCB to conduct a mandatory data collection to provide the basis for the adoption of permanent IPCS rates.  *2024 IPCS Order*, 39 FCC Rcd at 7944-46, paras. 573-75.  It also

(continued….)

57. We clarify that our revisions to the rate cap setting methodologies and rate structure continue to be based on the used and useful framework for analyzing industry costs the Commission used in the *2024 IPCS Order*.[175] For example, based on the limited data available for our analysis and in light of the recognized inconsistencies with the categorical approach the Commission took in the *2024 IPCS Order*, we cannot conclude that the categories of safety and security costs formerly excluded from the lower bounds are not in fact used and useful in the provision of IPCS, and we thus treat these categories, pending our further data collection, as used and useful as a whole.[176] As previously discussed, we are unable to reconcile the disparities in reporting among providers and the inconsistencies of providers' allocation of safety and security measure costs among reporting categories, which effectively precluded further analysis of the data.[177] Upon reconsideration, we find it unworkable to apply the used and useful analysis at a categorical level given the available data. By the same token, neither can we apply the used and useful analysis to the reported costs of individual safety and security measures, as the reported data is insufficiently granular and inconsistently allocated between the categories by providers.[178] Without the ability to reliably attribute cost data to the categories employed by the data collection, and in order to avoid the unintended consequences—for providers and consumers alike—of incorrectly classifying costs and thereby excluding from the lower bounds the cost of safety and security measures that are necessary to the provision of IPCS and to consumers' continuing access to IPCS, we find it appropriate, on an interim basis, to include reported safety and security costs as a whole in the revised interim rate caps.[179]

(Continued from previous page) ————————————————
concluded that the additional data collection would be sufficient to set permanent rates and that "a recurring collection is not warranted at this time." *Id.* at 7946, para. 576.

[175] *See id.* at 7844-48, paras. 374-79 (discussing the used and useful analysis framework as applicable to the Commission's evaluation of safety and security measures). We also maintain a per-minute rate structure for audio and video rates, as discussed in the *2024 IPCS Order*. *See id.* at 7709-11, paras. 124-26.

[176] *Id.* at 7844, para. 374 (explaining the relationship between a safety and security measure's purpose and the appropriateness of its inclusion in the Commission's IPCS rate caps under the used and useful framework for cost analysis); *see infra* note 172.

[177] *Id.* at 8079, Appx. I, para. 56 & n.81 (explaining that further analysis of the safety and security measure cost data collected from the 2023 Mandatory Data Collection is not possible because the reporting method prevented isolation of individual safety and security measure cost data and providers declined to allocate costs among individual services).

[178] *Id.* at 7759-60, 8080-83, paras. 204-05, and Appx. I, paras. 60-64 (analyzing and adjusting Securus' reported video IPCS cost data after finding the data to be a "substantial outlier vis-à-vis their closest competitors and the industry as a whole").

[179] We therefore revisit the Commission's conclusion that "[a]llowing the costs of measures that are not used and useful in the provision of IPCS to be recovered through IPCS rates would be inconsistent with that mandate [to ensure just and reasonable rates]." *See 2024 IPCS Order*, 39 FCC Rcd at 7844-45, paras. 374, 376. Where, as here, the decision to exclude certain of those expenses would frustrate the industry's ability to provide the service at all, *see supra* para. 35, the inclusion of those same expenses in order to enable service is inherently just and reasonable, unless and until additional data allows the Commission the ability to review and analyze such expenses on a more granular basis to determine whether such expenses are used and useful in the provision of IPCS. At present, we find the developed record insufficient to determine the requisite "nexus" of reported safety and security expenses, particularly under a categorical analysis. *2024 IPCS Order*, 39 FCC Rcd at 7845, para. 376. Therefore, in the interim and out of an abundance of caution to preserve the general availability of IPCS, we treat all reported safety and security costs as used and useful in the provision of IPCS. Given the state of the record, we likewise consider this approach the best way to ensure that the Commission has satisfied its duty under the Martha Wright-Reed Act to "consider costs associated with any safety and security measures necessary to provide" IPCS. Martha Wright-Reed Act § 3(b)(2). While some parties might seek to portray this approach as a departure from the ordinary application of the used and useful framework, we find that this approach benefits ratepayers by ensuring that they continue to

(continued….)

## 2. Establishing Zones of Reasonableness

58. We employ a zone of reasonableness approach to rate cap setting that follows a three-step analysis consistent with the process used by the Commission in the *2021 ICS Order* and the *2024 IPCS Order*, and base our analysis on the data submitted by providers in response to the 2023 Mandatory Data Collection.[180] We first establish upper bounds for each rate tier, which set a ceiling on the upper range of reasonable rates. We then establish lower bounds for each rate tier, by beginning with the upper bound figures and then making certain reasonable and conservative data adjustments which reduce the reported costs to set a reasonable rate floor.[181] Finally, we rely on record evidence and on extensive agency expertise to determine a rate cap for each tier from within those upper and lower bounds for both audio and video IPCS.[182]

59. *Determining the Upper Bounds.* Our approach to establishing the upper bounds of the zones of reasonableness remains largely identical to the approach taken by the Commission in the *2024 IPCS Order*. In short, we take a series of familiar steps to reach the upper bounds, each identical to the approach adopted in the *2024 IPCS Order*. For continuity, we continue to use the dataset developed for the *2024 IPCS Order*, which incorporates the vast majority of reported data but which excludes certain data submissions that were either incomplete or unusable.[183] We again accept providers' costs and weighted average cost of capital as reported. Importantly, we continue to incorporate all of providers' safety and security costs into the upper bounds without any adjustment.[184] As we note above, our estimate of the upper bounds likewise includes the provider-reported costs of ancillary service charges, as well as an estimate of providers' TRS-related costs.[185] We repeat these steps in setting upper bounds for rates today based on the same analysis and reasoning used in setting upper bounds in the *2024 IPCS Order*, and we readopt them for our use here.[186]

60. Our approach to establishing the upper bounds of the zones of reasonableness diverges from that in the *2024 IPCS Order* in one key respect: we no longer incorporate into the upper bounds any estimate of the separate IPCS-related costs which correctional facilities may incur in allowing access to IPCS.[187] As we previously explained, the record that has developed since the adoption of the *2024 IPCS Order* demonstrates a need to account for such costs in the form of a separate rate additive.[188] Because we

(Continued from previous page) ———————————

receive service, and thus is directionally aligned with the ordinary operation of the framework. *See 2024 IPCS Order*, 39 FCC Rcd at 7672-73, paras. 42-43 & nn.157, 159, 161.

[180] *See 2021 ICS Order*, 36 FCC Rcd at 9545, paras. 61-62; *2024 IPCS Order*, 39 FCC Rcd at 7752-69, paras. 189-221.

[181] *See 2024 IPCS Order*, 39 FCC Rcd at 7752-61, paras. 189-206.

[182] *See id.* at 7752-53, 7761-67, paras. 189, 207-18. As addressed above, our calculation is based on billed, not total minutes of use.

[183] *See id.* at 8015-22, Appx. D.

[184] *See id.* at 7753-54, para. 191.

[185] *See, e.g., id.* at 7714, para. 130 (clarifying that the costs of ancillary services are included in the estimates of industry costs which form both upper and lower bounds); *id.* at 7754-55, para. 193 (including an estimate of TRS costs in the upper bounds). These bounds were developed the same way they were developed in the *2024 IPCS Order*.

[186] *See, e.g., id.* at 7753-56, paras. 190-97.

[187] *Cf. id.* at 7754, para. 192.

[188] *See supra* paras. 37-51; *see also* Pay Tel Oct. 21, 2024 Comments at 17 ("[T]he Order acknowledges that facilities themselves incur costs in making IPCS available yet the Order does not provide any mechanism for

(continued….)

adopt and implement that rate additive in today's Order, those costs are now recovered outside of the rate caps, which in turn removes any need to account for them when developing our estimate of industry average IPCS costs. We therefore exclude such costs from the upper bounds we establish today.

61. In light of the foregoing, and after adding the new size tier for "extremely small jails," we calculate the upper bounds for interim audio and video IPCS rate caps for each tier as follows:

- Prisons: $0.094 per minute for audio communications and $0.470 per minute for video communications;

- Large Jails: $0.086 per minute for audio communications and $0.327 per minute for video communications;

- Medium Jails: $0.097 per minute for audio communications and $0.259 per minute for video communications;

- Small Jails: $0.108 per minute for audio communications and $0.230 per minute for video communications;

- Very Small Jails: $0.128 per minute for audio communications and $0.263 per minute for video communications; and

- Extremely Small Jails: $0.168 per minute for audio communications and $0.436 per minute for video communications.

62. *Determining the Lower Bounds.* The second step of our rate cap setting process is to establish lower bounds of our zones of reasonableness. To reach the lower bounds, we incorporate the results of the upper bound analysis and make reasonable adjustments beyond those applied to reach our upper bounds.[189] Our approach to these adjustments largely follows that taken by the Commission in the *2024 IPCS Order*, with the exception that we incorporate all reported safety and security costs in the industry costs we use to calculate the lower bounds.

63. As explained above, and upon reconsideration, we now incorporate the five previously excluded categories of safety and security costs in the lower bounds, which includes costs for: Category 2 (Law Enforcement Support Services); Category 4 (Communication Recording Services); Category 5 (Communication Monitoring Services); Category 6 (Voice Biometric Services); and Category 7 (Other Safety & Security Services). Including these costs increases industry-wide total costs in the lower bounds by approximately $346 million.[190] Because we find that the data collected by the categorical approach the Commission took in 2024 did not offer sufficient precision to allow the Commission to exclude entire categories without risking providers' and facilities' ability to provide and/or fund IPCS and the necessary safety and security services, we take the conservative approach to include all such reported costs in our lower bounds.

(Continued from previous page) ───────────

facilities to recover those costs. . . In contrast, an actual, real facility cost additive—as the Commission previously recognized in its 2016 reconsideration order and in its 2021 ICS Order permitted a $0.02 facility cost recovery additive—would help prevent these abuses and better align market forces for the benefit of incarcerated people, providers, and facilities."); *see also* National Sheriffs' Association Oct. 21, 2024 Comments at 4 ("[The National Sheriffs' Association] continues to believe a cost additive could be an appropriate mechanism to fairly compensate facilities for the costs associated with the availability of IPCS.").

[189] *See, e.g.*, *2024 IPCS Order*, 39 FCC Rcd at 7756-61, paras. 198-205 (describing adjustments for the weighted average cost of capital and Securus's reported video costs).

[190] *See id.* at 7757-58, para. 200 & n.718; *id*. at 8078-79, Appx. I, paras. 55-57. *See also infra* Appx. D.

64.     Apart from the inclusion of safety and security costs in the lower bounds, the remaining steps and adjustments we take today replicate those taken in 2024. To be clear, the components of the lower bounds continue to incorporate reported ancillary service charge costs and an estimate of providers' TRS-related costs, both of which were also included in the upper bounds.[191] And, because we excluded an estimate of facility costs from the upper bound, we need no longer adjust the lower bound to remove them.[192]

65.     We make two adjustments to the industry cost data. First, we adjust the weighted average cost of capital reported by certain providers to match the industry default of 9.75%.[193] As explained in greater length in Appendix D, the net effect of this adjustment is to reduce reported costs by about $72.5 million industry-wide.[194]

66.     Second, we adjust Securus's reported video costs to bring Securus's costs in line with its competitors in the IPCS market and set Securus's video IPCS cost per minute equal to the weighted average for all other providers offering video IPCS.[195] We complete the adjustment by reducing Securus's cost per-minute data reported for each facility by the appropriate relative percentage. Without adjustment, the per-minute video IPCS costs reported by Securus in the 2023 Mandatory Data Collection are between {[          ]} times the average of the rest of the industry.[196] Given its size, Securus should be able to "achieve economies of scale" by "spread[ing] its fixed costs over a relatively large portfolio of contracts relative to other providers."[197] Notably, these economies of scale are present in Securus's reported cost data for audio IPCS but not for video IPCS.[198] While Securus argues that the Commission should set interim rates that reflect their costs as reported in the data collection and not future expectations of costs,[199] we find it inappropriate to set rates based on cost data that is heavily

---

[191] *See, e.g.*, *2024 IPCS Order*, 39 FCC Rcd at 7714, para. 130; *id.* at 7758, para. 202 (including the same estimate of TRS costs). As we describe in Appendix D, the adjustment we make to the reported weighted average cost of capital lowers the net sum of ancillary service expenses, although the total per minute allowance for recovery of these expenses is otherwise developed identically. This is the same approach the Commission took in 2024, to which no commenter objected.

[192] In other words, because we adopt an external rate additive to ensure recovery of facilities' costs of making IPCS available, we no longer include any separate estimate of facility costs in our rate cap setting analysis. *Cf. 2024 IPCS Order*, 39 FCC Rcd at 7758, para. 201 (excluding the estimate of facility costs from the 2024 lower bound calculation).

[193] *See id.* at 7758-59, para. 203 (reviewing the weighted average cost of capital adjustment made to the lower bound); *id.* at 8080-83, Appx. I, paras 60-64; *see also infra* Appx. D.

[194] *See infra* Appx. D (explaining the effect of the WACC adjustment (and the related tax-deductible interest expense adjustment for one of these providers) on audio IPCS, video IPCS, safety and security measures, and ancillary service expenses).

[195] *2024 IPCS Order*, 39 FCC Rcd at 7759-60, paras. 204-05 (describing the Securus video cost adjustment); *id.* at 8080-83, Appx. I, paras. 60-64; *infra* Appx. D. *See also id.* at 7758-59, para. 203; *id.* at 8080-82, Appx. I, paras. 60-62.

[196] *See infra* Appx. D, para. 21.

[197] *2021 ICS Order*, 36 FCC Rcd at 9550, para. 75 (finding that disproportionate cost data is "inconsistent with the record evidence establishing that providers are able to achieve significant economies of scale"); *see also 2020 ICS Notice*, 35 FCC Rcd at 8518, para. 94; *2024 IPCS Order*, 39 FCC Rcd at 7759, para. 204.

[198] *2024 IPCS Order*, 39 FCC Rcd at 7759, n.729.

[199] Securus July 15, 2024 *Ex Parte* at 19-20.

"skewed by one provider's outsized investment in upfront costs for a nascent service offering."[200] Therefore, we find it reasonable to adjust Securus's video IPCS costs to align with IPCS industry costs for the purposes of calculating interim video rate caps.

67.     Separate from its video IPCS cost data, Securus's reported video safety and security cost data are also significantly higher than the rest of the industry.[201] Given the inclusion of all safety and security costs in the lower bounds we establish here, including those for video IPCS, we extend our adjustment of Securus's video IPCS costs to include its video safety and security costs.[202] Failure to do so would perpetuate the distortions caused by Securus's extremely high video costs, which would "significantly skew the industry average" on which we base our interim video IPCS rate caps.[203] Further, not extending our adjustment to Securus's video safety and security costs would also be inconsistent with our adjustment to other costs, including our adjustment to weighted average cost of capital costs, which applies to both IPCS and safety and security costs.[204]

68.     Following the aforementioned steps, including adding all reported safety and security costs upon reconsideration, and adding the new "extremely small jail" tier, we calculate the lower bounds for interim audio and video IPCS rate caps as follows:

- Prisons:  $0.086 per minute for audio communications and $0.214 per minute for video communications;

- Large Jails:  $0.079 per minute for audio communications and $0.156 per minute for video communications;

- Medium Jails:  $0.091 per minute for audio communications and $0.161 per minute for video communications;

- Small Jails:  $0.103 per minute for audio communications and $0.174 per minute for video communications;

- Very Small Jails:  $0.124 per minute for audio communications and $0.216 per minute for video communications; and

- Extremely Small Jails:  $0.163 per minute for audio communications and $0.390 per minute for video communications.

### 3.     Determining Interim Rate Caps for Audio IPCS and Video IPCS

69.     Based on the available information and on the changes outlined above regarding billed and unbilled minutes, the adoption of a new "extremely small jail" tier, and the incorporation into the lower bounds of all safety and security costs as reported, we find that the following rate caps based on the

---

[200] *Id*. (arguing that Securus's reported costs reflected the nascent status of the video IPCS market and that the Commission should have set interim rates that reflect current costs, not future expectations of costs); *see 2024 IPCS Order*, 39 FCC Rcd at 7760, paras. 204-05 (finding that "Securus's reported video IPCS data likely reflect substantial initial investment in fixed assets . . . disproportionate to the number of video IPCS minutes Securus provided" over the reporting period).

[201] *See infra* Appx. D.  The Commission made a similar finding in the *2024 IPCS Order* but, given the exclusion of the majority of safety and security costs from those rate cap calculations, did not adjust Securus's video safety and security expense data.  *See 2024 IPCS Order*, 39 FCC Rcd at 8081, Appx. I, para. 62.

[202] *See infra* Appx. D.

[203] *2024 IPCS Order*, 39 FCC Rcd at 8080-81, Appx. I, para. 60.

[204] *See infra* Appx. D, para. 11 & Tbl. 6.

zone of reasonableness for each tier of facilities will provide just and reasonable rates while ensuring fair compensation. We establish these rate caps based on our examination of the developing record, the available data, and the Commission's experience regulating the IPCS marketplace.[205] These rate caps are interim in nature given the need to conduct an additional industry data collection that will capture, particularly for the evolving video IPCS market, more mature market characteristics that will provide a sufficient basis for the establishment of permanent IPCS rate caps. These interim rate caps and rate additives will serve to ensure that the demonstrated benefits of increased communication in the carceral setting—reduced recidivism, increased public safety and strengthened family ties—will not be jeopardized by unintended implementation challenges.

70. *Setting Interim Audio Rate Caps.* We begin by setting our audio rate caps at the lower bounds of the zones of reasonableness, and rounding to the nearest whole cent for each tier.[206] The audio caps we set at each tier are as follows:

---

[205] *See, e.g.*, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Notice of Proposed Rulemaking, 27 FCC Rcd 16629 (2012); *2013 ICS Order*, 28 FCC Rcd 14107; *2015 ICS Order*, 30 FCC Rcd 12763; *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order on Reconsideration, 31 FCC Rcd 9300 (2016); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485 (2020); *2021 ICS Order*, 36 FCC Rcd 9519; *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, 37 FCC Rcd 11900 (2022) (*2022 ICS Order* or *2022 ICS Notice*); *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669 (2023) (*2023 IPCS Order* or *2023 IPCS Notice*); *see* Inmate Calling Services Mandatory Data Collection, WC Docket No. 12-375, General Instructions, https://docs.fcc.gov/public/attachments/DOC-343708A3.docx (*Second Mandatory Data Collection Instructions*); Calling Services for Incarcerated People Third Mandatory Data Collection, WC Docket No. 12-375, Instructions, http://www.fcc.gov/sites/default/files/2022_mdc_-_instructions_to_third_mandatory_data_collection_1.18.2022.docx (*Third Mandatory Data Collection Instructions*); *2023 MDC Instructions*.

[206] At the outset, we note that the upper and lower bounds for audio rates differ by relatively small margins; at no tier do they differ by more than $0.01.

Table 5: Interim Audio IPCS Rate Caps and Rate Additive

| Tier | Audio Lower Bound | Audio Rate Cap* | Audio Upper Bound | Audio Cost Additive | Effective Audio Rate Cap* |
|---|---|---|---|---|---|
| Prisons (any ADP) | $0.086 | $0.09 | $0.094 | $0.02 | $0.11 |
| Large Jails (1,000 +) | $0.079 | $0.08 | $0.086 | $0.02 | $0.10 |
| Med. Jails (350-999) | $0.091 | $0.10 | $0.097 | $0.02 | $0.12 |
| Small Jails (100-349) | $0.103 | $0.11 | $0.108 | $0.02 | $0.13 |
| Very Small Jails (50-99) | $0.124 | $0.13 | $0.128 | $0.02 | $0.15 |
| Extremely Small Jails (0-49) | $0.163 | $0.17 | $0.168 | $0.02 | $0.19 |

Source: Appendix D. * Audio rate caps include adjustment for inflation.

71. The lower bounds are the appropriate starting points when setting the audio IPCS rate caps, for many of the reasons that drove the Commission's rate cap setting decisions in the *2024 IPCS Order*. First, the collected data reflect "total industry reported costs which exceeded total industry revenues by $219 million;"[207] a mismatch which continues to strongly suggest that reported costs are overstated. While we nonetheless find these cost data provide a valid basis on which to set rates, they suggest that setting rate caps based initially on our lower bounds will ensure just and reasonable rates and fair compensation for providers. Second, our analysis of the cost data still suggests that several providers have reported "substantial amounts of goodwill," which resulted in large allocations of reported costs to IPCS activities.[208] As the Commission did in 2024, we again decline to introduce an adjustment to reported costs on this basis. Continued inclusion of these goodwill amounts argues in favor of calculating our rate caps based initially on the lower bounds we have set. As the Commission noted in 2024, these goodwill allocations "tend to inflate reported costs" and therefore support our reliance on the lower bounds as the initial step of our rate setting process.[209]

72. Choosing to set interim audio rate caps based on the lower bounds also is justified by the fact that the largest adjustment we make—the inclusion of all reported safety and security costs in our calculation of the lower bounds—may include some costs that are only marginally related to the provision of IPCS. Although we describe above why the categorical exclusion of safety and security costs failed to adequately provide fair compensation for facilities and providers, it is just as important to note that the

---

[207] *2024 IPCS Order*, 39 FCC Rcd at 7762-63, para. 210. The difference between total industry revenues and costs does not, by itself, undermine the reasonableness of the interim rate caps we set here given that we are unable to ascertain and quantify the factors driving this difference in the dataset. We will seek additional clarity on this question in the forthcoming mandatory data collection that will be the basis for the Commission's adoption of permanent rate caps.

[208] *Id.* at 7763, para. 212; *see also id.* at 8073-78, Appx. I, paras. 42-54.

[209] *Id.* at 7763-64, para. 212.

wholesale inclusion of all reported safety and security costs may be overbroad.[210]  Consequently, taking all such costs as reported should also tend to result in a conservative estimate of IPCS costs, further supporting the use of the lower bounds as a basis for setting interim rate caps.

73.     Record evidence received since the *2024 IPCS Order* was adopted also supports our interim audio rate caps.  As the record illustrates, providers have contracted to provide audio IPCS at lower rates in some circumstances.[211]  Although we cannot evaluate these prices in the abstract without a complete understanding of the contractual relationships between the parties, they nonetheless provide additional evidence in favor of adopting audio rate caps at the lower bounds.

74.     After deciding to set audio IPCS rate caps based on the lower bounds, we use the standard rounding rule, in order to set caps at the whole cent.  We find that setting rate caps at the whole cent will reduce confusion and complexity, and result in rate caps which can be more easily understood and used by consumers.  While rounding a lower bound downward (or upward) can result in a rate cap that technically falls below a lower bound (or above an upper bound), our use of standard rounding principles is a statistically defensible process that yields interim rate caps that remain consonant with our zone of reasonableness approach.[212]  Additionally, rounding to the nearest whole cent avoids conveying a false sense of precision, given the limitations of the data, and facilitates the administration of and provision of IPCS.[213]  Further, by the very nature of the rounding process, the differences between the audio rate caps we now adopt and the lower bounds which we have calculated are *de minimis* and therefore will not result either in unjust rates or unfair compensation for providers.  The audio rate caps we adopt today are above the caps adopted in the *2024 IPCS Order*, reflecting a more comprehensive accounting of IPCS costs, thereby ensuring that, even for marginal cases, providers should be more than able to recover their costs.[214]

75.     Finally, the rate caps we set today are interim in nature given remaining outstanding questions we have with the dataset we use (goodwill costs, excess of costs over revenues industry-wide, inconsistent allocation practices, etc.) and given the continued evolution of the IPCS market.  Likewise, interim caps are particularly appropriate until we can better isolate and analyze the costs of safety and security measures.  Rather than the permanent caps adopted in the *2024 IPCS Order*, today's audio rate caps are designed to be temporary in nature thus helping reduce concerns about their levels which the

---

[210] *See, e.g., id.* at 7866, para. 408 (excluding costs for other safety and security measures as a category because "few, if any, of the safety and security measures reported in this category serve even a nominal communications function").

[211] For example, both New York and California contracted to provide audio IPCS to their respective state prison systems at a lower rate.  *See* Letter from Bianca Tylek, Executive Director of Worth Rises, and Celina Chapin, Chief Advocacy Officer of Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed Aug. 5, 2025) (Worth Rises Aug. 5, 2025 *Ex Parte*); Worth Rises Aug. 5, 2025 *Ex Parte* at 1..  While the rates charged in these instances support our use of the lower bounds in setting our rate caps, they are rates paid by facilities directly to providers and are therefore not directly comparable to the interim consumer rate caps we adopt here.

[212] Our use of a factor to estimate the effects of inflation on the 2022 cost data is intended to reflect a separate dynamic in our ratesetting process and does not impact the validity of our standard rounding rule.  *See infra* paras. 80-81.

[213] *See, e.g.*, *2024 IPCS Order*, 39 FCC Rcd at 8057, Appx. H, para. 5 (applying standard rounding to reach estimate of TRS costs).

[214] To the extent that a provider with exceptionally high costs can demonstrate that its costs exceed the interim audio and video rate caps we adopt today, it may use the Commission's waiver process.  *See* 47 CFR § 64.6120 (describing the waiver process for IPCS).

Commission has already committed to revisit in the relatively near future on the basis of additional data.[215]

76. *Setting Interim Video IPCS Rate Caps.* We find that the lower bounds are also the appropriate starting points when setting interim video IPCS rate caps, for many of the same reasons we have used the lower bounds as the starting point for setting interim rate caps for audio IPCS. We find that setting the interim video rate caps based on the lower bounds of the video zones of reasonableness gives appropriate weight to a range of factors, as described below. The video rate caps we set at each tier are as follows:

**Table 6: Interim Video IPCS Rate Caps and Rate Additive**

| Tier | Video Lower Bound | Interim Video Rate Cap* | Video Upper Bound | Interim Facility Cost Additive | Effective Interim Video Rate Cap* |
|---|---|---|---|---|---|
| Prisons | $0.214 | **$0.23** | $0.470 | $0.02 | $0.25 |
| Large Jails | $0.156 | **$0.17** | $0.327 | $0.02 | $0.19 |
| Medium Jails | $0.161 | **$0.17** | $0.259 | $0.02 | $0.19 |
| Small Jails | $0.174 | **$0.19** | $0.230 | $0.02 | $0.21 |
| Very Small Jails | $0.216 | **$0.23** | $0.263 | $0.02 | $0.25 |
| Extremely Small Jails | $0.390 | **$0.42** | $0.436 | $0.02 | $0.44 |

Source: Appendix D. * Video rate caps include adjustment for inflation.

77. We identify certain factors that support setting video IPCS rate caps based on the lower bounds, including several that dovetail with those referenced above in the discussion of our audio IPCS rate caps, as well as with those the Commission relied on in 2024.[216] In particular, we reiterate that including all safety and security costs is generally conservative, and that providers have a natural incentive to overreport their IPCS cost data.[217] Additionally, given the nascent nature of the video IPCS market, substantial initial investments in fixed assets are typical and are evident in our record, which gives us further confidence that relying on our lower bounds to set video IPCS rate caps will result in rate caps that are just and reasonable and fairly compensatory. Finally, given the inclusion of all safety and security costs in the lower bounds and the removal of facility costs from our rate cap analysis, the video rate caps we adopt today are above the corresponding rate caps adopted in the *2024 IPCS Order*, ensuring that providers should be able to recover their costs.[218]

---

[215] *See 2024 IPCS Order*, 39 FCC Rcd at 7944-46, paras. 573-75 (adopting "an additional data collection to collect detailed data and other information . . . on audio and video IPCS from all providers" to inform the development of permanent rates).

[216] *See id.* at 7764-65, para. 213 (discussing reasons in favor of setting caps above the lower bounds).

[217] *See id.* at 7762-63, para. 210 (discussing likelihood of inflated IPCS costs in the reported data); *see also id.* at 8099, Appx. J, para. 5 & n.9 ("We likewise reiterate that we believe reported costs are inflated, particularly given that total industry reported costs exceed total industry reported revenues by such a wide margin.").

[218] We acknowledge that the adjustment we apply to Securus's video expenses reduces the lower bounds for video IPCS. *See supra* paras. 66-68. For the aforementioned reasons, however, we find that relying on that adjustment does not undermine our reliance on our lower bounds as the basis for setting rate caps.

78.     We continue to adopt video rate caps on an interim basis, as the Commission did in the *2024 IPCS Order*. The same considerations which led us to adopt interim audio IPCS rate caps today support the adoption of interim video IPCS rate caps. Further, the interim nature of the video rate caps will allow the Commission to monitor the evolving nature of the video IPCS industry. As an emerging segment of the IPCS industry, we expect that the per minute costs reflected in the 2023 Mandatory Data Collection would normally fall over time as the industry matures.[219] As with the interim audio rate caps we set today, our interim video caps will be revisited going forward on the basis of additional data and input from stakeholders generally.

79.     *Inflation factor*. Securus contends that the interim IPCS rate caps we adopt in this Order should be adjusted for inflation as these rate caps are based on provider cost data from calendar year 2022.[220] It proposes an inflation adjustment factor of 11.6% using the Telecommunications Producer Price Index (Telecom PPI).[221] We agree that the interim rate caps should be adjusted to account for inflation since 2022 but do not choose to rely on Securus's method of calculating the adjustment. Securus relies on the Telecom PPI but IPCS providers' investments and expenses reflect a mix of assets and business activities that is not purely a telecommunications service. For example, the provision of IPCS safety and security measures, which accounts for roughly one-third of all industry costs, aligns as much with the information technology and systems software sectors as it does with telecommunications. Similarly, the costs reported by providers like Securus also include significant hardware investments, particularly in tablets used for video IPCS and other non-IPCS services. Using a broader index like the Gross Domestic Product Price Index (GDP-PI) to estimate an inflation adjustment factor would arguably be more applicable to the relatively diverse mix of costs IPCS providers typically incur.[222] Moreover, Securus does not explain or justify the starting point for its calculation. Nor could we confirm the initial figure Securus cites (104.25) in its calculation in the Telecom PPI series published by the Bureau of Labor Statistics (BLS).[223]

80.     We therefore find it more appropriate to use the GDP-PI figure for the 4th quarter 2022, 120.175, as the starting point (i.e., time zero or baseline figure) and the GDP-PI figure for the 2nd quarter 2025, the most recent figure published by the Bureau of Economic Analysis (BEA), 128.266, as the

---

[219] *See, e.g.*, *2024 IPCS Order*, 39 FCC Rcd at 7709, para. 123 (discussing the need for interim caps to respond to the nascent status of the video industry and the likelihood of "growth and evolution in the video IPCS marketplace").

[220] Letter from Michael H. Pryor, Counsel for Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 at 2-3 (filed Oct. 21, 2025) (Securus Oct. 21, 2025 *Ex Parte*).

[221] *Id*. at 3.

[222] *See* Bureau of Economic Analysis, Table 1.1.4. Price Indexes for Gross Domestic Product, Line 1, Gross domestic product at
https://apps.bea.gov/iTable/?reqid=19&step=2&isuri=1&categories=survey&_gl=1*4mkknn*_ga*MTQzMzQwMT
YyOC4xNzYxMjQxMzQz*_ga_J4698JNNFT*czE3NjEzMzQ4NTgkbzUkZzEkdDE3NjEzMzc2OTckajU3JGwwJ
Ggw#eyJhcHBpZCI6MTksInN0ZXBzIjpbMSwyLDNdLCJkYXRhIjpbWyJjYXRlZ29yaWVzIiwiU3VydmV5Il0s
WyJOSVBBX1RhYmxlX0xpc3QiLCI0Il1dfQ== (last visited October 23, 2025). The Commission has a long history of relying on broad measures of inflation including, for example, use of the GDP-PI to adjust the Price Cap Index used as part of the *ex ante* rate-setting methodology that limits certain interstate access rates that incumbent local exchange carriers subject to the Commission's price cap and incentive regulation rules may charge. *See* 47 CFR §§ 61.45 and 61.50(c).

[223] *See* PPI industry sub-sector data for Telecommunications, not seasonally adjusted, PCU517---517 at
https://data.bls.gov/dataViewer/view/timeseries/PCU517---517---; and FRED, Federal Reserve Bank of St. Louis, Producer Price Index by Industry: Telecommunications (PCU517517) at
https://fred.stlouisfed.org/series/PCU517517 (both last visited October 24, 2025).

ending point to calculate an inflation adjustment factor. Our use of these two factors produces an inflation adjustment factor of 6.73%.[224] We apply this factor to the lower bounds before rounding from three to two decimal places, and then we round the products of these calculations to two decimal places to produce the final rate caps.[225]

## C.    Other Matters

### 1.    Data Collection

81.    We reaffirm the Commission's prior delegation of authority to WCB and OEA to conduct an additional data collection to enable the Commission to set permanent rate caps for both audio and video IPCS.[226] That delegation included a direction to WCB and OEA to determine the timing and scope of the data collection, "provided that such collection shall be conducted as soon as practicable."[227] Parties have underscored the importance of conducting a data collection without further delay.[228] Given the time that has elapsed since the most recent mandatory data collection, the evolution of the market in the interim, and the importance of establishing permanent IPCS rate caps without undue delay, we now direct WCB and OEA to conduct a data collection following the conclusion of the Further Notice comment period with the goal of establishing permanent rate caps before the end of the first quarter of 2027. We reiterate our delegation of authority to WCB and OEA to make any appropriate modifications to the structure of the collection and the template and instructions for the collection necessary to provide the Commission an objective basis to establish permanent IPCS rate caps.[229]

### 2.    Cost Benefit Analysis

82.    We perform an analysis of the relative costs and benefits of establishing new, interim audio and video IPCS rate caps. We expect that the benefits of adopting new, interim audio rate caps that are lower than the rate caps currently in effect, and establishing new interim video rate caps, will far exceed the implementation costs over a five-year time horizon. The net welfare gain to IPCS consumers alone is sufficient to ensure that the benefits of our actions exceed the costs. The other salutary effects of higher IPCS call volume—greater family stability, improved mental health, and lower recidivism and crime—will further expand these benefits.

83.    *Upward Revision of IPCS Demand Price Elasticity.* Commission staff previously estimated a price elasticity of demand for inmate calling services of -0.3 based on empirical evidence of

---

[224] ((128.266 - 120.175)/120.75) x 100 = 6.73%

[225] We also note that when the Commission incorporates an estimate of inflation in a ratesetting process, it also typically includes an offsetting estimate of productivity, which we do not attempt here given the relative lack of productivity data specific to the IPCS industry. *See, e.g.*, *Business Data Services in an Internet Protocol Environment et al.*, WC Docket no. 16-143 et al., Report and Order, 32 FCC Rcd 3459, 3544-57, paras. 200-236 (2017) (setting a productivity factor of 2% for certain business data services).

[226] *2024 IPCS Order*, 39 FCC Rcd at 7944-45, para. 573.

[227] *Id*. at 7945-46, para. 575.

[228] *See, e.g.*, UCC, et al. Oct. 21, 2025 *Ex Parte* at 6 (urging the Commission to "direct the Bureau to act with a final mandatory data collection within **at least 45 days** of the completion of the record in the Further Notice") (emphasis in original); Letter from Bianca Tylek, Executive Director and Celina Chapin, Chief Advocacy Officer, Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 at 3 (filed Oct. 17, 2025) (Worth Rises Oct. 17, 2025 *Ex Parte*).

[229] *2024 IPCS Order*, 39 FCC Rcd at 7944-46, paras. 573-75.

the responsiveness of inmate calling volumes to price declines.[230]  A more recent empirical study estimates a higher IPCS price elasticity of demand of between -0.55 and -0.69, a range with a midpoint of -0.62.[231]  The authors computed the demand elasticity as the implied rate of a 15-minute call fell from $2.30 to $0.72 in New York and from $4.95 to $0.66 in New Jersey.[232]  We find that the increase identified by this study more accurately reflects the surge in call volume from unleashing the pent-up demand of inmates who had previously either called less than desired or not at all.[233]  The literature corroborates the higher elasticity:  typical basic telephone demand price elasticities in developed countries range between -0.1 to -0.5 for local calls, -0.2 to -0.5 for long distance calls, and -0.2 to -1.5 for international calls.[234]  The price elasticity estimated by Miller, et al. is only slightly higher in absolute terms.  This difference might be attributable to the higher incidence of youth or poverty among inmates.[235]  Another possible explanation is that Miller, et al. are estimating a blended elasticity for all calls, which would be higher because of the inclusion of the relatively more elastic international call volume (*i.e.*, their price elasticity is tantamount to a weighted average).  We therefore revise our previous demand elasticity estimate and rely on a price elasticity of demand of -0.6 to estimate consumer welfare effects.

84.    *Gain in IPCS Consumer Welfare*.  Using our revised IPCS price elasticity of demand, we estimate a net increase in IPCS caller welfare of nearly $14 million annually, for a net present value of $64 million over a five-year period.[236]

---

[230] The record at the time included five estimates of demand elasticity which ranged from -0.38 to -0.29.  The Commission selected a demand elasticity estimate effectively at the lower end of this range as a conservative estimate.  *2021 ICS Order*, 36 FCC Rcd at 9607-08, paras. 199-200 & nn.607-611.

[231] Nathan H. Miller, Marleen Marra, Gretchen Sileo, *Phoning Home: The Procurement of Telecommunications for Incarcerated Individuals in the United States*, (January 24, 2025), https://www.nathanhmiller.org/prisonphones.pdf (*Miller Article*).

[232] *Id.* at 14.

[233] Indeed, Miller et al. found that the average number of calls per inmate/per month increased from 8.82 to 15.86 in New York and from 8.32 to 27.00 in New Jersey, a near-doubling and tripling, respectively, of incarcerated people call volume.  *See Miller Article*, page 15, Table 5.  Miller et al. also developed a model using pooled New York and New Jersey data that showed rate elasticities of demand are higher at higher rates.  *Id.* at 16.  Massachusetts sheriffs also witnessed a significant surge in demand when the price of inmate calling was lowered.  Christian M. Wade, *Mass. sheriffs seek relief from rising costs of unlimited prison phone calls* (Apr. 19, 2025), https://www.corrections1.com/finance-and-budgets/mass-sheriffs-seek-relief-from-rising-costs-of-unlimited-prison-phone-calls.

[234] Jeffrey J. Wheatley, Price Elasticities for Telecommunications Services with Reference to Developing Countries, MEDIA@LSE, London School of Economics, Department of Media and Communications, https://idl-bnc-idrc.dspacedirect.org/server/api/core/bitstreams/0158d327-10e1-4c87-bbfc-87e8770d33cb/content#:~:text=16-,SUMMARY,are%20higher%20than%20market%20elasticities.

[235] *Id.* at 4.  Studies have shown price elasticities are highest among the youngest and poorest customers.  *See* Bodnar J. et al. (1988): Cross-sectional analysis of residential telephone subscription in Canada, Information Economics and Policy 3:359.

[236] $64 million is the present value of a five-year stream of $14 million payments discounted at an OMB recommended rate of 3%.  *See* Office of Management and Budget, *Circular A-4* (Sept. 17, 2003), https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4.  Worth Rises also estimates higher elasticity for IPCS, although it does so by comparing the rates adopted here to those adopted in the *2024 IPCS Order* instead of those currently in force.  *See* Worth Rises Oct. 17, 2025 *Ex Parte* at 2 (estimating that the change in rates from the *2024 IPCS Order* will result in a reduction in increased call volume "from 2.1 billion additional call minutes a year . . . to just 714 million under the 2025 revised rules, a drop of **66%**") (emphasis in original).

85. *Other Salutary Effects of Increased IPCS Call Volume.* The anticipated expansion in IPCS call volume due to the new, interim rate caps that are lower than the rate caps currently in effect should generate salutary effects similar in nature to those discussed in prior Commission orders, namely facilitating inmate re-entry, reducing recidivism and crime, diminishing costly foster-child care placements, and improving the mental health outcomes of inmates and their families.[237]

86. *Costs of Implementing New IPCS Rates.* We previously estimated that implementing new IPCS rates would cost IPCS providers a one-time expense of $14 million in order to revise audio and video contracts to reflect the new rate caps.[238] To account for unanticipated challenges faced by IPCS providers to implement the changes, including substantial admin costs, we revise our estimate upward by 50%, for a total of $21 million. For the sake of direct comparison with estimated annual benefits, this one-time cost averages to $2.8 million per year over five years. The revised IPCS rates stipulated in this Order will not alter estimated contract revision costs.

### 3. Effective Date and Compliance Date

87. We find good cause to make our rules effective on publication in the Federal Register. The Administrative Procedure Act ordinarily requires notice of a rule "not less than 30 days before its effective date," subject to exceptions, including "as . . . provided by the agency for good cause."[239] Here, there is good cause to make the rules we adopt effective immediately upon publication. The Martha Wright-Reed Act required the Commission to promulgate implementing rules not more than 24 months after the Act's enactment,[240] or by January 5, 2025. The Commission adopted implementing rules in the *2024 IPCS Order*, but as previously discussed, those rules had unintended consequences that prompted us to revisit them soon after (and before widespread compliance). Because we are making fundamental changes to those rules—including superseding the rate caps themselves—we conclude that there is still a reason for urgency. Therefore, consistent with Congress's direction to move quickly and avoid unnecessary delay, we make this Order effective on publication of notice in the Federal Register.[241]

88. At the same time—and to avoid any risk of prejudice from our determination to make the new rules effective immediately upon publication of notice in the Federal Register—we do not require compliance with the new interim audio and video IPCS rate caps and rate additive adopted in this Order until 120 days after the date of Federal Register notice. This will allow providers, correctional institutions, and state and local governments sufficient time to conduct any negotiations and administrative steps that may be necessary to implement the new rate caps and rate additive.[242] We find that deferring the compliance date until after the effective date, as the Commission previously did in the *2024 IPCS Order*,[243] will best balance the interests in fulfilling Congress's intent to ensure

---

[237] *2024 IPCS Order*, 39 FCC Rcd at 7949, para. 584; *see also 2021 ICS Order*, 36 FCC Rcd at 9604-05, 9609, paras. 194-96, 201.

[238] *2024 IPCS Order*, 39 FCC Rcd at 7949, para. 585.

[239] 5 U.S.C. § 553(d).

[240] Martha Wright-Reed Act § 3(a).

[241] *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996) (upholding good cause finding for rules effective in less than 30 days, based in part on a "tight deadline").

[242] The Commission's release of proposed orders three weeks in advance of their consideration at the Commission's monthly open meetings and the additional time inherent in the Federal Register publication process provide additional reasons why we believe this deferred effective date gives providers and facilities reasonable time to implement the revised interim rate caps and rate additive.

[243] *See 2024 IPCS Order*, 39 FCC Rcd at 7950-54, paras. 587–96.

implementation of the Martha Wright-Reed Act without undue delay, while at the same time allowing parties sufficient time to implement these changes.[244]

89.      The compliance date, 120 days after publication in the Federal Register, represents the "alternative date the Commission sets as part of further action in the IPCS proceeding," as anticipated in the *2025 IPCS Waiver Order* and therefore supersedes the April 1, 2027 compliance deadline previously established in that order.[245]  The compliance date of this Order therefore becomes the date on which compliance will be required for the three rules temporarily suspended in the *2025 IPCS Waiver Order*— the IPCS interim rate caps (as modified herein), the prohibition on the payment of site commissions, and the per-minute rate requirement for IPCS offerings.[246]  This compliance date will approximate the latest of the staggered compliance dates established by the *2024 IPCS Order*[247] and the deferred compliance dates set by WCB in granting waivers of the per-minute pricing rule for video IPCS.[248]

---

[244] *See Omnipoint Corp.*, 78 F.3d at 269 (agency must "'balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date'" (quoting *United States v. Gavrilovic*, 551 F.2d 1099, 1105 (8th Cir.1977))); *Nance v. EPA*, 645 F.2d 701, 709 (9th Cir. 1981) ("Because the petitioners . . . were aware of the proposed redesignation and suffered almost no adverse effects as a result of the noncompliance with the thirty-day requirement, their hardship was outweighed by the Agency's need to put the order into immediate effect.").

[245] *2025 IPCS Waiver Order* at 12, para. 22.  While not directly responding to the Application for Review filed by the Public Interest Parties, by superseding the April 1, 2027 compliance date of the *2025 IPCS Waiver Order*, the Commission effectively provides the substance of the relief sought in that filing.  *See* Public Interest Parties' Application for Review at 8 ("The [*2025 IPCS Waiver Order*] contravenes Congress's directives by suspending for almost two years the reforms required under the law . . . .  Because the [*2025 IPCS Waiver Order*] is contrary to Congress's directive in the bipartisan Martha Wright Reed Act, the Commission should rescind the [*2025 IPCS Waiver Order*].").

[246] *See* 47 CFR §§ 64.6010, 64.6015, 64.6080.  The compliance date of this Order, which supersedes the extended deadline for compliance with the Commission's per minute rate rules set by the *2025 IPCS Waiver Order*, works in conjunction with deadlines previously set for compliance by two other recent Bureau orders.  The effective date of this Order will provide Securus the additional time it requested to implement the per-minute rate requirement for its video IPCS in the *ex parte* it filed in this proceeding on June 27, 2025.  *See* Securus June 27, 2025 *Ex Parte* (requesting an extension of a waiver previously granted to Securus by the Bureau).  The compliance date for this Order supersedes and effectively extends the waiver relief previously granted Securus by the Bureau.  *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Ac*t, *Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Order, 39 FCC Rcd 13726 (WCB 2024) (*Securus 2024 Video IPCS Waiver Order*) (granting Securus a waiver of its compliance with the per-minute pricing rule for its video IPCS until September 1, 2025).  We do not modify waiver relief previously granted TKC Telecom, which extended its compliance with the per-minute pricing rule for its video IPCS until April 1, 2026.  *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Ac*t, *Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, DA 25-515 (*TKC Waiver Order*) (WCB June 13, 2025).

[247] *2024 IPCS Order*, 39 FCC Rcd at 7950-51, para. 587.

[248] *TKC Waiver Order* (granting TKC Telecom a temporary waiver of the Commission's per-minute pricing requirement as applied to its video IPCS until April 1, 2026 and granting a similar further waiver to Securus for complying with the per-minute pricing rule for its video IPCS).  Securus seeks additional time to implement the per-minute pricing rule, which we do not grant.  *See* Letter from Michael H. Pryor, Counsel for Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 at 2 (filed Oct. 20, 2025) (Securus Oct. 20, 2025 *Ex Parte*) ("Securus requests 270 days from publication in the Federal Register" to "deploy per-minute video IPCS billing in all facilities.").  While the Commission does not grant additional time for providers to meet the per-minute pricing rule, it reminds providers that they may seek a waiver of the Commission's rules on an as-needed basis.  *See* 47 CFR § 64.6120.

## IV.    FURTHER NOTICE OF PROPOSED RULEMAKING

90.    In this Further Notice, we seek additional comment and data from stakeholders on the following issues:  adopting permanent audio and video IPCS rate caps; adopting a permanent rate additive for facility cost recovery, including one that varies by facility type and size; and maintaining the prohibition on ancillary service charges, among other matters.  We place particular emphasis on seeking additional data from parties to the extent feasible to enable us to resolve these issues based on objective data and analysis, wherever possible.

### A.    Adoption of Permanent Rate Caps for Audio and Video IPCS

91.    Today's Order adopts interim rate caps for audio and video IPCS, reflecting the evolving video IPCS marketplace and resulting anomalies in provider-reported video data, but also in recognition of the limitations of the available data on safety and security costs and of the cost data more generally.[249] Meanwhile, commenters continue to acknowledge a need for permanent rate caps.[250]  We agree that permanent caps are necessary for IPCS and, accordingly, we seek further comment on how the Commission could best adopt permanent rate caps for audio and video IPCS which are just, reasonable, and fairly compensatory and the time frame for implementing any such rate caps.

92.    *Permanent Audio IPCS Rate Caps*.  The accompanying Order adopts audio IPCS rate caps on an interim basis in light of the need to resolve questions with the current data, and to better refine and analyze safety and security data, among other factors.[251]  We invite further comment about how to adopt permanent audio IPCS rate caps, and about the data we need to allow us to do so.  The Commission will be receiving more refined data about market rates and demand after recent revisions to the IPCS Annual Reports are implemented, and from a future mandatory data collection.[252]  What additional information is essential to collect before the Commission can act to set permanent audio IPCS rate caps? Are any further changes to our rate cap setting methodology necessary?

93.    *Permanent Video IPCS Rate Caps*.  The accompanying Order adopts video IPCS rate caps on an interim basis for several reasons, including the aforementioned market and data factors.[253] Significant time has passed since the Commission last sought comment on the adoption of permanent rate

---

[249] *See supra* Section III.B.3 (Determining Interim Rate Caps for Audio IPCS and Video IPCS).

[250] *See* The Episcopal Church Office of Governmental Relations Comments, WC Docket Nos. 23-62 and 12-375, at 1-2 (rec. Oct. 21, 2024) ("The Episcopal Church would encourage the FCC to make its rate caps on video calls permanent, as it has for the phone call rates.  Video calls may be the only way for some people in federal custody to speak with their children, who benefit from seeing the faces and expressions of their parent in addition to hearing their voice.").

[251] *See supra* Section III.B.3 (Determining Interim Rate Caps for Audio IPCS and Video IPCS).

[252] On January 8, 2025 the Commission revised the IPCS annual reporting and certification obligations to require submissions of information related to video IPCS.  *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, 40 FCC Rcd 149, 157-162, paras. 24-38 (WCB Jan. 8, 2025) (*2025 IPCS Annual Reports Order*). The first filings of the revised Annual Reports and certifications that will include information on video IPCS are due on November 3, 2025.  *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, DA 25-711, at 1, para. 1 (WCB Aug. 12, 2025) (extending the filing deadline for 2025 IPCS Annual Reports and Certifications from September 15, 2025 to November 3, 2025).

[253] *See, e.g.*, *supra* Section III.B.3 (Determining Interim Rate Caps for Audio IPCS and Video IPCS) (discussing video IPCS as a "nascent" service and readopting the Securus video adjustment when setting interim video rate caps).

caps for video rates as part of the *2024 IPCS Notice* and the Bureau has since granted waiver petitions sought by IPCS providers to accommodate certain unintended consequences of the Commission's rate structure rules governing video IPCS.[254]  We now invite commenters to further supplement the record concerning the status of the video IPCS market and the adoption of permanent video IPCS rates.  What changes have commenters observed in the video IPCS marketplace since the adoption of the *2024 IPCS Notice*?[255]  How have video market costs, prices, demand, revenues, deployment, and services changed over time?[256]

94.    How else has the video IPCS marketplace evolved with the passage of time?  We seek comment on the changes in availability of and demand for video IPCS, and for other, non-IPCS video products, including the deployment of platforms and devices capable of delivering these services.  For example, how has demand for video IPCS changed since the 2023 Mandatory Data Collection (reflecting 2022 data)?  We also seek comment on how costs for providing video IPCS and revenues for video IPCS have changed since the *2024 IPCS Notice*.  Have per-minute costs declined as the market developed?[257]  What are the trends for video IPCS industry revenues and profitability, given potentially declining per-minute costs and increasing demand?  How do costs for providing video IPCS differ between industry leaders, or between large providers and smaller providers?  Similarly, what investments are IPCS providers making in video platforms and devices today, and how do those expenditures differ from recent years, if at all?  And how should such trends factor into the adoption of permanent rate caps for video IPCS?  What data could be used to project the rate of future investments in video software and hardware?[258]  Video IPCS platforms and devices typically enable the provision of both regulated video IPCS and nonregulated video services.  We seek comment on how video IPCS providers recover shared costs between regulated and nonregulated services.[259]  Do commenters expect the usage of regulated and nonregulated services to change over time, and, if so, how should such trends be taken into account in adopting permanent video IPCS rate caps?

95.    Commenters generally agree that the video IPCS marketplace is still in its nascent stages and investments in video IPCS infrastructure continue to be relatively high given current demand.[260]  We

---

[254] *See TKC Waiver Order* at 1, para. 1 (granting TKC TeleCom, LLC's request for temporary waiver of the Commission's rate cap compliance deadline and per-minute pricing requirement as applied to its video IPCS until April 1, 2026); *see also Securus 2024 Video IPCS Waiver Order*, 39 FCC Rcd at 13726, para. 1 (granting Securus's request for waiver of the Commission's per-minute pricing rules as applied to video IPCS to enable Securus to continue offering uninterrupted video IPCS).

[255] *2024 IPCS Notice*, 39 FCC Rcd at 7958-60, paras. 608-11.

[256] *Id.* at 7958-59, para. 609.

[257] Securus Oct. 21, 2024 Comments at 11 ("In general, hardware costs for video equipment [are] trending downward.").

[258] *See* Worth Rises Reply, WC Docket Nos. 23-62 and 12-375, at 3 (rec. Dec. 17, 2024) (Worth Rises Dec. 17, 2024 Reply) ("[IPCS providers] should make smart investments in services that consumers — whether they be ratepayers or agencies — have a demonstrated interest in and demand for, which there are ways to assess before fully developing a service.").

[259] *See* Worth Rises Oct. 21, 2024 Comments at 4 (". . . [O]ther services—such as movies, eBooks, games, and music—are often provided through the same hardware and under the same contracts.  Moreover, providers are finding ways to recover investment costs for the provision of video IPCS through other fees.").  *But see* National Sheriffs' Association Reply, WC Docket Nos. 23-62 and 12-375, at 1-2 (rec. Dec. 17, 2024) (cautioning against any requirement for IPCS providers to cross subsidize video IPCS rates using revenue from nonregulated operations).

[260] *See* Public Interest Parties Dec. 17, 2024 Reply at 4 ("If, after the Commission collects additional data, the video IPCS market appears to have achieved greater equilibrium, the Public Interest Parties urge the Commission to

(continued….)

seek comment on the continued evolution of the video IPCS marketplace, and on the data that would most accurately reflect its growth and development. One commenter suggests three criteria which may indicate a maturing market: "comparing the variance of costs across video calling products with the variance of costs among audio calling products, comparing within-provider costs to those of market leaders, and analyzing forecast demand by service providers."[261] Are these effective ways of gauging whether the video IPCS marketplace has matured with sufficient reliability to set permanent video rates? If so, why? If not, what are the other alternatives?[262] What additional data will best support these analyses, and how can we obtain such data, if it has not already been collected?

96. When do commenters expect the video IPCS marketplace will reach a point where the Commission will be able to set reliable permanent rate caps? Conversely, if commenters believe the video IPCS data already allows us to adopt permanent rate caps, why? Certain commenters suggest permanent video IPCS rate caps should be adopted immediately.[263] What advantages and disadvantages would there be from adopting permanent caps in the near future versus doing so at a later date? What are the costs and benefits of maintaining interim caps over a longer period to allow the marketplace to develop? How do the costs and benefits of delay versus immediacy translate to the adoption of permanent audio rate caps?

97. *Considerations Applicable to Both Audio and Video IPCS.* While our rate making methodology is largely a settled matter, we seek comment on a proposal to modify one aspect of the methodology. Specifically, we seek comment on Securus's proposal that the Commission use simple averages instead of minute-weighted averages to set its rate caps, noting that the *2021 ICS Order* used simple averages and claiming that "using minute-weighted average costs overemphasizes large facility costs."[264] We also seek comment on Securus's claim that using simple, facility-based averages to set rate caps would "lead to a higher rate cap and more providers being able to recover their actual costs."[265]

---

(Continued from previous page) ———————————————

evaluate the data and adjust the rate caps downward."); *see, e.g.*, Securus Oct. 21, 2024 Comments at 6 ("Securus expects that demand for video calling will continue to increase as more correctional agencies permit the deployment of tablets and the Commission's interim rate caps take effect. . . . Securus anticipates that demand for video service will increase over time and it is exploring innovations such as three-way video conferencing or securely connecting tablets to commercial cell towers over 5G."). *But see* Worth Rises Dec. 21, 2024 Reply at 1-2 (referencing Securus's assertion that overall investment remains high in relation to demand, "[b]ut history calls this claim into question and suggests that past investments may have been somewhat wasteful. Video IPCS came on the market in 1995").

[261] *See* Public Interest Parties' Oct. 21, 2024 Comments at 4-5; *id.*, Appx. A (Brattle Report) at 5, para. 17.

[262] *See, e.g.*, Securus Oct. 21, 2024 Comments at 11 (arguing that "a mature market is evidenced by a leveling of demand and investment").

[263] *See* Pay Tel Oct. 21, 2024 Comments at 10; Public Interest Parties Oct. 21, 2024 Comments at 5 ("To ensure that video IPCS rates are just and reasonable and protect the public interest, the Commission should move as quickly as possible to adopt permanent rate caps, but at the very least, the Commission should act promptly to update interim video IPCS rate caps as provider efficiency increases."). *But see* Public Interest Parties Oct. 21, 2024 Comments, Appx. A (Brattle Report) at 5, para. 17 (arguing that without "a mature cost structure, it would be advisable to set interim rates and refresh the data collection on a periodic basis until the industry has had an opportunity to stabilize").

[264] Letter from Michael Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 at 4 (filed Sept. 29, 2025) (Securus Sept. 29, 2025 *Ex Parte*); *see also id.* at 4-8.

[265] *Id.* at 5.

98.     We seek additional comment on whether and how we should refine the IPCS data collections going forward, particularly in light of the recognized anomalies with IPCS data. Are any adjustments to the structure of the collection necessary to distinguish between necessary equipment and services costs? What other data are necessary, if any, for the Commission to consider establishing permanent, per-minute audio and video IPCS rate caps? In particular, should we attempt to collect data that would allow us to measure the effects future inflation and productivity increases will have on the average cost per minute of providing audio and video IPCS and rate caps and, if so, what data should we collect? How can the Commission ensure all video IPCS providers fully respond to any additional data collection?[266]

99.     Commenters should identify the relevant safety and security data and information necessary to set permanent IPCS audio and video rate caps, and should specify how the Commission should seek to have such information reported. To what extent have audio and video IPCS safety and security services changed over time, and how should any such change impact the adoption of permanent audio or video IPCS rate caps? Are there any trends in safety and security expenses in the IPCS provider or private business sectors, and if so, how should they be accounted for when adopting permanent audio or video IPCS rate caps? [267]

100.     We also seek comment on how providers recover shared costs for safety and security services between video and audio IPCS and between IPCS and non-IPCS services. What data would help the Commission to properly allocate such costs among these services? Should the categories used previously be adjusted and, if so, how? Should there be a larger, smaller, or the same number of categories as compared to the number in the 2023 Mandatory Data Collection, and how should each category be defined? Should the Commission exclude from rate caps any allowance for recovery of safety and security expenses attributable to law enforcement functions? The 2023 Mandatory Data Collection directed providers to allocate safety and security expenses among seven different categories and then to further allocate the expenses within each of these categories among (1) audio IPCS, (2) video IPCS, (3) ancillary services, and (4) other products and services.[268] If we were to draw a line between safety and security expenses attributable to IPCS functions versus law enforcement functions, for example, could we simply retain the existing reporting structure and at the same time clarify that safety and security expenses are to be allocated to other products and services to the extent these are incurred as a consequence of providing law enforcement functions? Or would a better approach be to add law enforcement as a separate, fifth "service" to which safety and security expenses could be allocated? How might the Commission direct providers to allocate expenses shared between IPCS and law enforcement functions? Are there better approaches than our current category-based approach to standardize the reporting and collection of safety and security cost data that commenters recommend? What other information should we seek concerning safety and security services which would help us determine just, reasonable, and fairly compensatory rates? Are there any factors related to safety and security expenses that primarily affect either audio or video rates alone, and if so, what are they, and why?

101.     Likewise, we seek comment on any interaction or interdependence between audio IPCS and video IPCS offerings, including relationships between service pricing or usage. Will the continued video IPCS market evolution also affect the market for audio rates and, if so, how? Do providers expect

---

[266] *See, e.g.*, NCIC Oct. 21, 2024 Comments at 8 ("[B]efore the FCC takes any action to adopt permanent video IPCS rates, it must ensure that all video visitation providers register with the FCC and comply with the FCC's reporting obligations.").

[267] For example, Zoom and Teramind offer safety and security add-ons (including listening to a call without the parties being aware and remote employee monitoring) as part of their business communications services.

[268] *See 2023 MDC Excel Template.*

demand for audio IPCS to fall as demand or availability of video IPCS increases? Should video IPCS be considered a substitute for audio IPCS? Additionally, when adopting permanent rate caps for either audio or video IPCS, how should the Commission factor in the recovery allotted to providers from a permanent rate additive for facility costs as proposed in this Further Notice, if any?

102. Parties note that correctional institutions are increasingly paying directly for IPCS and making service available to incarcerated people free of charge.[269] They propose that the Commission address the applicability of its IPCS regulations to instances where a correctional institution is the party that pays for IPCS.[270] Commenters note, for example, that in the "agency-paid model," correctional institutions may use alternative units of sale, such as ADP, instead of per-minute rates to purchase IPCS.[271] We seek comment on the applicability of our regulations to correctional institutions as, in effect, wholesale purchasers of IPCS. To what extent do the Martha Wright-Reed Act and the Communications Act provide legal authority to the Commission to regulate the rates and related conditions of IPCS when purchased by an intermediary for retail customers' use?

## B. Adoption of Permanent Rate Additives for Facility Cost Recovery

103. We seek comment on how and when the Commission should structure a permanent rate additive or additives to account for correctional facility costs. In today's Order, we adopt a uniform interim rate additive of up to $0.02 per minute for audio and video IPCS for all facility types and size tiers.[272] Several commenters support the use of an additive, arguing that it will provide a predictable framework for IPCS providers and correctional authorities to ensure the recovery of correctional facility costs in the provision of IPCS.[273] Do commenters agree? Why or why not? We seek comment on the assertion by one commenter that additives will effectively reintroduce site commissions[274] and on the extent adopting a permanent rate additive may actually minimize market distortions the record shows site commissions can generate.[275] What are the benefits and burdens of a rate additive for IPCS providers, correctional facilities, and IPCS consumers?

---

[269] *See, e.g.*, Securus Oct. 20, 2025 *Ex Parte* at 3; UCC et al. Oct. 21, 2025 *Ex Parte* at 9; Letter from Bianca Tylek, Executive Director and Celina Chapman, Chief Advocacy Officer, Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 (filed Aug. 5, 2025).

[270] *See* Securus Oct. 20, 2025 *Ex Parte* at 3 (requesting the Commission to "tentatively conclude that IPCS regulations do not apply to agency-paid models and seek comment on that conclusion"); UCC et al. Oct. 21, 2025 *Ex Parte* at 9 (recommending the Commission seek comment "as to how the Commission's rules should apply to wholesale rates or in other instances in which facilities pay for the cost of calling").

[271] Securus Oct. 20, 2025 *Ex Parte* at 3 (noting that "agencies often avoid per minute payments and instead adopt per ADP amounts or other units of sale that provide for more predictable budgeting"); UCC et al. Oct. 21, 2025 *Ex Parte* at 9 (observing that "states and localities do not typically purchase communications on a per minute basis as do the individual consumers for other IPCS").

[272] *Supra* Section III.B.3 (Determining Interim Rate Caps for Audio IPCS and Video IPCS).

[273] *See, e.g.*, Securus Oct. 21, 2024 Comments at 42; Pay Tel Oct. 21, 2024 Comments at 18; Pay Tel Dec. 17, 2024 Reply at 6-7; National Sheriffs' Association Oct. 21, 2024 Comments at 4 (arguing that a cost additive would be an appropriate mechanism to fairly compensate facilities for IPCS costs).

[274] Worth Rises Oct. 21, 2024 Comments at 7.

[275] The interim rate caps we set today are provider-related rate components, the revenues from which are not intended for facility cost recovery, which is the purpose of the separate rate additives we seek further comment on today. Pay Tel, however, cites the fact that the record shows that at least one provider sought to offer correctional facilities payments from rate cap revenues. Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 at 4 (filed Sept. 30, 2025) (Pay Tel

(continued….)

104. We also seek comment on how to structure a permanent rate additive. As an initial matter, we invite comment on whether a permanent additive should be a uniform cap across all rate tiers or whether it should vary by correctional facility type and/or size.[276] What specific tasks, responsibilities and activities do correctional facilities undertake? What are the number of person hours and the hourly wage rates required to provide each activity and each activity's frequency of occurrence? Do these activities and their frequency and costs vary depending on the size or type of the facility, the volume of calls, the correctional authority's policies, or other factors and, if so, how should the Commission incorporate those variations into any permanent rate additive? We also seek comment on a recommendation by one commenter that "IPCS providers that incorporate any facility additive [with] the rate and compensate facilities accordingly must document those costs before such a payment could be imposed on or charged to the paying customer."[277] Additionally, should providers be required to demonstrate that any expenses being recovered through the rate additive be for used and useful expenses incurred in making IPCS available?

105. The interim per-minute rate additive we adopt today applies uniformly to all rate tiers,[278] in principal part due to the lack of reliable correctional facility cost data currently in the record beyond the National Sheriffs' Association 2015 cost survey.[279] As we explain above, the record lacks the requisite data that would allow the Commission to reasonably justify a variable additive based on facility type or size.[280] Yet, the National Sheriffs' Association argues that a rate additive "cannot be uniform because the costs to facilities are not uniform" but provides no data or other information regarding costs beyond what was previously submitted in the record.[281] As Securus notes, the "[k]ey to establishing a reasonable rate additive is gaining up-to-date information on facility costs."[282] We agree and invite further comment on how we can ensure we receive current, complete, and reliable data that accurately capture the differences in used and useful costs that facilities of different sizes and types incur. We request commenters address in detail the types of data that would be most useful in determining facility costs and the procedures we should follow in collecting the data.

106. To the extent commenters support a permanent rate additive that varies by facility type and size, we underscore the importance of receiving updated, relevant data in the record given that correctional facilities are not regulated entities subject to data retention requirements, as commenters have recognized.[283] Securus suggests that while "the Commission cannot compel correctional agencies to provide such information, the Commission could facilitate the voluntary submission of such information by creating a simple and straightforward template by which correctional agencies could submit

(Continued from previous page) ─────────────────

Sept. 30, 2025 *Ex Parte*) (citing the Petition for Clarification of Securus Technologies, LLC, WC Docket No. 12-375 at 4-5 (filed Sept. 17, 2021)). We seek further comment on Pay Tel's request for clarification "that any site commissions in excess of the facility cost additive remain prohibited." *Id.*

[276] National Sheriffs' Association Oct. 21, 2024 Comments at 4.

[277] UCC et al. Oct. 21, 2025 *Ex Parte* at 4.

[278] *See supra* Section III.B.3 (Determining Interim Rate Caps for Audio IPCS and Video IPCS).

[279] The Commission previously has highlighted that "[o]btaining reliable correctional facility cost data has been a perennial problem in these proceedings." *2024 IPCS Order*, 39 FCC Rcd at 7964, para. 622 & n.2166.

[280] *See supra* Section III.B.3 (Determining Interim Rate Caps for Audio IPCS and Video IPCS).

[281] National Sheriffs' Association Oct. 21, 2024 Comments at 4.

[282] Securus Oct. 21, 2024 Comments at 42.

[283] National Sheriffs' Association Oct. 21, 2024 Comments at 5 (adding that "such data is not easily produced").

information on the costs they incur."[284]  The Commission has not previously considered undertaking the design of a template given its inability to compel the submission of facility cost data by correctional institutions.  However, the Commission seeks comment on whether it should consider doing so.  Apart from creating a template, what categories of cost information should correctional institutions submit and how can the Commission best work with providers and correctional institutions to encourage the submission of reliable and consistent cost data?  If we engage in a voluntary collection, how should we evaluate the data received to determine if it is a representative sample appropriate for use in this regulatory context?  Are there other sources of data or methods of collection that we should consider?

107.    To the extent commenters support a uniform additive, should we make the interim $0.02 per minute additive adopted in today's Order permanent?  Why or why not?  If $0.02 per minute would not be a reasonable permanent uniform additive, are there data that the Commission could rely on that would support adopting a different amount?[285]  Here, too, the receipt of reliable, current cost data is paramount and commenters are encouraged to provide data and analysis supporting any such proposal.  If the Commission does not receive any such data, how should the Commission proceed?

### C.    Continued Prohibition of Ancillary Service Charges

108.    Ancillary service charges have long been a source of detrimental practices in the IPCS market and imposing constraints on such fees has been an integral part of the Commission's attempts to ensure just and reasonable IPCS rates.[286]  The Commission has taken steps on several occasions to set limits on ancillary service charges and associated practices.[287]  Most recently, in the *2024 IPCS Order*, the Commission prohibited ancillary service charges and instead incorporated the costs providers reported incurring to make these services available in the rate caps it adopted.[288]  In its Petition for Reconsideration, HomeWAV seeks reinstatement of two previously permissible ancillary service charges—automated payment fees and third-party financial transaction fees.[289]

---

[284] Securus Oct. 21, 2024 Comments at 42.

[285] For example, a limited survey conducted by Pay Tel's outside consultant, which consisted of only 30 correctional facilities, reported an average cost to facilities of $0.08 per minute for allowing the provision of IPCS.  Wood June 7, 2024 Report at 6.  The Commission gave no weight to this survey in the *2024 IPCS Order* and we do not give any weight to it today in adopting the $0.02 per minute interim additive for the same reasons articulated in the *2024 IPCS Order*.  *2024 IPCS Order*, 39 FCC Rcd at 7743, para. 175.  However, Pay Tel's outside consultant argued that with this limited survey "and previously-submitted data, the Commission has the information necessary to adopt a rate cap that includes an explicit additive for the recovery of facility-incurred safety and security costs."  Wood June 7, 2024 Report at 7.  Pay Tel neither identifies the "previously-submitted data" nor explains how its survey might fit with those data to arrive at a rate additive.  We invite comment on these issues.

[286] The term "ancillary service charge" encompasses any charge to an IPCS consumer that is associated with the provision or use of IPCS that is not (a) included in the per-minute or alternate pricing plan charges assessed in accordance with the Commission's rules; or (b) an authorized fee, mandatory fee, or mandatory tax as defined by the Commission's rules.  47 CFR 64.6000.  Authorized Fee means "a government authorized, but discretionary, fee which a provider must remit to a federal, state, or local government, and which a provider is permitted, but not required to pass through to consumers for or in connection with intrastate, interstate, or international IPCS.  An Authorized Fee may not include a markup, unless the markup is specifically authorized by a federal, state, or local statute, rule, or regulation."  *Id.*

[287] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9612-16, paras. 209-216; *2022 ICS Order,* 37 FCC Rcd at 11936-40, paras. 81-87.

[288] *2024 IPCS Order*, 39 FCC Rcd at 7866-67, para. 408.

[289] Petition for Reconsideration and/or Clarification of HomeWAV, LLC, WC Docket Nos. 23-62 and 12-375, at 3-8 (filed Oct. 21, 2024) (HomeWAV Petition for Reconsideration).

109. We propose retaining, for the same reasons the Commission articulated in the *2024 IPCS Order*, the prohibition on ancillary service charges adopted by the Commission and seek comment on this proposal.[290] As the Public Interest Parties explain, the Commission made a determination in the *2024 IPCS Order* "that eliminating separate ancillary service charges and incorporating" the costs of those services "into the per-minute rate caps would best reflect the nature of such services as an intrinsic part of IPCS and balance the relevant interests at stake."[291] Do commenters agree with this assessment? Why or why not? Would the benefits of retaining the prohibition on separate ancillary service charges outweigh the burdens? Why or why not?

110. However, to be thorough, we seek comment on HomeWAV's request that we reinstate automated payment fees and third-party financial transaction fees as permissible ancillary service charges.[292] Automated payment fees include a wide variety of fees assessed by IPCS providers for most, if not all, financial transactions with consumers. Third-party financial transaction fees include credit card processing fees and fees for transfers from third-party commissary accounts. We seek comment on whether these two ancillary charges should be reinstated and on the appropriate regulatory treatment of ancillary service charges generally.

111. In comments to HomeWAV's Petition for Reconsideration, Securus questions if the Commission contemplated whether the number of transactions would increase due to the removal of minimum deposit amounts and account funding fees, and what impact the potential increase of transactions would have on overall costs that would need to be recovered.[293] Pay Tel adds that prohibiting these two ancillary service charges "will encourage behavior that increases . . . costs—and under the new rate structure, these costs will not be recoverable."[294] HomeWAV further asserts that "imposing all associated [automated payment fees and third-party financial transaction fee] costs solely on the provider" could "lead to operational disruptions and compromise the long-term sustainability of providers."[295]

112. We seek comment on whether providers are able to recover their costs of providing account funding services without being able to charge separate fees—under the rate caps set by the Commission in the *2024 IPCS Order*, the current interim rate caps we set here, or under any permanent rate caps we adopt—and what impact the prohibition on these fees may have on the sustainability of IPCS providers. We now seek comment and additional data on the amount of additional costs providers incur in making these two ancillary services available in the absence of being able to assess separate charges for them.[296] We also seek comment on the potential burden of such costs.

---

[290] *2024 IPCS Order*, 39 FCC Rcd at 7867-76, paras. 408-26; 47 CFR § 64.6020.

[291] Public Interest Parties' Opposition to NCIC Reconsideration Petition at 10.

[292] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*; *Rates for Interstate Inmate Calling Service*, WC Docket Nos. 23-62 and 12-375, Public Notice, Report No. 3221, 2024 WL 4616212 (OMD Oct. 28, 2024).

[293] Securus Comments to Reconsideration Petitions at 3.

[294] Pay Tel Comments to Reconsideration Petitions at 3.

[295] HomeWAV Petition for Reconsideration at 2-8.

[296] In the *2024 IPCS Order*, the Commission found that providers incurred an average cost of $0.011 per minute to provide ancillary services, based on the 2023 Mandatory Data Collection. *2024 IPCS Order*, 39 FCC Rcd at 8044, Appx. F, Tbl. 11: Lower Bound Audio and Video IPCS and IPCS-Related Expenses Per Billed and Unbilled Audio and Video Minutes, By Facility Type ($/minute) (calculating the amount of ancillary service-related costs reported by providers to be included in the rate caps).

113.     If either fee or both fees should be reinstated, at what amount should the related fee cap or caps be set, and why?  The Commission previously established a $3.00 cap on automated payment fees and a $5.95 cap on third-party financial transaction fees.[297]  Should we reimpose the same caps on these two fees previously imposed or should we set different caps?  At what level would a cap or caps allow providers to recover their costs?  At what level would a cap or caps be just and reasonable for consumers?  Subsequent to its petition, HomeWAV advocates in favor of $3.00 "payment processing fees."[298]  We seek comment on this suggestion.  Should the Commission use the cost data providers report in a subsequent data collection to calculate different, cost-based caps for one or more of the two fees if necessary to reflect any increased usage rates providers are experiencing?  Would setting fee caps based on those data overstate costs, if fees are reinstated and demand for the services is reduced?

114.     While HomeWAV requests reinstatement of automated payment fees and third-party transaction fees, other providers suggest different fees should also be reinstated.  For example, NCIC proposes reinstating certain transaction fees, including a live agent fee and a single call fee, but also proposes the elimination of certain other transaction fees.[299]  We seek comment on whether any other fees should be reinstated, and we request that any proposals for reinstating other ancillary service charges address the issues raised here with regard to automated payment fees and third-party transaction fees.  We seek comment specifically on alternative proposals made by NCIC.[300]  We also seek comment on the potential burden of such costs.

115.     If the Commission were to reinstate one or more ancillary service charges, it will need sufficiently reliable cost and demand data on each of the types of service charges that is reinstated in order to determine the relevant costs for each charge.  What changes, if any, to the Commission's reporting requirements, including to a future mandatory data collection and to its ongoing IPCS Annual Reports, should we consider to more accurately capture up-to-date ancillary service costs and demand, including the costs incurred when consumers fund their IPCS accounts?[301]

116.     We also seek comment on how automated payment fees and third-party financial transaction fees could be reinstated without unduly burdening consumers.  Commenters have previously

---

[297] *See 2022 ICS Order*, 37 FCC Rcd at 11936-37, para. 81 (capping automated payment fees to a maximum amount of $3.00 when the fee is paid through an automated payment system and $5.95 when the fee is paid through a live agent); *see 2021 ICS Order*, 36 FCC Rcd at 9612-13, para. 209 (establishing a uniform cap for automated payment fees and third-party transaction fees at $6.95 per transaction on an interim basis).

[298] Letter from Colin K. Artinger, General Counsel, HomeWAV, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 12-375 and 23-62, at 1 (filed Sept. 16, 2025).

[299] *See* NCIC Mar. 6, 2025 *Ex Parte* at 6.

[300] NCIC's alternative proposals include suggesting the establishment of a $3.00 funding fee for automated, web, and app payments, a $5.95 funding fee for payments making use of a live agent, a $0.25 funding fee for single calls or a ban on single call service, and deposit limits for minimums set at $5.00 and maximums set at $100.00.  NCIC proposes to re-establish single-call fees, albeit at the rate of $0.25 per call and provides the option to ban single-call services outright.  *Id.  See also* Letter from Glenn S. Richards and Lee G. Petro, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 at 8 & n.7 (filed Oct. 21, 2025) (proposing the same alternate fee proposals, a minimum deposit amount requirement of $5.00, and the elimination of "all other transaction fees (i.e., no pass-through of credit card transaction fees)").

[301] *See generally 2023 MDC Instructions* (listing requirements for the 2023 MDC); *see also* Incarcerated People's Communications Services Annual Reporting and Annual Certification Forms (FCC Forms 2301(a) and 2301(b)), WC Docket Nos. 23-62 and 12-375, at 3-4, https://docs.fcc.gov/public/attachments/DOC-408703A1.pdf (*IPCS Annual Reporting Instructions*) (directing IPCS providers on how to prepare filings to comply with IPCS annual reporting obligations).

voiced concerns that automated payment fees and third-party financial transaction fees were often exploited, and consumers were charged both fees for a single transaction, effectively allowing providers to double bill or recover.[302]  How could the Commission redefine these charges to avoid such concerns?[303]  We also seek comment on how implementing two separate financial transaction charges can protect consumers from unfair charges as HomeWAV suggests.[304]  Similarly, we seek comment on other concerns raised related to ancillary service charges, including the risk of consumer fraud and money laundering[305] and the risk that the combination of the prohibition of ancillary service charges with the prohibition of account minimums create conditions that encourage consumers to "inundate providers with small deposits," which can "drastically increase costs for providers."[306]

117.　　We also seek comment as to whether there are any similarly effective alternatives to reinstating automated payment fees and third-party financial transaction fees.  For example, Securus suggests that the Commission allow IPCS providers to establish a minimum deposit amount.[307]  We seek comment on this proposal.  Is this a reasonable alternative that will change consumer incentives and

---

[302] *See* NCIC Inmate Communications Comments, WC Docket No. 12-375, at 10 (rec. Sept. 27, 2021) ("NCIC renews its request for the FCC to prohibit third-party transaction fees which lead to double billing of ICS customers."); *see* Prison Policy Initiative Comments, WC Docket No. 12-375, at 11 (rec. Sept. 27, 2021) (PPI Sept. 7, 2021 Comments) ("The fundamental problem of double dipping is that carriers are recouping payment-card processing costs twice over. . . .  When carriers impose the $3 fee allowed under 47 C.F.R. § 64.6020(b)(1) while also making customers pay the carrier's card-processing costs under § 64.6020(b)(5), this constitutes an unreasonable charge, unjust enrichment, and circumvention of the Commission's stated purpose in promulgating ICS rules.").

[303] *See* NCIC Mar. 6, 2025 *Ex Parte* at 7, Attach. (claiming that "[a]pproximately 85% of the industry is either adding a flat charge or percentages up to 5% of the payments on top of the transaction funding fee, basically double-dipping considering the transaction funding fees were designed to cover credit card transaction fees"); *see also 2021 ICS Order*, 36 FCC Rcd at 9967, para. 327.

[304] HomeWAV Petition for Reconsideration at 3 ("[A] balanced approach is necessary—one that protects consumers from unfair charges while also ensuring that providers are not unfairly burdened with the full financial responsibility of user activity without the opportunity to recover costs.").

[305] *Id.* at 6-7 ("Over the past eight months, HomeWAV has lost approximately $50,000 due to fraudulent transactions.  Forbidding fees intending to recover the costs associated with this [credit card] payment service will inevitably result in a substantial increase in these losses, as it will encourage fraudulent behavior and increase the frequency of such transaction.").  HomeWAV argues that the existence of fees to fund IPCS accounts serve as a deterrent to fraud and money laundering by "associating an appropriate cost with the deposit of funds" and that, if IPCS accounts are loaded using credit cards that are later determined to be stolen, then IPCS providers are responsible for "chargebacks, bank fees, and licensing costs."  *Id.*

[306] *Id.* at 5; Pay Tel Comments to Reconsideration Petitions at 2-3; Pay Tel Reply, GN Docket No. 25-133, WC Docket Nos. 23-62 and 12-375, at 7-8 (rec. Apr. 28, 2024) (Pay Tel Delete Delete Delete Reply) (arguing that "because the Commission barred providers from passing transaction costs directly to consumers and prohibited a minimum deposit threshold, consumers are incented to make very small, repeated deposits, dramatically increasing the number of transactions, and driving up provider costs"); Securus Comments to Reconsideration Petitions at 2 (implying that separate charges can deter consumer behavior that inundate providers with small deposits); NCIC Mar. 6, 2025 *Ex Parte* at 6-7 ("The *2024 Report and Order* adopted below-cost rate caps, and compounded the harmful impact by prohibiting IPCS providers from charging any ancillary fees, despite clear evidence that IPCS providers incur additional costs in permitting IPCS customers to fund their accounts.").

[307] Securus Comments to Reconsideration Petitions at 3; *see also* Pay Tel Delete Delete Delete Reply at 8 (supporting Securus' proposal to set minimum deposit amounts at $10); *see also* Letter from Lee G. Petro and Glenn S. Richards, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. at 4 (filed Feb. 5, 2025) (proposing $5 minimum and $100 maximum deposit limits).

reduce provider costs?  What amount would be appropriate as a potential minimum deposit limit and why?  Securus suggests $10, but others suggest lower minimums.[308]  How should the Commission calculate a minimum deposit amount if it chooses this alternative approach?  For example, would a minimum deposit limit of $10 provide enough stability to provider costs to offset the burden of prohibiting these types of fees?  Conversely, we also seek comment on the burden that a minimum deposit amount would impose on families of incarcerated people and IPCS users.  Commenters are encouraged to quantify the costs and benefits to providers, IPCS users and their families, of any alternative approaches to fee reinstatement.

## V.    PROCEDURAL MATTERS

118.    *Regulatory Flexibility Act*.  The Regulatory Flexibility Act of 1980, as amended (RFA),[309] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[310]  Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this Report and Order and this Order on Reconsideration on small entities. The FRFA is set forth in Appendix B.

119.    The Commission has also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of rule and policy change proposals in the *2025 IPCS Notice* on small entities.  The IRFA is set forth in Appendix C.  The Commission invites the general public, in particular small businesses, to comment on the IRFA.  Comments must be filed by the deadlines for comments on the *2025 IPCS Notice* indicated on the first page of this document and must have a separate and distinct heading designating them as responses to the IRFA.

120.    *Congressional Review Act*.  The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget concurs, that this Report & Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking is non-major under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this Report & Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

121.    *Providing Accountability Through Transparency Act*.  Consistent with the Providing Accountability Through Transparency Act, Public Law 118-9, a summary of the *2025 IPCS NPRM* will be available on https://www.fcc.gov/proposed-rulemakings.

122.    *OPEN Government Data Act*.  The OPEN Government Data Act,[311] requires agencies to make "public data assets" available under an open license and as "open Government data assets," *i.e.*, in machine-readable, open format, unencumbered by use restrictions other than intellectual property rights, and based on an open standard that is maintained by a standards organization.[312]  This requirement is to be

---

[308] Securus Comments to Reconsideration Petitions at 3; NCIC Mar. 6, 2025 *Ex Parte* at 6 (proposing as part of larger proposal to include setting a minimum deposit amount at $5).

[309] 5 U.S.C. §§ 601 *et seq*., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[310] *Id.* § 605(b).

[311] Congress enacted the OPEN Government Data Act as Title II of the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435 (2019), §§ 201-202.

[312] 44 U.S.C. §§ 3502(20), (22) (definitions of "open Government data asset" and "public data asset"), 3506(b)(6)(B) (public availability).

implemented "in accordance with guidance by the Director" of OMB.[313]  The term "public data asset" means "a data asset, or part thereof, maintained by the Federal Government that has been, or may be, released to the public, including any data asset, or part thereof, subject to disclosure under the Freedom of Information Act (FOIA)."[314]  A "data asset" is "a collection of data elements or data sets that may be grouped together,"[315] and "data" is "recorded information, regardless of form or the media on which the data is recorded."[316]  We delegate authority to the Wireline Competition Bureau, in consultation with the agency's Chief Data and Analytics Officer and after seeking public comment to the extent it deems appropriate, to determine whether any data assets maintained or created by the Commission pursuant to the rules adopted in the *2025 IPCS Order* are "public data assets" and if so, to determine when and to what extent such information should be published as "open Government data assets."  In doing so, WCB shall take into account the extent to which such data assets should not be made publicly available because they are not subject to disclosure under the Freedom of Information Act.  *See, e.g.*, 5 U.S.C. § 552(b)(4), (6)-(7) (exemptions concerning confidential commercial information, personal privacy, and information compiled for law enforcement purposes, respectively).  We also seek comment in the *2025 IPCS Notice* on whether any of the information proposed to be collected in the Notice would constitute "data assets" for purposes of the OPEN Government Data Act and, if so, whether such information should be published as "open Government data assets."

123.    *Comment Period and Filing Procedures.*  Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  All filings must refer to WC Docket Nos. 23-62 and 12-375.

- Electronic filers: Comments may be filed electronically using the Internet by accessing the Commission's Electronic Comment Filing System (ECFS): https://www.fcc.gov/ecfs.  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.
    - Filings can be sent by hand or messenger delivery, by commercial courier, or by the U.S. Postal Service.  **All filings must be addressed to the Secretary, Federal Communications Commission.**
    - Hand-delivered or messenger-delivered paper filings for the Commission's Secretary are accepted between 8:00 a.m. and 4:00 p.m. by the FCC's mailing contractor at 9050 Junction Drive, Annapolis Junction, MD 20701.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.
    - Commercial courier deliveries (any deliveries not by the U.S. Postal Service) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.
    - Filings sent by U.S. Postal Service First-Class Mail, Priority Mail, and Priority Mail Express must be sent to 45 L Street NE, Washington, DC 20554.

124.    Comments and reply comments must include a short and concise summary of the substantive arguments raised in the pleading.  Comments and reply comments must also comply with

---

[313] OMB has not yet issued final guidance.

[314] 44 U.S.C. § 3502(22).

[315] *Id.* § 3502(17).

[316] *Id.* § 3502(16).

section 1.49 and all other applicable sections of the Commission's rules. We direct all interested parties to include the name of the filing party and the date of the filing on each page of their comments and reply comments. All parties are encouraged to use a table of contents, regardless of the length of their submission. We also strongly encourage parties to track the organization set forth in the *2025 IPCS Notice* in order to facilitate our internal review process.

125. *Ex Parte Rules.* The proceeding that the *2025 IPCS Notice* initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[317] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in the prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b). In proceedings governed by section 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

126. *People with Disabilities.* To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530.

127. *Availability of Documents.* Comments, reply comments, and *ex parte* submissions will be publicly available online via ECFS.

128. *Further Information.* For further information, contact Shabbir Hamid, at (202) 418-2328 or Shabbir.Hamid@fcc.gov or IPCS@fcc.gov.

# VI. ORDERING CLAUSES

129. Accordingly, IT IS ORDERED, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2022), that this joint Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking in WC Docket Nos. 23-62 and 12-375 ARE ADOPTED.[318]

130. Accordingly, IT IS FURTHER ORDERED, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)-(j), 201(b), 218, 220, 276, 403, and 617, and the Martha Wright-

---

[317] 47 CFR § 1.1200 *et seq.*

[318] Pursuant to Executive Order 14215, 90 Fed. Reg. 10447 (Feb. 20, 2025), this regulatory action has been determined to be not significant under Executive Order 12866, 58 Fed. Reg. 68708 (Dec. 28, 1993).

Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2022), that this joint Report and Order and Order on Reconsideration SHALL BE EFFECTIVE upon publication of a summary of it in the Federal Register, compliance with which shall be required one hundred and twenty (120) days after such publication. The effective date and compliance date of this joint Report and Order and Order on Reconsideration supersede the extended deadline established by the *2025 Waiver Order* previously adopted by the Wireline Competition Bureau.[319] The Commission directs the Wireline Competition Bureau to announce the effective date and compliance date by subsequent Public Notice.

131. IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), the Petition for Reconsideration, filed October 21, 2024, by NCIC Inmate Communications IS GRANTED IN PART as described herein.

132. IT IS FURTHER ORDERED that, pursuant to applicable procedures set forth in sections 1.415 and 1.419 of the Commission's Rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments on this Further Notice of Proposed Rulemaking on or before 30 days after publication of a summary of this Further Notice of Proposed Rulemaking in the Federal Register and reply comments on or before 60 days after publication of a summary of this Further Notice of Proposed Rulemaking in the Federal Register.

133. IT IS FURTHER ORDERED that the Commission's Office of the Secretary, SHALL SEND a copy of this Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis and the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

134. IT IS FURTHER ORDERED that the Office of the Managing Director, Performance and Program Management, SHALL INCLUDE a copy of this Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking in a report to be sent to Congress and the Government Accountability Officer pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[319] *See generally 2025 IPCS Waiver Order*.

# APPENDIX A:  FINAL RULES

For the reasons set forth above, the Federal Communications Commission amends part 64 of Title 47 of the Code of Federal Regulations as follows:

## PART 64 – MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

1.  The authority citation for part 64 continues to read as follows:

**Authority:** 47 U.S.C. 151, 152, 154, 201, 202, 217, 218, 220, 222, 225, 226, 227, 227b, 228, 251(a), 251(e), 254(k), 255, 262, 276, 403(b)(2)(B), (c), 616, 620, 716, 1401-1473, unless otherwise noted; Pub. L. No. 115-141, Div. P, sec. 503, 132 Stat. 348, 1091; Pub. L. No. 117-338, 136 Stat. 6156.

### Subpart FF—Incarcerated People's Communications Services

2.  Amend § 64.6010 by deleting the contents of paragraphs (a) through (d), reserving the same paragraphs, and amending paragraph (e) as follows:

(e)  A Provider must not charge a per-minute rate for international audio Incarcerated People's Communications Services in each Prison or Jail it serves in excess of the applicable interim interstate and intrastate cap set forth in section 64.6030 plus the average amount that the Provider paid its underlying international service providers for audio communications to the International Destination of that communication, on a per-minute basis.  A Provider shall determine the average amount paid for communications to each International Destination for each calendar quarter and shall adjust its maximum rates based on such determination within one month of the end of each calendar quarter.

3.  Amend § 64.6015 by revising the introductory text and deleting paragraphs (a) through (c) to read as follows:

### § 64.6015 Prohibition against Site Commissions.

A Provider must not pay any Site Commissions associated with its provision of Incarcerated People's Communications Services.

4.  Revise § 64.6030 to read as follows:

### § 64.6030 Incarcerated People's Communications Services interim rate caps.

(a)  A Provider must offer each Incarcerated People's Communications Service at a per-minute rate.  A Provider may also offer an Incarcerated People's Communications Service under one or more Alternate Pricing Plans, pursuant to § 64.6140.

(b)  A Provider must not charge a per-minute rate for intrastate or interstate audio Incarcerated People's Communications Services in excess of the following interim rate caps:

(1)  $0.09 per minute for each Prison;

(2)  $0.08 per minute for each Jail having an Average Daily Population of 1,000 or more Incarcerated People;

(3)  $0.10 per minute for each Jail having an Average Daily Population of between and including 350 and 999 Incarcerated People;

(4)  $0.11 per minute for each Jail having an Average Daily Population of between and including 100 and 349 Incarcerated People;

(5)  $0.13 per minute for each Jail having an Average Daily Population of between and including 50 and 99 Incarcerated People; and

(6)  $0.17 per minute for each Jail having an Average Daily Population below and including 49 Incarcerated People.

(c) A Provider must not charge a per-minute rate for video Incarcerated People's Communications Services in excess of the following interim rate caps:

    (1) $0.23 per minute for each Prison;

    (2) $0.17 per minute for each Jail having an Average Daily Population of 1,000 or more Incarcerated People;

    (3) $0.17 per minute for each Jail having an Average Daily Population of between and including 350 and 999 Incarcerated People;

    (4) $0.19 per minute for each Jail having an Average Daily Population of between and including 100 and 349 Incarcerated People;

    (5) $0.23 per minute for each Jail having an Average Daily Population of between and including 50 and 99 Incarcerated People; and

    (6) $0.42 per minute for each Jail having an Average Daily Population of below and including 49 Incarcerated People.

(d) Providers may charge up to an additional $0.02 per minute above the audio and video Incarcerated People's Communications Services rate caps in paragraphs (b) and (c) of this section to recover the costs that a Correctional Facility may incur in making Incarcerated People's Communications Services available.

### APPENDIX B

### Final Regulatory Flexibility Analysis

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Federal Communications Commission (Commission) incorporated Initial Regulatory Flexibility Analyses (IRFAs) in the *Incarcerated People's Communications Services*; *Implementation of the Martha Wright-Reed Act*; *Rates for Interstate Inmate Calling Services*, *Further Notice of Proposed Rulemaking* (*2024 IPCS Notice*), released in July 2024), in the Notice of Proposed Rulemaking (Notice) in WC Docket Nos. 23-62 and 12-375 (released in March 2023), in the Sixth Further Notice of Proposed Rulemaking in WC Docket No. 12-375 (released in September 2022), and in the Fifth Further Notice of Proposed Rulemaking in WC Docket No. 12-375 (released in May 2021).[2]  The Commission sought written public comment on the proposals in those notices, including comment on the IFRA.  No comments were filed addressing the IRFA.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA and it (or a summary thereof) will be published in the Federal Register.[3]

### A.        Need for, and Objectives of, the Rules

2.        The Report and Order and Order on Reconsideration modify the incarcerated people's communications services (IPCS) regulatory framework, changing the methodology for calculating IPCS rate caps and adopting revised, interim audio and video IPCS rate caps that address unintended consequences of the Commission's *2024 IPCS Order*.[4]  These actions ensure rates and charges for incarcerated people's audio and video communications services are just and reasonable and IPCS providers are fairly compensated.

3.        The Report and Order and Order on Reconsideration alters the ratesetting methodology used in the *2024 IPCS Order* by: (1) excluding the use of unbilled minutes of use in calculating per-minute rate caps; (2) establishing a new rate cap tier for extremely small jails; (3) including previously excluded safety and security costs from rate cap calculations; and (4) removing an estimate of correctional facilities' costs from the rate caps and creating a separate rate additive to account for those costs.  In the Report and Order and Order on Reconsideration, the Commission adopts interim rate caps

---

[1] 5 U.S.C. §§ 601 *et seq*., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[2] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647, 8003-8014, Appx. C (2024) (*2024 IPCS Order* or *2024 IPCS Notice*).  The Report and Order and Order on Reconsideration continues ongoing efforts to reform providers' rates, charges, and practices in connection with i incarcerated people's communication services.  *See, e.g., Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669, 2706, Appx. A (2023); *Rates for Interstate Inmate Calling Services, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking*, 37 FCC Rcd 11900, 11991, Appx. D (2022); *Rates for Interstate Inmate Calling Services, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking*, 36 FCC Rcd 9519, 9697, Appx. D (2021).  The Report and Order and Order on Reconsideration also addresses issues raised in the Petition for Reconsideration of Network Communications International Corp. d/b/a NCIC Correctional Services, WC Docket Nos. 23-62 and 12-375, at 4 (filed Oct. 21, 2024) (NCIC Reconsideration Petition).

[3] 5 U.S.C. § 604.

[4] *2024 IPCS Order*, 39 FCC Rcd at 750-54, paras. 587-96.

for all intrastate and interstate audio IPCS and video IPCS and revises the existing dates for providers' compliance with the Commission's rules.[5]  The goal of the Report and Order and Order on Reconsideration is to properly balance the Commission's implementation of the dual statutory mandates—just and reasonable rates for consumers and fair compensation for providers—and thereby ensure the continued availability of IPCS to incarcerated people and preserve correctional officials' ability to provide safe and secure access to IPCS.

### B.      Summary of Significant Issues Raised by Public Comments in Response to the IRFA

4.      No comments were filed addressing the impact of the proposed rules on small entities.

### C.      Response to Comments by the Chief Counsel for the Small Business Administration Office of Advocacy

5.      Pursuant to the Small Business Jobs Act of 2010, which amended the RFA,[6] the Commission is required to respond to any comments filed by the Chief Counsel for the Small Business Administration Office of Advocacy (SBA), and also provide a detailed statement of any change made to the proposed rules as a result of those comments.[7]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

### D.      Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

6.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules they adopt.[8]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[9]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act (SBA).[10]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[11]  The SBA establishes small business size standards that agencies are required to use when promulgating regulations relating to small businesses; agencies may establish alternative size standards for use in such programs, but must consult and obtain approval from SBA before doing so.[12]

---

[5] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, DA 25-565, at 1, para. 1 (WCB June 30, 2025) (*2025 IPCS Waiver Order*) (extending the effective date provisions of the *2024 IPCS Order* to the earlier of April 1, 2027 or further Commission action to set an alternative date in these proceedings).

[6] Small Business Jobs Act of 2010, Pub. L. No. 111-240, 124 Stat. 2504 (2010).

[7] 5 U.S.C. § 604 (a)(3).

[8] *Id.* § 604.

[9] *Id*. § 601(6).

[10] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[11] 15 U.S.C. § 632.

[12] 13 CFR § 121.903.

7.      Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe three broad groups of small entities that could be directly affected by our actions.[13] In general, a small business is an independent business having fewer than 500 employees.[14]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 34.75 million businesses.[15]  Next, "small organizations" are not-for-profit enterprises that are independently owned and operated and are not dominant in their field.[16]  While we do not have data regarding the number of non-profits that meet that criteria, over 99 percent of nonprofits have fewer than 500 employees.[17]  Finally, "small governmental jurisdictions" are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less than fifty thousand.[18]  Based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.[19]

8.      The rules adopted in the Report and Order and Order on Reconsideration will apply to small entities in the industries identified in the chart below by their six-digit North American Industry Classification System (NAICS)[20] codes and corresponding SBA size standard.[21]  Based on currently available U.S. Census data regarding the estimated number of small firms in each identified industry, we conclude that the new rules will impact several small entities.  Where available, we also provide additional information regarding the number of potentially affected entities in the identified industries below.

---

[13] 5 U.S.C. § 601(3)-(6).

[14] *See* SBA, Office of Advocacy, *Frequently Asked Questions About Small Business*  (July 23, 2024), https://advocacy.sba.gov/wp-content/uploads/2024/12/Frequently-Asked-Questions-About-Small-Business_2024-508.pdf.

[15] *Id.*

[16] 5 U.S.C. § 601(4).

[17] *See* SBA, Office of Advocacy, *Small Business Facts, Spotlight on Nonprofits* (July 2019), https://advocacy.sba.gov/2019/07/25/small-business-facts-spotlight-on-nonprofits/.

[18] 5 U.S.C. § 601(5).

[19] *See* U.S. Census Bureau, 2022 Census of Governments –Organization, https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html, tables 1-11.

[20] The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy.  *See* www.census.gov/NAICS for further details regarding the NAICS codes identified in this chart.

[21] The size standards in this chart are set forth in 13 CFR § 121.201, by six-digit NAICS code.

**Table 1:  2022 U.S. Census Bureau Data by NAICS Code**

| Regulated Industry (Footnotes specify potentially affected entities within a regulated industry where applicable) | NAICS Code | SBA Size Standard | Total Firms[22] | Total Small Firms[23] | % Small Firms |
|---|---|---|---|---|---|
| All Other Telecommunications[24] | 517810 | $40 million | 1,673 | 1,007 | 60.19% |
| Wired Telecommunications Carriers[25] | 517111 | 1,500 employees | 3,403 | 3,027 | 88.95% |
| Wireless Telecommunications Carriers (except Satellite) | 517112 | 1,500 employees | 1,184 | 1,081 | 91.30% |
| Telecommunications Resellers[26] | 517121 | 1,500 employees | 955 | 847 | 88.69% |

---

[22] *U.S. Census Bureau, "Selected Sectors: Employment Size of Firms for the U.S.: 2022."* Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEEMPFIRM, 2025, and *"Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2022."* Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEREVFIRM, 2025.

[23] *Id.*

[24] Affected entities in this industry include Telecommunications Relay Service (TRS) Providers.

[25] Affected entities in this industry include Competitive Local Exchange Carriers (CLECs), Incumbent Local Exchange Carriers (Incumbent LECs), Interexchange Carriers (IXCs), Local Exchange Carriers (LECs), and Other Toll Carriers.

[26] Affected entities in this industry include Local Resellers, Payphone Service Providers, and Toll Resellers.

Table 2: Telecommunications Service Provider Data

| 2024 Universal Service Monitoring Report Telecommunications Service Provider Data [27]<br>(Data as of December 2023) | SBA Size Standard<br>(1500 Employees) | | |
|---|---|---|---|
| **Affected Entity** | **Total # FCC Form 499A Filers** | **Small Firms** | **% Small Entities** |
| Competitive Local Exchange Carriers (CLECs)[28] | 3,729 | 3,576 | 95.90 |
| Incumbent Local Exchange Carriers (Incumbent LECs) | 1,175 | 917 | 78.04 |
| Interexchange Carriers (IXCs) | 113 | 95 | 84.07 |
| Local Exchange Carriers (LECs)[29] | 4,904 | 4,493 | 91.62 |
| Local Resellers | 222 | 217 | 97.75 |
| Other Toll Carriers | 74 | 71 | 95.95 |
| Payphone Service Providers | 28 | 24 | 85.71 |
| Toll Resellers | 411 | 398 | 96.84 |
| Telecommunications Resellers | 633 | 615 | 97.16 |
| Wired Telecommunications Carriers[30] | 4,682 | 4,276 | 91.33 |
| Wireless Telecommunications Carriers (except Satellite)[31] | 585 | 498 | 85.13 |

### E.    Description of Economic Impact and Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities

9.    The RFA directs agencies to describe the economic impact of the adopted rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.[32]

---

[27] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2024), https://docs.fcc.gov/public/attachments/DOC-408848A1.pdf.

[28] Affected entities in this industry include all reporting local competitive service providers.

[29] Affected entities in this industry include all reporting fixed local service providers (CLECs & and Incumbent LECs).

[30] Local Resellers in this industry fall into another U.S. Census Bureau industry (Telecommunications Resellers) and therefore data for these providers are not included in this industry.

[31] Affected entities in this industry include all reporting wireless carriers and service providers.

[32] 5 U.S.C. § 604(a)(5).

10. IPCS providers that qualify as small entities should be positively impacted by the modifications made in the calculation of IPCS rate caps. Those changes include the incorporation of five additional safety and security costs in the rate caps, helping to ensure that IPCS providers, and particularly smaller IPCS providers, recover their costs and therefore receive fair compensation. The Commission also determined that only billed minutes will be used to calculate interim rate caps, which will help ensure that small and other providers will be fairly compensated. The creation of a new rate cap tier for extremely small jails (0-49 average daily population or ADP) is specifically designed to ensure that the predominantly smaller providers that serve the smallest jails, which the Commission's data collection show tend to have higher per-minute costs, will be able to recover their costs of service.

11. Additionally, the creation of a $0.02 per-minute interim rate additive to account for costs that facilities incur in making IPCS available will ensure the adopted IPCS rates allow smaller correctional institutions to be better able to recover those costs. Setting the effective date of the joint Report and Order and Order on Reconsideration at the date of its publication in the Federal Register but adding a separate compliance date at 120 days post-publication of the item in the Federal Register, instead of the April 1, 2027 date established in the *2025 Waiver Order*,[33] will give small and other providers a reasonable time frame to adapt to the new rates and ensure compliance burdens for small entities are reasonable. Additional resources or personnel should not be required to effectuate these changes because IPCS providers should already be familiar with how to adjust their systems to effectuate new rate caps and should be able to make the necessary operational changes.

F. **Discussion of Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

12. The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[34]

13. In the Report and Order and Order on Reconsideration, the Commission took several steps to minimize the economic impact of its IPCS regulations on small entities. First, the item modifies existing rate caps by including additional safety and security costs in the rate cap calculations which will minimize the chance that providers, particularly smaller providers with generally higher per-minute costs, will not be able to recover their costs. The Commission also adopts a new rate cap tier that provides additional differentiation between five different sizes of jails—large, medium, small, very small, and extremely small—based on ADP. The use of five different size tiers for jails is supported in the record and accounts for differences in costs incurred by providers serving these different facility sizes. Adding this extremely small jail tier minimizes the risk that providers, and smaller providers that typically serve smaller facilities, will not be able to recover their cost of service. However, we decline to adopt a proposed alternative to set an additional tier below extremely small because it would likely create a disproportionate compliance burden for jails with a lower ADP. Finally, instead of the approach adopted in the *2024 IPCS Order*, the Commission adopts a $0.02 per-minute rate additive to account for correctional facilities' IPCS costs, which will aid with cost recovery and minimize economic uncertainties faced by smaller correctional facilities when they make service available to their incarcerated populations.

---

[33] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, DA 25-565 (WCB June 30, 2025) (*2025 IPCS Waiver Order*).

[34] 5 U.S.C. § 604(a)(6).

**G.      Report to Congress**

14.      The Commission will send a copy of the Report and Order and Order on Reconsideration, including this Final Regulatory Flexibility Analysis, in a report to Congress pursuant to the Congressional Review Act.[35]  In addition, the Commission will send a copy of the Report and Order and Order on Reconsideration, including this Final Regulatory Flexibility Analysis, to the Chief Counsel for the SBA Office of Advocacy and will publish a copy of the Report and Order and Order on Reconsideration, and this Final Regulatory Flexibility Analysis (or a summary thereof) in the Federal Register.[36]

---

[35] 5 U.S.C. § 801(a)(1)(A).

[36] *Id.* § 604(b).

## APPENDIX C

### Initial Regulatory Flexibility Analysis

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Federal Communications Commission (Commission) has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the policies and rules proposed in the Further Notice of Proposed Rulemaking (*Further Notice*) assessing the possible significant economic impact on small entities.  The Commission requests written public comments on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments specified on the first page of the *Further Notice*.  The Commission will send a copy of the *Further Notice*, including this IRFA, to the Chief Counsel for the Small Business Administration Office of Advocacy (SBA).[2]  In addition, the *Further Notice* and IRFA (or summaries thereof) will be published in the Federal Register.[3]

#### A.  Need for, and Objectives of, the Proposed Rules

2.        In the *Further Notice*, the Commission seeks additional comment on establishing permanent, just and reasonable, and fairly compensatory rate caps for audio and video incarcerated people's communications services (IPCS).  The Commission requests comment on what information and changes to its rate setting methodology will be needed to allow the adoption of permanent rate caps for audio IPCS, among other matters.  The Commission also requests comment regarding the status of the video IPCS market and how costs, prices, revenues, and services have changed over time.  Additionally, the Commission requests information on the evolution of the video IPCS marketplace and on when it will be able to set reliable permanent video IPCS rate caps.  Further, the Commission seeks comment on matters applicable to both audio and video IPCS, including how it should collect data, how safety and security services have changed over time, and the relationship of audio IPCS pricing and usage to video IPCS pricing and usage.

3.        The Commission also seeks comment on whether it should adopt a permanent rate additive to account for correctional facility costs related to the provision of IPCS and on how to structure such a rate additive.  The Commission also asks whether a permanent rate additive should be uniform across all rate tiers or whether it should vary by correctional facility type and/or size.  Further, the Commission asks how it can obtain updated, relevant data on correctional facilities' costs given that facilities are not regulated entities subject to data retention and accounting requirements.  The Commission seeks comment on whether it should make the interim $0.02 per-minute uniform rate additive permanent.

4.        The Commission also seeks comment on how it should address site commission payments made by IPCS providers to the facilities they serve.  Specifically, the Commission proposes to retain the prohibition on site commission payments and seeks comment on the extent to which its adoption of an industry-wide, per-minute rate additive, either uniform or non-uniform, would eliminate any need for site commission payments.  The Commission asks whether facilities could use a rate additive to recover their used and useful costs of allowing access to IPCS in lieu of, or in addition to, site commission payments.  Alternatively, the Commission seeks comment on whether, if the Commission were to permanently allow providers to pay site commissions, it should cap or otherwise limit to the amount or type of site commissions providers may pay.  Additionally, the Commission seeks comment on

---

[1] 5 U.S.C. §§ 601 *et seq*., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[2] *Id.* § 603(a).

[3] *Id*.

the appropriate timeframe for compliance with any site commissions reforms that may be adopted in response to the *Further Notice*.

5.    The Commission also seeks comment on its proposal to retain the prohibition on ancillary service charges adopted in the *2024 IPCS Order*. The Commission also seeks comment on whether the benefits of retaining the prohibition on separate ancillary service charges would outweigh the burdens. Further, the Commission seeks specific comment on two types of ancillary service charges—automated payment fees and third-party financial transaction fees—and asks whether they should be reinstated. Lastly, the Commission seeks comment on whether any alternatives to reinstating automated payment fees and third-party financial transactional fees exist.

### B.    Legal Basis

6.    The proposed actions are authorized pursuant to sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2022).

### C.    Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

7.    The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[4]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[6]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Act.[7]  The SBA establishes small business size standards that agencies are required to use when promulgating regulations relating to small businesses; agencies may establish alternative size standards for use in such programs, but must consult and obtain approval from SBA before doing so.[8]

8.    Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe three broad groups of small entities that could be directly affected by our actions.[9]  In general, a small business is an independent business having fewer than 500 employees.[10]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 34.75

---

[4] 5 U.S.C. § 603(b)(3).

[5] *Id*. § 601(6).

[6] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[7] 15 U.S.C. § 632.

[8] 13 CFR § 121.903.

[9] 5 U.S.C. § 601(3)-(6).

[10] *See* SBA, Office of Advocacy, *Frequently Asked Questions About Small Business* (July 23, 2024), https://advocacy.sba.gov/wp-content/uploads/2024/12/Frequently-Asked-Questions-About-Small-Business_2024-508.pdf.

million businesses.[11]  Next, "small organizations" are not-for-profit enterprises that are independently owned and operated and not dominant their field.[12]  While we do not have data regarding the number of non-profits that meet that criteria, over 99 percent of nonprofits have fewer than 500 employees.[13]  Finally, "small governmental jurisdictions" are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less than fifty thousand.[14]  Based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.[15]

9.  The rules proposed in the *Further Notice* will apply to small entities in the industries identified in the chart below by their six-digit North American Industry Classification System (NAICS)[16] codes and corresponding SBA size standard.[17]  Based on currently available U.S. Census data regarding the estimated number of small firms in each identified industry, we conclude that the proposed rules will impact a substantial number of small entities.  Where available, we also provide additional information regarding the number of potentially affected entities in the industries identified below.

**Table 1: 2022 U.S. Census Bureau Data by NAICS Code**

| Regulated Industry (Footnotes specify potentially affected entities within a regulated industry where applicable) | NAICS Code | SBA Size Standard | Total Firms[18] | Total Small Firms[19] | % Small Firms |
|---|---|---|---|---|---|
| All Other Telecommunications[20] | 517810 | $40 million | 1,673 | 1,007 | 60.19% |

---

[11] *Id.*

[12] 5 U.S.C. § 601(4).

[13] *See* SBA, Office of Advocacy, *Small Business Facts, Spotlight on Nonprofits* (July 2019), https://advocacy.sba.gov/2019/07/25/small-business-facts-spotlight-on-nonprofits/.

[14] 5 U.S.C. § 601(5).

[15] *See* U.S. Census Bureau, 2022 Census of Governments –Organization, https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html, tables 1-11.

[16] The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy.  *See* www.census.gov/NAICS for further details regarding the NAICS codes identified in this chart.

[17] The size standards in this chart are set forth in 13 CFR § 121.201, by six-digit NAICS code.

[18] *U.S. Census Bureau*, "*Selected Sectors: Employment Size of Firms for the U.S.: 2022.*" Economic Census, Table ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., EC2200SIZEEMPFIRM, 2025, and "*Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2022.*" Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S. Table EC2200SIZEREVFIRM, 2025.

[19] *Id.*

[20] Affected entities in this industry include Telecommunications Relay Service (TRS) Providers.

| Regulated Industry (Footnotes specify potentially affected entities within a regulated industry where applicable) | NAICS Code | SBA Size Standard | Total Firms[18] | Total Small Firms[19] | % Small Firms |
|---|---|---|---|---|---|
| Wired Telecommunications Carriers[21] | 517111 | 1,500 employees | 3,403 | 3,027 | 88.95% |
| Wireless Telecommunications Carriers (except Satellite) | 517112 | 1,500 employees | 1,184 | 1,081 | 91.30% |
| Telecommunications Resellers[22] | 517121 | 1,500 employees | 955 | 847 | 88.69% |

**Table 2: Telecommunications Service Provider Data**

| 2024 Universal Service Monitoring Report Telecommunications Service Provider Data [23] (Data as of December 2023) | SBA Size Standard (1500 Employees) | | |
|---|---|---|---|
| Affected Entity | Total # FCC Form 499A Filers | Small Firms | % Small Entities |
| Competitive Local Exchange Carriers (CLECs)[24] | 3,729 | 3,576 | 95.90 |
| Incumbent Local Exchange Carriers (Incumbent LECs) | 1,175 | 917 | 78.04 |
| Interexchange Carriers (IXCs) | 113 | 95 | 84.07 |
| Local Exchange Carriers (LECs)[25] | 4,904 | 4,493 | 91.62 |
| Local Resellers | 222 | 217 | 97.75 |
| Other Toll Carriers | 74 | 71 | 95.95 |
| Payphone Service Providers | 28 | 24 | 85.71 |
| Toll Resellers | 411 | 398 | 96.84 |
| Telecommunications Resellers | 633 | 615 | 97.16 |

[21] Affected entities in this industry include Competitive Local Exchange Carriers (CLECs), Incumbent Local Exchange Carriers (Incumbent LECs), Interexchange Carriers (IXCs), Local Exchange Carriers (LECs), and Other Toll Carriers.

[22] Affected entities in this industry include Local Resellers, Payphone Service Providers, and Toll Resellers.

[23] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2024), https://docs.fcc.gov/public/attachments/DOC-408848A1.pdf.

[24] Affected entities in this industry include all reporting local competitive service providers.

[25] Affected entities in this industry include all reporting fixed local service providers (CLECs and Incumbent LECs).

| 2024 Universal Service Monitoring Report Telecommunications Service Provider Data [25] (Data as of December 2023) | SBA Size Standard (1500 Employees) | | |
|---|---|---|---|
| **Affected Entity** | **Total # FCC Form 499A Filers** | **Small Firms** | **% Small Entities** |
| Wired Telecommunications Carriers[26] | 4,682 | 4,276 | 91.33 |
| Wireless Telecommunications Carriers (except Satellite)[27] | 585 | 498 | 85.13 |

### D. Description of Economic Impact and Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

10.     The RFA directs agencies to describe the economic impact of proposed rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirements and the type of professional skills necessary for preparation of the report or record.[28]

11.     In the *Further Notice*, the Commission seeks comment on a series of matters whose resolution will affect all IPCS providers and correctional facilities, including those that may be small entities. These matters include whether the Commission should establish permanent audio and video IPCS rate caps for all types of facilities (including jails with average daily populations below 1,000) and whether the Commission should adopt a permanent IPCS rate additive to account for correctional facility costs and how to structure a permanent rate additive. In considering how to allocate IPCS providers' costs, the Commission seeks comment on how these costs should be divided between regulated and nonregulated costs. In addition, the Commission seeks to identify the relevant safety and security data necessary to set permanent IPCS rate caps. The Commission also seeks comment on whether it should continue to prohibit site commission payments and ancillary service charges given its other actions with regard to IPCS, and whether any such changes should result in additional annual reporting requirements.

12.     The Commission anticipates that all IPCS providers, including those that are small entities, will be subject to any rules adopted in response to the *Further Notice* and that such rules will not affect small providers disproportionately. The Commission requests comment on the appropriate amount of time needed for ICPS providers to comply with the proposed rules, including time needed to negotiate with correctional facilities to implement any of the proposed changes. In addition, the Commission expects that all IPCS providers, including those that are small entities, will need to hire, or retain the services of, lawyers and other professionals to ensure they comply with the proposed rules. The Commission anticipates that the information it receives in comments will help it identify and evaluate relevant compliance matters for small entities, including compliance costs and other burdens that may result from implementation of the proposals and inquiries in the *Further Notice*.

---

[26] Local Resellers in this industry fall into another U.S. Census Bureau industry (Telecommunications Resellers) and therefore data for these providers are not included in this industry.

[27] Affected entities in this industry include all reporting wireless carriers and service providers.

[28] 5 U.S.C. § 603(b)(4).

>    E.    **Discussion of Significant Alternatives Considered That Minimize the Significant Economic Impact on Small Entities**

13.    The RFA directs agencies to provide a description of any significant alternatives to the proposed rules that would accomplish the stated objectives of applicable statutes, and minimize any significant economic impact on small entities.[29]  The discussion is required to include alternatives such as: "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[30]

14.    In the *Further Notice*, the Commission seeks to continue its implementation of the Martha Wright-Reed Act, including its directive that the Commission ensure just, reasonable, and fairly compensatory rates and charges for incarcerated people's audio and video communications services. While doing so, the Commission seeks comment on a number of alternatives to determine the potential impact of the proposals in the *Further Notice* on small businesses and, in particular, any disproportionate impact or unique burdens that small businesses may face in complying with any rules the Commission may adopt.  This includes whether and how to determine the evolution of the video IPCS marketplace, and how the data may be used to set permanent rate caps.  Other alternatives considered in the *Further Notice* include whether and how to structure a permanent rate cap additive while continuing the prohibition on site commission payments, and the associated burdens that may result for IPCS providers, correctional facilities, and IPCS consumers.  Alternatively, should site commissions be permitted, the Commission seeks comment on whether there should be a cap on such payments.

15.    In evaluating the proposals in the *Further Notice*, the Commission will consider the information submitted regarding the costs small providers incur in the provision of audio and video IPCS, as well the costs and benefits of those proposals and any alternatives to those proposals suggested in the record.  Considering the economic impact on any IPCS providers that are small entities through comments filed in response to this *Further Notice* and this IRFA could allow the Commission to refine its cost-benefit analysis and provide other input that would enable it to identify reasonable alternatives that may not be readily apparent, and offer alternatives not already considered that could minimize the economic impact on small entities.

>    F.    **Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

16.    None.

---

[29] 5 U.S.C. § 603(c).

[30] *Id.* § 603(c)(1)-(4).

**APPENDIX D**

**Rate Cap Methodology**

1.     This appendix sets forth the Commission's revised methodology for setting just and reasonable and fairly compensatory rate caps for incarcerated people's communications services (IPCS). The appendix reflects our reassessment of the data and other information IPCS providers submitted to the 2023 Mandatory Data Collection in light of the expanded record developed in response to the *2024 IPCS Notice* and the NCIC Petition for Reconsideration of aspects of the *2024 IPCS Order*.[1]  Our reassessment relies on the same dataset that the Commission staff developed for the *2024 IPCS Order* (as described in Appendix D of that order) and, subject to the exceptions discussed below, adheres to the rate cap methodology set forth in Appendices E, F, H, and I of that order.[2]

2.     *Unit of Sale.*  Our revised rate cap methodology relies on billed minutes of audio or video IPCS as the unit of sale to determine industry average costs per minute.[3]  Billed minutes refer to the number of audio and/or video IPCS minutes supplied during a year for which payment is demanded.[4] Table 1 summarizes the billed and total audio and video IPCS minutes for each reporting provider, along with the percentage of total minutes that are billed and share of industry billed and total minutes for each provider.

3.     The percentage of total IPCS minutes that are billed significantly differs between audio and video IPCS.  Table 1 shows that 93.1% of all audio IPCS minutes are billed.  Providers with the lowest percentages of billed audio minutes include {[          ]}, {[                    ]}, {[               ]}, and {[                    ]}.  Three providers ({[                    ]}) report {[          ]} of their audio minutes as billed.  In contrast, only 72.5% of all video IPCS minutes are billed, with significant variation among providers ranging from {[                    ]}.  {[                    ]} reports the lowest percent of billed video minutes at {[          ]}, followed in increasing order by {[               ]}, {[                    ]}, and {[                    ]}.  Only two providers ({[               ]}) report {[          ]} of billed video minutes.

4.     The industry share of billed versus total minutes across providers also varies between audio and video IPCS.  Securus and ViaPath supply almost {[          ]} of the industry's billed and total audio minutes, with Securus supplying more than a third and ViaPath supplying nearly half of industry audio minutes.  ICSolutions has the third largest share of audio minutes at {[          ]}, while the remaining nine providers account for less than {[          ]} of the industry.  As for video IPCS, ViaPath similarly supplies a large share of the billed and total minutes ({[                    ]}), but Securus, the second largest provider of video IPCS, supplies a much smaller share of respective industry billed and total video minutes ({[                    ]}) compared to audio IPCS minutes ({[                    ]}). HomeWAV, ICSolutions, and Pay Tel account for {[                    ]} of billed video minutes and

[1] *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647, 7650-52, paras. 5-8 (2024) (*2024 IPCS Order* or *2024 IPCS Notice*); Petition for Reconsideration of Network Communications International Corp. d/b/a NCIC Correctional Services, WC Docket Nos. 23-62 and 12-375 (filed Oct. 21, 2024) (NCIC Reconsideration Petition).

[2] *2024 IPCS Order*, 39 FCC Rcd at 7753, para. 189; *id.* at 8015-51, 8056-96, Appendices D, E, F, H, I.

[3] In the *2024 IPCS Order*, the Commission relied on the sum of billed and unbilled minutes (i.e., total minutes) in calculating those averages.  *2024 IPCS Order*, 39 FCC Rcd at 7753, para. 189; *id.* at 8024-25, Appx. E, para. 4.

[4] 2023 IPCS Mandatory Data Collection Instructions at 8.

{[                        ]} of total video minutes, respectively. The remaining five providers account for
{[                        ]} of industry billed and total video minutes, respectively.

**Table 1: Billed and Total Audio and Video IPCS Minutes, By Provider**

| | Provider | Billed Minutes | Share of Industry Billed Minutes | Total Billed and Unbilled Minutes | Share of Industry Total Minutes | Share Billed Minutes of Total Minutes |
|---|---|---|---|---|---|---|
| **Audio** | ATN | {[ | | | | |
| | CPC | | | | | |
| | City Tele-Coin | | | | | |
| | HomeWAV | | | | | |
| | ICSolutions | | | | | |
| | NCIC | | | | | |
| | Pay Tel | | | | | |
| | Prodigy | | | | | |
| | Securus | | | | | |
| | Smart | | | | | |
| | TKC | | | | | |
| | ViaPath | | | | | ]} |
| | **Industry** | 10,494,473,118 | | 11,266,271,215 | | 93.1% |
| **Video** | ATN | {[ | | | | |
| | CPC | | | | | |
| | City Tele-Coin | | | | | |
| | HomeWAV | | | | | |
| | ICSolutions | | | | | |
| | NCIC | | | | | |
| | Pay Tel | | | | | |
| | Prodigy | | | | | |
| | Securus | | | | | |
| | Smart | | | | | |
| | TKC | | | | | |
| | ViaPath | | | | | ]} |
| | **Industry** | 407,122,234 | | 561,373,604 | | 72.5% |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

5.     *Separation into Tiers.* In setting rate caps in the *2024 IPCS Order*, the Commission adopted tiers for prisons and different sized jails (large, medium, small, and very small) based on average daily population (ADP) data reported by providers.[5] Our revised rate cap methodology adds a new rate cap tier for extremely small jails (0-49 ADP). The largest three jail tiers remain the same as those adopted in the *2024 IPCS Order*: large jails (ADP ≥ 1,000); medium jails (350 ≤ ADP < 1,000); and small jails (100 ≤ ADP < 350).[6] We divide the very small jail category, originally including all jails with an ADP of less than 100, into two jail tiers: very small jails (50 ≤ ADP < 100) and extremely small jails (ADP < 50). Jails with an ADP below 100 include a disproportionally large number of facilities with

---

[5] *2024 IPCS Order*, 39 FCC Rcd at 7725-33, paras. 146-55.

[6] *Id.* at 7725-26, para. 146.

disparate demand and cost characteristics. Table 2 sets out summary statistics for audio and video IPCS for each rate tier as well as the industry as a whole. There are 534 very small jails and 881 extremely small jails, or 1,415 facilities, out of the 4,149 total facilities that provide access to audio IPCS. As for video IPCS, there are 325 very small and 259 extremely small jails, or 684 facilities out of 2,234 total facilities that provide access to video IPCS. The very small and extremely small jail tiers not only comprise a significant proportion of these facilities, but also of total industry video IPCS expenses. These tiers, however, account for a small share of total ADP (2.1% and 1.1% for audio and 2.2% and 0.7% for video, respectively) and billed minutes (1.7% and 0.9% for audio and 6% and 1.7% for video, respectively).[7] Despite the small share of billed minutes and ADP of the extremely small jail tier, jails in that tier account for an outsized share of total IPCS expenses for both audio and video IPCS (8% for audio and 10.1% for video). This observation supports the disaggregation of the previous very small jail tier into the two new tiers we use in our revised rate cap methodology.

6. Additionally, Table 2 shows that the average costs of providing audio and video IPCS differed between very small and extremely small jails, further supporting our disaggregation of the former very small tier (ADP < 100) into two separate tiers. For example, the average per minute cost of providing audio IPCS in very small jails was $0.083 as compared to $0.115 for extremely small jails. For video IPCS, the average per minute cost of providing service in very small jails was $0.192 as compared to $0.282 for extremely small jails. The cost differences between these two sets of facilities support disaggregation of the former very small jail tier into two tiers to ensure our rate caps are just and reasonable and fairly compensate the providers serving these two sets of facilities.

---

[7] Rate tiers for larger facilities account for all other ADP and billed minutes. For example, prisons account for a majority of ADP and billed minutes and nearly half of total audio IPCS expenses. For video IPCS, ADP and billed minutes are more dispersed among the largest four facility tiers, with prisons still retaining the majority of total ADP.

**Table 2: Summary Statistics for Audio and Video IPCS, By Facility Type**

| | Facility Type | Facility Count | ADP | Share of ADP | Billed Minutes | Share of Billed Minutes | Total IPCS Expenses | Share of Total IPCS Expenses |
|---|---|---|---|---|---|---|---|---|
| **Audio** | Prisons | 1,330 | 1,140,488 | 62.7% | 6,309,115,632 | 60.1% | $153,526,350 | 46.4% |
| | Large Jails | 120 | 218,291 | 12.0% | 1,569,714,440 | 15.0% | $39,300,968 | 11.9% |
| | Medium Jails | 414 | 235,731 | 13.0% | 1,502,276,185 | 14.3% | $58,970,501 | 17.8% |
| | Small Jails | 872 | 165,422 | 9.1% | 833,730,354 | 7.9% | $52,339,244 | 15.8% |
| | Very Small Jails | 534 | 38,560 | 2.1% | 180,183,005 | 1.7% | $14,959,984 | 4.5% |
| | Extremely Small Jails | 881 | 19,294 | 1.1% | 99,453,502 | 0.9% | $11,426,685 | 3.5% |
| | **Industry** | 4,151 | 1,817,786 | | 10,494,473,118 | | $330,523,732 | |
| **Video** | Prisons | 633 | 624,765 | 56.7% | 85,477,740 | 21.0% | $20,396,004 | 30.9% |
| | Large Jails | 83 | 143,987 | 13.1% | 60,592,951 | 14.9% | $9,241,790 | 14.0% |
| | Medium Jails | 325 | 184,869 | 16.8% | 123,825,773 | 30.4% | $15,226,764 | 23.1% |
| | Small Jails | 624 | 117,241 | 10.6% | 105,461,579 | 25.9% | $14,486,897 | 21.9% |
| | Very Small Jails | 327 | 24,046 | 2.2% | 24,444,147 | 6.0% | $4,698,191 | 7.1% |
| | Extremely Small Jails | 260 | 7,257 | 0.7% | 7,009,229 | 1.7% | $1,975,636 | 3.0% |
| | **Industry** | 2,252 | 1,102,165 | | 406,811,419 | | $66,025,282 | |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs. We exclude facilities with no valid data entries for audio/video IPCS expenses, total audio/video minutes, ADP when the facility is a jail, and/or facility type. Total audio IPCS expenses are unadjusted and do not include TRS or facility additives.

7.       *Upper Bound Analysis.* We again establish zones of reasonableness, separately for audio and video IPCS and for each facility tier, and determine interim audio and video IPCS rate caps using these zones.[8] The upper bounds of our zones of reasonableness incorporate four distinct per-minute expense components: (1) audio/video IPCS expenses; (2) audio/video safety and security expenses; (3) ancillary service expenses; and (4) a telecommunications relay services (TRS) allowance. These bounds are calculated in the same manner as in the *2024 IPCS Order*, with two exceptions. First, as previously indicated, the unit of sale is now billed audio or video IPCS minutes of use rather than total billed and unbilled minutes as in the *2024 IPCS Order*. Second, we remove the correctional facilities' expense component previously included in the upper bounds in the *2024 IPCS Order* and do not consider it in the determination of our zones of reasonableness or our rate caps. Instead, we adopt a separate per-minute rate cap additive to allow for recovery of these expenses. We make this separation because, if a provider does not incur expenses by collecting monies from its customers and remitting those monies to the facility, the additive should not be included in its rate cap.

8.       The per billed minute ancillary services expenses included in our rate cap calculations equal the sum of all ancillary service expenses divided by the sum of all billed audio and video minutes for providers that reported ancillary expenses. Those expenses total $0.013 per billed minute—an increase from the estimate of $0.011 per minute in the *2024 IPCS Order* that results from using billed,

---

[8] *2024 IPCS Order*, 39 FCC Rcd at 8056-96, Appendices H, I.

instead of total, minutes to calculate per billed minute expenses.[9] The TRS per billed minute allowance ($0.002 per minute) remains unchanged from the *2024 IPCS Order*.[10]

**Table 3: Upper Bound IPCS Expenses Per Billed Minutes, By Facility Type ($/Minute)**

| | Audio | | | | Video | | | |
|---|---|---|---|---|---|---|---|---|
| | IPCS Expenses (1A) | Safety and Security (2A) | (1A) + (2A) | Upper Bounds: (1A) + (2A) + $0.002 + $0.013* | IPCS Expenses (1B) | Safety and Security (2B) | (1B) + (2B) | Upper Bounds: (1B) + (2B) + $0.002 + $0.013* |
| Prisons | 0.024 | 0.054 | 0.079 | 0.094 | 0.242 | 0.213 | 0.455 | 0.470 |
| Large Jails | 0.025 | 0.046 | 0.071 | 0.086 | 0.154 | 0.158 | 0.312 | 0.327 |
| Medium Jails | 0.039 | 0.043 | 0.082 | 0.097 | 0.126 | 0.118 | 0.244 | 0.259 |
| Small Jails | 0.063 | 0.030 | 0.093 | 0.108 | 0.143 | 0.072 | 0.215 | 0.230 |
| Very Small Jails | 0.083 | 0.030 | 0.113 | 0.128 | 0.200 | 0.047 | 0.248 | 0.263 |
| Extremely Small Jails | 0.115 | 0.038 | 0.153 | 0.168 | 0.348 | 0.072 | 0.421 | 0.436 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs. Ancillary services additive calculated using the 2023 Mandatory Data Collection commission and revenue sharing Excel tab for ancillary services expenses totals.

* Per-minute additives for TRS ($0.002) and ancillary services ($0.013).

9. *Lower Bound Analysis.* We establish lower bounds for our zones of reasonableness by making reasoned adjustments to reported provider cost data, which we explain below. After the adjustments to certain expense categories, the lower bounds incorporate the following components of industry average expenses: (1) audio/video IPCS expenses; (2) audio/video IPCS safety and security expenses; (3) ancillary service expenses;[11] and (4) a TRS allowance.

10. *Weighted Average Cost of Capital and Tax-Deductible Interest Expense Adjustments.* In their 2023 Mandatory Data Collection submissions, Securus reported an {[ ]} weighted average cost of capital (WACC), and ViaPath reported a {[ ]} WACC for audio and video IPCS, safety and security measures, and ancillary services.[12] In determining the lower bounds of our zones of reasonableness, we again adjust Securus's and ViaPath's claimed WACCs and Securus's claimed tax-deductible interest expense for the same reasons and in the same manner as in the *2024 IPCS Order*.[13]

---

[9] *Id.* at 8057, Appx. H, para. 4.

[10] Use of billed minutes instead of total minutes to calculate the TRS additive produces the same per minute figure when rounded to the third decimal place. *See 2024 IPCS Order*, 39 FCC Rcd at 8057, Appx. H, para. 5.

[11] The impact of the expense adjustments on the allowance for recovery of ancillary service expenses is again trivial, decreasing the lower bounds by $0.002 per minute (after rounding the upper- and lower-bound figures to the nearest third decimal place). Accordingly, the lower-bound allowance for recovery of ancillary services is $0.011 per billed minute.

[12] *See* Securus Excel template supplement, Company-Wide Information worksheet, row 57, columns C-J; Facility Audio IPCS Costs worksheet, row 68, columns B-BGS; and Facility Video IPCS Costs worksheet, row 68, columns B-BGS; ViaPath Excel template supplement, Company-Wide Information worksheet, row 57, columns C-J; Facility Audio IPCS Costs worksheet, row 68, columns B-AWY; and Facility Video IPCS Costs worksheet, row 68, columns B-AWY.

[13] For a complete discussion, see *2024 IPCS Order*, 39 FCC Rcd at 7758-59, para. 203 and *id.* at 8061-72, Appx. I, paras. 3-37.

There are three steps to these adjustments.  First, we replace Securus's and ViaPath's claimed WACC figures with the default WACC of 9.75% on their Excel templates to adjust their reported annual total expenses.[14]  Decreasing the WACC decreases the (dollar) return on net capital stock reflected in annual total expenses; at the same time, the lower return reduces taxable income, and thus the allowance for state and federal income taxes reflected in annual total expenses.[15]  Second, we replace the tax-deductible interest expense Securus reported for IPCS and IPCS-related services with a formula that multiplies Securus's return by 30%.[16]  Use of this formula reduces the WACC adjustment's impact on Securus's annual total expenses because it reduces tax-deductible interest expense as return decreases, thereby increasing taxable income, and thus the allowance for state and federal income taxes.[17]  Third, we reduce the safety and security measure expenses these providers reported at the facility level by the same percentage by which these expenses are reduced at the company-wide level as a result of the WACC and tax-deductible interest expense adjustments.[18]

11.     The adjustments we make in this Order to Securus's and ViaPath's claimed WACCs and Securus's tax-deductible interest expense also have the effect of reducing these providers' claimed expenses for all seven categories of safety and security measures, as here we make no adjustment to remove any of these categories.[19]  Moreover, the adjustments we make here to Securus's WACC and tax-deductible interest expense are made prior to the adjustments we make below to bring Securus's video expenses in line with industry expenses (by disallowing a portion of Securus's claimed expenses for both video IPCS costs and video safety and security measure costs).  In the *2024 IPCS Order*, the Commission disallowed five of the seven categories of safety and security measure expenses, but did so after making the corresponding WACC and tax-deductible interest expense adjustments to all seven categories of these providers' safety and security measure expenses.  The Commission did not make an adjustment in the *2024 IPCS Order* to disallow any of Securus's claimed expenses within the two categories of safety and security measure for which it allowed recovery of expenses as a general matter.  Accordingly, the adjustments we make here to Securus's and ViaPath's WACCs and Securus's tax-deductible interest expense on these providers' claimed safety and security measure expenses produce the same effect as the adjustments the Commission made in the *2024 IPCS Order*, prior to excluding five categories of safety

---

[14] *See 2024 IPCS Order*, 39 FCC Rcd at 8070, Appx. I, para. 35.  Annual total expenses is the sum of annual operating expenses and annual capital expenses including a return on net capital stock to cover the cost of capital. Net capital stock is gross investment in assets, net of accumulated depreciation and amortization, accumulated deferred federal and state income taxes, and customer prepayments or deposits, plus an allowance for cash working capital.  The Excel template uses formulas and investment, expense, and other inputs to calculate annual total expenses for audio IPCS, video IPCS, safety and security measures, and ancillary services at the company level and separately for audio IPCS and video IPCS at each facility.  The WACC and tax-deductible interest expense are two of these inputs.  The Excel template calculates return by multiplying net capital stock by the provider's claimed WACC or the default after-tax rate of return of 9.75%.  *See id.* at 8070-72, Appx. I, paras. 35-37.

[15] *Id.* at 8070-71, Appx. I, para. 35.

[16] This adjustment is consistent with the explanation provided by Securus in its Word supplement as to how it determined its tax-deductible interest expense.  *Id.*

[17] *Id.*

[18] *Id.*

[19] The seven categories of safety and security measures are: (i) Communications Assistance for Law Enforcement Act (CALEA) compliance measures; (ii) law enforcement support services; (iii) communication security services; (iv) communication recording services; (v) communication monitoring services; (vi) voice biometrics services; and (vii) other safety and security measures.  The Commission allowed recovery of expenses claimed for categories (i) and (iii) in the *2024 IPCS Order* and disallowed the other categories of these expenses.  *Id.* at 7757-58, para. 200; *id*. at 8079, Appx. I, para. 56.

and security measure expenses in the *2024 IPCS Order* and disallowing a portion of Securus's claimed expenses for safety and security measures in this Order.

12.     Table 4 summarizes IPCS and safety and security expenses for audio and video IPCS before and after adjusting Securus's and ViaPath's WACC and Securus's tax-deductible interest expenses.  Adjusting both providers' WACCs to 9.75% and Securus's tax-deductible interest expense results in total audio and video IPCS and safety and security expenses decreasing by about $60 million.[20] This reduction corresponds to a 6.2% decrease in total expenses for the industry.  The total of the expenses reported separately by ICSolutions and ViaPath for the 22 facilities at which ICSolutions is the contractor and ViaPath is the subcontractor is reduced because of the adjustment to ViaPath's WACC, but the impact is limited.[21]  As shown in Table 4 below, of the $60 million total reduction in expenses associated with the WACC and tax-deductible interest expense adjustments, $54 million comes from a reduction in audio IPCS and safety and security expenses while the remaining $6 million comes from a reduction in video IPCS and safety and security expenses.[22]

**Table 4:  Audio and Video IPCS and Safety & Security Expenses Before and After Adjustments**

| | | Before WACC & Tax-Deductible Interest Expense Adjustments | | After WACC & Tax-Deductible Interest Expense Adjustments | | |
|---|---|---|---|---|---|---|
| | | IPCS Expenses Before Adjustments | Safety and Security Expenses Before Adjustments | IPCS Expenses After Adjustments | Safety and Security Expenses After Adjustments | Reduction in IPCS Expenses and Safety and Security Expenses |
| **Audio** | Securus | {[ | | | | |
| | ViaPath | | | | | |
| | ICSolutions (via ViaPath)* | | | | | ]} |
| | **Industry** | $330,553,437 | $514,613,041 | $315,592,000 | $475,589,426 | $53,985,052 |
| **Video** | Securus | {[ | | | | |
| | ViaPath | | | | | |
| | ICSolutions (via ViaPath)* | | | | | ]} |
| | **Industry** | $68,072,716 | $51,658,707 | $65,646,337 | $48,039,872 | $6,045,214 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.
*ViaPath is a subcontractor for 22 of ICSolutions' facilities.

---

[20] The WACC and tax-deductible interest expense adjustments for Securus and the WACC adjustment for ViaPath also reduce Securus's and ViaPath's reported ancillary service expenses by approximately {[              ]}, respectively.  These adjustments are developed using the investment and expense data reported by these providers for ancillary services in their Company-Wide Information worksheets, as company-wide data are used to develop the allowance for recovery of ancillary services expenses.

[21] ViaPath reports almost exclusively video IPCS expenses in these facilities, with a negligible change in audio IPCS expenses after the WACC adjustment.

[22] Adding the total of the two ancillary services expense reductions referenced above, about {[              ]}, to the reduction to audio and video IPCS and safety and security expenses, about $60 million, brings the total of the WACC and tax-deductible interest expense reductions to about {[              ]}.

13.        *Safety and Security.* We include all categories of safety and security expenses in establishing the lower bounds of our zones of reasonableness.[23]  This is in contrast to the approach taken in the *2024 IPCS Order*, where the costs of Communications Assistance for Law Enforcement Act (CALEA) compliance measures and communication security services were the only safety and security measure costs included in the lower bounds.[24]  Tables 5 through 7 examine safety and security expenses for audio and video IPCS after adjusting for Securus's and ViaPath's WACC and Securus's tax-deductible interest expenses.

14.        Table 5 summarizes the safety and security expenses attributable to audio and video IPCS by category and by provider.  Audio safety and security expenses total approximately $475 million.  Video safety and security expenses total approximately $48 million.  For audio IPCS, Securus and ViaPath report total safety and security expenses of {[                                        ]}, respectively, accounting for nearly  {[     ]} percent of the industry total.  All other providers have expenses between {[                                ]}.  For video IPCS, Securus's and ViaPath's respective safety and security expenses ({[                              ]} account for {[          ]} of the industry total).  All other providers' expenses range from as little as  {[                                ]}.

---

[23] *See supra* footnote 19 (listing safety and security expense categories).

[24] *2024 IPCS Order*, 39 FCC Rcd at 7757, para. 200; *id.* at 8078-80, Appx. I, paras. 55-57.

**Table 5:  Audio and Video Safety & Security Expenses, By Category and Provider**

| | | CALEA | Law Enforcement | Comm. Security | Comm. Recording | Comm. Monitoring | Voice Biometrics | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Audio** | ATN | {[ | | | | | | | |
| | CPC | | | | | | | | |
| | City Tele-Coin | | | | | | | | |
| | HomeWAV | | | | | | | | |
| | ICSolutions | | | | | | | | |
| | NCIC | | | | | | | | |
| | Pay Tel | | | | | | | | |
| | Prodigy | | | | | | | | |
| | Securus | | | | | | | | |
| | Smart | | | | | | | | |
| | TKC | | | | | | | | |
| | ViaPath | | | | | | | | ]} |
| | **Industry** | 5,306 | 20,944,006 | 161,938,954 | 117,784,624 | 84,954,753 | 40,293,972 | 49,667,811 | 475,589,426 |
| **Video** | ATN | {[ | | | | | | | |
| | CPC | | | | | | | | |
| | City Tele-Coin | | | | | | | | |
| | HomeWAV | | | | | | | | |
| | ICSolutions | | | | | | | | |
| | NCIC | | | | | | | | |
| | Pay Tel | | | | | | | | |
| | Prodigy | | | | | | | | |
| | Securus | | | | | | | | |
| | Smart | | | | | | | | |
| | TKC | | | | | | | | |
| | ViaPath | | | | | | | | ]} |
| | **Industry** | 84 | 1,500,426 | 17,720,659 | 15,376,802 | 7,267,749 | 1,428,469 | 4,745,683 | 48,039,872 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

15.     Table 6 summarizes safety and security expenses attributable to audio and video by provider and across facility tiers.  For audio, prisons account for 66.6% of industry-wide safety and security expenses and Securus and ViaPath jointly account for {[      ]} of those prison expenses. Extremely small jails account for the lowest share of audio safety and security expenses, and Securus and ViaPath account for {[          ]} such expenses.  Video safety and security expenses are more evenly distributed across the four larger facility tiers.  Securus and ViaPath account for {[      ]} of the industry's video safety and security expenses among prisons ({[      ]}), large jails ({[      ]}), and medium jails ({[      ]}), but their combined share decreases within the smaller jail tiers ({[         ]} for small, very small, and extremely small jails, respectively).

**Table 6:  Audio and Video Safety & Security Expenses, By Facility Type and Provider**

| | | All Facilities | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails | Extremely Small Jails |
|---|---|---|---|---|---|---|---|---|
| **Audio** | ATN | {[ | | | | | | |
| | CPC | | | | | | | |
| | City Tele-Coin | | | | | | | |
| | HomeWAV | | | | | | | |
| | ICSolutions | | | | | | | |
| | NCIC | | | | | | | |
| | Pay Tel | | | | | | | |
| | Prodigy | | | | | | | |
| | Securus | | | | | | | |
| | Smart | | | | | | | |
| | TKC | | | | | | | |
| | ViaPath | | | | | | | ]} |
| | **Industry** | 475,589,426 | 316,747,403 | 66,659,410 | 59,868,423 | 23,677,616 | 5,089,796 | 3,546,777 |
| **Video** | ATN | {[ | | | | | | |
| | CPC | | | | | | | |
| | City Tele-Coin | | | | | | | |
| | HomeWAV | | | | | | | |
| | ICSolutions | | | | | | | |
| | NCIC | | | | | | | |
| | Pay Tel | | | | | | | |
| | Prodigy | | | | | | | |
| | Securus | | | | | | | |
| | Smart | | | | | | | |
| | TKC | | | | | | | |
| | ViaPath | | | | | | | ]} |
| | **Industry** | 48,039,872 | 16,974,163 | 8,938,916 | 13,535,856 | 7,031,714 | 1,083,911 | 475,312 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

16.     Table 7 presents per billed minute audio and video safety and security expenses by provider and across facility tiers.  For audio, the industry-wide per-minute safety and security expense across all facility tiers is $0.045.  Paradoxically, per-minute audio safety and security expenses are highest among prisons ($0.05), followed by large jails ($0.042), medium jails ($0.04), and extremely small jails ($0.036).  Small and very small jails have the lowest per-minute average safety and security expenses at $0.028 (each), due in part to providers' differing expense allocation practices.  Industry-wide video per-minute safety and security expenses are over 2.5 times higher than audio, averaging $0.118.  As with audio, prisons have the highest per-minute video safety and security expenses at $0.198, followed by large jails ($0.148), medium jails ($0.109), and extremely small jails ($0.068).

17.     We would expect larger facilities to have lower per billed minute expenses due to economies of scale.  However, these counterintuitive observations result, in large part, from the different ways providers allocated expenses between IPCS and safety and security measures.  Only Securus and

ViaPath allocated a non-trivial share of their expenses to categories of safety and security measures.[25] Because Securus and ViaPath supply a lower share of billed minutes in the smallest facility tiers relative to their share in prisons and large jails, per billed minute safety and security expenses in the smallest tiers are driven less by these two market leaders and more by the smaller providers. These smaller providers allocated nearly all of their expenses to audio and video IPCS, and nearly none to safety and security measures.[26] As a consequence, industry average safety and security measure expenses across facility size tiers appear to exhibit diseconomies of scale. However, this is almost entirely the result of the different cost allocation approaches taken by Securus and ViaPath as compared to those taken by smaller providers.

---

[25] Securus reports {[        ]} of its total expenses as safety and security expenses. ViaPath reports {[        ]} of its total expenses as safety and security expenses. The rest of the industry, on average, reports only 3.9% of total expenses as safety and security expenses.

[26] Securus and ViaPath have per billed minute audio safety and security expenses of {[                ]}, respectively, which dwarfs all other providers' expenses. The provider with the next highest per billed minute safety and security expense is CPC at {[        ]}. For video safety and security, Securus and ViaPath have per billed minute expenses of {[                ]}, respectively. ICSolutions is third at {[        ]} per billed minute.

**Table 7:  Audio and Video Safety & Security Expenses Per Billed Minute, By Facility Type and Provider**

| | | All Facilities | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails | Extremely Small Jails |
|---|---|---|---|---|---|---|---|---|
| **Audio** | ATN | {[ | | | | | | |
| | CPC | | | | | | | |
| | City Tele-Coin | | | | | | | |
| | HomeWAV | | | | | | | |
| | ICSolutions | | | | | | | |
| | NCIC | | | | | | | |
| | Pay Tel | | | | | | | |
| | Prodigy | | | | | | | |
| | Securus | | | | | | | |
| | Smart | | | | | | | |
| | TKC | | | | | | | |
| | ViaPath | | | | | | | ]} |
| | **Industry** | 0.045 | 0.050 | 0.042 | 0.040 | 0.028 | 0.028 | 0.036 |
| **Video** | ATN | {[ | | | | | | |
| | CPC | | | | | | | |
| | City Tele-Coin | | | | | | | |
| | HomeWAV | | | | | | | |
| | ICSolutions | | | | | | | |
| | NCIC | | | | | | | |
| | Pay Tel | | | | | | | |
| | Prodigy | | | | | | | |
| | Securus | | | | | | | |
| | Smart | | | | | | | |
| | TKC | | | | | | | |
| | ViaPath | | | | | | | ]} |
| | **Industry** | 0.118 | 0.198 | 0.148 | 0.109 | 0.067 | 0.044 | 0.068 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.
* CPC's per-minute video expenses rely on {[                                    ]}, which have a total of {[
      ]} for video.

18.    *Adjustment to Securus's Video IPCS Expenses.*  We adjust Securus's extraordinarily high per-minute video IPCS expenses to bring them in line with the rest of the industry.[27]  The adjustment involves several steps.  First, we calculate the weighted average video IPCS expense per billed minute for all providers, excluding Securus.  We then multiply this estimate by Securus's total billed video IPCS

---

[27] The Commission previously made a similar adjustment to the same expenses, with the exception that here we use billed instead of total billed and unbilled minutes.  *See 2024 IPCS Order*, 39 FCC Rcd at 8080-81, Appx. I, para. 60.

minutes to simulate the video IPCS expenses Securus would incur if they were equivalent to the average of the rest of the industry's expenses on a per-minute basis. This estimate is then divided by Securus's reported expenses and subtracted from one to calculate the percent reduction to Securus's video IPCS expenses. Excluding Securus, the industry expense per billed minute for video IPCS is {[    ]}. After multiplying this estimate by Securus's total billed video minutes, dividing by Securus's original expenses and subtracting by one, we calculate {[    ]} reduction in Securus's video IPCS expenses.[28]

19.　　Table 8 presents the unadjusted and adjusted video IPCS expenses per billed minute for Securus and the industry (including Securus) for each facility type. Securus's unadjusted per-minute expenses range from just under {[    ]}, depending on facility type. Securus's per-minute average of {[  ]} across all facilities is more than {[  ]} times higher than the industry average, and more than {[  ]} times higher than the industry average when excluding Securus. Securus's unusually high per-minute expenses increase the industry average from {[    ]}, a {[  ]} increase. However, once the adjustment to Securus's video IPCS expenses is made, its per-minute expenses are significantly more comparable to those of the rest of the industry.[29]

**Table 8:  Non-Adjusted\* and Adjusted\*\* Video IPCS Expenses Per Billed Video Minute, For Securus and Industry**

| | Before Adjustment* | | After Adjustment** | |
|---|---|---|---|---|
| | **Securus Video IPCS Expenses ($ / Min)** | **Industry Video IPCS Expenses ($ / Min)** | **Securus Video IPCS Expenses ($ / Min)** | **Industry Video IPCS Expenses ($ / Min)** |
| **All Facilities** | {[ | 0.161 | {[ | 0.099 |
| Prisons | | 0.229 | | 0.093 |
| Large Jails | | 0.147 | | 0.066 |
| Medium Jails | | 0.121 | | 0.079 |
| Small Jails | | 0.140 | | 0.115 |
| Very Small Jails | | 0.198 | | 0.176 |
| Extremely Small Jails | ]} | 0.345 | ]} | 0.324 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.
\* No adjustment to Securus's video IPCS expenses but includes other adjustments made to the lower bounds.
\*\* Includes adjustment to Securus's video IPCS expenses along with other adjustments made to the lower bounds.

20.　　Table 9 shows the total video IPCS expenses for Securus and the industry before and after the adjustment. The overall reduction in video IPCS expenses is roughly {[  ]} million, or a reduction in industry video IPCS expenses of {[  ]}%.

---

[28] {[                           ]}

**Table 9: Video IPCS Expenses Before and After Adjusting for Securus's Video IPCS Expenses**

|  | Video IPCS Expenses Before Adjustment* | Video IPCS Expenses After Adjustment** | Total Reduction in Video IPCS Expenses |
|---|---|---|---|
| Securus | {[ | | |
| **Industry** | | | ]} |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.
* No adjustment to Securus's video IPCS expenses but includes other adjustments made to the lower bounds.
** Includes adjustment to Securus's video IPCS expenses along with other adjustments made to the lower bounds.

21.    *Adjustment to Securus's Video IPCS Safety and Security Measure Expenses.* Table 10 demonstrates the proportionality of Securus's reported expenses, and shows Securus's audio and video IPCS billed minutes and safety and security measure expenses in dollars and per billed minutes along with the analogous figures for ViaPath, the industry, and the industry without Securus. Securus's video IPCS safety and security measure per billed minute expenses {[         ]} are substantially higher than ViaPath's, its most comparable provider in terms of scale and scope, {[         ]}, and the industry average is significantly skewed by including Securus {[                    ]} as compared to the industry average of all providers excluding Securus ({[       ]} without Securus). Securus's video IPCS safety and security expenses per billed minute are over {[            ]} times higher than the industry average with and without Securus, respectively, and over {[       ]} times higher than those of ViaPath. Notably, Securus's share of the industry's IPCS video safety and security measure expenses also markedly exceeds Securus's share of the industry's video IPCS minutes. While Securus accounts for about {[       ]} of the industry's IPCS video safety and security measure expenses, it only reports about {[        ]} of the video minutes. By comparison, ViaPath's share of the industry's video IPCS billed minutes and safety and security measure expenses mirror one another, at {[         ]}, respectively. Securus's video IPCS safety and security measure data are also inconsistent with its audio IPCS safety and security measure data. Securus's audio IPCS safety and security measure per billed minute expenses {[          ]}, are lower than ViaPath's {[         ]} and only slightly above the industry average {[        ]}, with and without Securus, respectively. Moreover, Securus's shares of the industry's audio IPCS billed minutes and safety and security measure expenses, {[          ]}, respectively, are similar. These data and their relative proportions demonstrate the anomalous character of Securus's video IPCS and video safety and security expense data and the need for adjustments.

**Table 10: Total and Industry Share of Audio and Video IPCS Billed Minutes and Safety & Security Measure Expenses and Per Billed Minute Safety & Security Measure Expenses, by Securus, ViaPath, Industry, and Industry Excluding Securus**

| | | Billed Minutes | Share of Industry Billed Minutes | Safety and Security Expenses | Share of Industry Safety and Security Expenses | Safety and Security Expenses Per Minute |
|---|---|---|---|---|---|---|
| **Audio** | Securus | {[ | | | | |
| | ViaPath | | | | | ]} |
| | **Industry** | 10,494,473,118 | 100% | 475,589,426 | 100% | 0.045 |
| | **Industry Excluding Securus** | {[ | | | | ]} |
| **Video** | Securus | {[ | | | | |
| | ViaPath | | | | | ]} |
| | **Industry** | 407,122,234 | 100% | 48,039,872 | 100% | 0.118 |
| | **Industry Excluding Securus** | {[ | | | | ]} |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs. Expense data are net of other lower-bound adjustments.

22. The record does not allow us to fully determine why Securus's per billed minute video IPCS safety and security measure expenses deviate so significantly from those of the other providers. However, Securus's video IPCS safety and security measure expenses are not indicative of a mature, ongoing operation. Taking Securus's expense data at face value, however, it is reasonable to anticipate future demand for Securus's video IPCS to increase to a level more commensurate with its future video IPCS and video IPCS safety and security expenses as the rate of investment in new infrastructure slows and customer awareness and use of video IPCS increase. This would enable Securus to spread its significant early stage and subsequent incremental investments in long-term video IPCS and video safety and security measure assets over significantly more video IPCS billed minutes, and thus reduce both its per billed minute video IPCS and video IPCS safety and security measure expenses.

23. We therefore adjust Securus's high video IPCS safety and security measure expenses per billed minute down to the industry average (without Securus). The adjustment is made in the same manner as the adjustment to Securus's video IPCS expenses. We thus use the industry average (without Securus) to reduce both Securus's video IPCS expenses and its video IPCS safety and security measure expenses. Specifically, we reduce Securus's video IPCS safety and security measure expenses equally across all facilities by the percentage that equates the sum of these expenses to the overall industry average (excluding Securus) on a per billed minute basis. Securus's video IPCS safety and security measure expenses are {[          ]} per billed minute. The industry average video IPCS safety and security measure expenses per billed minute without Securus are $0.07. A reduction of {[          ]} to Securus's video IPCS safety and security measure expenses across all of its facilities reduces the sum of these expenses to the level of the industry average on a per billed minute basis.

24. Table 11 shows the unadjusted and adjusted video IPCS safety and security measure expenses per billed minute for Securus and the industry (including Securus) for each facility type. Securus's unadjusted billed per minute expenses range from {[                ]}, depending on facility type. After the adjustment to Securus's video IPCS safety and security measure expenses, its per billed minute expenses range from {[                ]}, and as shown in the final column, these adjusted per billed minute expenses are significantly more comparable to the industry average for each facility type.

**Table 11: Non-Adjusted\* and Adjusted\*\* Video Safety and Security Expenses Per Billed Video Minute, For Securus and Industry**

| | Before Adjustment\* | | After Adjustment\*\* | |
|---|---|---|---|---|
| | **Securus Video Safety and Security Expenses ($ / Min)** | **Industry Video Safety and Security Expenses ($ / Min)** | **Securus Video Safety and Security Expenses ($ / Min)** | **Industry Video Safety and Security Expenses ($ / Min)** |
| All Facilities | {[ | | | |
| Prisons | | | | |
| Large Jails | | | | |
| Medium Jails | | | | |
| Small Jails | | | | |
| Very Small Jails | | | | |
| Extremely Small Jails | | | | ]} |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.
\* No adjustment to Securus's video safety and security expenses but includes other adjustments made to the lower bounds.
\*\* Includes adjustment to Securus's video safety and security expenses along with other adjustments made to the lower bounds.

25. Table 12 shows Securus and industry total (including Securus) video IPCS safety and security measure expenses before and after the {[ ]} downward adjustment to Securus's expenses. Adjusting Securus's video IPCS safety and security measure expenses to reflect the industry average per billed minute expense reduces Securus's video expenses by approximately {[ ]} million. This reduction decreases total industry video IPCS safety and security measure expenses by {[ ]}.

**Table 12: Video Safety & Security Expenses Before and After Adjusting for Securus' Video**

| | **Video Safety and Security Expenses Before Adjustment\*** | **Video Safety and Security Expenses After Adjustment\*\*** | **Total Reduction in Video Safety and Security Expenses** |
|---|---|---|---|
| Securus | {[ | | |
| **Industry** | | | ]} |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.
\* No adjustment to Securus' video safety and security expenses but includes other adjustments made to the lower bounds.
\*\* Includes adjustment to Securus' safety and security IPCS expenses along with other adjustments made to the lower bounds.

26. *Lower Bounds.* We now determine lower bounds, which in conjunction with the upper bounds addressed above, will establish the zones of reasonableness that we use to set audio and video IPCS rate caps. The four distinct per billed minute expense components of the lower bounds are: (1) audio/video IPCS expenses; (2) audio/video safety and security expenses; (3) ancillary service expenses; and (4) TRS allowance. These per billed minute components are calculated using the upper bound data net of the adjustments to Securus's and ViaPath's WACCs and to Securus's tax-deductible interest, video IPCS, and video IPCS safety and security measure expenses. As with our upper bound analysis, the correctional facilities' expenses are not included in the lower bound analysis but are addressed separately through the establishment of a rate additive for facility costs. The ancillary service expenses per billed minute additive is calculated in the same manner as in the upper bound analysis except for using ancillary

expense data after the WACC and tax-deductible interest expense adjustments. This per billed minute additive totals $0.011. The TRS additive of $0.002 included in the upper bound remains unchanged. Table 13 shows the lower bounds for audio and video IPCS for each facility type and size.

**Table 13: Lower Bound IPCS Expenses Per Billed Minutes, By Facility Type ($/Minute)**

| | Audio | | | | Video | | | |
|---|---|---|---|---|---|---|---|---|
| | IPCS Expenses (1A) | Safety and Security (2A) | (1A) + (2A) | Lower Bounds: (1A) + (2A) + $0.002 + $0.011* | IPCS Expenses (1B) | Safety and Security (2B) | (1B) + (2B) | Lower Bounds: (1B) + (2B) + $0.002 + $0.011* |
| **Prisons** | 0.023 | 0.050 | 0.073 | 0.086 | 0.093 | 0.108 | 0.201 | 0.214 |
| **Large Jails** | 0.024 | 0.042 | 0.066 | 0.079 | 0.066 | 0.077 | 0.143 | 0.156 |
| **Medium Jails** | 0.038 | 0.040 | 0.078 | 0.091 | 0.079 | 0.069 | 0.148 | 0.161 |
| **Small Jails** | 0.062 | 0.028 | 0.090 | 0.103 | 0.115 | 0.046 | 0.161 | 0.174 |
| **Very Small Jails** | 0.082 | 0.028 | 0.111 | 0.124 | 0.176 | 0.027 | 0.203 | 0.216 |
| **Extremely Small Jails** | 0.114 | 0.036 | 0.150 | 0.163 | 0.324 | 0.053 | 0.377 | 0.390 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs (other than for ancillary services expenses). The ancillary services additive is calculated using ancillary service expenses drawn from the Company-Wide Information tab of the 2023 Mandatory Data Collection.
* Per billed minute additives for TRS ($0.002) and ancillary services ($0.011).

## STATEMENT OF
## CHAIRMAN BRENDAN CARR

Re: *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375 (October 28, 2025).

For more than a decade, the FCC has tried to set rates for inmate calling services that are both fair and legally sustainable—ones that are reasonable for callers and sufficient to ensure that providers and facilities have the resources to make those calling services available. By my count, the FCC has attempted to find the right balance on 6 separate occasions. Those decisions have resulted in no less than 4 court cases or challenges. In many cases, the courts have stayed or otherwise invalidated the FCC's approach. This endless cycle of uncertainty is not good for anyone or any stakeholder involved in the process.

Congress took an important step forward with the passage of the Martha Wright-Reed Act in 2022. That law addressed some of the statutory authority concerns that sank prior FCC efforts and directed the FCC to weigh two specific statutory goals—namely, reasonable rates and fair compensation. In its last effort to strike the right balance, the Commission adopted new rules in 2024 to implement the Act. But as the record has shown, those rules have resulted in serious, unintended consequences. For example, by limiting how facilities could recover safety and security costs, some prisons or jails were forced to scale back or even stop offering calling services altogether. That's not good for anyone—especially when it puts staff and public safety at risk.

Today's action seeks to correct course by taking the lessons we've learned and applying them to create a new framework—one that we intend to be durable, predictable, and lawful. In doing so, this item not only stays true to the Martha Wright-Reed Act and delivers just and reasonable rates that are below rates set in 2021 by the Biden Administration, but also ensures providers can keep these vital services running safely and securely.

For their great work on this item, I'd like to thank Allison Baker, Peter Bean, Terry Cavanaugh, Bradley Craigmyle, Lynne Engledow, Shabbir Hamid, Bill Kehoe, Dick Kwiatkowski, Erik Raven-Hansen, Simon Solemani, and David Zesiger.

## STATEMENT OF
## COMMISSIONER ANNA M. GOMEZ

Re:     *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking (October 28, 2025).

This Order is indefensible. It implements an egregious transfer of wealth from families in incredibly vulnerable situations to monopoly companies that seek to squeeze every penny out of them.

In this Order, the Commission adopts a framework that gives monopoly companies facing zero competition the authority to increase the costs for families to maintain critical connections with their loved ones in prison. These families have no option but to pay the higher rates. Regardless of whether they have enough to make rent, buy groceries, pay the electric bill or the broadband bill, or whether they are able to work enough hours or need to get a third job. From now on, they face the reality that if they want to stay in touch with a loved one in a correctional facility – a cousin, friend, brother, mother – they have no other option but to figure out how to pay the higher rates of incarcerated people's communications services (IPCS) the Commission imposes on them today.

In 2024, at the direction of bipartisan legislation that was long in the making, we adopted just and reasonable rates that provided fair compensation for providers, pursuant to the Martha Wright-Reed Act.[1] The Commission adopted this decision unanimously, with no dissents and only one concurrence.[2] Since then, the decision brought relief to incarcerated people and their families in the form of lower rate caps and seemed to have been working for IPCS providers as well.

By one measure, today, 76% of prison systems across the country already comply with the 2024 rate caps, and only three states –Florida, Kentucky, and Oklahoma– have rates above the interim rate caps the Commission adopts in this Order.[3] This means that the majority of the prisons in the country can and do provide IPCS services within the 2024 rate caps.

Despite this, the Commission is hearing from providers that the 2024 rate caps have resulted in reduced access to revenue and the safety and security measures that IPCS providers offer to correctional facilities, which in turn endanger facility safety, public safety, and has left some prisons considering stopping the provision of IPCS.[4] But to be clear, the instant Order does not cite to any incidents

---

[1] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156, pmbl. (Martha Wright-Reed Act).

[2] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647 (2024) (*2024 IPCS Order*).

[3] Letter from Bianca Tylek, Executive Director, Worth Rises, to Marlene H. Dortch, Secretary, FCC (filed Sept. 15, 2025).

[4] Letter from Michael Pryor, Counsel for Securus Technologies, LLC, and Marcus Trathen, Counsel for Pay Tel, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 (filed Apr. 3, 2025) (Securus and Pay Tel Apr. 3, 2025 *Ex Parte*).

demonstrating unsafe conditions at correctional facilities as a result of the 2024 rate caps. Nor does the Order acknowledge that these facilities and monopoly providers have been funding from IPCS users safety and security measures that are unrelated to the costs of providing IPCS. Law enforcement should foot the bill for unrelated security and safety costs, not the families of incarcerated people. Instead, the Commission relies on providers' claims of isolated facilities warning that they would not be able to pay for safety and security measures for IPCS services.

An examination of the evidence cited as substantiating these claims reveals a minimal basis for the significant nationwide increases adopted in this Order. The cited letter points to a single facility in Arkansas that reported terminating access to IPCS – the Baxter County Sheriff's Office, which posted this decision on February 25, 2025 on its website.[5] Additionally, Pay Tel asserts it "was forced to cease IPCS services to four small jails in Arizona and New Mexico," and Securus asserts it was "forced to end service to three smaller facilities for economic reasons," without specifying the location.[6] Finally, both providers cite to statements made by a North Carolina Sheriff and the Montana Sheriffs and Peace Officers Association that budgetary constraints in their jails would "lead to a reduction in service."[7] That is all the evidence provided.

Rather than considering granting an individual waiver of the 2024 rate caps to facilities that made a showing that reduced revenues resulted in the unavailability of IPCS services, the FCC took these narrow and speculative concerns and granted a waiver of the entire 2024 IPCS decision, and now reviews and sets higher rates in the Order we adopt.

It is baffling that the Order claims the FCC lacked sufficient data to support the decisions in 2024, and nonetheless, without additional data, decides to err on the side of granting higher rate caps and giving the monopoly companies that have provided the supposedly insufficient data everything they ask for and more. In other words, the FCC today decides to reward bad behavior. And throughout the Order it rewards bad behavior out of concern for the companies that elected to provide poor data required by the Commission.

For example, the agency now reverses course and agrees to include security and law enforcement expenses that were previously excluded based on a careful analysis of the data provided by IPCS providers that found these costs were not used and useful to the provision of IPCS.

In 2024, the Commission allowed costs for CALEA compliance and Communications Security Services to be incorporated into the rate caps.[8] In this Order, the FCC expands the types of costs that providers can recover from the families of incarcerated persons, and includes three additional categories: Law Enforcement Support Services, Communication Recording Services, and Communication Monitoring Services.

---

[5] Securus and Pay Tel Apr. 3, 2025 Ex Parte, at 3. *See also* John Montgomery, *Inmate Phone System Will Not Be in Use After March 30th* (Feb. 25, 2025), https://www.baxtercountysheriff.com/press-releases/inmate-phone-system-will-not-be-in-use-after-march-30th.

[6] Securus and Pay Tel Apr. 3, 2025 *Ex Parte,* at 4.

[7] Securus and Pay Tel Apr. 3, 2025 *Ex Parte,* at 3.

[8] *2024 IPCS Order*, 39 FCC Rcd at 7825-7826, para. 339

Based on information provided by IPCS providers themselves, the Law Enforcement Category includes expenses for "search warrant processing" and "FOIA request processing."[9] The Communications Recording Services Category includes expenses for "storing recorded communications, transcribing such recordings, and converting recordings into digital formats to support investigation and litigation activities."[10] And the Communications Monitoring Services Category is now predominantly "used to aid investigations related to detention facilities," "aid corrections and law enforcement agencies in investigation and litigation activities," and "provide for skilled investigators."[11] None of these functions serves to facilitate the actual provision of IPCS.

In 2024, we concluded that these categories in general serve law enforcement needs rather than being used and useful in the provision of IPCS and thus should not be included in the framework to set rate caps.[12] In other words, the families who are paying for these calls should not have to shoulder these unrelated costs.

However, in this very Order, the Commission states that "despite the detailed instructions and description of the categories" the FCC provided to encourage data submission, there is a "lack of comprehensive data" necessary to analyze how these costs should be treated in the rate caps. Despite this admission, the Commission decides to treat all costs as worthy of being recoverable through the fees imposed on the families of incarcerated people. IPCS providers have the missing puzzle pieces to solve this problem. IPCS providers have these data, but fail to submit them, and then claim that the FCC lacked the data necessary when the decision the agency makes is not in their favor. In this Order, rather than requesting providers to provide sufficient data before setting new rates, the Commission fulfills their requests without any new data. Again, the Commission rewards bad behavior.

To be clear, these correctional facilities should have safety and security services. The families of incarcerated persons, however, should not pay the costs of safety and security measures that are unrelated to the making of IPCS calls. That is what the Martha Wright Reed Act requires.[13] Yet this Order places these costs on their shoulders.

And then the Commission goes beyond simply increasing rates. In this Order, it also adds a two-cent per minute additive on top of the baseline of rate caps, to reward correctional facilities – another class of entities that have failed to provide the Agency with data to justify their asserted costs. The Commission implements this two-cent additive based on a survey that is ten years old and limited to jails, and thus does not include information about the costs prisons incur to allow access to IPCS.[14]

Indeed, despite the fact that the additive is based on old data on costs jails incur, the extra two cents per minute will be available to both jails and prisons, immediately, effectively raising the rate caps

---

[9] *2024 IPCS Order*, 39 FCC Rcd at 7857, para. 394.

[10] *2024 IPCS Order*, 39 FCC Rcd at 7861, para. 398.

[11] *2024 IPCS Order*, 39 FCC Rcd at 7864, para. 403.

[12] *2024 IPCS Order*, 39 FCC Rcd at 7825-7826, para. 339. *See also* paras. 394, 398, 403.

[13] Martha Wright-Reed Act § 3(b).

[14] National Sheriffs' Association Comments, WC Docket No. 12-375, Exh. A (rec. Jan. 12, 2015) (National Sheriffs' Association Jan. 12, 2015 Survey).

the Commission allows. Thus, with outdated data that fail to include information about costs in prisons or make a distinction between calls and video services, the Commission agrees to allow IPCS providers to charge higher rates to families that can in turn be passed on to jails and to prisons.

I disagree with including an additive at all. If it is to be included, however, there are better ways to implement this additive than what the Commission chooses to adopt in this Order. The FCC could have limited the additive to jails only based on the scope of the survey data. The Commission could have also structured an opt-in process, where the additive could be initially available to jails, and available to prisons upon request and with a showing justifying why the two cents per minute were critical to the facility's provision of IPCS. But, once again, the Commission opted to reward bad behavior at the expense of families.

And then there is even more. The Order points to a single company letter filed in the eleventh hour before Sunshine,[15] which requested additional rate increases through the application of an inflation factor.[16] This factor was adopted without giving notice to the public that an inflation factor was being considered; without evidence in the instant record that this factor is actually necessary, but for the request of a single company; and with an insufficient explanation as to why the inflation factor should be 6.7% and not offset by a productivity factor as is commonplace in rate setting.

The inflation factor will go into effect immediately and result in an additional one to two cent per minute increase to the majority of the rate caps, depending on facility size. This action shows an FCC, once again, choosing to go above and beyond to address the unsubstantiated needs of monopoly providers to squeeze every penny possible from families that want to stay in touch with their loved ones.

And finally, the Commission chooses to leave the window open to a question that has been asked and answered – are site commissions allowed under any circumstance?[17] Site commissions are at the heart of what drove the unreasonable rates that plagued IPCS for decades. Site commissions are payments that IPCS providers pay to correctional facilities when they compete for the IPCS contract, money that is paid with no requirement that it fund IPCS-related costs. Site commissions payments have no relation to the actual provision of IPCS. That is why, in the 2024 IPCS Order, the Commission was clear that site commissions are not a cost of providing service and therefore not recoverable as a cost in IPCS rates, and chose to end the practice.[18] While the FCC today does not ultimately adopt a section in the instant Further Notice re-opening the door to site commissions, it manages to leave a window open with a niche question in Footnote 278 asking whether a site commission in "excess of the facility cost additive remain[s] prohibited."

---

[15] Section 1.1203 of the Commission's Rules, 47 CFR § 1.1203, prohibits the making of any presentation to decision-making personnel concerning any matter listed on the Commission's Sunshine Agenda, from the day after the Sunshine Agenda is released until the Commission releases the text of a decision or order relating to that matter, or otherwise removes the item from the Sunshine Agenda.

[16] Letter from Michael H. Pryor, Counsel for Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 (filed Oct. 21, 2025) (Securus Oct. 21, 2025 *Ex Parte*).

[17] *See* footnote 278 of this Order.

[18] *2024 IPCS Order*, 39 FCC Rcd at 7777-7778, para. 242 "We then end the practice of paying site commissions associated with IPCS."

Throughout this Order, the FCC chooses to reward corporations with money taken from vulnerable families based on factual assertions insufficient to justify the broad relief granted. The decisions the Commission makes today are not abstract economic calculations without ripple effects across our society. We know that keeping families connected during incarceration saves lives, strengthens re-entry for people returning from incarceration, and supports safer communities.

Throughout the record of this proceeding there are personal stories about the impact these actions will have on real families. For Liliana, IPCS "isn't just about money, it's about family, healing, and giving people a real chance to rebuild their lives."[19] Liliana grew up with her mother in and out of prison. When she was very young, she could not afford to pay for the calls and her caretakers did not want to cover the costs. The inability to reach her mom meant she could not reach her even when she needed to ask for medical information in order to take her younger sister to the doctor.

Anelisa, who has seen her father and uncle in prison, knows that "even small costs can be a huge barrier for struggling families."[20] At a young age, after seeing her father arrested and being unable to speak to him for nearly a month, Anelisa fell into a deep depression that required hospitalization. Anelisa says that is when she learned "just how important it is for children to be able to stay in contact with their parents…[and that] [p]hone calls can make all the difference."[21]

The Commission must do right by all families reliant on IPCS. This does not mean that providers cannot recover their legitimate and documented costs and continue to provide IPCS services to all who need them. But it does mean that our establishment of rate caps cannot be based on hyperbolic threats to discontinue service and expenses that have nothing to do with the costs of actually providing the service. It also means that the Commission should not reward uncooperative providers and facilities that consistently fail to give us the data we need to set just and reasonable rates for IPCS users that provide fair compensation for providers, as we are required to do by law.

Technology is relational. At its best, IPCS represents a lifeline for struggling families. At its worst, it represents a relationship severed by monopoly power. The Commission has to stop rewarding bad behavior and do better for those who end up paying the true cost of the rates we implement. Many people are fortunate not to have to worry about the cost of a phone or video call. Incarcerated people and their loved ones, like Liliana and Anelisa, know too well the prohibitive cost of staying connected.

For these reasons, I dissent.

---

[19] Letter from Bianca Tylek, Executive Director, Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 (filed Sept. 15, 2025) (Worth Rises *Addendum to Ex Parte*).

[20] Worth Rises *Addendum to Ex Parte*.

[21] *Id.*

# STATEMENT OF
# COMMISSIONER OLIVIA TRUSTY

Re:     *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375 (October 28, 2025).

The Commission's approach to incarcerated people's communications services, or "IPCS," rests on three core principles.

First, there are tremendous public benefits when incarcerated individuals can communicate with friends and loved ones. Those connections promote rehabilitation, strengthen families, and ultimately reduce the likelihood of re-offense. That benefits not only the individuals and their families, but society as a whole.

Second, because each correctional facility typically has only one IPCS provider, we are dealing with a monopoly environment. That reality demands regulatory oversight to protect consumers from anti-competitive practices.

And third, any communications system operating in a correctional setting must incorporate robust measures to ensure the safety and security of correctional staff, inmates, and the public.

These three principles are deeply interconnected. Unjust or unreasonable IPCS rates can make it more difficult for incarcerated individuals to stay connected to their loved ones, undermining the public benefits of communication. But without proper safety and security measures, correctional facilities cannot responsibly allow IPCS at all. Those measures are essential, and the associated costs must be recognized.

For too long, the Commission failed to fully grapple with that second principle, leaving IPCS consumers unprotected in a monopoly market. When the agency later stepped in, it did so with good intentions, but without a clear statutory foundation or sufficient record support. As a result, our rules were in constant flux: adopted, revised, reconsidered, and ultimately overturned by the courts.

The D.C. Circuit's 2017 decision left the Commission with narrow authority and limited tools to act. But the story didn't end there. In 2021, the FCC took a more balanced approach, acknowledging both the need for safety and security measures and the need to protect consumers, within the limits of our authority at the time.

Then, in 2023, Congress gave the Commission clear direction and expanded authority we had long needed. That legislation explicitly empowered the FCC to ensure IPCS rates are just, reasonable, and fair, and it required us to account for the costs of necessary safety and security measures.

When the Commission implemented the new law in 2024, it did so with the right intentions. But subsequent developments suggest that the 2024 rate caps did not always strike the right balance under the new statutory framework.

For example, the 2024 analysis relied heavily on categories that proved too rigid in practice, which resulted in excluding recovery for many legitimate costs in providing IPCS services. That, in turn, has contributed to unintended consequences, like the loss of IPCS service in some facilities. Through the Further Notice, we can take a closer look at how to more accurately capture those costs and avoid

disruptions to service going forward.

With today's item, I support the corrective steps we're taking to address the unintended effects of the 2024 rules, but it is clear that more work remains. Consumers, providers, and facilities alike need stability, and I'm counting on stakeholders to ensure that the record we build in the Further Notice will enable us to act with confidence to adopt legally sound, permanent rate caps that achieve that balance. I particularly look forward to more up-to-date and comprehensive evidence regarding correctional facility costs to evaluate whether those costs should be recovered through permanent rates. I also look forward to provider data regarding safety and security costs that enable the Commission to conduct a nuanced analysis to determine which of those costs should be recovered in permanent rates.

My sincere thanks to the Wireline Competition Bureau and the Office of Economics and Analytics for their thorough and thoughtful work on this item, and for their continued efforts to advance a framework that promotes safety, consumer benefits, and stability in IPCS.

# ATTACHMENT B



(h) *Electronic reporting of compliance certification reports.* Beginning on July 7, 2025, or once the report template for this subpart has been available on the EPA's Compliance and Emissions Data Reporting Interface (CEDRI) website for one year, whichever date is later, submit all subsequent reports to the EPA via the CEDRI according to § 63.9(k) except that confidential business information (CBI) should be submitted according to paragraph (k) of this section.

\* \* \* \* \*

■ 6. Amend § 63.314 by revising the introductory text to read as follows:

### § 63.314  Fenceline monitoring provisions.

For each by-product coke oven battery facility as defined in § 63.301, beginning no later than July 7, 2025, the owner or operator of a coke manufacturing facility shall conduct sampling along the facility property boundary and analyze the samples in accordance with paragraphs (a) through (g) of this section.

\* \* \* \* \*

## Subpart CCCCC—National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks

■ 7. Amend § 63.7283 by revising paragraphs (d)(1) and (2) to read as follows:

### § 63.7283  When do I have to comply with this subpart?

\* \* \* \* \*

(d) \* \* \*

(1) If you have an existing affected source or a new or reconstructed affected source for which construction or reconstruction commenced on or before August 16, 2023, you must be in compliance no later than January 5, 2026.

(2) If you have a new or reconstructed affected source for which construction or reconstruction commenced after August 16, 2023, you must be in compliance no later than January 5, 2026, or upon startup, whichever is later.

\* \* \* \* \*

■ 8. Amend § 63.7300 by revising paragraph (c)(4) introductory text to read as follows:

### § 63.7300  What are my operation and maintenance requirements?

\* \* \* \* \*

(c) \* \* \*

(4) Beginning January 5, 2026, you must identify and implement a set of site-specific good combustion practices for each battery. These good combustion practices should correspond to your standard operating procedures for maintaining the proper and efficient combustion within battery waste heat flues. Good combustion practices include, but are not limited to, the elements listed in paragraphs (c)(4)(i) through (v) of this section.

\* \* \* \* \*

■ 9. Amend § 63.7341 by revising paragraph (f) to read as follows:

### § 63.7341  What reports must I submit and when?

\* \* \* \* \*

(f) *Electronic reporting of compliance reports.* Beginning on July 7, 2026, or once the report template for this subpart has been available on the CEDRI website for one year, whichever date is later, submit all subsequent reports to the EPA via the CEDRI according to § 63.9(k) except that confidential business information (CBI) should be submitted according to paragraph (h) of this section.

\* \* \* \* \*

[FR Doc. 2025–22034 Filed 12–4–25; 8:45 am]

**BILLING CODE 6560–50–P**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 64

[WC Docket Nos. 12–375, 23–62; FCC 25–75; FR ID 319372]

### Incarcerated People's Communication Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) modifies the Commission's previous incarcerated people's communications services (IPCS) rate caps in response to record evidence of the significant unintended consequences of those rate caps. It establishes new interim audio and video IPCS rate caps by basing the calculation of the Commission's rate caps only on billed minutes, incorporating all safety and security measure expenses that IPCS providers reported incurring, and creating an additional rate cap tier for extremely small jails. It also creates a separate interim rate additive to ensure recovery of correctional facilities' costs of administering IPCS. Additionally, it sets a new compliance date for providers' compliance with the new rules and clarifies that the rate cap, site commission, and per-minute pricing rules from the Commission's 2021 Order will no longer apply following that date.

**DATES:**
*Effective date:* This rule is effective December 5, 2025.

*Compliance date:* compliance with this rule will be required on April 6, 2026.

**FOR FURTHER INFORMATION CONTACT:** Shabbir Hamid, Pricing Policy Division of the Wireline Competition Bureau, at (202) 418–2328 or via email at *shabbir.hamid@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Report and Order and Order on Reconsideration, document FCC 25–75, adopted on October 28, 2025 and released on November 6, 2025, in WC Docket Nos. 12–375 and 23–62. This summary is based on the public redacted version of the document, the full text of this document can be obtained from the Commission's Electronic Document Management System (EDOCS) website at *www.fcc.gov/edocs* or via the Commission's Electronic Comment Filing System (ECFS) website at *www.fcc.gov/ecfs,* or is available at the following internet address: *https://docs.fcc.gov/public/attachments/FCC-25-75A1.pdf.*

### Synopsis

### I. Introduction

1. The rates and other practices of the incarcerated people's communications services (IPCS) industry have been the subject of the Commission's and Congress' attempts to ensure just and reasonable rates for consumers and fair compensation for providers for over a decade. Indeed, the Commission has attempted on multiple occasions over the last 12 years to address these issues, spawning multiple rounds of litigation in several federal courts. With the passage of the Martha Wright-Reed Act and its implementation by the Commission in the *2024 IPCS Order,* the regulatory framework to achieve these dual goals was largely established. But in taking those steps, the new regulatory framework has led to significant unintended consequences that have been brought to light by stakeholders, as well as other challenges that are currently before the First Circuit. The ongoing implementation challenges and the resulting risks to safety and security they cause greatly exceed what the Commission considered or anticipated when it adopted the *2024 IPCS Order,* leading the Commission to today's action.

2. The goal of today's action is to establish a regulatory framework that is

faithful to the Martha Wright-Reed Act and is also consistent with the record that has developed over the last two years. The changes we make in the IPCS regulatory framework today, in particular changes to the methodology for calculating IPCS rate caps, supersede the corresponding aspects of the *2024 IPCS Order* and result in revised, interim audio and video IPCS rate caps that respond to these unintended consequences. We modify certain aspects of the rate cap calculations and rate structure to more accurately reflect the costs providers and correctional authorities incur in the provision of IPCS. The revised audio and video rate caps we establish are interim, while we seek additional comment in the Further Notice of Proposed Rulemaking (Further Notice) on, among other issues, rate structure and rate cap setting methodologies, the continued evolution of the IPCS market, and potential unintended consequences of these proposals. The goal of our actions today is to create a durable, predictable, and lawful framework that will properly balance our implementation of the dual statutory mandates—just and reasonable rates for consumers and providers and fair compensation for providers—and thereby ensure the continued availability of IPCS to incarcerated people and preserve correctional officials' ability to provide safe and secure access to IPCS. The steps we take today will provide a more stable framework to ensure continued higher levels of communication between incarcerated people and their loved ones, bringing all the benefits that have been demonstrated to provide, including improved reentry into society, reduced recidivism, increased public safety, and strengthened family ties between parents and children, between spouses, and with family members generally.

## II. Background

3. The Martha Wright-Reed Act was enacted by Congress in January 2023 to ensure that "all [IPCS] rates and charges are just and reasonable" while continuing to ensure that "all payphone service providers are fairly compensated." The Act expanded the Commission's jurisdiction to regulate IPCS to include intrastate IPCS and

advanced communications services, including video IPCS. It also permitted the Commission to use industry-wide average costs to determine just and reasonable rates and directed the Commission to "consider costs associated with any safety and security measures necessary to provide" IPCS in determining those rates. In July 2024, the Commission adopted the *2024 IPCS Order,* implementing the Martha Wright-Reed Act and establishing a new framework for the regulation of the IPCS industry. The Commission also adopted the *2024 IPCS Notice,* seeking further comment on certain issues, including further disaggregation of the very small jail rate cap tier and the adoption of a uniform rate additive to account for costs incurred by correctional facilities providing IPCS.

4. In October 2024, petitions were filed seeking reconsideration of various aspects of the *2024 IPCS Order,* including for our purposes here, a petition by NCIC (NCIC Reconsideration Petition). The NCIC Reconsideration Petition seeks reconsideration of two issues the Commission addresses herein. First, it challenges the Commission's decision to exclude certain safety and security costs from the lower bounds of its zones of reasonableness, asserting that the exclusion led to rate caps that are "below the cost of providing service for most IPCS providers." It also seeks reconsideration of the Commission's decision to include unbilled minutes of use in its cap calculations, claiming that "led to unsustainable rate cap reductions."

5. During the transition period to the newly adopted rate caps, the Commission was made aware of certain unintended consequences of the new IPCS rules for the industry and for correctional facilities. In the *2025 IPCS Waiver Order,* the Wireline Competition Bureau (WCB or the Bureau) found the record, developed subsequent to the adoption of the *2024 IPCS Order,* contained evidence indicating that the restructuring of the IPCS industry required to implement the Commission's new rate cap rules "imposes implementation challenges and safety and security risks greatly exceeding those the Commission envisioned in the *2024 IPCS Order.*" In

light of these difficulties, the Bureau adopted the *2025 IPCS Waiver Order,* which extended compliance deadlines for the IPCS rate caps and other rules "until April 1, 2027 or any alternative date the Commission sets as part of further action in this proceeding." On July 30, 2025, the Public Interest Parties filed an Application for Review of the *2025 IPCS Waiver Order,* asking the Commission to rescind the order and allow the relevant IPCS rules to go into effect as adopted. The Bureau sought and received comment on the Application for Review.

## III. Report and Order and Order on Reconsideration

6. We adopt a joint Report and Order and Order on Reconsideration (Order) to address rate cap setting issues that arose in two distinct procedural settings in this rulemaking—some in response to the *2024 IPCS Notice* and others in response to the NCIC Reconsideration Petition. We combine the discussions of our Report and Order and Order on Reconsideration into a single holistic discussion to simplify and clarify our analysis of the various rate cap setting modifications we make, which are interrelated and interdependent, but which must be factored together to result in a single set of revised rate caps. For clarity's sake, we identify throughout this hybrid discussion the procedural source of each issue we address and therefore the aspect of the joint Order we issue today.

7. In this Order, we use a two-step process for revising the IPCS rate caps. We first address four methodological issues raised in the record and revise the approach to each in response to comments raised in the record. We then incorporate the effects of those modifications into the audio and video rate cap calculations by establishing a zone of reasonableness for each rate tier, calculating upper and lower bounds for each rate tier, and then select new rate caps from within the resulting zones, rounding to whole cent amounts. The rate caps we establish are interim, acknowledging the limitations of the data submitted and allowing the Commission to seek further comment before setting permanent rate caps.

8. We adopt the following revised, interim audio and video IPCS rate caps:

**Table 1: Revised Interim Audio and Video IPCS Rate Caps**

| Tier (ADP) | Audio (Per Minute) | | | Video (Per Minute) | | |
|---|---|---|---|---|---|---|
| | Rate Cap | Rate Additive | Effective Rate Cap | Rate Cap | Rate Additive | Effective Rate Cap |
| Prisons (any ADP) | $0.09 | $0.02 | $0.11 | $0.23 | $0.02 | $0.25 |
| Large Jails (1,000 +) | $0.08 | $0.02 | $0.10 | $0.17 | $0.02 | $0.19 |
| Med. Jails (350-999) | $0.10 | $0.02 | $0.12 | $0.17 | $0.02 | $0.19 |
| Small Jails (100-349) | $0.11 | $0.02 | $0.13 | $0.19 | $0.02 | $0.21 |
| Very Small Jails (50-99) | $0.13 | $0.02 | $0.15 | $0.23 | $0.02 | $0.25 |
| Extremely Small Jails (0-49) | $0.17 | $0.02 | $0.19 | $0.42 | $0.02 | $0.44 |

*A. Revisions to Rate Cap Setting Methodology and Rate Structure*

9. We first revise four aspects of the rate cap setting approach the Commission used in the *2024 IPCS Order,* based on the record developed in response to the *2024 IPCS Notice* and NCIC's Petition for Reconsideration of various aspects of the *2024 IPCS Order,* as well as updated information received in the record of this proceeding. As noted above, these changes supersede the corresponding aspects of the *2024 IPCS Order.* First, in response to the NCIC Reconsideration Petition, we reconsider the use of unbilled minutes in calculating the IPCS rate caps, excluding such minutes as they result in no compensation for IPCS providers. Second, pursuant to comment sought in the *2024 IPCS Notice,* we adopt an additional size tier for extremely small jails (from 0 to 49 average daily population (ADP)) to better reflect the

generally higher per-minute and per-capita costs extremely small jails face. Third, in response to the NCIC Reconsideration Petition, we revise the treatment of safety and security costs to include all such reported costs in the revised rate caps. Finally, pursuant to comment sought in the *2024 IPCS Notice,* we adopt a separate rate additive for all rate tiers of up to $0.02 per minute that may be charged on top of the newly revised per-minute rate caps. The net effect of these changes will be to properly balance the way we implement the Martha Wright-Reed Act and thereby ensure consumers, correctional facilities, and IPCS providers realize the shared goal of increased communication with all the benefits that has been shown to produce.

1. Exclusion of Unbilled Minutes in Calculating Rate Caps

10. NCIC seeks reconsideration of the Commission's inclusion of unbilled minutes of use in calculating IPCS rate caps in the *2024 IPCS Order.* NCIC argues that the inclusion of unbilled minutes of use—minutes that facilities may require and for which providers currently collect no revenue—''would lead to IPCS providers being under-compensated.'' The majority of commenters that responded to the petition support NCIC's claim. We agree and therefore grant this portion of the NCIC Reconsideration Petition.

11. In the *2024 IPCS Order,* the Commission calculated the IPCS rate caps by dividing used and useful costs incurred in the provision of IPCS by the sum of billed and unbilled minutes as the unit of sale. It reasoned that using both billed and unbilled minutes ''better reflect[ed] the cost of actual minutes.''

The Commission considered that using both billed and unbilled minutes would "ensure all incarcerated persons are charged no more than the cost of their calls, and treat[] all minutes equally, regardless of a facility's or a provider's policy decisions on whether and how to provide free minutes."

12. NCIC contends that the Commission erred by including unbilled minutes in its calculation of rate caps. It claims that the Commission failed to "adequately explain how including unbilled minutes, for which IPCS providers incur costs to carry the traffic and monitor the communications but receive no revenue, is a better reflection of an IPCS providers's costs to provide service." We find that using total reported minutes of use to calculate interim rate caps may not produce rate caps that allow providers sufficient revenues to recover their costs, even if doing so may be useful in assessing overall industry cost characteristics. Using both billed and unbilled minutes, without accounting for the fact that providers may not presently have contracts in place enabling them to recover from facilities the costs of providing any unbilled minutes that facilities require, may lead to under-compensation, contrary to the "fair compensation" principle of section 276(b)(1)(A) of the Communications Act of 1934, as amended (Communications Act).

13. NCIC challenges the Commission's conclusion that using billed and unbilled minutes to derive its rate caps was "an improvement from the *2021 ICS Order*, which divided expenses by paid minutes." It further claims the Commission "failed to provide any meaningful discussion on why its prior conclusion to rely on solely [paid] minutes was in error." It cites the Commission's previous conclusion in the *2021 ICS Order* to use paid minutes to derive rate caps "because those are the minutes that providers rely on to recover their costs." As NCIC noted, using unbilled minutes for which no compensation is received to calculate rate caps leads "to IPCS providers' costs being diluted by non-revenue generating IPCS calls," which may not ensure providers are fairly compensated, as required by the Martha Wright-Reed Act.

14. While NCIC seeks to exclude unbilled minutes from the calculation of IPCS rate caps, it does not seek a return to the use of paid minutes to calculate rate caps as was done in the *2021 ICS Order*. A return to using paid minutes

was not necessary in the *2024 IPCS Order* as the Commission accounted for the difference between paid and billed minutes by including bad debt expense in its rate cap calculations. In this Order, we account for this difference by including a similar allowance for bad debt expense in the costs used to calculate rate caps.

15. The Public Interest Parties assert that "excluding unbilled minutes would lead to rate caps that are unreasonably high . . . in at least some facilities." But they fail to acknowledge that basing rates on unbilled minutes will undercompensate providers unless they recover those costs directly from facilities. We therefore are not persuaded that excluding unbilled minutes results in interim rate caps that are not just and reasonable. Additionally, the Commission must take into account the fact that unbilled minutes represent a non-trivial percentage of all minutes as it balances the dual goals of ensuring just and reasonable rates for consumers and fair compensation for providers. Finally, consumers are direct beneficiaries of unbilled minutes, an offsetting benefit which must be factored in assessing the reasonableness of industry rate caps overall. This revision to our rate caps, as well as the others adopted in this Order, are cost-based, supported by the record, and meet the dual requirements that our rate caps be just and reasonable and fairly compensatory. We find that excluding unbilled minutes in calculating our interim rate caps satisfies both statutory mandates.

16. In the *2024 IPCS Order,* the Commission further explained its decision to use unbilled minutes by citing the fact that the "ratio of billed minutes to unbilled minutes varies across facilities" and that basing rates on billed and unbilled minutes would minimize the problem of under-recovery in facilities with a higher proportion of unbilled minutes and over-recovery in facilities with a lower proportion of unbilled minutes. However, as NCIC observes, that reasoning reflects the inherent variability of rate caps based on average industry data and therefore does not constitute a flaw in the Commission's rate cap setting methodology, only an inherent attribute of average cost-based ratemaking.

17. Finally, NCIC questions the Commission's reasoning that "if the relative proportions of billed to unbilled minutes were to shift in the future, a rate cap based on the amount of billed minutes would become outdated." It

asserts that the Commission "already has plans to address any outdated rate caps in connection with ongoing oversight of IPCS service." The Public Interest Parties assert in contrast that including unbilled minutes "eliminat[es] the need for the type of ongoing monitoring NCIC describes," but do not explain how including unbilled minutes in rate calculations would obviate the need for the Commission to discharge its ongoing oversight responsibilities under the Communications Act and the Martha Wright-Reed Act. We agree with NCIC. We are currently monitoring and fully intend to continue to monitor the IPCS industry as part of our ongoing oversight obligations under the Communications Act and the Martha Wright-Reed Act.

18. We therefore use only billed minutes in calculating our interim rate caps, superseding our decision in the *2024 IPCS Order,* which we find will help ensure IPCS providers are fairly compensated while still ensuring just and reasonable rates. Removing unbilled minutes from the calculation of those rate caps will, in combination with the other modifications to IPCS rate caps adopted in this Order, ensure those rate caps comply with the statutory requirement that providers are fairly compensated. The impact of altering this aspect of the Commission's rate cap calculation, as further explained in Appendix D, is material. Unbilled minutes constitute 7.8% of the total number of minutes reported by the industry in response to the 2023 Mandatory Data Collection, although this proportion varies across different rate tiers and between audio and video services. Unbilled minutes consist of a greater proportion of video minutes than audio minutes, approximately 27.5% of reported video minutes, versus roughly 7% of audio minutes. Removing unbilled minutes from our calculations increases the per minute industry averages for audio and video IPCS and safety and security expenses by as little as 6.2% to as much as 63.7%, depending on the service and the tier in question (before lower-bound adjustments). Replacing total minutes with billed minutes increases the per-minute allowance for recovery of ancillary service expenses reflected in the rate caps by about 8.5% (before lower-bound adjustments and rounding to the nearest third decimal place). The effect of this change is reflected in the interim rate caps adopted by the Commission.

**Table 2: Effect of Removing Unbilled Minutes on Audio and Video Safety and Security Expenses**

| | Audio | | | Video | | |
|---|---|---|---|---|---|---|
| | IPCS and Safety & Security Expenses Per Total Minute | IPCS and Safety & Security Expenses Per Billed Minute | Percent Change | IPCS and Safety & Security Expenses Per Total Minute | IPCS and Safety & Security Expenses Per Billed Minute | Percent Change |
| Prisons | 0.074 | 0.079 | 7.0% | 0.293 | 0.455 | 55.1% |
| Large Jails | 0.065 | 0.071 | 9.1% | 0.190 | 0.312 | 63.7% |
| Medium Jails | 0.077 | 0.082 | 7.5% | 0.183 | 0.244 | 32.8% |
| Small Jails | 0.088 | 0.093 | 6.2% | 0.175 | 0.215 | 22.7% |
| Very Small Jails | 0.106 | 0.113 | 7.0% | 0.222 | 0.248 | 11.6% |
| Extremely Small Jails | 0.141 | 0.153 | 8.6% | 0.369 | 0.421 | 14.1% |

Source: 2023 Mandatory Data Collection facility-specific Excel tabs.

Total minutes include billed and unbilled audio or video minutes. Billed minutes do not include unbilled audio or video minutes.

2. Establishing the Extremely Small Jail Tier

19. In the *2024 IPCS Notice,* the Commission sought comment on the costs of providing IPCS to very small jails, whether to disaggregate the very small jail tier, and the types of data that would help capture the variability of IPCS costs in this very small jail tier. After analyzing the record received in response to the *2024 IPCS Notice,* we now further disaggregate the very small jail tier into two separate tiers—very small jails and extremely small jails. Specifically, we revise our definition of "very small jails" to include jails with an ADP between and including 50 to 99 and create a new rate cap tier for "extremely small jails" for jails with an ADP of 0 to 49. These revisions result in the following rate cap tiers, reflecting

differences in facility type and size, which we hereby adopt:

• A separate tier for all prisons regardless of average daily population;
• Jails with an average daily population of 1,000 or more (large jails);
• Jails with an average daily population between and including 350 to 999 (medium jails);
• Jails with an average daily population between and including 100 to 349 (small jails);
• Jails with an average daily population between and including 50 to 99 (very small jails); and
• Jails with an average daily population of 0 to 49 (extremely small jails).

20. The Martha Wright-Reed Act directs the Commission to ensure just and reasonable rates and consider costs associated with "small, medium, and large facilities" or "other

characteristics." In the *2024 IPCS Order,* the Commission interpreted this language as a mandate to analyze the cost characteristics of different-sized facilities. The Commission found no need to create separate rate cap tiers among prisons because they are almost uniformly large, enjoy greater economies of scale, and the data do not indicate significant differences in the costs of serving different prison facilities. Further, the Commission did not interpret the Martha Wright-Reed Act as a directive that limits the Commission to adopting only three size tiers. Given the record before it, the Commission adopted a four-tiered rate cap structure that includes the "very small jail" rate cap tier that we reexamine here to better reflect the differences in the costs of serving various sizes of jails.

21. Notably, the very small jail tier included jails with an ADP between 0 and 99, which encompassed over half of all jails in the United States. Generally speaking, these and other small jails are located in rural areas—an "other characteristic[ ]" within the meaning of the Martha Wright-Reed Act—where the record suggests that providing IPCS involves increased costs due to "higher telecommunications expenses and customization requirements." The Commission recognized that the rate cap tiers adopted in the *2024 IPCS Order,* while an improvement over its previous rate caps, may still not effectively capture cost variations within this tier, and sought comment in the *2024 IPCS Notice* on further disaggregation of the very small jail tier. Given the significant number of such jails and their distinct cost structures, and given their generally more rural nature, we find it necessary to further refine our rate cap tiers to better capture the variability among small jails generally and within the very small jail tier specifically to more accurately reflect providers' costs and ensure they are fairly compensated.

22. As a general matter, we agree with commenters that as ADP decreases, per-minute or per capita costs for the provision of IPCS increase for the provider. Several factors cause per-minute IPCS costs to rise as ADP shrinks. For one, the fixed costs of providing IPCS at smaller or more rural facilities are distributed over fewer incarcerated people and therefore fewer minutes of use, which results in providers tending to have higher costs per minute at smaller facilities as opposed to larger facilities. Importantly, extremely small jails and very small jails are more typically located in rural areas, where the per minute cost of service is higher because of the reported difficulty of serving those areas. In addition to increased costs for jail management and account set-up, greater reliance on prepaid accounts, and fewer calling minutes, IPCS providers that serve smaller jail facilities typically in rural locations often must also provision longer haul, higher cost broadband connections to deliver service. Accordingly, building upon the Commission's prior actions and based on the record and analysis of IPCS data, we subdivide the very small jail tier established in the *2024 IPCS Order* and instead create two separate tiers: a more focused very small jail tier for jails with ADPs between 50 and 99, and a new extremely small jail tier for jails with ADPs between 0 and 49.

23. The real world implications of adopting rate caps that do not sufficiently take into account the higher costs of serving the smallest and most rural facilities is evident in the record subsequent to the adoption of the *2024 IPCS Order.* One provider reported being "forced to cease the provision of IPCS services to four small jails in Arizona and New Mexico that would no longer be financially viable under the 2024 Order." After attempting to find a replacement provider, "the facilities had no other choice but to revert to 1980s-style supervised public pay telephones for use by the incarcerated population." Securus and Pay Tel further emphasize that rate caps that do not take into account the costs of serving very small facilities "will undoubtedly impact small jails in rural areas to the greatest extent, as those facilities typically have the lowest calling levels and the highest costs."

24. We find that further disaggregating the very small jail tier into two separate tiers better accounts for the operational challenges of providing IPCS to very small and extremely small jails, more accurately captures the heightened costs associated with providing IPCS to jails in rural areas, and therefore more reliably ensures that IPCS rates are just, reasonable, and fairly compensatory. Further, the majority of incarcerated people that would have been covered by the former very small jail tier rate cap will pay relatively lower rates than they otherwise would have if the very small jail tier were not subdivided, given that the majority of incarcerated people within the two new tiers will be in the revised very small jail tier. Incarcerated people housed in jails included in the new extremely small jail tier, while paying marginally higher rates than they otherwise would have if the very small jail tier were not subdivided, will be assured of the long-term availability of IPCS at those institutions given that those rates will more accurately compensate providers for their costs.

25. We subdivide the former very small jail tier at 50 ADP to create two tiers, and find that using this additional threshold will improve or better ensure the provision of IPCS within these tiers, while balancing the differences in ADP, average length of time incarcerated people are detained, and consumers' interests. This action subdivides the rate tier that encompasses the largest number of facilities. The most recent Bureau of Justice Statistics show that of the 2,779 jails in operation, over half have an ADP below 100 (567 with an ADP of between 50 to 99 and 956 with an ADP lower than 50). While there are a higher number of jails in the lower half of the 0–100 ADP range, those jails house significantly fewer people. Of the total ADP of 59,600 in jails below 100

ADP during the 12-month period from July 1, 2021 to June 30, 2022, jails with ADPs from 50 to 99 account for roughly 40,500 (68%), while jails with ADPs under 50 account for only 19,100 (32%).

26. We agree with commenters that assert that, because of this uneven population distribution within the former very small jail tier, the rate cap for this tier "saddles many with rates that are far too high as a result of the costs associated with providing service in the smallest jails." Taking into account the differences in ADP at the very small jail tier and the extremely small jail tier, we find that dividing the existing very small jail tier at 50 ADP will ensure that, at any given point in time, the majority of consumers in this group will pay lower IPCS rates, reflecting the relatively lower per-minute cost of service in jails from 50 to 99 ADP, while allowing providers at extremely small jails to charge rates that will enable them to recover their higher per-minute cost of service and therefore ensure they will be able to continue providing service over the long term. Differences in average length of stay between these two sets of facilities further amplify the importance of disaggregating the former very small jail tier to set appropriate rates for both new tiers. According to Worth Rises, on average, "people in jails with an ADP of 50 to 99 are detained for 21.6 days, whereas people in jails with an ADP of 0 to 49 are detained for 13.4 days." Shorter detentions would tend to increase the frequency of one-time administrative costs, all else being the same. We therefore divide the former very small jail tier into two separate tiers based on ADP.

27. We decline to further disaggregate the extremely small jail tier by setting an additional threshold below 50 ADP. NCIC suggests that there are a limited number of IPCS providers willing to serve very small jails because they lack a consistent ADP that would enable adequate revenue projections. After a certain point, however, we find further disaggregating the smallest rate cap tiers beyond those we adopt today would likely offer diminishing benefits. We recognize that IPCS providers—both large and small—serving jails with, for example, an ADP below 20 would likely face disproportionate compliance burdens if an additional, even smaller tier were created. Therefore, after carefully reviewing the data and record, we conclude 50 ADP represents a reasonable break point between the very small and extremely small jail tiers.

3. Inclusion of Safety and Security Costs

28. In the *2024 IPCS Order,* to determine which provider-reported expenses to include when calculating industry-average IPCS costs, the Commission applied a used and useful framework and evaluated various categories of safety and security expenses. After evaluating seven categories "based on the nature of the preponderance of tasks or functions within each category," the Commission found that two categories of safety and security expenses were used and useful in the provision of IPCS. The Commission therefore included the reported costs for the two categories—CALEA compliance measures and communications security services—in the cost of service, but ultimately concluded that "the remaining five categories should not be treated as used and useful" for purposes of determining the lower bounds of the zones of reasonableness. NCIC disputes this conclusion, arguing that the Commission's "inconsistent application of the 'used and useful' standard led to material errors" when the Commission rejected the costs in those five categories.

29. We now grant in part NCIC's Petition, by reconsidering the Commission's previous decision to exclude various safety and security costs from its IPCS rate cap calculations

and instead treat all reported safety and security costs as used and useful costs for determining the costs to be included in the lower bounds of the zones of reasonableness. In its Petition, NCIC alleges that the Commission's application of the used and useful analysis "did not fully account for IPCS providers' safety and security costs." NCIC argues that "the lack of comprehensive data" prevented "a reasoned analysis of the IPCS costs allocated across the seven categories of safety and security measures." On reconsideration, we agree. While the available record evidence concerning used and useful safety and security costs provided a basis for the Commission to exclude certain categories of safety and security costs, given the record which has developed since the Commission adopted the *2024 IPCS Order,* we find that this led to rate caps that did not sufficiently recover providers' used and useful safety and security costs. Accordingly, given our concerns about jeopardizing access to IPCS if we underestimate used and useful safety and security costs, we take a more conservative approach on the existing record and treat all reported such costs as used and useful, unless and until an improved record going forward shows otherwise, thereby superseding our treatment of safety and security costs in the *2024 IPCS Order.*

Therefore, for the purposes of our interim rate caps we now incorporate all safety and security cost categories in the Commission's IPCS rate cap calculations and specifically add all such categories of costs into our calculation of the lower bounds. The zone's upper bounds already included and incorporated all reported safety and security costs, and we need make no corresponding change to the upper bounds as a result. In doing so, we not only reconsider the Commission's earlier exclusion of five of the seven reported cost categories, but also incorporate and reaffirm the Commission's earlier reasons for including the other two reported cost categories.

30. In the 2023 Mandatory Data Collection, the Commission expanded the scope of collected data, gathering more granular information concerning safety and security services offered by providers, particularly those safety and security services which were used and useful in the provision of IPCS, and required providers to report on these data in detail for the first time. The Commission structured reporting of safety and security expenses by requiring providers to allocate these expenses across seven different cost categories. Industry-wide, providers reported the following expenses by category:

### Table 3: Reported Safety & Security Expenses By Category

|  | Total | Percent |
| --- | --- | --- |
| CALEA Compliance Measures | 5,839 | 0.001% |
| Law Enforcement Support Services | 24,593,237 | 4.3% |
| Communication Security Services | 195,760,913 | 34.4% |
| Communication Recording Services | 144,917,189 | 25.4% |
| Communication Monitoring Services | 99,898,694 | 17.5% |
| Voice Biometrics Services | 44,599,879 | 7.8% |
| Other Safety and Security Measures | 60,113,471 | 10.5% |
| All Categories | 569,889,222 | 100% |

Source: 2023 Mandatory Data Collection Safety & Security Measures Excel tabs.

As the chart demonstrates, providers reported a total of $569.9 million in safety and security costs across all categories, with Category 3 ("Communications Security Services") showing the highest reported costs of any category. These costs represent 34.4% of all reported costs.

31. While the Commission's categories were designed to group costs according to the uses or functions for which they were incurred, the Bureaus further disaggregated the category-based approach by directing providers to report cost data for each category between regulated IPCS (like audio IPCS, video IPCS, and ancillary services) and nonregulated services using a catch-all column for reporting. Despite these changes and attempts at clarification, providers still had difficulty in reporting. Commenters have since disputed the categories as a viable means of identifying used and useful costs, arguing that "IPCS providers do not categorize safety and security measures costs the same way the [Commission] grouped them." For example, the record demonstrates that responding providers interpreted communications monitoring services (category 5) to include functions that might be considered as typical of law enforcement, such as "aid[ing] investigations related to detention facilities," but that providers also reported services more typically considered IPCS-related in category 5, for example costs for "keeping incarcerated people from calling blocked numbers and from engaging in three-way calling." Similarly, as the National Sheriffs' Association argues, call recording (category 4) and call monitoring (category 5) both may include functions they consider used and useful in the provision of IPCS, insofar as threats are made or crimes are committed during the use of IPCS. On reconsideration, we find these arguments imply a benefit to IPCS consumers and that overlapping uses between the categories of safety and security measures include costs that the Commission did not evaluate previously, which we find appropriate to contemplate for all categories. Without more and better information, the Commission undermined its category-based analysis by requiring providers to lump reported costs into inexact categories, which, in some instances, excluded certain reported costs from the categories the Commission deemed used and useful.

32. At a more granular level, some of the individual services within each category also suffered from ambiguity in function and use, as they could be

classified as a law enforcement function, as a service which supported the provision of IPCS, or potentially both. Cost data for safety and security measures can be allocated among different security categories or functions in many ways, for example, by allocating costs for research and development processes to one specific category even if those costs apply more broadly to additional categories. Further, reported safety and security costs—such as platform development—could support both regulated IPCS and nonregulated services like text messaging. For example, certain IPCS providers develop their own proprietary software platforms for use by customers and law enforcement; such platforms naturally serve multiple functions, supporting not only the use of IPCS, but also education, entertainment, or other nonregulated uses, in addition to providing some safety and security features. Without a prescribed method of cost allocation or attribution, the categorical distinctions lose reliability, and can be treated differently by different respondents. In sum, we find other costs, such as platform development costs, and other functional overlaps heighten the degree to which regulated and nonregulated service costs are intermingled, and further obfuscate the Commission's ability to exclude reported safety and security cost categories without better data.

33. Next, given the limitations of the available data in the *2024 IPCS Order,* the Commission could not verify whether the costs of each provider's reported safety and security measures were allocated consistently to the seven cost categories. Despite the detailed instructions and description of the safety and security cost categories the Commission issued in the Mandatory Data Collection, providers did not report their safety and security data in a uniform fashion; in fact, the absence of costs reported in certain categories by certain carriers underscores this point. For example, {[ REDACTED ]} recorded costs for all seven categories of safety and security measures costs. (Material that is set off by double brackets {[ ]} is subject to a request for confidential treatment and is redacted from the public version of this document.) Similarly, {[ REDACTED ]} providers reported costs in only two out of seven categories, while the remaining {[ REDACTED ]} reported costs across six different categories. Different sized providers made very different safety and security cost allocations. The two largest providers allocated approximately {[ REDACTED ]} percent of their

expenses (besides other ancillary services and other products and services expenses) to safety and security, in contrast to all other providers which collectively allocated only about 3.3 percent of these expenses to safety and security. These percentages are derived from company-wide data. The expenses reflected in the base used to calculate these percentages are expenses reported as audio IPCS, video IPCS, safety and security measures, automated payment services, live agent services, paper bill/statement services, single-call and related services, and third-party financial transaction services. Further, the Commission was aware that providers had difficulty allocating safety and security costs among categories as instructed or otherwise attributed safety and security measures to many categories without supporting that allocation. We find these types of reporting issues to be particularly impactful on allocation decisions, particularly when some providers elected not to allocate, despite instructions to do so. Similarly, the National Sheriffs' Association argues that many providers do not maintain "more granular cost" data that would allow accurate categorization. Reporting disparities like these cannot be attributed exclusively to the inexactitude of the Commission's reporting categories; nonetheless, we agree that, upon reconsideration, these flaws suggest on balance that the structure of the data collection needs further refinement.

34. Despite the Commission's analysis, the safety and security data on which the Commission relied in the *2024 IPCS Order* were imperfect; our reevaluation of that data in light of the record we have since developed leaves us without assurance that the Commission's approach was the best way to implement the relevant directives of the Martha Wright-Reed Act. We now find that the method of data collection, and providers' allocations in response to the collection, together impaired the Commission's ability to assess the effect of excluding certain safety and security costs. The data collection results fell short of capturing the manner in which individual safety and security measures were used in the provision of IPCS, particularly at smaller institutions. We also agree that more specific, discrete, and granular cost data and operational information would assist the Commission in more reliably analyzing the costs and uses of reported safety and security measures.

35. The record demonstrates that the unintended consequences of these

shortcomings have had a significant impact on providers, correctional facilities, and ultimately consumers. Correctional facilities have raised basic safety and security concerns following the adoption of the *2024 IPCS Order* suggesting that the adopted rates resulted in reduced access to certain safety and security measures. For example, certain IPCS providers state that ''many correctional facilities have made the difficult—but [2024 IPCS] Order-required—decision to forgo these services because they lack the funds to pay for them,'' ultimately impacting the availability of IPCS generally. One provider reported that it renegotiated contracts with a number of facilities that ''lack sufficient financial resources to pay for the suite of safety and security tools they previously relied upon to provide IPCS safely to their populations and, accordingly, have elected to move forward with a substantially reduced set of those tools, thus endangering facility and public safety.'' The effects of the exclusion of certain safety and security costs from IPCS rate calculations also appears to have impacted access to IPCS generally. Another IPCS provider reported that some facilities ''have decided to stop offering IPCS altogether because they cannot guarantee the continued safety and security of their facilities.''

36. While the Commission attempted to reconcile the intermingled nature of these costs in the *2024 IPCS Order,* particularly when setting the relevant rate caps inside the zones of reasonableness, the results of the 2023 Mandatory Data Collection did not enable the Commission to be precise enough to avoid the unintended consequences described above. As we have noted, the categories excluded by the *2024 IPCS Order* included services or functions that are used and useful. As a result of excluding the costs of such services from the rate caps, and as the record since the adoption of the *2024 IPCS Order* shows, the fiscal resources required to provide requisite safety and security services were put at risk, implicating the availability of IPCS generally. We therefore take the interim step of reincorporating the five excluded cost categories of safety and security measures into the lower bounds and calculating new interim rate caps for audio IPCS and video IPCS accordingly, while continuing to include the two previously included categories. The seven categories are as follows: Communications Assistance for Law Enforcement Act (CALEA) compliance measures; law enforcement support services; communication security

services; communication recording services; call monitoring services; voice biometrics services; and other safety and security measures. This approach applies the used and useful framework to an imperfect record and therefore best ensures that all used and useful costs from safety and security measures necessary to the provision of IPCS will be accounted for in the governing interim rate caps pending the adoption of permanent rate caps, alleviating the risk that consumers could lose access to IPCS at some facilities altogether while the Commission works to collect more precise data and operational information. While it may at times be challenging to discern actual IPCS market conditions given imperfect data and marketplace complexities, the evidence of a threat to the availability of service is sufficient to justify our actions today. We note that Pay Tel asserts that ''[b]ut for the 2025 waiver order suspending several portions of the 2024 order, and the FCC's ongoing consideration of revisions to the 2024 order, Pay Tel would likely have been forced to forego service in other high-cost jails.'' Ultimately, we do not have the option to wait until market failure becomes more widespread to intervene. The inclusion of these costs for the purposes of our interim rate caps produces a reasonable outcome given the fact that they are based on providers' reported costs. We note that the upcoming data collection to establish permanent rates for IPCS will provide the Commission and interested parties another opportunity to revisit and reconsider these topics in the future.

### 4. Interim Facility Cost Rate Additive

37. On an interim basis and consistent with the record, we adopt a uniform rate additive of up to $0.02 per minute separate from and in addition to our rate caps to account for the costs correctional facilities incur in allowing access to IPCS. This additive is applicable equally to each rate tier we adopt today, and may be charged on top of the new, interim per-minute audio and video IPCS rate caps adopted in this Order. Our adoption of this uniform additive is an interim measure designed to provide greater certainty to IPCS providers and correctional facilities in determining compensation for correctional facilities for the costs they incur in allowing access to IPCS while the Commission seeks comment on how to structure a permanent rate additive in today's Further Notice.

38. As an initial matter, we modify the IPCS rate structure to create separate provider-related and facility-related cost recovery components, as the

Commission previously did in the *2021 ICS Order.* This rate structure more clearly delineates between provider-incurred IPCS costs and IPCS costs incurred by correctional facilities. Importantly, both rate elements are limited to the recovery of used and useful expenses incurred in the provision of IPCS. Accordingly, we modify the rate calculations used in the *2024 IPCS Order,* which included, based on the record before the Commission at that time, all of the used and useful costs incurred in the provision of IPCS regardless of whether such costs are incurred by IPCS providers or correctional facilities. In this Order, we supersede that decision and remove from our rate cap calculations the costs incurred by correctional facilities in making IPCS available and allow recovery of those costs through a separate rate additive for facility-related cost recovery. Establishing separate provider-related and facility-related rate components helps ensure our rate structure accounts for both providers' and correctional facilities' used and useful costs.

39. In the *2024 IPCS Order,* the Commission established a framework that aimed to account for, and to allow providers to reimburse correctional facilities for the used and useful costs they incur in allowing access to IPCS. To do so, the Commission incorporated its best estimate of the costs correctional facilities incur into the zones of reasonableness. Due to the lack of reliable correctional facility cost data in the record, the Commission relied on the National Sheriffs' Association's 2015 cost survey to incorporate $0.02 into the upper bounds of the zones of reasonableness for all facilities. The Commission explained that the ''$0.02 figure derives from the Commission's prior analysis of the amount of used and useful correctional facility costs the National Sheriffs' Association Cost survey reasonably supported'' in the *2021 ICS Order.* In the *2021 ICS Order,* the Commission stated that it relied on ''two separate independent bases'' in adopting the $0.02 per minute facility rate additive. The *2021 ICS Order* first based the rate additive on the Commission's analysis of the portion of site commissions that were legitimately related to inmate calling services. That analysis included site commission data submitted by prisons and jails and compared the per-minute site commission costs between all facilities that paid site commissions to all those that did not. Second, the Commission also based its decision on survey data submitted by the National Sheriffs'

Association. We likewise rely on both sources of data here in adopting an interim rate additive and therefore reject the assertion by the UCC, et al. that the "2-cent facility fee does not apply to prisons" and that the data on which the $0.02 per minute rate additive is based is "not related to costs in prisons." The Commission included no estimate for correctional facility costs in the lower bounds of the zones of reasonableness as the record contained "no data that would allow [it] to estimate those costs with any degree of precision." Because the Commission did not incorporate a measure of correctional facility costs in the lower bounds, it explained that those bounds may understate the used and useful costs of providing IPCS. The Commission aimed to account for this fact by adopting rate caps that exceeded the lower bounds of the zones of reasonableness at each tier.

40. To provide correctional facilities with the opportunity to recover their used and useful costs, the Commission permitted IPCS providers to reimburse correctional facilities for such costs under the rate caps. The Commission explained that the rate caps "reflect . . . all of the used and useful costs incurred in the provision of IPCS regardless of whether such costs are incurred by IPCS providers or correctional facilities" and thus "recognize[d], consistent with the record, that correctional facilities may incur some used and useful costs in allowing access to IPCS." Since the Commission also eliminated site commissions, which likely were the primary means by which correctional facilities recovered their used and useful costs, they would have no means to recover those costs absent a reimbursement mechanism.

41. In response to comments that the Commission's reimbursement mechanism may be difficult for IPCS providers to implement and the suggestion of some commenters that the Commission should instead use an explicit additive to IPCS rate caps to account for correctional facility costs, the Commission sought comment on whether the Commission should adopt a uniform additive to its IPCS rate caps to account for correctional facility costs. The Commission sought comment on the appropriate amount of a uniform rate additive, noting that one commenter had suggested that $0.02 per-minute could be established as a maximum facility cost recovery amount. Considering the "perennial problem" of receiving reliable correctional facility cost data in these proceedings, the Commission also sought comment on which data the Commission should rely

on in determining any additive and how the Commission can ensure that it receives reliable data.

42. The record now before us supports the adoption, on an interim basis, of a uniform rate additive in lieu of the reimbursement framework adopted in the *2024 IPCS Order*. Commenters explain that the reimbursement mechanism, which leaves correctional facilities and IPCS providers to negotiate reimbursement between them "will create confusion and conflict for facilities and IPCS providers, and will be less transparent for end users." Some commenters argue that the reimbursement framework effectively resurrects the harms of site commission payments insofar as IPCS providers will compete to offer the highest reimbursement amounts instead of competing on price or quality of service metrics, just as they did in connection with site commission payments. In addition, "the absence of a specific additive to rates as a cost-recovery mechanism, and the separate prohibition on providers using regulated revenue to fund safety and security services, is by necessity requiring correctional facilities to divert already-limited resources away from core elements of their public-safety mission."

43. In contrast, a "rate additive would provide much greater certainty and remove providers from the role of gatekeeper for correctional facility cost reimbursement." Pay Tel explains that a fixed correctional facility cost rate additive would "prevent the harms associated with the flawed reimbursement provision and better align market forces for all participants in the IPCS industry" because it would permit "full facility cost recovery" while also incentivizing correctional facilities to increase the availability of IPCS and create downward pressure on rates "to stimulate more calling." Commenters also point out that a rate additive structure is a "tested approach" that is "far simpler to implement and enforce, and can better ensure that facilities can recover their reasonably incurred costs." Indeed, "a uniform additive has been in place" for prisons and large jails since the *2021 ICS Order* became effective. The $0.02 per-minute rate additive "has proven to be an efficient, consistent, predictable, and transparent solution for ensuring correctional facilities can recover their costs associated with providing access to IPCS."

44. Although there is broad support for a rate additive, some commenters oppose this approach. Worth Rises argues because "the Commission's rates already account for all investments

necessary to sustain IPCS, a uniform rate additive is duplicative at best and a way around the ban on commissions at the worst." Given the prohibition on paying site commissions, however, a rate additive does not result in duplicative recovery. Nor does a uniform rate additive allow circumvention of that prohibition because the rate additive is limited to used and useful IPCS costs incurred by facilities. The Public Interest Parties likewise oppose a rate additive, noting that it "would include an additional amount on top of the rate caps," which already incorporate an estimate of used and useful correctional facility costs. But, unlike in the *2024 IPCS Order*, our ratemaking methodology is based exclusively on provider costs and thus excludes facility costs from our interim rate cap calculations. Commenters also note that even if there were a basis to adopt an additive, the record is devoid of reliable correctional facility cost data on which to base an additive.

45. Securus and Pay Tel acknowledge that the record lacks definitive correctional facility cost data and that such data is difficult to obtain, complicating the process of determining the appropriate additive amount. Securus notes that "the data used to derive the previous $0.02 rate additive . . . is based on old data" but that IPCS providers "do not have information on the costs correctional facilities incur." For its part, Pay Tel argues that "implementing an interim fixed additive of $0.02 per minute consistent with the 2021 ICS Order is achievable" even if it would need adjustment at a later date "based on further evidence." In today's Further Notice, we seek comment on how to obtain correctional facility cost data that could be used to implement a permanent rate additive. Additionally, prior to the adoption of the *2024 IPCS Order*, the Prison Policy Initiative proposed that if the Commission were to adopt a rate additive, it should set a "maximum facility cost recovery fee of 2 cents per minute of use" while prohibiting site commission payments.

46. Considering the significant record support, we adopt an interim uniform rate additive of up to $0.02 per minute. We agree with commenters that an additive will provide greater certainty for IPCS providers and correctional facilities. In particular, as Securus notes, a rate additive "would better enable facilities to estimate their IPCS-related costs that would be compensable by providers" as opposed to the current reimbursement mechanism which requires correctional facilities to negotiate contracts with providers

providing for reimbursement of their used and useful costs and to persuade the provider that the costs for which they seek reimbursement are used and useful. Additionally, as some commenters note, providers and correctional facilities are already familiar with the rate additive mechanism adopted in the *2021 ICS Order,* which will facilitate implementation by IPCS providers and correctional facilities alike. While some commenters support non-uniform rate additives that would reflect the varying costs faced by different facilities, the record at this point is insufficient for us to adopt such additives. We seek further comment on such rate additives in the Further Notice.

47. We therefore cap the interim additive at $0.02 per minute for audio and video IPCS across all rate tiers for all correctional facilities. The $0.02 additive derives from the additive adopted in the *2021 ICS Order* and the estimate of used and useful correctional facility costs in the upper bounds of the zones of reasonableness in the *2024 IPCS Order,* both of which were based in part on the National Sheriffs' Association's 2015 cost survey. The lack of reliable correctional facility cost data in the record constrains our ability to justify adopting a different additive today, including one based on facility size, as the National Sheriffs' Association suggests. We find that the $0.02 per minute interim rate additive to be a reasonable proxy for correctional facilities' used and useful costs pending the receipt of additional information and data in response to today's Further Notice. Although we concur with the National Sheriffs' Association suggestion that rate additives more closely tailored to facilities' costs would be preferable, the record before us does not allow it and we therefore seek additional comment in the Further Notice. Nevertheless, the National Sheriffs' Association cost survey remains the best data available about the costs correctional facilities incur in allowing access to IPCS that has been reported by correctional facility representatives, despite outstanding questions about the reliability of these data. We also continue to rely in part on the analysis of prison and jail site commission data that the Commission conducted when it originally adopted the $0.02 per minute rate additive in the *2021 ICS Order.* We therefore rely on these data to implement an interim rate additive of up to $0.02 per minute at all correctional facilities while the Commission considers the record that develops in response to today's Further Notice. The survey provided by Pay Tel's outside consultant, which quantified safety and security costs at 30 correctional facilities, is potentially helpful to inform future consideration of a permanent additive. However, the survey is not sufficient for the purposes of the industry-wide interim step we take today.

48. The interim additive we adopt today is to be charged on top of the per-minute audio and video rate caps as set forth in this Order. It is thus "in addition to, and not an offset or extraction from" the IPCS rate caps as they have been recalculated in this Order. The interim rate caps adopted in this Order are higher than the rate caps adopted in the *2024 IPCS Order* due to the inclusion of an additional $346 million of safety and security costs now included in the lower bounds of the zones of reasonableness. To be clear, however, the revised rate caps we adopt today reflect our removal from the upper bounds of the zones of reasonableness the $0.02 estimate of used and useful correctional facility costs that the Commission had added in the *2024 IPCS Order.* Additionally, removing the $0.02 from the upper bounds of the zones of reasonableness will mitigate the possibility that the interim uniform additive we adopt today "could double-count any purported used and useful facility costs that have already been factored into the Commission's IPCS rate caps."

49. The interim $0.02 per-minute rate additive "does not constitute a site commission" as that term is defined in the Commission's rules. In the *2024 IPCS Order,* the Commission distinguished between "IPCS provider payments to correctional facilities for costs used and useful in the provision of IPCS" from site commissions. With respect to the former, the Commission concluded that its rate caps would "allow for IPCS provider reimbursements to correctional facilities for costs used and useful in the provision of regulated IPCS." The Commission took a different approach with respect to site commissions, concluding that these payments are not used and useful in the provision of IPCS and therefore must be excluded from the calculation of the Commission's rate caps. We maintain this distinction today.

50. Some commenters argue that if "IPCS providers are allowed to freely compensate correctional facilities for costs without oversight, they will effectively reintroduce site commissions by a different name." We disagree. The interim rate additive we adopt is capped at $0.02 per minute. In contrast, the current reimbursement mechanism is "uncapped" in that its only constraint is the IPCS rate caps. The $0.02 per-minute rate additive we adopt here will provide a more "consistent, predictable, and transparent solution for ensuring correctional facilities can recover their costs associated with providing access to IPCS."

51. We also disagree with commenters arguing against a rate additive based on the lack of data in the record regarding used and useful correctional facility costs. While the Commission has noted the lack of updated correctional facility cost data in the record, it has, "out of an abundance of caution," incorporated a measure of correctional facility costs into its rate structure based on the National Sheriffs' Association's 2015 cost survey in both the *2021 ICS Order* and the *2024 IPCS Order.* In both cases the Commission determined that capping facility reimbursement at $0.02 per minute represents a "reasonable estimate" of used and useful correctional facility costs and provides a reasonable outer bound for providers' negotiations with facilities over the used and useful costs they incur in making IPCS available. For purposes of the interim facility rate additive we adopt today, we continue to rely on these data while we seek further information regarding correctional facility costs in today's Further Notice. While the Commission originally applied the $0.02 per-minute additive only to prisons and jails with average daily populations of 1,000 or more in the *2021 ICS Order,* those facilities' used and useful IPCS costs may be less per minute than the used and useful IPCS costs incurred by jails with lower average daily populations, a question we seek further comment on in the attached Further Notice. Given this capped and interim nature of the rate additive we adopt while we consider alternatives, we find it is unlikely that the additive will result in unreasonably high IPCS rates during the period the rate additive remains in effect.

## B. Adopting Revised Interim Audio and Video IPCS Rate Caps

52. After carefully considering the record developed since the Commission adopted the *2024 IPCS Order* and the *2024 IPCS Notice,* and incorporating the foregoing modifications to our rate cap setting methodology and rate structure, we adopt the following interim, per-minute, audio and video IPCS rate caps:

**Table 4: Interim Audio and Video IPCS Rate Caps**

| Tier (ADP) | Audio (Per Minute) | | | Video (Per Minute) | | |
|---|---|---|---|---|---|---|
| | Rate Cap | Rate Additive | Effective Audio Rate Cap | Rate Cap | Rate Additive | Effective Video Rate Cap |
| Prisons (any ADP) | $0.09 | $0.02 | $0.11 | $0.23 | $0.02 | $0.25 |
| Large Jails (1,000 +) | $0.08 | $0.02 | $0.10 | $0.17 | $0.02 | $0.19 |
| Med. Jails (350-999) | $0.10 | $0.02 | $0.12 | $0.17 | $0.02 | $0.19 |
| Small Jails (100-349) | $0.11 | $0.02 | $0.13 | $0.19 | $0.02 | $0.21 |
| Very Small Jails (50-99) | $0.13 | $0.02 | $0.15 | $0.23 | $0.02 | $0.25 |
| Extremely Small Jails (0-49) | $0.17 | $0.02 | $0.19 | $0.42 | $0.02 | $0.44 |

53. Our revised rate structure consists of two primary rate components: provider-related rate caps designed to allow providers to recover their used and useful costs in providing IPCS, and facility-related rate additives, designed for the recovery of the used and useful costs facilities incur in making IPCS available. In calculating revised interim rate caps and rate additives for each tier, we incorporate the four principal changes described in the foregoing section based on the record developed in response to the *2024 IPCS Notice* and NCIC's Petition for Reconsideration.

Those changes include: (1) the removal of unbilled minutes from the rate cap calculations in response to the NCIC Reconsideration Petition; (2) the adoption of an additional size tier for extremely small jails (from 0 to 49 ADP) pursuant to the *2024 IPCS FNPRM;* (3) revisions to the treatment of safety and security costs to include all such reported costs in the rate caps in response to the NCIC Reconsideration Petition; and (4) the adoption of a separate rate additive component consistent with the rate additive adopted in the *2021 ICS Order* of up to

$0.02 per minute for all rate tiers to address facilities' costs in making IPCS available, pursuant to the *2024 IPCS Notice.* Together, these modifications to our rate caps and rate structure result in new, interim audio and video IPCS rate caps that, while higher than the rate caps adopted in the *2024 IPCS Order,* appropriately balance the need to ensure that IPCS rates and charges are just and reasonable and that IPCS providers are fairly compensated in accordance with section 276. These interim rate caps and rate additives supersede the rate caps from the *2024*

*IPCS Order* and will remain in place pending resolution of the issues set forth in today's Further Notice.

54. Each of these modifications functions within the ratesetting methodology that the Commission used in both the *2021 ICS Order* and the *2024 IPCS Order.* That framework remains unchanged. We use average industry costs to develop rate caps pursuant to section 3(b)(1) of the Martha Wright-Reed Act as the Commission did in the *2024 IPCS Order.* We continue to rely on the 2023 Mandatory Data Collection and record evidence to calculate rate caps as the Commission did in the *2024 IPCS Order* since it remains the best data available to the Commission on which to base IPCS rate caps. In calculating the revised rate caps, we use the zone of reasonableness approach that was previously used in both the *2021 ICS Order* and the *2024 IPCS Order* as the best means for minimizing the impact of any imperfections in the dataset on our final rate caps. As the Commission noted in the *2024 IPCS Order,* the zone of reasonableness approach is "well-suited to reconcile competing concerns," in particular, the "competing interests of providers and consumers." It also gives us "flexibility to effectively address imperfections in the data and ultimately select rate caps that satisfy" the dual mandates of the Martha Wright-Reed Act—just and reasonable rates for consumers and fair compensation for providers. As the Commission did in the *2024 IPCS Order,* we include an allowance for the additional costs IPCS providers incur in making TRS and other, related disability access communications technologies available to disabled incarcerated people in both our upper and lower bounds calculations. Finally, we continue to include IPCS providers' reported costs of providing ancillary services in both our upper and lower bounds calculations to ensure providers are fairly compensated. Together, these modifications will ensure a stable regulatory framework that continues to foster increased communication for incarcerated people while the Commission adopts permanent rate caps and rate additives based on additional data and stakeholder input.

1. Preliminary Rate Cap Setting Observations

55. Our revisions to IPCS rates are based on the 2023 Mandatory Data Collection, which remains the best data available to us, notwithstanding the limitations previously acknowledged. From the results of that data collection, the Commission developed and refined a database that enabled it to analyze industry cost and operational characteristics and ultimately to select IPCS rate caps. The database represents approximately 99% of all industry minutes of use and approximately 97% of all industry revenues. We revisit the IPCS rate caps and rate cap setting methodology given the fact that the record developed since the adoption of the *2024 IPCS Order* makes clear the unforeseen consequences of some aspects of the methodology used. The modifications we make in our rate cap setting methodology and rate structure ensure that the revised rate caps we set today will result in just and reasonable rates for consumers and fair compensation to providers.

56. We set audio and video IPCS rate caps on an interim basis. As the aforementioned discussion on safety and security costs illustrates, more accurate data is needed with regard to how safety and security measures are used in the provision of IPCS, including data on the costs of individual safety and security measures and data on how and where such measures are used, before the Commission can set permanent audio rate caps. Additionally, as the Commission previously noted in the *2024 IPCS Order,* the data collected regarding the video IPCS market demonstrates the nascent character of that market, which will continue to mature over time as video IPCS deployment and usage becomes more widespread. Therefore, we adopt interim rate caps, which will give us flexibility to adjust our rate caps to reflect the evolution of the marketplace, and time for us to refine our rate analysis based on a future data collection before adopting permanent IPCS rates.

57. We clarify that our revisions to the rate cap setting methodologies and rate structure continue to be based on the used and useful framework for analyzing industry costs the Commission used in the *2024 IPCS Order.* For example, based on the limited data available for our analysis and in light of the recognized inconsistencies with the categorical approach the Commission took in the *2024 IPCS Order,* we cannot conclude that the categories of safety and security costs formerly excluded from the lower bounds are not in fact used and useful in the provision of IPCS, and we thus treat these categories, pending our further data collection, as used and useful as a whole. As previously discussed, we are unable to reconcile the disparities in reporting among providers and the inconsistencies of providers' allocation of safety and security measure costs among reporting categories, which effectively precluded further analysis of the data. Upon reconsideration, we find it unworkable to apply the used and useful analysis at a categorical level given the available data. By the same token, neither can we apply the used and useful analysis to the reported costs of individual safety and security measures, as the reported data is insufficiently granular and inconsistently allocated between the categories by providers. Without the ability to reliably attribute cost data to the categories employed by the data collection, and in order to avoid the unintended consequences—for providers and consumers alike—of incorrectly classifying costs and thereby excluding from the lower bounds the cost of safety and security measures that are necessary to the provision of IPCS and to consumers' continuing access to IPCS, we find it appropriate, on an interim basis, to include reported safety and security costs as a whole in the revised interim rate caps. We therefore revisit the Commission's conclusion that "[a]llowing the costs of measures that are not used and useful in the provision of IPCS to be recovered through IPCS rates would be inconsistent with that mandate [to ensure just and reasonable rates]." Where, as here, the decision to exclude certain of those expenses would frustrate the industry's ability to provide the service at all, the inclusion of those same expenses in order to enable service is inherently just and reasonable, unless and until additional data allows the Commission the ability to review and analyze such expenses on a more granular basis to determine whether such expenses are used and useful in the provision of IPCS. At present, we find the developed record insufficient to determine the requisite "nexus" of reported safety and security expenses, particularly under a categorical analysis. Therefore, in the interim and out of an abundance of caution to preserve the general availability of IPCS, we treat all reported safety and security costs as used and useful in the provision of IPCS. Given the state of the record, we likewise consider this approach the best way to ensure that the Commission has satisfied its duty under the Martha Wright-Reed Act to "consider costs associated with any safety and security measures necessary to provide" IPCS. While some parties might seek to portray this approach as a departure from the ordinary application of the used and useful framework, we find that this approach benefits ratepayers by ensuring that they continue to receive service, and thus is directionally aligned

with the ordinary operation of the framework.

2. Establishing Zones of Reasonableness

58. We employ a zone of reasonableness approach to rate cap setting that follows a three-step analysis consistent with the process used by the Commission in the *2021 ICS Order* and the *2024 IPCS Order*, and base our analysis on the data submitted by providers in response to the 2023 Mandatory Data Collection. We first establish upper bounds for each rate tier, which set a ceiling on the upper range of reasonable rates. We then establish lower bounds for each rate tier, by beginning with the upper bound figures and then making certain reasonable and conservative data adjustments which reduce the reported costs to set a reasonable rate floor. Finally, we rely on record evidence and on extensive agency expertise to determine a rate cap for each tier from within those upper and lower bounds for both audio and video IPCS.

59. *Determining the Upper Bounds.* Our approach to establishing the upper bounds of the zones of reasonableness remains largely identical to the approach taken by the Commission in the *2024 IPCS Order*. In short, we take a series of familiar steps to reach the upper bounds, each identical to the approach adopted in the *2024 IPCS Order*. For continuity, we continue to use the dataset developed for the *2024 IPCS Order*, which incorporates the vast majority of reported data but which excludes certain data submissions that were either incomplete or unusable. We again accept providers' costs and weighted average cost of capital as reported. Importantly, we continue to incorporate all of providers' safety and security costs into the upper bounds without any adjustment. As we note above, our estimate of the upper bounds likewise includes the provider-reported costs of ancillary service charges, as well as an estimate of providers' TRS-related costs. We repeat these steps in setting upper bounds for rates today based on the same analysis and reasoning used in setting upper bounds in the *2024 IPCS Order*, and we readopt them for our use here.

60. Our approach to establishing the upper bounds of the zones of reasonableness diverges from that in the *2024 IPCS Order* in one key respect: we no longer incorporate into the upper bounds any estimate of the separate IPCS-related costs which correctional facilities may incur in allowing access to IPCS. As we previously explained, the record that has developed since the adoption of the *2024 IPCS Order*

demonstrates a need to account for such costs in the form of a separate rate additive. Because we adopt and implement that rate additive in today's Order, those costs are now recovered outside of the rate caps, which in turn removes any need to account for them when developing our estimate of industry average IPCS costs. We therefore exclude such costs from the upper bounds we establish today.

61. In light of the foregoing, and after adding the new size tier for "extremely small jails," we calculate the upper bounds for interim audio and video IPCS rate caps for each tier as follows:

• *Prisons:* $0.094 per minute for audio communications and $0.470 per minute for video communications;

• *Large Jails:* $0.086 per minute for audio communications and $0.327 per minute for video communications;

• *Medium Jails:* $0.097 per minute for audio communications and $0.259 per minute for video communications;

• *Small Jails:* $0.108 per minute for audio communications and $0.230 per minute for video communications;

• *Very Small Jails:* $0.128 per minute for audio communications and $0.263 per minute for video communications; and

• *Extremely Small Jails:* $0.168 per minute for audio communications and $0.436 per minute for video communications.

62. *Determining the Lower Bounds.* The second step of our rate cap setting process is to establish lower bounds of our zones of reasonableness. To reach the lower bounds, we incorporate the results of the upper bound analysis and make reasonable adjustments beyond those applied to reach our upper bounds. Our approach to these adjustments largely follows that taken by the Commission in the *2024 IPCS Order*, with the exception that we incorporate all reported safety and security costs in the industry costs we use to calculate the lower bounds.

63. As explained above, and upon reconsideration, we now incorporate the five previously excluded categories of safety and security costs in the lower bounds, which includes costs for: Category 2 (Law Enforcement Support Services); Category 4 (Communication Recording Services); Category 5 (Communication Monitoring Services); Category 6 (Voice Biometric Services); and Category 7 (Other Safety & Security Services). Including these costs increases industry-wide total costs in the lower bounds by approximately $346 million. Because we find that the data collected by the categorical approach the Commission took in 2024 did not offer sufficient precision to

allow the Commission to exclude entire categories without risking providers' and facilities' ability to provide and/or fund IPCS and the necessary safety and security services, we take the conservative approach to include all such reported costs in our lower bounds.

64. Apart from the inclusion of safety and security costs in the lower bounds, the remaining steps and adjustments we take today replicate those taken in 2024. To be clear, the components of the lower bounds continue to incorporate reported ancillary service charge costs and an estimate of providers' TRS-related costs, both of which were also included in the upper bounds. As we describe in Appendix D, the adjustment we make to the reported weighted average cost of capital lowers the net sum of ancillary service expenses, although the total per minute allowance for recovery of these expenses is otherwise developed identically. This is the same approach the Commission took in 2024, to which no commenter objected. And, because we excluded an estimate of facility costs from the upper bound, we need no longer adjust the lower bound to remove them. In other words, because we adopt an external rate additive to ensure recovery of facilities' costs of making IPCS available, we no longer include any separate estimate of facility costs in our rate cap setting analysis.

65. We make two adjustments to the industry cost data. First, we adjust the weighted average cost of capital reported by certain providers to match the industry default of 9.75%. As explained in greater length in Appendix D, the net effect of this adjustment is to reduce reported costs by about $72.5 million industry-wide.

66. Second, we adjust Securus's reported video costs to bring Securus's costs in line with its competitors in the IPCS market and set Securus's video IPCS cost per minute equal to the weighted average for all other providers offering video IPCS. We complete the adjustment by reducing Securus's cost per-minute data reported for each facility by the appropriate relative percentage. Without adjustment, the per-minute video IPCS costs reported by Securus in the 2023 Mandatory Data Collection are between {{ REDACTED }} times the average of the rest of the industry. Given its size, Securus should be able to "achieve economies of scale" by "spread[ing] its fixed costs over a relatively large portfolio of contracts relative to other providers." Notably, these economies of scale are present in Securus's reported cost data for audio IPCS but not for video IPCS. While

Securus argues that the Commission should set interim rates that reflect their costs as reported in the data collection and not future expectations of costs, we find it inappropriate to set rates based on cost data that is heavily ''skewed by one provider's outsized investment in upfront costs for a nascent service offering.'' Therefore, we find it reasonable to adjust Securus's video IPCS costs to align with IPCS industry costs for the purposes of calculating interim video rate caps.

67. Separate from its video IPCS cost data, Securus's reported video safety and security cost data are also significantly higher than the rest of the industry. Given the inclusion of all safety and security costs in the lower bounds we establish here, including those for video IPCS, we extend our adjustment of Securus's video IPCS costs to include its video safety and security costs. Failure to do so would perpetuate the distortions caused by Securus's extremely high video costs, which would ''significantly skew the industry average'' on which we base our interim video IPCS rate caps. Further, not extending our adjustment to Securus's video safety and security costs would also be inconsistent with our adjustment to other costs, including our adjustment to weighted average cost of capital costs, which applies to both IPCS and safety and security costs.

68. Following the aforementioned steps, including adding all reported safety and security costs upon reconsideration, and adding the new ''extremely small jail'' tier, we calculate the lower bounds for interim audio and video IPCS rate caps as follows:

- *Prisons:* $0.086 per minute for audio communications and $0.214 per minute for video communications;
- *Large Jails:* $0.079 per minute for audio communications and $0.156 per minute for video communications;
- *Medium Jails:* $0.091 per minute for audio communications and $0.161 per minute for video communications;
- *Small Jails:* $0.103 per minute for audio communications and $0.174 per minute for video communications;
- *Very Small Jails:* $0.124 per minute for audio communications and $0.216 per minute for video communications; and
- *Extremely Small Jails:* $0.163 per minute for audio communications and $0.390 per minute for video communications.

3. Determining Interim Rate Caps for Audio IPCS and Video IPCS

69. Based on the available information and on the changes outlined above regarding billed and unbilled minutes, the adoption of a new ''extremely small jail'' tier, and the incorporation into the lower bounds of all safety and security costs as reported, we find that the

following rate caps based on the zone of facilities will provide just and reasonable rates while ensuring fair compensation. We establish these rate caps based on our examination of the developing record, the available data, and the Commission's experience regulating the IPCS marketplace. These rate caps are interim in nature given the need to conduct an additional industry data collection that will capture, particularly for the evolving video IPCS market, more mature market characteristics that will provide a sufficient basis for the establishment of permanent IPCS rate caps. These interim rate caps and rate additives will serve to ensure that the demonstrated benefits of increased communication in the carceral setting—reduced recidivism, increased public safety and strengthened family ties—will not be jeopardized by unintended implementation challenges.

70. *Setting Interim Audio Rate Caps.* We begin by setting our audio rate caps at the lower bounds of the zones of reasonableness, and rounding to the nearest whole cent for each tier. At the outset, we note that the upper and lower bounds for audio rates differ by relatively small margins; at no tier do they differ by more than $0.01. The audio caps we set at each tier are as follows:

**Table 5: Interim Audio IPCS Rate Caps and Rate Additive**

| Tier | Audio Lower Bound | Audio Rate Cap* | Audio Upper Bound | Audio Cost Additive | Effective Audio Rate Cap* |
|------|------|------|------|------|------|
| **Prisons (any ADP)** | $0.086 | **$0.09** | $0.094 | $0.02 | $0.11 |
| **Large Jails (1,000+)** | $0.079 | **$0.08** | $0.086 | $0.02 | $0.10 |
| **Med. Jails (350–999)** | $0.091 | **$0.10** | $0.097 | $0.02 | $0.12 |
| **Small Jails (100–349)** | $0.103 | **$0.11** | $0.108 | $0.02 | $0.13 |
| **Very Small Jails (50–99)** | $0.124 | **$0.13** | $0.128 | $0.02 | $0.15 |
| **Extremely Small Jails (0–49)** | $0.163 | **$0.17** | $0.168 | $0.02 | $0.19 |

Source: Appendix D.   * Audio rate caps include adjustment for inflation.

71. The lower bounds are the appropriate starting points when setting the audio IPCS rate caps, for many of the reasons that drove the Commission's rate cap setting decisions in the *2024 IPCS Order.* First, the collected data reflect ''total industry reported costs which exceeded total industry revenues by $219 million;'' a mismatch which continues to strongly suggest that reported costs are overstated. The difference between total industry revenues and costs does not, by itself, undermine the reasonableness of the interim rate caps we set here given that we are unable to ascertain and quantify the factors driving this difference in the dataset. We will seek additional clarity on this question in the forthcoming mandatory data collection that will be the basis for the Commission's adoption of permanent rate caps. While we nonetheless find these cost data provide

a valid basis on which to set rates, they suggest that setting rate caps based initially on our lower bounds will ensure just and reasonable rates and fair compensation for providers. Second, our analysis of the cost data still suggests that several providers have reported ''substantial amounts of goodwill,'' which resulted in large allocations of reported costs to IPCS activities. As the Commission did in 2024, we again decline to introduce an adjustment to reported costs on this basis. Continued inclusion of these goodwill amounts argues in favor of calculating our rate caps based initially on the lower bounds we have set. As the Commission noted in 2024, these goodwill allocations ''tend to inflate reported costs'' and therefore support our reliance on the lower bounds as the initial step of our rate setting process.

72. Choosing to set interim audio rate caps based on the lower bounds also is justified by the fact that the largest adjustment we make—the inclusion of all reported safety and security costs in our calculation of the lower bounds— may include some costs that are only marginally related to the provision of IPCS. Although we describe above why the categorical exclusion of safety and security costs failed to adequately provide fair compensation for facilities and providers, it is just as important to note that the wholesale inclusion of all reported safety and security costs may be overbroad. Consequently, taking all such costs as reported should also tend to result in a conservative estimate of IPCS costs, further supporting the use of the lower bounds as a basis for setting interim rate caps.

73. Record evidence received since the *2024 IPCS Order* was adopted also

supports our interim audio rate caps. As the record illustrates, providers have contracted to provide audio IPCS at lower rates in some circumstances. For example, both New York and California contracted to provide audio IPCS to their respective state prison systems at a lower rate. While the rates charged in these instances support our use of the lower bounds in setting our rate caps, they are rates paid by facilities directly to providers and are therefore not directly comparable to the interim consumer rate caps we adopt here. Although we cannot evaluate these prices in the abstract without a complete understanding of the contractual relationships between the parties, they nonetheless provide additional evidence in favor of adopting audio rate caps at the lower bounds.

74. After deciding to set audio IPCS rate caps based on the lower bounds, we use the standard rounding rule, in order to set caps at the whole cent. We find that setting rate caps at the whole cent will reduce confusion and complexity, and result in rate caps which can be more easily understood and used by consumers. While rounding a lower bound downward (or upward) can result in a rate cap that technically falls below a lower bound (or above an upper bound), our use of standard rounding principles is a statistically defensible process that yields interim rate caps that remain consonant with our zone of reasonableness approach. (Our use of a factor to estimate the effects of inflation on the 2022 cost data is intended to reflect a separate dynamic in our ratesetting process and does not impact the validity of our standard rounding rule.) Additionally, rounding to the nearest whole cent avoids conveying a false sense of precision, given the limitations of the data, and facilitates the administration of and provision of IPCS. Further, by the very nature of the rounding process, the differences between the audio rate caps we now adopt and the lower bounds which we have calculated are *de minimis* and therefore will not result either in unjust rates or unfair compensation for providers. The audio rate caps we adopt today are above the caps adopted in the *2024 IPCS Order,* reflecting a more comprehensive accounting of IPCS costs, thereby ensuring that, even for marginal cases, providers should be more than able to recover their costs. To the extent that a provider with exceptionally high costs can demonstrate that its costs exceed the interim audio and video rate caps we adopt today, it may use the Commission's waiver process.

75. Finally, the rate caps we set today are interim in nature given remaining outstanding questions we have with the dataset we use (goodwill costs, excess of costs over revenues industry-wide, inconsistent allocation practices, etc.) and given the continued evolution of the IPCS market. Likewise, interim caps are particularly appropriate until we can better isolate and analyze the costs of safety and security measures. Rather than the permanent caps adopted in the *2024 IPCS Order,* today's audio rate caps are designed to be temporary in nature thus helping reduce concerns about their levels which the Commission has already committed to revisit in the relatively near future on the basis of additional data.

76. *Setting Interim Video IPCS Rate Caps.* We find that the lower bounds are also the appropriate starting points when setting interim video IPCS rate caps, for many of the same reasons we have used the lower bounds as the starting point for setting interim rate caps for audio IPCS. We find that setting the interim video rate caps based on the lower bounds of the video zones of reasonableness gives appropriate weight to a range of factors, as described below. The video rate caps we set at each tier are as follows:

Table 6: Interim Video IPCS Rate Caps and Rate Additive

| Tier | Video Lower Bound | Interim Video Rate Cap* | Video Upper Bound | Interim Facility Cost Additive | Effective Interim Video Rate Cap* |
|------|------|------|------|------|------|
| Prisons | $0.214 | $0.23 | $0.470 | $0.02 | $0.25 |
| Large Jails | $0.156 | $0.17 | $0.337 | $0.02 | $0.19 |
| Medium Jails | $0.161 | $0.17 | $0.259 | $0.02 | $0.19 |
| Small Jails | $0.174 | $0.19 | $0.230 | $0.02 | $0.21 |
| Very Small Jails | $0.216 | $0.23 | $0.263 | $0.02 | $0.25 |
| Extremely Small Jails | $0.390 | $0.42 | $0.456 | $0.02 | $0.44 |

Source: Appendix D. * Video rate caps include adjustment for inflation.

77. We identify certain factors that support setting video IPCS rate caps based on the lower bounds, including several that dovetail with those referenced above in the discussion of our audio IPCS rate caps, as well as with those the Commission relied on in 2024. In particular, we reiterate that including all safety and security costs is generally conservative, and that providers have a natural incentive to overreport their IPCS cost data. Additionally, given the nascent nature of the video IPCS market, substantial initial investments in fixed assets are typical and are evident in our record, which gives us further confidence that relying on our lower bounds to set video IPCS rate caps will result in rate caps that are just and reasonable and fairly compensatory. Finally, given the inclusion of all safety and security costs in the lower bounds and the removal of facility costs from our rate cap analysis, the video rate caps we adopt today are above the corresponding rate caps adopted in the *2024 IPCS Order,* ensuring that providers should be able to recover their costs. We acknowledge that the adjustment we apply to Securus's video expenses reduces the lower bounds for video IPCS. For the aforementioned reasons, however, we find that relying

on that adjustment does not undermine our reliance on our lower bounds as the basis for setting rate caps.

78. We continue to adopt video rate caps on an interim basis, as the Commission did in the *2024 IPCS Order.* The same considerations which led us to adopt interim audio IPCS rate caps today support the adoption of interim video IPCS rate caps. Further, the interim nature of the video rate caps will allow the Commission to monitor the evolving nature of the video IPCS industry. As an emerging segment of the IPCS industry, we expect that the per minute costs reflected in the 2023 Mandatory Data Collection would normally fall over time as the industry matures. As with the interim audio rate caps we set today, our interim video caps will be revisited going forward on the basis of additional data and input from stakeholders generally.

79. *Inflation factor.* Securus contends that the interim IPCS rate caps we adopt in this Order should be adjusted for inflation as these rate caps are based on provider cost data from calendar year 2022. It proposes an inflation adjustment factor of 11.6% using the Telecommunications Producer Price Index (Telecom PPI). We agree that the interim rate caps should be adjusted to

account for inflation since 2022 but do not choose to rely on Securus's method of calculating the adjustment. Securus relies on the Telecom PPI but IPCS providers' investments and expenses reflect a mix of assets and business activities that is not purely a telecommunications service. For example, the provision of IPCS safety and security measures, which accounts for roughly one-third of all industry costs, aligns as much with the information technology and systems software sectors as it does with telecommunications. Similarly, the costs reported by providers like Securus also include significant hardware investments, particularly in tablets used for video IPCS and other non-IPCS services. Using a broader index like the Gross Domestic Product Price Index (GDP–PI) to estimate an inflation adjustment factor would arguably be more applicable to the relatively diverse mix of costs IPCS providers typically incur. The Commission has a long history of relying on broad measures of inflation including, for example, use of the GDP–PI to adjust the Price Cap Index used as part of the *ex ante* rate-setting methodology that limits certain interstate access rates that incumbent local exchange carriers subject to the

Commission's price cap and incentive regulation rules may charge. Moreover, Securus does not explain or justify the starting point for its calculation. Nor could we confirm the initial figure Securus cites (104.25) in its calculation in the Telecom PPI series published by the Bureau of Labor Statistics (BLS).

80. We therefore find it more appropriate to use the GDP–PI figure for the 4th quarter 2022, 120.175, as the starting point (*i.e.,* time zero or baseline figure) and the GDP–PI figure for the 2nd quarter 2025, the most recent figure published by the Bureau of Economic Analysis (BEA), 128.266, as the ending point to calculate an inflation adjustment factor. Our use of these two factors produces an inflation adjustment factor of 6.73%. We apply this factor to the lower bounds before rounding from three to two decimal places, and then we round the products of these calculations to two decimal places to produce the final rate caps. We also note that when the Commission incorporates an estimate of inflation in a ratesetting process, it also typically includes an offsetting estimate of productivity, which we do not attempt here given the relative lack of productivity data specific to the IPCS industry.

## C. Other Matters

### 1. Data Collection

81. We reaffirm the Commission's prior delegation of authority to WCB and OEA to conduct an additional data collection to enable the Commission to set permanent rate caps for both audio and video IPCS. That delegation included a direction to WCB and OEA to determine the timing and scope of the data collection, "provided that such collection shall be conducted as soon as practicable." Parties have underscored the importance of conducting a data collection without further delay. Given the time that has elapsed since the most recent mandatory data collection, the evolution of the market in the interim, and the importance of establishing permanent IPCS rate caps without undue delay, we now direct WCB and OEA to conduct a data collection following the conclusion of the Further Notice comment period with the goal of establishing permanent rate caps before the end of the first quarter of 2027. We reiterate our delegation of authority to WCB and OEA to make any appropriate modifications to the structure of the collection and the template and instructions for the collection necessary to provide the Commission an objective basis to establish permanent IPCS rate caps.

### 2. Cost Benefit Analysis

82. We perform an analysis of the relative costs and benefits of establishing new, interim audio and video IPCS rate caps. We expect that the benefits of adopting new, interim audio rate caps that are lower than the rate caps currently in effect, and establishing new interim video rate caps, will far exceed the implementation costs over a five-year time horizon. The net welfare gain to IPCS consumers alone is sufficient to ensure that the benefits of our actions exceed the costs. The other salutary effects of higher IPCS call volume—greater family stability, improved mental health, and lower recidivism and crime—will further expand these benefits.

83. *Upward Revision of IPCS Demand Price Elasticity.* Commission staff previously estimated a price elasticity of demand for inmate calling services of −0.3 based on empirical evidence of the responsiveness of inmate calling volumes to price declines. The record at the time included five estimates of demand elasticity which ranged from −0.38 to −0.29. The Commission selected a demand elasticity estimate effectively at the lower end of this range as a conservative estimate. A more recent empirical study estimates a higher IPCS price elasticity of demand of between −0.55 and −0.69, a range with a midpoint of −0.62. The authors computed the demand elasticity as the implied rate of a 15-minute call fell from $2.30 to $0.72 in New York and from $4.95 to $0.66 in New Jersey. We find that the increase identified by this study more accurately reflects the surge in call volume from unleashing the pent-up demand of inmates who had previously either called less than desired or not at all. Indeed, Miller et al. found that the average number of calls per inmate/per month increased from 8.82 to 15.86 in New York and from 8.32 to 27.00 in New Jersey, a near-doubling and tripling, respectively, of incarcerated people call volume. Miller et al. also developed a model using pooled New York and New Jersey data that showed rate elasticities of demand are higher at higher rates. Massachusetts sheriffs also witnessed a significant surge in demand when the price of inmate calling was lowered. The literature corroborates the higher elasticity: typical basic telephone demand price elasticities in developed countries range between −0.1 to −0.5 for local calls, −0.2 to −0.5 for long distance calls, and −0.2 to −1.5 for international calls. The price elasticity estimated by Miller, et al. is only slightly higher in absolute terms. This difference might be attributable to the higher incidence of youth or poverty among inmates. Studies have shown price elasticities are highest among the youngest and poorest customers. Another possible explanation is that Miller, et al. are estimating a blended elasticity for all calls, which would be higher because of the inclusion of the relatively more elastic international call volume (*i.e.,* their price elasticity is tantamount to a weighted average). We therefore revise our previous demand elasticity estimate and rely on a price elasticity of demand of −0.6 to estimate consumer welfare effects.

84. *Gain in IPCS Consumer Welfare.* Using our revised IPCS price elasticity of demand, we estimate a net increase in IPCS caller welfare of nearly $14 million annually, for a net present value of $64 million over a five-year period. $64 million is the present value of a five-year stream of $14 million payments discounted at an OMB recommended rate of 3%. Worth Rises also estimates higher elasticity for IPCS, although it does so by comparing the rates adopted here to those adopted in the *2024 IPCS Order* instead of those currently in force.

85. *Other Salutary Effects of Increased IPCS Call Volume.* The anticipated expansion in IPCS call volume due to the new, interim rate caps that are lower than the rate caps currently in effect should generate salutary effects similar in nature to those discussed in prior Commission orders, namely facilitating inmate re-entry, reducing recidivism and crime, diminishing costly foster-child care placements, and improving the mental health outcomes of inmates and their families.

86. *Costs of Implementing New IPCS Rates.* We previously estimated that implementing new IPCS rates would cost IPCS providers a one-time expense of $14 million in order to revise audio and video contracts to reflect the new rate caps. To account for unanticipated challenges faced by IPCS providers to implement the changes, including substantial admin costs, we revise our estimate upward by 50%, for a total of $21 million. For the sake of direct comparison with estimated annual benefits, this one-time cost averages to $2.8 million per year over five years. The revised IPCS rates stipulated in this Order will not alter estimated contract revision costs.

### 3. Effective Date and Compliance Date

87. We find good cause to make our rules effective on publication in the **Federal Register**. The Administrative Procedure Act ordinarily requires notice of a rule "not less than 30 days before

its effective date,'' subject to exceptions, including "as . . . provided by the agency for good cause.'' Here, there is good cause to make the rules we adopt effective immediately upon publication. The Martha Wright-Reed Act required the Commission to promulgate implementing rules not more than 24 months after the Act's enactment, or by January 5, 2025. The Commission adopted implementing rules in the *2024 IPCS Order*, but as previously discussed, those rules had unintended consequences that prompted us to revisit them soon after (and before widespread compliance). Because we are making fundamental changes to those rules—including superseding the rate caps themselves—we conclude that there is still a reason for urgency. Therefore, consistent with Congress's direction to move quickly and avoid unnecessary delay, we make this Order effective on publication of notice in the **Federal Register**.

88. At the same time—and to avoid any risk of prejudice from our determination to make the new rules effective immediately upon publication of notice in the **Federal Register**—we do not require compliance with the new interim audio and video IPCS rate caps and rate additive adopted in this Order until 120 days after the date of **Federal Register** notice. This will allow providers, correctional institutions, and state and local governments sufficient time to conduct any negotiations and administrative steps that may be necessary to implement the new rate caps and rate additive. The Commission's release of proposed orders three weeks in advance of their consideration at the Commission's monthly open meetings and the additional time inherent in the **Federal Register** publication process provide additional reasons why we believe this deferred effective date gives providers and facilities reasonable time to implement the revised interim rate caps and rate additive. We find that deferring the compliance date until after the effective date, as the Commission previously did in the *2024 IPCS Order,* will best balance the interests in fulfilling Congress's intent to ensure implementation of the Martha Wright-Reed Act without undue delay, while at the same time allowing parties sufficient time to implement these changes.

89. The compliance date, 120 days after publication in the **Federal Register**, represents the "alternative date the Commission sets as part of further action in the IPCS proceeding,'' as anticipated in the *2025 IPCS Waiver Order* and therefore supersedes the April 1, 2027 compliance deadline

previously established in that order. While not directly responding to the Application for Review filed by the Public Interest Parties, by superseding the April 1, 2027 compliance date of the *2025 IPCS Waiver Order,* the Commission effectively provides the substance of the relief sought in that filing. The compliance date of this Order therefore becomes the date on which compliance will be required for the three rules temporarily suspended in the *2025 IPCS Waiver Order*—the IPCS interim rate caps (as modified herein), the prohibition on the payment of site commissions, and the per-minute rate requirement for IPCS offerings. The compliance date of this Order, which supersedes the extended deadline for compliance with the Commission's per minute rate rules set by the *2025 IPCS Waiver Order,* works in conjunction with deadlines previously set for compliance by two other recent Bureau orders. The effective date of this Order will provide Securus the additional time it requested to implement the per-minute rate requirement for its video IPCS in the *ex parte* it filed in this proceeding on June 27, 2025. The compliance date for this Order supersedes and effectively extends the waiver relief previously granted Securus by the Bureau. We do not modify waiver relief previously granted TKC Telecom, which extended its compliance with the per-minute pricing rule for its video IPCS until April 1, 2026. This compliance date will approximate the latest of the staggered compliance dates established by the *2024 IPCS Order* and the deferred compliance dates set by WCB in granting waivers of the per-minute pricing rule for video IPCS. Securus seeks additional time to implement the per-minute pricing rule, which we do not grant. While the Commission does not grant additional time for providers to meet the per-minute pricing rule, it reminds providers that they may seek a waiver of the Commission's rules on an as-needed basis.

## IV. Procedural Matters

90. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA), requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.'' Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this Report and Order and

this Order on Reconsideration on small entities. The FRFA is set forth in section V below.

91. *Paperwork Reduction Act.* This document does not contain proposed information collections subject to the Paperwork Reduction Act of 1995 (PRA), 44 U.S.C. 3501–3521. In addition, therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, 44 U.S.C. 3506(c)(4).

92. *Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget concurs, that this Report & Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking is non-major under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of this Report & Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking to Congress and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

93. *Providing Accountability Through Transparency Act.* Consistent with the Providing Accountability Through Transparency Act, Public Law 118–9, a summary of the *2025 IPCS NPRM* will be available on *https://www.fcc.gov/ proposed-rulemakings.*

94. *OPEN Government Data Act.* The OPEN Government Data Act requires agencies to make "public data assets'' available under an open license and as "open Government data assets,'' *i.e.,* in machine-readable, open format, unencumbered by use restrictions other than intellectual property rights, and based on an open standard that is maintained by a standards organization. This requirement is to be implemented "in accordance with guidance by the Director'' of OMB. The term "public data asset'' means "a data asset, or part thereof, maintained by the Federal Government that has been, or may be, released to the public, including any data asset, or part thereof, subject to disclosure under the Freedom of Information Act (FOIA).'' A "data asset'' is "a collection of data elements or data sets that may be grouped together,'' and "data'' is "recorded information, regardless of form or the media on which the data is recorded.'' We delegate authority to the Wireline Competition Bureau, in consultation with the agency's Chief Data and Analytics Officer and after seeking public comment to the extent it deems appropriate, to determine whether any

data assets maintained or created by the Commission pursuant to the rules adopted in the *2025 IPCS Order* are "public data assets" and if so, to determine when and to what extent such information should be published as "open Government data assets." In doing so, WCB shall take into account the extent to which such data assets should not be made publicly available because they are not subject to disclosure under the Freedom of Information Act. *See, e.g.,* 5 U.S.C. 552(b)(4), (6)–(7) (exemptions concerning confidential commercial information, personal privacy, and information compiled for law enforcement purposes, respectively). We also seek comment in the *2025 IPCS Notice* on whether any of the information proposed to be collected in the Notice would constitute "data assets" for purposes of the OPEN Government Data Act and, if so, whether such information should be published as "open Government data assets."

95. *People with Disabilities.* To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* or call the Consumer and Governmental Affairs Bureau at 202–418–0530.

96. *Availability of Documents.* Comments, reply comments, and *ex parte* submissions will be publicly available online via ECFS.

97. *Further Information.* For further information, contact Shabbir Hamid, at (202) 418–2328 or *Shabbir.Hamid@fcc.gov* or *IPCS@fcc.gov.*

## V. Final Regulatory Flexibility Analysis

98. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), the Federal Communications Commission (Commission) incorporated Initial Regulatory Flexibility Analyses (IRFAs) in the *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services, Further Notice of Proposed Rulemaking* (*2024 IPCS Notice*), released in July 2024), in the Notice of Proposed Rulemaking (Notice) in WC Docket Nos. 23–62 and 12–375 (released in March 2023), in the Sixth Further Notice of Proposed Rulemaking in WC Docket No. 12–375 (released in September 2022), and in the Fifth Further Notice of Proposed Rulemaking in WC Docket No. 12–375 (released in May 2021). The Report and Order and Order on Reconsideration continue ongoing efforts to reform providers' rates, charges, and practices in connection with incarcerated people's

communication services. The Report and Order and Order on Reconsideration also address issues raised in the Petition for Reconsideration of Network Communications International Corp. The Commission sought written public comment on the proposals in those notices, including comment on the IFRA. No comments were filed addressing the IRFA. This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA and it (or a summary thereof) will be published in the **Federal Register**.

### A. Need for, and Objectives of, the Rules

99. The Report and Order and Order on Reconsideration modify the incarcerated people's communications services (IPCS) regulatory framework, changing the methodology for calculating IPCS rate caps and adopting revised, interim audio and video IPCS rate caps that address unintended consequences of the Commission's *2024 IPCS Order.* These actions ensure rates and charges for incarcerated people's audio and video communications services are just and reasonable and IPCS providers are fairly compensated.

100. The Report and Order and Order on Reconsideration alters the ratesetting methodology used in the *2024 IPCS Order* by: (1) excluding the use of unbilled minutes of use in calculating per-minute rate caps; (2) establishing a new rate cap tier for extremely small jails; (3) including previously excluded safety and security costs from rate cap calculations; and (4) removing an estimate of correctional facilities' costs from the rate caps and creating a separate rate additive to account for those costs. In the Report and Order and Order on Reconsideration, the Commission adopts interim rate caps for all intrastate and interstate audio IPCS and video IPCS and revises the existing dates for providers' compliance with the Commission's rules. The goal of the Report and Order and Order on Reconsideration is to properly balance the Commission's implementation of the dual statutory mandates—just and reasonable rates for consumers and fair compensation for providers—and thereby ensure the continued availability of IPCS to incarcerated people and preserve correctional officials' ability to provide safe and secure access to IPCS.

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

101. No comments were filed addressing the impact of the proposed rules on small entities.

### C. Response to Comments by the Chief Counsel for the Small Business Administration Office of Advocacy

102. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for the Small Business Administration Office of Advocacy (SBA), and also provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

### D. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

103. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules they adopt. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act (SBA). A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA. The SBA establishes small business size standards that agencies are required to use when promulgating regulations relating to small businesses; agencies may establish alternative size standards for use in such programs, but must consult and obtain approval from SBA before doing so.

104. Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe three broad groups of small entities that could be directly affected by our actions. In general, a small business is an independent business having fewer than 500 employees. These types of small businesses represent 99.9% of all businesses in the United States, which translates to 34.75 million businesses. Next, "small organizations" are not-for-profit enterprises that are independently owned and operated and are not dominant in their field. While we do not have data regarding the number of non-profits that meet that criteria, over 99 percent of nonprofits have fewer than 500 employees. Finally, "small governmental jurisdictions" are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less

than fifty thousand. Based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.

105. The rules adopted in the Report and Order and Order on Reconsideration will apply to small entities in the industries identified in the chart below by their six-digit North American Industry Classification System (NAICS) codes and corresponding SBA size standard. Based on currently available U.S. Census data regarding the estimated number of small firms in each identified industry, we conclude that the new rules will impact several small entities. Where available, we also provide additional information regarding the number of potentially affected entities in the identified industries below.

BILLING CODE 6712–01–P

Table 1: 2022 U.S. Census Bureau Data by NAICS Code

| Regulated Industry (Footnotes specify potentially affected entities within a regulated industry where applicable) | NAICS Code | SBA Size Standard | Total Firms | Total Small Firms | % Small Firms |
|---|---|---|---|---|---|
| All Other Telecommunications | 517810 | $40 million | 1,673 | 1,007 | 60.19% |
| Wired Telecommunications Carriers | 517111 | 1,500 employees | 3,403 | 3,027 | 88.95% |
| Wireless Telecommunications Carriers (except Satellite) | 517112 | 1,500 employees | 1,184 | 1,081 | 91.30% |
| Telecommunications Resellers | 517121 | 1,500 employees | 955 | 847 | 88.69% |

**Table 2: Telecommunications Service Provider Data**

| 2024 Universal Service Monitoring Report Telecommunications Service Provider Data (Data as of December 2023) | | SBA Size Standard (1500 Employees) | |
|---|---|---|---|
| **Affected Entity** | **Total # FCC Form 499A Filers** | **Small Firms** | **% Small Entities** |
| Competitive Local Exchange Carriers (CLECs) | 3,729 | 3,576 | 95.90 |
| Incumbent Local Exchange Carriers (Incumbent LECs) | 1,175 | 917 | 78.04 |
| Interexchange Carriers (IXCs) | 113 | 95 | 84.07 |
| Local Exchange Carriers (LECs) | 4,904 | 4,493 | 91.62 |
| Local Resellers | 222 | 217 | 97.75 |
| Other Toll Carriers | 74 | 71 | 95.95 |
| Payphone Service Providers | 28 | 24 | 85.71 |
| Toll Resellers | 411 | 398 | 96.84 |
| Telecommunications Resellers | 633 | 615 | 97.16 |
| Wired Telecommunications Carriers | 4,682 | 4,276 | 91.33 |
| Wireless Telecommunications Carriers (except Satellite) | 585 | 498 | 85.13 |

BILLING CODE 6712–01–C

*E. Description of Economic Impact and Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities*

106. The RFA directs agencies to describe the economic impact of the adopted rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

107. IPCS providers that qualify as small entities should be positively impacted by the modifications made in the calculation of IPCS rate caps. Those changes include the incorporation of five additional safety and security costs in the rate caps, helping to ensure that IPCS providers, and particularly smaller IPCS providers, recover their costs and therefore receive fair compensation. The Commission also determined that only billed minutes will be used to calculate

interim rate caps, which will help ensure that small and other providers will be fairly compensated. The creation of a new rate cap tier for extremely small jails (0–49 average daily population or ADP) is specifically designed to ensure that the predominantly smaller providers that serve the smallest jails, which the Commission's data collection show tend to have higher per-minute costs, will be able to recover their costs of service.

108. Additionally, the creation of a $0.02 per-minute interim rate additive to account for costs that facilities incur in making IPCS available will ensure the adopted IPCS rates allow smaller correctional institutions to be better able to recover those costs. Setting the effective date of the joint Report and Order and Order on Reconsideration at the date of its publication in the **Federal Register** but adding a separate compliance date at 120 days post-publication of the item in the **Federal Register**, instead of the April 1, 2027 date established in the *2025 Waiver Order,* will give small and other providers a reasonable time frame to adapt to the new rates and ensure compliance burdens for small entities are reasonable. Additional resources or personnel should not be required to effectuate these changes because IPCS providers should already be familiar with how to adjust their systems to effectuate new rate caps and should be able to make the necessary operational changes.

*F. Discussion of Steps Taken To Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered*

109. The RFA requires an agency to provide, ''a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.''

110. In the Report and Order and Order on Reconsideration, the Commission took several steps to minimize the economic impact of its IPCS regulations on small entities. First, the item modifies existing rate caps by

including additional safety and security costs in the rate cap calculations which will minimize the chance that providers, particularly smaller providers with generally higher per-minute costs, will not be able to recover their costs. The Commission also adopts a new rate cap tier that provides additional differentiation between five different sizes of jails—large, medium, small, very small, and extremely small—based on ADP. The use of five different size tiers for jails is supported in the record and accounts for differences in costs incurred by providers serving these different facility sizes. Adding this extremely small jail tier minimizes the risk that providers, and smaller providers that typically serve smaller facilities, will not be able to recover their cost of service. However, we decline to adopt a proposed alternative to set an additional tier below extremely small because it would likely create a disproportionate compliance burden for jails with a lower ADP. Finally, instead of the approach adopted in the *2024 IPCS Order,* the Commission adopts a $0.02 per-minute rate additive to account for correctional facilities' IPCS costs, which will aid with cost recovery and minimize economic uncertainties faced by smaller correctional facilities when they make service available to their incarcerated populations.

Rate Cap Methodology

111. This appendix sets forth the Commission's revised methodology for setting just and reasonable and fairly compensatory rate caps for incarcerated people's communications services (IPCS). The appendix reflects our reassessment of the data and other information IPCS providers submitted to the 2023 Mandatory Data Collection in light of the expanded record developed in response to the *2024 IPCS Notice* and the NCIC Petition for Reconsideration of aspects of the *2024 IPCS Order.* Our reassessment relies on the same dataset that the Commission staff developed for the *2024 IPCS Order* (as described in Appendix D of that order) and, subject to the exceptions discussed below, adheres to the rate cap methodology set forth in Appendices E, F, H, and I of that order.

112. *Unit of Sale.* Our revised rate cap methodology relies on billed minutes of audio or video IPCS as the unit of sale to determine industry average costs per

minute. Billed minutes refer to the number of audio and/or video IPCS minutes supplied during a year for which payment is demanded. Table 1 summarizes the billed and total audio and video IPCS minutes for each reporting provider, along with the percentage of total minutes that are billed and share of industry billed and total minutes for each provider.

113. The percentage of total IPCS minutes that are billed significantly differs between audio and video IPCS. Table 1 shows that 93.1% of all audio IPCS minutes are billed. Providers with the lowest percentages of billed audio minutes include {[ REDACTED ]}, {[ REDACTED]}, {[ REDACTED ]}, and {[ REDACTED ]}. Three providers ({[ REDACTED ]}) report {[ REDACTED ]} of their audio minutes as billed. In contrast, only 72.5% of all video IPCS minutes are billed, with significant variation among providers ranging from {[ REDACTED ]}. {[ REDACTED ]} reports the lowest percent of billed video minutes at {[ REDACTED ]}, followed in increasing order by {[ REDACTED ]}, {[ REDACTED ]}, and {[ REDACTED ]}. Only two providers ({[ REDACTED ]}) report {[ REDACTED ]} of billed video minutes.

114. The industry share of billed versus total minutes across providers also varies between audio and video IPCS. Securus and ViaPath supply almost {[ REDACTED ]} of the industry's billed and total audio minutes, with Securus supplying more than a third and ViaPath supplying nearly half of industry audio minutes. ICSolutions has the third largest share of audio minutes at {[ REDACTED ]}, while the remaining nine providers account for less than {[ REDACTED ]} of the industry. As for video IPCS, ViaPath similarly supplies a large share of the billed and total minutes ({[ REDACTED ]}), but Securus, the second largest provider of video IPCS, supplies a much smaller share of respective industry billed and total video minutes ({[ REDACTED ]}) compared to audio IPCS minutes ({[ REDACTED ]}). HomeWAV, ICSolutions, and Pay Tel account for {[ REDACTED ]} of billed video minutes and {[ REDACTED ]} of total video minutes, respectively. The remaining five providers account for {[ REDACTED ]} of industry billed and total video minutes, respectively.

**BILLING CODE 6712–01–P**

Table 1: Billed and Total Audio and Video IPCS Minutes, By Provider

| | Provider | Billed Minutes | Share of Industry Billed Minutes | Total Billed and Unbilled Minutes | Share of Industry Total Minutes | Share Billed Minutes of Total Minutes |
|---|---|---|---|---|---|---|
| Audio | ATN | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | CPC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | City Tele-Com | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | HomeWAV | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ICSolutions | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | NCIC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Pay Tel | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Prodigy | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Smart | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | TKC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Industry** | 10,494,473,118 | ▨ | 11,266,271,215 | ▨ | 93.1% |
| **Video** | ATN | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | CPC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | City Tele-Coin | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | HomeWAV | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ICSolutions | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | NCIC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Pay Tel | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Prodigy | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Smart | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | TKC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | **Industry** | 407,122,234 | ▨ | 561,373,604 | ▨ | 72.5% |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

115. *Separation into Tiers.* In setting rate caps in the *2024 IPCS Order,* the Commission adopted tiers for prisons and different sized jails (large, medium,

small, and very small) based on average daily population (ADP) data reported by providers. Our revised rate cap methodology adds a new rate cap tier for extremely small jails (0–49 ADP). The largest three jail tiers remain the same as those adopted in the *2024 IPCS Order:* large jails (ADP ≥ 1,000); medium jails (350 ≤ ADP < 1,000); and small jails (100 ≤ ADP < 350). We divide the very small jail category, originally including all jails with an ADP of less than 100, into two jail tiers: very small jails (50 ≤ ADP < 100) and extremely small jails (ADP < 50). Jails with an ADP below 100 include a disproportionally large number of facilities with disparate demand and cost characteristics. Table 2 sets out summary statistics for audio and video IPCS for each rate tier as well as the industry as a whole. There are 534 very small jails and 881 extremely small jails, or 1,415 facilities, out of the 4,149 total facilities that provide access to audio IPCS. As for video IPCS, there are 325 very small and 259 extremely small jails, or 684 facilities out of 2,234

total facilities that provide access to video IPCS. The very small and extremely small jail tiers not only comprise a significant proportion of these facilities, but also of total industry video IPCS expenses. These tiers, however, account for a small share of total ADP (2.1% and 1.1% for audio and 2.2% and 0.7% for video, respectively) and billed minutes (1.7% and 0.9% for audio and 6% and 1.7% for video, respectively). Rate tiers for larger facilities account for all other ADP and billed minutes. For example, prisons account for a majority of ADP and billed minutes and nearly half of total audio IPCS expenses. For video IPCS, ADP and billed minutes are more dispersed among the largest four facility tiers, with prisons still retaining the majority of total ADP. Despite the small share of billed minutes and ADP of the extremely small jail tier, jails in that tier account for an outsized share of total IPCS expenses for both audio and video IPCS (8% for audio and 10.1% for video). This observation supports the

disaggregation of the previous very small jail tier into the two new tiers we use in our revised rate cap methodology.

116. Additionally, Table 2 shows that the average costs of providing audio and video IPCS differed between very small and extremely small jails, further supporting our disaggregation of the former very small tier (ADP < 100) into two separate tiers. For example, the average per minute cost of providing audio IPCS in very small jails was $0.083 as compared to $0.115 for extremely small jails. For video IPCS, the average per minute cost of providing service in very small jails was $0.192 as compared to $0.282 for extremely small jails. The cost differences between these two sets of facilities support disaggregation of the former very small jail tier into two tiers to ensure our rate caps are just and reasonable and fairly compensate the providers serving these two sets of facilities.

**BILLING CODE 6712–01–P**

Table 2: Summary Statistics for Audio and Video IPCS, By Facility Type

| | Facility Type | Facility Count | ADP | Share of ADP | Billed Minutes | Share of Billed Minutes | Total IPCS Expenses | Share of Total IPCS Expenses |
|---|---|---|---|---|---|---|---|---|
| Audio | Prisons | 1,330 | 1,140,488 | 62.7% | 6,309,115,632 | 60.1% | $153,526,350 | 46.4% |
| | Large Jails | 120 | 218,291 | 12.0% | 1,569,714,440 | 15.0% | $39,300,968 | 11.9% |
| | Medium Jails | 414 | 235,731 | 13.0% | 1,502,276,185 | 14.3% | $58,970,501 | 17.8% |
| | Small Jails | 872 | 165,422 | 9.1% | 833,730,354 | 7.9% | $52,339,244 | 15.8% |
| | Very Small Jails | 534 | 38,560 | 2.1% | 180,183,005 | 1.7% | $14,959,984 | 4.5% |
| | Extremely Small Jails | 881 | 19,294 | 1.1% | 99,453,502 | 0.9% | $11,426,685 | 3.5% |
| | **Industry** | 4,151 | 1,817,786 | | 10,494,473,118 | | $330,523,732 | |
| Video | Prisons | 633 | 624,765 | 56.7% | 85,477,740 | 21.0% | $20,396,004 | 30.9% |
| | Large Jails | 83 | 143,987 | 13.1% | 60,592,951 | 14.9% | $9,241,790 | 14.0% |
| | Medium Jails | 325 | 184,869 | 16.8% | 123,825,773 | 30.4% | $15,226,764 | 23.1% |
| | Small Jails | 624 | 117,241 | 10.6% | 105,461,579 | 25.9% | $14,486,897 | 21.9% |
| | Very Small Jails | 327 | 24,046 | 2.2% | 24,444,147 | 6.0% | $4,698,191 | 7.1% |
| | Extremely Small Jails | 260 | 7,257 | 0.7% | 7,009,229 | 1.7% | $1,975,636 | 3.0% |
| | **Industry** | 2,252 | 1,102,165 | | 406,811,419 | | $66,025,282 | |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs. We exclude facilities with no valid data entries for audio/video IPCS expenses, total audio/video minutes, ADP when the facility is a jail, and/or facility type. Total audio IPCS expenses are unadjusted and do not include TRS or facility additives.

117. *Upper Bound Analysis.* We again establish zones of reasonableness, separately for audio and video IPCS and for each facility tier, and determine interim audio and video IPCS rate caps using these zones. The upper bounds of our zones of reasonableness incorporate four distinct per-minute expense components: (1) audio/video IPCS expenses; (2) audio/video safety and security expenses; (3) ancillary service expenses; and (4) a telecommunications relay services (TRS) allowance. These bounds are calculated in the same manner as in the *2024 IPCS Order,* with two exceptions. First, as previously indicated, the unit of sale is now billed audio or video IPCS minutes of use rather than total billed and unbilled minutes as in the *2024 IPCS Order.* Second, we remove the correctional facilities' expense component previously included in the upper bounds in the *2024 IPCS Order* and do not consider it in the determination of our zones of reasonableness or our rate caps. Instead, we adopt a separate per-minute rate cap additive to allow for recovery of these expenses. We make this separation because, if a provider does not incur expenses by collecting monies from its customers and remitting those monies to the facility, the additive should not be included in its rate cap.

118. The per billed minute ancillary services expenses included in our rate cap calculations equal the sum of all ancillary service expenses divided by the sum of all billed audio and video minutes for providers that reported ancillary expenses. Those expenses total $0.013 per billed minute—an increase from the estimate of $0.011 per minute in the *2024 IPCS Order* that results from using billed, instead of total, minutes to calculate per billed minute expenses. The TRS per billed minute allowance ($0.002 per minute) remains unchanged from the *2024 IPCS Order.* Use of billed minutes instead of total minutes to calculate the TRS additive produces the same per minute figure when rounded to the third decimal place.

**BILLING CODE 6712–01–C**

Table 3: Upper Bound IPCS Expenses Per Billed Minutes, By Facility Type ($/Minute)

| | Audio | | | | Video | | | |
|---|---|---|---|---|---|---|---|---|
| | IPCS Expenses (1A) | Safety and Security (2A) | (1A) + (2A) | Upper Bounds: (1A) + (2A) + $0.002 + $0.013* | IPCS Expenses (1B) | Safety and Security (2B) | (1B) + (2B) | Upper Bounds: (1B) + (2B) + $0.002 + $0.013* |
| Prisons | 0.024 | 0.054 | 0.079 | 0.094 | 0.242 | 0.213 | 0.455 | 0.470 |
| Large Jails | 0.025 | 0.046 | 0.071 | 0.086 | 0.154 | 0.158 | 0.312 | 0.327 |
| Medium Jails | 0.039 | 0.043 | 0.082 | 0.097 | 0.126 | 0.118 | 0.244 | 0.259 |
| Small Jails | 0.063 | 0.030 | 0.093 | 0.108 | 0.143 | 0.072 | 0.215 | 0.230 |
| Very Small Jails | 0.083 | 0.030 | 0.113 | 0.128 | 0.200 | 0.047 | 0.248 | 0.263 |
| Extremely Small Jails | 0.115 | 0.038 | 0.153 | 0.168 | 0.348 | 0.072 | 0.421 | 0.436 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs. Ancillary services additive calculated using the 2023 Mandatory Data Collection commission and revenue sharing Excel tab for ancillary services expenses totals.

* Per-minute additives for TRS ($0.002) and ancillary services ($0.013).

119. *Lower Bound Analysis.* We establish lower bounds for our zones of reasonableness by making reasoned adjustments to reported provider cost data, which we explain below. After the adjustments to certain expense categories, the lower bounds incorporate the following components of industry average expenses: (1) audio/video IPCS expenses; (2) audio/video IPCS safety and security expenses; (3) ancillary service expenses; and (4) a TRS allowance. The impact of the expense adjustments on the allowance for recovery of ancillary service expenses is again trivial, decreasing the lower bounds by $0.002 per minute (after rounding the upper- and lower-bound figures to the nearest third decimal place). Accordingly, the lower-bound allowance for recovery of ancillary services is $0.011 per billed minute.

120. *Weighted Average Cost of Capital and Tax-Deductible Interest Expense Adjustments.* In their 2023 Mandatory Data Collection submissions, Securus reported an {[ REDACTED ]} weighted average cost of capital (WACC), and ViaPath reported a {[ REDACTED ]} WACC for audio and video IPCS, safety and security measures, and ancillary services. In determining the lower bounds of our zones of reasonableness, we again adjust Securus's and ViaPath's claimed WACCs and Securus's claimed tax-deductible interest expense for the

same reasons and in the same manner as in the *2024 IPCS Order.* There are three steps to these adjustments. First, we replace Securus's and ViaPath's claimed WACC figures with the default WACC of 9.75% on their Excel templates to adjust their reported annual total expenses. Annual total expenses is the sum of annual operating expenses and annual capital expenses including a return on net capital stock to cover the cost of capital. Net capital stock is gross investment in assets, net of accumulated depreciation and amortization, accumulated deferred federal and state income taxes, and customer prepayments or deposits, plus an allowance for cash working capital. The Excel template uses formulas and investment, expense, and other inputs to calculate annual total expenses for audio IPCS, video IPCS, safety and security measures, and ancillary services at the company level and separately for audio IPCS and video IPCS at each facility. The WACC and tax-deductible interest expense are two of these inputs. The Excel template calculates return by multiplying net capital stock by the provider's claimed WACC or the default after-tax rate of return of 9.75%. Decreasing the WACC decreases the (dollar) return on net capital stock reflected in annual total expenses; at the same time, the lower return reduces taxable income, and thus the allowance for state and federal income taxes reflected in annual total expenses. Second, we replace the tax-deductible interest expense Securus reported for IPCS and IPCS-related services with a formula that multiplies Securus's return by 30%. This adjustment is consistent with the explanation provided by Securus in its Word supplement as to how it determined its tax-deductible interest expense. Use of this formula reduces the WACC adjustment's impact on Securus's annual total expenses because it reduces tax-deductible interest expense as return decreases, thereby increasing taxable income, and thus the allowance for state and federal income

taxes. Third, we reduce the safety and security measure expenses these providers reported at the facility level by the same percentage by which these expenses are reduced at the company-wide level as a result of the WACC and tax-deductible interest expense adjustments.

121. The adjustments we make in this Order to Securus's and ViaPath's claimed WACCs and Securus's tax-deductible interest expense also have the effect of reducing these providers' claimed expenses for all seven categories of safety and security measures, as here we make no adjustment to remove any of these categories. Moreover, the adjustments we make here to Securus's WACC and tax-deductible interest expense are made prior to the adjustments we make below to bring Securus's video expenses in line with industry expenses (by disallowing a portion of Securus's claimed expenses for both video IPCS costs and video safety and security measure costs). In the *2024 IPCS Order,* the Commission disallowed five of the seven categories of safety and security measure expenses, but did so after making the corresponding WACC and tax-deductible interest expense adjustments to all seven categories of these providers' safety and security measure expenses. The Commission did not make an adjustment in the *2024 IPCS Order* to disallow any of Securus's claimed expenses within the two categories of safety and security measure for which it allowed recovery of expenses as a general matter. Accordingly, the adjustments we make here to Securus's and ViaPath's WACCs and Securus's tax-deductible interest expense on these providers' claimed safety and security measure expenses produce the same effect as the adjustments the Commission made in the *2024 IPCS Order,* prior to excluding five categories of safety and security measure expenses in the *2024 IPCS Order* and disallowing a portion of Securus's claimed expenses for safety and security measures in this Order.

122. Table 4 summarizes IPCS and safety and security expenses for audio and video IPCS before and after adjusting Securus's and ViaPath's WACC and Securus's tax-deductible interest expenses. Adjusting both providers' WACCs to 9.75% and Securus's tax-deductible interest expense results in total audio and video IPCS and safety and security expenses decreasing by about $60 million. The WACC and tax-deductible interest expense adjustments for Securus and the WACC adjustment for ViaPath also reduce Securus's and ViaPath's reported ancillary service expenses by approximately {[ REDACTED ]}, respectively. These adjustments are developed using the investment and expense data reported by these providers for ancillary services in their Company-Wide Information worksheets, as company-wide data are used to develop the allowance for recovery of ancillary services expenses. This reduction corresponds to a 6.2% decrease in total expenses for the industry. The total of the expenses reported separately by ICSolutions and ViaPath for the 22 facilities at which ICSolutions is the contractor and ViaPath is the subcontractor is reduced because of the adjustment to ViaPath's WACC, but the impact is limited. As shown in Table 4 below, of the $60 million total reduction in expenses associated with the WACC and tax-deductible interest expense adjustments, $54 million comes from a reduction in audio IPCS and safety and security expenses while the remaining $6 million comes from a reduction in video IPCS and safety and security expenses. Adding the total of the two ancillary services expense reductions referenced above, about {[ REDACTED ]}, to the reduction to audio and video IPCS and safety and security expenses, about $60 million, brings the total of the WACC and tax-deductible interest expense reductions to about {[ REDACTED ]}.

**BILLING CODE 6712–01–P**

Table 4: Audio and Video IPCS and Safety & Security Expenses Before and After Adjustments

| | | Before WACC & Tax-Deductible Interest Expense Adjustments | | After WACC & Tax-Deductible Interest Expense Adjustments | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | IPCS Expenses Before Adjustments | Safety and Security Expenses Before Adjustments | IPCS Expenses After Adjustments | Safety and Security Expenses After Adjustments | Reduction in IPCS Expenses and Safety and Security Expenses |
| Audio | Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ICSolutions (via ViaPath)* | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Industry | $330,553,437 | $514,613,041 | $315,592,000 | $475,589,426 | $53,985,052 |
| Video | Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ICSolutions (via ViaPath)* | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Industry | $68,072,716 | $51,658,707 | $65,646,337 | $48,039,872 | $6,045,214 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

*ViaPath is a subcontractor for 22 of ICSolutions' facilities.

123. *Safety and Security.* We include all categories of safety and security expenses in establishing the lower bounds of our zones of reasonableness.

This is in contrast to the approach taken in the *2024 IPCS Order,* where the costs of Communications Assistance for Law Enforcement Act (CALEA) compliance measures and communication security services were the only safety and security measure costs included in the lower bounds. Tables 5 through 7 examine safety and security expenses for audio and video IPCS after adjusting for Securus's and ViaPath's WACC and Securus's tax-deductible interest expenses.

124. Table 5 summarizes the safety and security expenses attributable to audio and video IPCS by category and by provider. Audio safety and security expenses total approximately $475 million. Video safety and security expenses total approximately $48 million. For audio IPCS, Securus and ViaPath report total safety and security expenses of {[ REDACTED ]}, respectively, accounting for nearly {[ REDACTED ]} percent of the industry total. All other providers have expenses between {[ REDACTED ]}. For video IPCS, Securus's and ViaPath's respective safety and security expenses ({[ REDACTED ]} account for {[ REDACTED ]} of the industry total). All other providers' expenses range from as little as {[ REDACTED ]}.

BILLING CODE 6712–01–P

Table 5: Audio and Video Safety & Security Expenses, By Category and Provider

| | CALEA | Law Enforcement | Comm. Security | Comm. Recording | Comm. Monitoring | Voice Biometrics | Other | Total |
|---|---|---|---|---|---|---|---|---|
| ATN | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| CPC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| City Tele-Coin | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Home WAV | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| ICSolutions | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| NCIC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Pay Tel | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Prodigy | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Securu | {[RED | {[REDA | {[REDA | {[REDA | {[REDA | {[REDA | {[RED | {[REDAC |

Audio

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | s | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Smart | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | TKC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | **Industry** | 5,306 | 20,944,006 | 161,938,954 | 117,784,624 | 84,954,753 | 40,293,972 | 49,667,811 | 475,589,426 |
| | ATN | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | CPC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | City Tele-Coin | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Video | Home WAV | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ICSolutions | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | NCIC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Pay Tel | | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Prodigy | | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Securus | | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| **Smart** | | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| TKC | | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| ViaPath | | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| **Industry** | 84 | 1,500,426 | 17,720,659 | 15,376,802 | 7,267,749 | 1,428,469 | 4,745,683 | 48,039,872 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

125. Table 6 summarizes safety and security expenses attributable to audio and video by provider and across facility tiers. For audio, prisons account for 66.6% of industry-wide safety and security expenses and Securus and ViaPath jointly account for {[ REDACTED ]} of those prison expenses. Extremely small jails account for the lowest share of audio safety and security expenses, and Securus and ViaPath account for {[ REDACTED ]} such expenses. Video safety and security expenses are more evenly distributed across the four larger facility tiers. Securus and ViaPath account for {[ REDACTED ]} of the industry's video safety and security expenses among prisons ({[ REDACTED ]}), large jails ({[ REDACTED ]}), and medium jails ({[ REDACTED ]}), but their combined

share decreases within the smaller jail tiers ({[ REDACTED ]} for small, very small, and extremely small jails, respectively).

**Table 6: Audio and Video Safety & Security Expenses, By Facility Type and Provider**

| | | All Facilities | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails | Extremely Small Jails |
|---|---|---|---|---|---|---|---|---|
| | ATN | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | CPC | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | City Tele-Coin | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | HomeWAV | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ICSolutions | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | NCIC | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Pay Tel | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Prodigy | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Securus | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Smart | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | TKC | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]; | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Audio | Industry | 475,589,426 | 316,747,4 | 66,659,41 | 59,868,42 | 23,677,61 | 5,089,796 | 3,546,777 |

| | | 0.3 | 0 | 3 | 6 | | |
|---|---|---|---|---|---|---|---|
| | ATN | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | CPC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | City Tele-Com | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | HomeWAV | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ICSolutions | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | NCIC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Pay Tel | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Prodigy | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Smart | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | TKC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Video | **Industry** | 48,039,872 | 16,974,163 | 8,938,916 | 13,535,856 | 7,031,714 | 1,083,911 | 475,312 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

126. Table 7 presents per billed minute audio and video safety and security expenses by provider and across facility tiers. For audio, the

industry-wide per-minute safety and security expense across all facility tiers is $0.045. Paradoxically, per-minute audio safety and security expenses are highest among prisons ($0.05), followed by large jails ($0.042), medium jails ($0.04), and extremely small jails ($0.036). Small and very small jails have the lowest per-minute average safety and security expenses at $0.028 (each), due in part to providers' differing expense allocation practices. Industry-wide video per-minute safety and security expenses are over 2.5 times higher than audio, averaging $0.118. As with audio, prisons have the highest per-minute video safety and security expenses at $0.198, followed by large jails ($0.148), medium jails ($0.109), and extremely small jails ($0.068).

127. We would expect larger facilities to have lower per billed minute expenses due to economies of scale. However, these counterintuitive observations result, in large part, from the different ways providers allocated expenses between IPCS and safety and security measures. Only Securus and ViaPath allocated a non-trivial share of their expenses to categories of safety and security measures. Securus reports {[ REDACTED ]} of its total expenses as safety and security expenses. ViaPath reports {[ REDACTED ]} of its total expenses as safety and security expenses. The rest of the industry, on average, reports only 3.9% of total expenses as safety and security expenses. Because Securus and ViaPath supply a lower share of billed minutes in the smallest facility tiers relative to their share in prisons and large jails, per billed minute safety and security expenses in the smallest tiers are driven less by these two market leaders and more by the smaller providers. These smaller providers allocated nearly all of their expenses to audio and video IPCS, and nearly none to safety and security measures. Securus and ViaPath have per billed minute audio safety and security expenses of {[ REDACTED ]}, respectively, which dwarfs all other providers' expenses. The provider with the next highest per billed minute safety and security expense is CPC at {[ REDACTED ]}. For video safety and security, Securus and ViaPath have per billed minute expenses of {[ REDACTED ]}, respectively. ICSolutions is third at {[ REDACTED ]} per billed minute. As a consequence, industry average safety and security measure expenses across facility size tiers appear to exhibit diseconomies of scale. However, this is almost entirely the result of the different cost allocation approaches taken by Securus and ViaPath as compared to those taken by smaller providers.

BILLING CODE 6712–01–P

Table 7: Audio and Video Safety & Security Expenses Per Billed Minute, By Facility Type and Provider

| | | All Facilities | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails | Extremely Small Jails |
|---|---|---|---|---|---|---|---|---|
| Audio | ATN | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | CPC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | City Tele-Coin | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | HomeWAV | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ICSolutions | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | NCIC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Pay Tel | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Prodigy | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Smart | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | TKC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |

| **Industry** | 0.045 | 0.050 | 0.042 | 0.040 | 0.028 | 0.028 | 0.036 |
|---|---|---|---|---|---|---|---|
| ATN | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| CPC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| City Tele-Coin | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| HomeWAV | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| ICSolutions | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| NCIC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Pay Tel | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Prodigy | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Smart | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| TKC | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Video **Industry** | 0.118 | 0.198 | 0.148 | 0.109 | 0.067 | 0.044 | 0.068 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

\* CPC's per-minute video expenses rely on {[ REDACTED ]}, which have a total of {[ REDACTED ]} for video.

128. *Adjustment to Securus's Video IPCS Expenses.* We adjust Securus's extraordinarily high per-minute video IPCS expenses to bring them in line

with the rest of the industry. The Commission previously made a similar adjustment to the same expenses, with the exception that here we use billed instead of total billed and unbilled minutes. The adjustment involves several steps. First, we calculate the weighted average video IPCS expense per billed minute for all providers, excluding Securus. We then multiply this estimate by Securus's total billed video IPCS minutes to simulate the video IPCS expenses Securus would incur if they were equivalent to the average of the rest of the industry's expenses on a per-minute basis. This estimate is then divided by Securus's reported expenses and subtracted from one to calculate the percent reduction to Securus's video IPCS expenses. Excluding Securus, the industry expense per billed minute for video IPCS is {[ REDACTED ]}. After multiplying this estimate by Securus's total billed video minutes, dividing by Securus's original expenses and subtracting by one, we calculate {[ REDACTED ]} reduction in Securus's video IPCS expenses.

129. Table 8 presents the unadjusted and adjusted video IPCS expenses per billed minute for Securus and the industry (including Securus) for each facility type. Securus's unadjusted per-minute expenses range from just under {[ REDACTED ]}, depending on facility type. Securus's per-minute average of {[ REDACTED ]} across all facilities is more than {[ REDACTED ]} times higher than the industry average, and more than {[ REDACTED ]} times higher than the industry average when excluding Securus. Securus's unusually high per-minute expenses increase the industry average from {[ REDACTED ]}, a {[ REDACTED ]} increase. However, once the adjustment to Securus's video IPCS expenses is made, its per-minute expenses are significantly more comparable to those of the rest of the industry.

**BILLING CODE 6712–01–P**

**Table 8: Non-Adjusted\* and Adjusted\*\* Video IPCS Expenses Per Billed Video Minute, For Securus and Industry**

| | Before Adjustment\* | | After Adjustment\*\* | |
|---|---|---|---|---|
| | Securus Video IPCS Expenses ($ / Min) | Industry Video IPCS Expenses ($ / Min) | Securus Video IPCS Expenses ($ / Min) | Industry Video IPCS Expenses ($ / Min) |
| **All Facilities** | {[REDACTED]} | 0.161 | {[REDACTED]} | 0.099 |
| Prisons | {[REDACTED]} | 0.229 | {[REDACTED]} | 0.093 |
| Large Jails | {[REDACTED]} | 0.147 | {[REDACTED]} | 0.066 |
| Medium Jails | {[REDACTED]} | 0.121 | {[REDACTED]} | 0.079 |
| Small Jails | {[REDACTED]} | 0.140 | {[REDACTED]} | 0.115 |
| Very Small Jails | {[REDACTED]} | 0.198 | {[REDACTED]} | 0.176 |
| Extremely Small Jails | {[REDACTED]} | 0.345 | {[REDACTED]} | 0.324 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

\* No adjustment to Securus's video IPCS expenses but includes other adjustments made to the lower bounds.

\*\* Includes adjustment to Securus's video IPCS expenses along with other adjustments made to the lower bounds.

130. Table 9 shows the total video IPCS expenses for Securus and the industry before and after the adjustment. The overall reduction in video IPCS expenses is roughly {[ REDACTED ]} million, or a reduction in

industry video IPCS expenses of {[ REDACTED ]}%.

**Table 9: Video IPCS Expenses Before and After Adjusting for Securus's Video IPCS Expenses**

| | Video IPCS Expenses Before Adjustment* | Video IPCS Expenses After Adjustment** | Total Reduction in Video IPCS Expenses |
|---|---|---|---|
| Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Industry | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

\* No adjustment to Securus's video IPCS expenses but includes other adjustments made to the lower bounds.

\*\* Includes adjustment to Securus's video IPCS expenses along with other adjustments made to the lower bounds.

BILLING CODE 6712–01–C

131. *Adjustment to Securus's Video IPCS Safety and Security Measure Expenses.* Table 10 demonstrates the proportionality of Securus's reported expenses, and shows Securus's audio and video IPCS billed minutes and safety and security measure expenses in dollars and per billed minutes along with the analogous figures for ViaPath, the industry, and the industry without Securus. Securus's video IPCS safety and security measure per billed minute expenses {[ REDACTED ]} are substantially higher than ViaPath's, its most comparable provider in terms of scale and scope, {[ REDACTED ]}, and the industry average is significantly skewed by including Securus {[ REDACTED ]} as compared to the industry average of all providers excluding Securus ({[ REDACTED ]} without Securus). Securus's video IPCS safety and security expenses per billed minute are over {[ REDACTED ]} times higher than the industry average with and without Securus, respectively, and over {[ REDACTED ]} times higher than those of ViaPath. Notably, Securus's share of the industry's IPCS video safety and security measure expenses also markedly exceeds Securus's share of the industry's video IPCS minutes. While Securus accounts for about {[ REDACTED ]} of the industry's IPCS video safety and security measure expenses, it only reports about {[ REDACTED ]} of the video minutes. By comparison, ViaPath's share of the industry's video IPCS billed minutes and safety and security measure expenses mirror one another, at {[ REDACTED ]}, respectively. Securus's video IPCS safety and security measure data are also inconsistent with its audio IPCS safety and security measure data. Securus's audio IPCS safety and security measure per billed minute expenses {[ REDACTED ]}, are lower than ViaPath's {[ REDACTED ]} and only slightly above the industry average {[ REDACTED ]}, with and without Securus, respectively. Moreover, Securus's shares of the industry's audio IPCS billed minutes and safety and security measure expenses, {[ REDACTED ]}, respectively, are similar. These data and their relative proportions demonstrate the anomalous character of Securus's video IPCS and video safety and security expense data and the need for adjustments.

BILLING CODE 6712–01–P

**Table 10: Total and Industry Share of Audio and Video IPCS Billed Minutes and Safety & Security Measure Expenses and Per Billed Minute Safety & Security Measure Expenses, by Securus, ViaPath, Industry, and Industry Excluding Securus**

| | | Billed Minutes | Share of Industry Billed Minutes | Safety and Security Expenses | Share of Industry Safety and Security Expenses | Safety and Security Expenses Per Minute |
|---|---|---|---|---|---|---|
| **Audio** | Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Industry | 10,494,473,118 | 100% | 475,589,426 | 100% | 0.045 |
| | Industry Excluding Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| **Video** | Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | ViaPath | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| | Industry | 407,122,234 | 100% | 48,039,872 | 100% | 0.118 |
| | Industry Excluding Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs. Expense data are net of other lower-bound adjustments.

132. The record does not allow us to fully determine why Securus's per billed minute video IPCS safety and security measure expenses deviate so

significantly from those of the other providers. However, Securus's video IPCS safety and security measure expenses are not indicative of a mature, ongoing operation. Taking Securus's expense data at face value, however, it is reasonable to anticipate future demand for Securus's video IPCS to increase to a level more commensurate with its future video IPCS and video IPCS safety and security expenses as the rate of investment in new infrastructure slows and customer awareness and use of video IPCS increase. This would enable Securus to spread its significant early stage and subsequent incremental investments in long-term video IPCS and video safety and security measure assets over significantly more video IPCS billed minutes, and thus reduce both its per billed minute video IPCS and video IPCS safety and security measure expenses.

133. We therefore adjust Securus's high video IPCS safety and security measure expenses per billed minute down to the industry average (without Securus). The adjustment is made in the same manner as the adjustment to Securus's video IPCS expenses. We thus use the industry average (without Securus) to reduce both Securus's video IPCS expenses and its video IPCS safety and security measure expenses. Specifically, we reduce Securus's video IPCS safety and security measure expenses equally across all facilities by the percentage that equates the sum of these expenses to the overall industry average (excluding Securus) on a per billed minute basis. Securus's video IPCS safety and security measure expenses are {[ REDACTED ]} per billed minute. The industry average video IPCS safety and security measure expenses per billed minute without

Securus are $0.07. A reduction of {[ REDACTED ]} to Securus's video IPCS safety and security measure expenses across all of its facilities reduces the sum of these expenses to the level of the industry average on a per billed minute basis.

134. Table 11 shows the unadjusted and adjusted video IPCS safety and security measure expenses per billed minute for Securus and the industry (including Securus) for each facility type. Securus's unadjusted billed per minute expenses range from {[ REDACTED ]}, depending on facility type. After the adjustment to Securus's video IPCS safety and security measure expenses, its per billed minute expenses range from {[ REDACTED ]}, and as shown in the final column, these adjusted per billed minute expenses are significantly more comparable to the industry average for each facility type.

**Table 11: Non-Adjusted\* and Adjusted\*\* Video Safety and Security Expenses Per Billed Video Minute, For Securus and Industry**

| | Before Adjustment\* | | After Adjustment\*\* | |
| --- | --- | --- | --- | --- |
| | Securus Video Safety and Security Expenses (S / Min) | Industry Video Safety and Security Expenses (S / Min) | Securus Video Safety and Security Expenses (S / Min) | Industry Video Safety and Security Expenses (S / Min) |
| All Facilities | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Prisons | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Large Jails | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Medium Jails | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Small Jails | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Very Small Jails | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Extremely Small Jails | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

\* No adjustment to Securus's video safety and security expenses but includes other adjustments made to the lower bounds.

\*\* Includes adjustment to Securus's video safety and security expenses along with other adjustments made to the lower bounds.

135. Table 12 shows Securus and industry total (including Securus) video IPCS safety and security measure expenses before and after the {[ REDACTED ]} downward adjustment to Securus's expenses. Adjusting Securus's video IPCS safety and security measure expenses to reflect the industry average per billed minute expense reduces Securus's video expenses by approximately {[ REDACTED ]} million. This reduction decreases total industry video IPCS safety and security measure expenses by {[ REDACTED ]}.

**Table 12: Video Safety & Security Expenses Before and After Adjusting for Securus' Video**

|  | Video Safety and Security Expenses Before Adjustment* | Video Safety and Security Expenses After Adjustment** | Total Reduction in Video Safety and Security Expenses |
|---|---|---|---|
| Securus | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |
| Industry | {[REDACTED]} | {[REDACTED]} | {[REDACTED]} |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs.

\* No adjustment to Securus' video safety and security expenses but includes other adjustments made to the lower bounds.

\*\* Includes adjustment to Securus' safety and security IPCS expenses along with other adjustments made to the lower bounds.

136. *Lower Bounds.* We now determine lower bounds, which in conjunction with the upper bounds addressed above, will establish the zones of reasonableness that we use to set audio and video IPCS rate caps. The four distinct per billed minute expense components of the lower bounds are: (1) audio/video IPCS expenses; (2) audio/video safety and security expenses; (3) ancillary service expenses; and (4) TRS allowance. These per billed minute components are calculated using the upper bound data net of the adjustments to Securus's and ViaPath's WACCs and to Securus's tax-deductible interest, video IPCS, and video IPCS safety and security measure expenses. As with our upper bound analysis, the correctional facilities' expenses are not included in the lower bound analysis but are addressed separately through the establishment of a rate additive for facility costs. The ancillary service expenses per billed minute additive is calculated in the same manner as in the upper bound analysis except for using ancillary expense data after the WACC and tax-deductible interest expense adjustments. This per billed minute additive totals $0.011. The TRS additive of $0.002 included in the upper bound remains unchanged. Table 13 shows the lower bounds for audio and video IPCS for each facility type and size.

**Table 13: Lower Bound IPCS Expenses Per Billed Minutes, By Facility Type ($/Minute)**

| | Audio | | | | Video | | | |
|---|---|---|---|---|---|---|---|---|
| | IPCS Expenses (1A) | Safety and Security (2A) | (1A) + (2A) | Lower Bounds: (1A) + (2A) + $0.002 + $0.011* | IPCS Expenses (1B) | Safety and Security (2B) | (1B) + (2B) | Lower Bounds: (1B) + (2B) + $0.002 + $0.011* |
| Prisons | 0.023 | 0.050 | 0.073 | 0.086 | 0.093 | 0.108 | 0.201 | 0.214 |
| Large Jails | 0.024 | 0.042 | 0.066 | 0.079 | 0.066 | 0.077 | 0.143 | 0.156 |
| Medium Jails | 0.038 | 0.040 | 0.078 | 0.091 | 0.079 | 0.069 | 0.148 | 0.161 |
| Small Jails | 0.062 | 0.028 | 0.090 | 0.103 | 0.115 | 0.046 | 0.161 | 0.174 |
| Very Small Jails | 0.082 | 0.028 | 0.111 | 0.124 | 0.176 | 0.027 | 0.203 | 0.216 |
| Extremely Small Jails | 0.114 | 0.036 | 0.150 | 0.163 | 0.324 | 0.053 | 0.377 | 0.390 |

Source: 2023 IPCS Mandatory Data Collection facility-specific Excel tabs (other than for ancillary services expenses). The ancillary services additive is calculated using ancillary service expenses drawn from the Company-Wide Information tab of the 2023 Mandatory Data Collection.

* Per billed minute additives for TRS ($0.002) and ancillary services ($0.011).

**Report to Congress**

137. The Commission will send a copy of the Report and Order and Order on Reconsideration, including this Final Regulatory Flexibility Analysis, in a report to Congress pursuant to the Congressional Review Act. In addition, the Commission will send a copy of the Report and Order and Order on Reconsideration, including this Final Regulatory Flexibility Analysis, to the Chief Counsel for the SBA Office of Advocacy and will publish a copy of the Report and Order and Order on Reconsideration, and this Final Regulatory Flexibility Analysis (or a summary thereof) in the **Federal Register**.

**VI. Ordering Clauses**

138. Accordingly, *it is ordered,* pursuant to the authority contained in sections 1, 2, 4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat. 6156 (2022), that this joint Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking in WC Docket Nos. 23–62 and 12–375 *are adopted.* Pursuant to Executive Order 14215, 90 FR 10447 (Feb. 20, 2025), this regulatory action has been determined to be not significant under Executive Order 12866.

139. Accordingly, *it is further ordered,* pursuant to the authority contained in sections 1, 2, 4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat. 6156 (2022), that this joint Report and

Order and Order on Reconsideration *shall be effective* upon publication of a summary of it in the **Federal Register**, compliance with which shall be required one hundred and twenty (120) days after such publication. The effective date and compliance date of this joint Report and Order and Order on Reconsideration supersede the extended deadline established by the *2025 Waiver Order* previously adopted by the Wireline Competition Bureau. The Commission directs the Wireline Competition Bureau to announce the effective date and compliance date by subsequent Public Notice.

140. *It is further ordered* that, pursuant to the authority contained in sections 1, 2, 4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat 6156 (2022), the Petition for Reconsideration, filed October 21, 2024, by NCIC Inmate Communications *is granted in part* as described herein.

141. *It is further ordered* that the Commission's Office of the Secretary, *shall send* a copy of this Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis and the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

142. *It is further ordered* that the Office of the Managing Director, Performance and Program Management, *shall include* a copy of this Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking in a report to be sent to Congress and the Government Accountability Officer pursuant to the Congressional Review Act, 5 U.S.C. 801(a)(1)(A).

## List of Subjects in 47 CFR Part 64

Communications, Communications common carriers, Incarcerated people, Inmates, Security measures, Telecommunications, Telephone, Video.

Federal Communications Commission.

**Marlene Dortch,**

*Secretary.*

## Final Rules

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR part 64 as follows:

## PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

■ 1. The authority citation for part 64 continues to read as follows:

**Authority:** 47 U.S.C. 151, 152, 154, 201, 202, 217, 218, 220, 222, 225, 226, 227, 227b, 228, 251(a), 251(e), 254(k), 255, 262, 276, 403(b)(2)(B), (c), 616, 620, 716, 1401–1473, unless otherwise noted; Pub. L. 115–141, Div. P, sec. 503, 132 Stat. 348, 1091; Pub. L. 117–338, 136 Stat. 6156.

## Subpart FF—Incarcerated People's Communications Services

■ 2. Amend § 64.6010 by:
■ a. Removing and reserving paragraphs (a) through (d); and
■ b. Revising paragraph (e).
The revision reads as follows:

### § 64.6010 Incarcerated People's Communications Services rate caps.

\* \* \* \* \*

(e) A Provider must not charge a per-minute rate for international audio Incarcerated People's Communications Services in each Prison or Jail it serves in excess of the applicable interim interstate and intrastate cap set forth in § 64.6030 plus the average amount that the Provider paid its underlying international service providers for audio communications to the International Destination of that communication, on a per-minute basis. A Provider shall determine the average amount paid for communications to each International Destination for each calendar quarter and shall adjust its maximum rates based on such determination within one month of the end of each calendar quarter.

■ 3. Revise § 64.6015 to read as follows:

### § 64.6015 Prohibition against Site Commissions.

A Provider must not pay any Site Commissions associated with its provision of Incarcerated People's Communications Services.

■ 4. Revise § 64.6030 to read as follows:

### § 64.6030 Incarcerated People's Communications Services interim rate caps.

(a) A Provider must offer each Incarcerated People's Communications Service at a per-minute rate. A Provider may also offer an Incarcerated People's Communications Service under one or more Alternate Pricing Plans, pursuant to § 64.6140.

(b) A Provider must not charge a per-minute rate for intrastate or interstate audio Incarcerated People's Communications Services in excess of the following interim rate caps:

(1) $0.09 per minute for each Prison;

(2) $0.08 per minute for each Jail having an Average Daily Population of 1,000 or more Incarcerated People;

(3) $0.10 per minute for each Jail having an Average Daily Population of between and including 350 and 999 Incarcerated People;

(4) $0.11 per minute for each Jail having an Average Daily Population of between and including 100 and 349 Incarcerated People;

(5) $0.13 per minute for each Jail having an Average Daily Population of between and including 50 and 99 Incarcerated People; and

(6) $0.17 per minute for each Jail having an Average Daily Population below and including 49 Incarcerated People.

(c) A Provider must not charge a per-minute rate for video Incarcerated People's Communications Services in excess of the following interim rate caps:

(1) $0.23 per minute for each Prison;

(2) $0.17 per minute for each Jail having an Average Daily Population of 1,000 or more Incarcerated People;

(3) $0.17 per minute for each Jail having an Average Daily Population of between and including 350 and 999 Incarcerated People;

(4) $0.19 per minute for each Jail having an Average Daily Population of between and including 100 and 349 Incarcerated People;

(5) $0.23 per minute for each Jail having an Average Daily Population of between and including 50 and 99 Incarcerated People; and

(6) $0.42 per minute for each Jail having an Average Daily Population of below and including 49 Incarcerated People.

(d) Providers may charge up to an additional $0.02 per minute above the audio and video Incarcerated People's Communications Services rate caps in paragraphs (b) and (c) of this section to recover the costs that a Correctional Facility may incur in making Incarcerated People's Communications Services available.

[FR Doc. 2025–22125 Filed 12–4–25; 8:45 am]

**BILLING CODE 6712–01–P**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 76

**[MB Docket Nos. 02–144; MM Docket Nos. 92–266, 93–215; CS Docket No. 94–28; FCC 25–33; FR ID 320818]**

### Cable Television Rates

**AGENCY:** Federal Communications Commission.